18

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

FEB 2 6 2002

Clerk of Court

| | | |
|---|---|---|
| PAUL CAMERON KAVANAUGH, | § | |
|     Plaintiff | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-01-104 |
| | § | |
| BROWNSVILLE COMMUNITY HEALTH | § | |
| CLINIC CORPORATION, D/B/A | § | JURY TRIAL DEMANDED |
| BROWNSVILLE COMMUNITY HEALTH | § | |
| CENTER | § | |
|     Defendant | § | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BROWNSVILLE COMMUNITY HEALTH CLINIC CORPORATION, D/B/A

BROWNSVILLE COMMUNITY HEALTH CENTER, Defendant, moves this court to grant

summary judgment in its favor, for the reason that there is no genuine issue of material fact, and

the Defendant is entitled to judgment as a matter of law. In support, the Defendant shows as

follows:

### Factual Background of Case

1.     The Defendant is a private, non-profit corporation which operates a primary care

medical and dental clinic in Brownsville, Texas which predominantly serves low-income

individuals.[1]  As part of its effort to provide indigent health care, the Defendant also operates

satellite clinics, referred to as campus care centers, at various public schools in Brownsville.[2]  Paul

Kavanaugh, the Plaintiff, was hired on November 9, 1998 to be the director in charge of the

campus care centers.[3]  His immediate supervisor was Emily Alpert, the Director of Clinical

Operations, who in turn reported to Paula Gomez, the Executive Director.[4]

---

[1]Affidavit of Paula Gomez, attached and incorporated herein as Exhibit "A."

[2]Exhibit "A."

[3]Exhibit "A."

[4]Exhibit "A."

-1-

2.     Starting in mid 1999, various of the Plaintiff's subordinates began complaining of what they regarded as inappropriate remarks and roughshod and dictatorial treatment by the Plaintiff.[5]  One employee, for example, when requesting more money for extra assignments, was told by the Plaintiff, in the presence of other professionals, to "bend over and I'll give you a raise," while indicating he was ready to kick her in the rear.[6]  A group of employees from one of the campus care facilities complained that the Plaintiff had threatened to withhold a portion of their pay until they performed painting and other off-duty chores at the facility.[7]  Employees at another center complained that the Plaintiff had accused them of being demon possessed.[8]  Peers and co-workers complained of what they regarded as condescending treatment and disorganization on the part of the Plaintiff.[9]  Efforts to bring such deficiencies in behavior and performance to the Plaintiff's attention almost invariably resulted in lengthy written responses by the Plaintiff wherein he denied any fault whatsoever.[10]

3.     On March 23, 2000, Paula Gomez and Emily Alpert met with the Plaintiff and assigned him specific written objectives for overcoming the problems which he had shown in communicating and working with subordinates and others.[11]  As part of the corrective action, the Plaintiff was to attend seminars dealing with supervision and effective communication.[12]

4.     The problems, however, continued.  Ms. Gomez, therefore, met with the Plaintiff on June 15, 2000 and told him that although he had talents in certain areas, such as writing, he was

---

[5]Exhibit "A."

[6]Exhibit "A." Deposition of Paul C. Kavanaugh, excerpted portions of which are attached hereto and incorporated herein as Exhibit "B," pp. 70, 71.

[7]Exhibit "A."  Exhibit "B," pp. 81-82.

[8]Exhibit "A."

[9]Exhibit "A."

[10]Exhibit "A." Exhibit "B," pp. 75.

[11]Exhibit "A."

[12]Exhibit "A."

unsuited for supervision.[13]  Accordingly, he was offered the opportunity to fill a vacancy as a grant writer, at his same level of pay.[14]  The Plaintiff, in turn, requested and was given several weeks to consider the offer.[15]

5.     When, by July 26, 2000, Ms. Gomez had not heard from the Plaintiff regarding the offer of reassignment, she met with him in his office and asked him if he wanted the grant writer position, to which he responded he did not.[16]  Ms. Gomez then instructed that he meet with her and with Ms. Alpert the next morning at 8:00 a.m. in Ms. Gomez' office.[17]

6.     The Plaintiff did not appear at Ms. Gomez' office at 8:00 a.m. the next day, but rather conducted meetings of his own.[18]  When asked by Ms. Gomez why he had not reported as directed, the Plaintiff responded that he already had meetings scheduled and saw no purpose in meeting with her.[19]  He was, at that time, told that his employment was terminated.[20]

7.     The Plaintiff thereafter filed suit in state court alleging that his dismissal was in violation of the Texas Whistleblower Act.[21]  When the Defendant filed a motion for summary judgment, on the basis that such a claim cannot be brought against a private-sector employer, the Plaintiff abandoned his whistleblower claim and instead brought the federal and state law claims now pending before this Court. In particular, the Plaintiff now alleges that the termination of his

─────────────────────

[13]Exhibit "A." Exhibit "B," p. 121.

[14]Exhibit "A."

[15]Exhibit "A." Exhibit "B," pp. 121.

[16]Exhibit "A." Exhibit "B," pp. 123.

[17]Exhibit "A."

[18]Exhibit "A."

[19]Exhibit "A."

[20]Exhibit "A." Exhibit "B," pp. 125-27, 129, 136, 161-62, 197.

[21]Tex. Lab. Code, Ch. 61 (Vernon). Exhibit "B," pp. 177, 186.  The Original Petition, as initially filed in state district court, is among the papers on file in this cause.  Reference is made to the pleading for the limited purpose only of showing the nature of the claims alleged, but without admitting to the truth of the allegations, which are denied.

employment violated the Texas and United States Constitutions, was motivated by his national origin, or his age, or his gender, in violation of the Age Discrimination in Employment Act (ADEA), Title VII of the Civil Rights Act of 1964, as amended (Title VII), and 42 U.S.C. §§1981 and 1983; and constituted a breach of his alleged employment contract.

8.    As the following will show, the Plaintiff cannot prevail on any of his claims, and the Defendant therefore is entitled to summary judgment as a matter of law.

**The Plaintiff Cannot Prevail On Claims Brought Under
The Texas Or United States Constitutions**

9.    The Plaintiff nowhere has articulated in his pleadings how the termination of his employment could have violated either the Texas or United States Constitutions.  Nonetheless, such claims are not viable under any circumstances, because no private right of action for monetary damages exists for alleged violations of the Texas Constitution, and because violations of the United States Constitution are actionable only upon a showing of "state action," which is nowhere pleaded and which cannot in any event be shown by the Plaintiff.

**There Is No Private Right Of Action For
Violation Of The Texas Constitution**

10.    The Texas Supreme Court in 1995 removed any remaining doubt as to whether or not there are constitutional torts to be inferred from the Texas Constitution.  In particular, the Court held in City of Beaumont v. Bullion[22] that since there is no state enabling legislation, such as found under federal law[23] whereby an individual may recover for federal constitutional violations, there can be no recovery of monetary damages for violations of the Texas Constitution.  Although the Court in Bullion envisioned circumstances in which equitable relief may be sought for state constitutional violations, the Plaintiff herein admittedly does not seek the equitable remedy of reinstatement,[24] and, since his employment has long-since terminated, there could be no basis

---

[22]896 S.W.2d 143 (Tex. 1995).

[23]42 U.S.C. §1983 provides a federal right of action for violations of constitutional rights by persons acting under color of state law.

[24]Exhibit "B."  pp. 211, 221.

-4-

whatsoever on which he might seek any other type of equitable relief. Moreover, in order to seek relief of any kind under the Texas Constitution, a plaintiff must, just as under the United States Constitution, show "state action,"[25] which, as will be shown next, the Plaintiff cannot even begin to do. Accordingly, the Court should grant summary judgment on the Plaintiff's claim brought under the Texas Constitution.

## The Defendant Cannot Be Liable For Claims
## Brought Under The United States Constitution

11.    The law is well settled that the amendments to the United States Constitution serve as restraints only on government and ordinarily have no application whatsoever to private individuals or entities.[26] Although private individuals and entities may, in extraordinary instances, be held liable for deprivations of constitutional rights, such may occur only when such private action may "fairly be said to be that of the States."[27] Such "state action" may be found, for example, in situations where the government has exerted such overriding coercion and control that the acts of a private entity may fairly be attributed to the government itself.[28] Such also may be found, although very rarely, where the entity, although private, performs what typically would be a uniquely governmental function.[29] Such also may be found, although again very rarely, where a symbiotic relationship existed between the private entity and the government, such that the acts of the private entity could, once again, be fairly attributable to the government itself.[30] As can readily be shown, none of those "state action" situations are presented in the matter now before this Court.

---

[25]See, e.g., Weaver v. AIDS Services of Austin, Inc., 835 S.W.2d 798, 802-03 (Tex. App. - Austin 1992, writ denied).

[26]See, e.g., Lugar v. Edmondson, 457 U.S. 922, 936, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482 (1982); Flagg Bros. V. Brooks, 436 U.S. 149, 156, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978); Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1882\3).

[27]Shelly v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948).

[28]See, Flagg Bros., supra.

[29]See, Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974).

[30]See, Burton v. Wilmington Parking Auth., 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961).

12.    The summary judgment evidence is clear and unrebuttable, for example, that the decision to terminate the Plaintiff's employment was made solely by Paula Gomez, after consultation with her own staff.[31]  Neither the Brownsville school district nor any other governmental entity played any role whatsoever in that decision.[32]  Moreover, the decision to terminate the Plaintiff's employment was not the result of, in whole or in part, any governmental statute, policy or rule.[33]

13.    Similarly, the Defendant, in providing medical and dental care to members of the public, does not in any fashion engage in what typically would be a traditional governmental function.[34]  Moreover, the fact that the Defendant, like any medical care provider, is subjected to extensive governmental regulation does not, as a matter of law, serve to convert it into a state actor.[35]  The fact that the Defendant receives extensive governmental funding similarly, and again as a matter of law, does not make it a state actor.[36]  A United States Supreme Court case, in turn, illustrates how governmental involvement, far in excess of that found in the matter now before this Court, still fell short of turning a private entity into a state actor.

14.    In Blum v. Yaretsky,[37] patients in a privately-owned nursing home filed suit complaining that their reassignment to a unit offering less-skilled care, without prior notice and a hearing, constituted a deprivation of their rights under, among other things, the Due Process Clause of the Fourteenth Amendment.  The patients, in order to be eligible for treatment, had to meet Medicaid standards in terms of income and in terms of the medical necessity of the care

---

[31]Exhibit "A."

[32]Exhibit "A."

[33]Exhibit "A."

[34]See, e.g., Blum v. Yaretsky, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 34 (1982).

[35]See, e.g., Blum, supra; Rendell-Baker v. Kohn, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

[36]Id.

[37]457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 34 (1982).

sought. Federal regulations, moreover, required that each provider appoint a utilization review committee, consisting of physicians, to determine whether the level of care given or sought was medically justified. Such a committee, in turn, had determined that the plaintiffs' conditions no longer warranted highly-skilled care, and thus, pursuant to governmental guidelines, notified the State that they be transferred. With regard to the issue of whether such governmental involvement constituted the state action necessary to impose constitutional restrictions on the privately-operated nursing home, the trial court ruled in favor of the plaintiffs. The Second Circuit affirmed. The Supreme Court reversed.

15.     In particular, the Supreme Court reiterated the principle that ". . . the action inhibited by the . . . Fourteenth Amendment is only such action as may fairly be said to be that of the States."[38]   With regard to the particular facts at hand, the Court found that the extensive governmental regulation would not by itself convert the nursing home into a state actor. Similarly, the fact that the decision-making committee existed solely by virtue of governmental guidelines was not at all determining of the state action issue. That the committee made use of governmental forms and the nursing home was subjected to penalties for providing unjustified levels of care were, once again, insufficient to convert the nursing home's transfer decisions into state action. The Court similarly did not view either the governmental funding of the nursing home or the reliance by the government on private nursing homes to effectuate the indigent care provided for by federal law as creating the "symbiotic relationship" needed to bring about state action. And finally, the Court determined that the nursing home, in providing skilled and unskilled medical care to the indigent public, did not engage in a traditionally governmental function. Instead, the Court ultimately regarded as determining of the state action issue the fact that the persons making the patient-transfer decisions were private parties whose actions, even though brought about and influenced by the government, could not, as a matter of law, be regarded as state action. For this reason, the lower courts' rulings on the Fourteenth Amendment claims were reversed.

---

[38]Id. 102 S.Ct. at 2785.

16.     In the matter now before the Court, the decision to terminate the Plaintiff's employment was made by Paula Gomez and no one else.  As in <u>Blum</u>, moreover, the fact that the Defendant is operated in part by governmental grants and other public funding, or that it is highly regulated, or that it serves as a vehicle for extending Medicaid and other governmental services to the poor do not, as a matter of law, make it a state actor.  This Court should, therefore, with reliance on <u>Blum</u> and similar Supreme Court rulings,[39] grant summary judgment in favor of the Defendant on any claims brought under the United States Constitution.

### The Plaintiff's Section 1983 Claim Similarly Must Fail Due To The Absence Of State Action

17.     Section 1983 ". . . was enacted pursuant to the authority of Congress to enforce the Fourteenth Amendment, [and] prohibits interference with federal rights under color of state law."[40] The term 'under color of state law,' in turn, ". . . has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment."[41]  As stated by the United States Supreme Court:

> The ultimate issue in determining whether a person is subject to suit under §1983 is the same question posed in cases arising under the Fourteenth Amendment: Is the alleged infringement of federal rights 'fairly attributable to the State?'[42]

18.     As shown, <u>supra,</u> the Defendant's treatment of the Plaintiff, including the termination of his employment, was not, as a matter of law, state action. Inasmuch, therefore, as the requirements for finding state action are identical to those necessary to find conduct "under color of state law," the Plaintiff cannot proceed on his claim brought under §1983.  Once again, a brief review of a United States Supreme Court decision is helpful.

---

[39]<u>See</u>, <u>e.g.</u>; <u>Moose Lodge No. 102 v. Irvis</u>, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972).

[40]<u>Rendell-Baker v. Kohn</u>, 457 U.S. 830, 838, 102 S.Ct. 2764, 2769 73 L.Ed.2d 418 (1982).

[41]<u>United Stated v. Price</u>, 383 U.S. 787, 794, n.7, 86 S.Ct. 115, 1157, n.7, 16 L.Ed.2d 267 (1966).

[42]<u>Rendell-Baker</u>, <u>supra</u>, 102 S.Ct. at 2769.

19.     In <u>Rendell-Baker v. Kohn</u>,[43] for example, former employees of a nonprofit, privately operated school sued, alleging that their dismissals by the school violated rights guaranteed them by the First and Fourteenth Amendments.  Although the school was privately owned, its students were referred by area public schools or by governmental agencies, and its curricula, like that of the public schools, were regulated by the State.  Tuition was paid by the respective cities from which the students were referred.  The school also received numerous grants from various state and federal agencies, many of which imposed guidelines for use of the funds.  The school also had contracts with various public entities.  One of the plaintiffs, moreover, was paid entirely from a federal grant, which in turn gave the federal government the right of final approval over the person hired for the position.  Such governmental involvement, however, whether viewed separately or as a whole, was determined by the Supreme Court to be insufficient to subject the school to federal constitutional restrictions.  What the Court found determining, instead, was that the decisions to terminate the plaintiffs' employments were made by school personnel, and were not compelled by the State or by governmental action or regulations.

20.     Once again, therefore, inasmuch as the Plaintiff's employment was terminated by Ms. Gomez, without any involvement whatsoever from any governmental entity, the Plaintiff cannot proceed under §1983, just as he cannot proceed under the United States Constitution.

### The Plaintiff Has No Common Law Claim For Breach Of Contract

21.     The Plaintiff refers to the Defendant's employee handbook, and in particular to those portions which set forth the Defendant's commitment to equal employment opportunity, as providing the basis for his common law breach of contract claim.  In particular, he argues that since the statutes calling for equal employment opportunity allegedly were violated, he is entitled to recover both for breach of contract and for the alleged violations of the anti-discrimination statutes.  As the following will show, however, the Plaintiff has adroitly omitted a critical provision of the very handbook to which he has cited.

22.     Specifically, the handbook expressly states in Section 1.03 as follows:

---

[43]457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).

> This employee manual does not constitute an employment contract and is
> not intended to create contractual obligations of any kind.[44]

Such a provision, in fact, reflects the prevailing view under Texas law of the legal effect to be

given employment handbooks, absent express language indicating a different intent by the

employer.[45]  Inasmuch, therefore, as the handbook relied on by the Plaintiff in support of his

breach of contract claim expressly states that the manual in fact does not create contractual

obligations of any kind, the Plaintiff has no basis at all on which to argue that the right to equal

employment opportunity and lawful treatment is somehow contractually created or even contractual

in nature.

 23. Moreover, the requirement that the Defendant not discriminate on the basis of

national origin, age or gender exists by virtue of the various state and federal anti-discrimination

statutes, and therefore would govern the Defendant's actions irrespective of what the handbook

may or may not say.  Thus, the Plaintiff once again cannot realistically contend that the

Defendant's obligation to provide equal employment opportunity emanates from the employee

handbook rather than from those anti-discrimination statutes which very obviously compelled the

policy in the first place.

 24. For the foregoing reasons, therefore, the Plaintiff should not be allowed to assert a

claim for breach of contract, and summary judgment instead should be granted in favor of the

Defendant on such a claim.

## The Plaintiff's Allegation Of Retaliation Is Based
## Purely On The Plaintiff's Mischaracterization Of The Facts

 25. Both Title VII and the ADEA prohibit an employer from taking adverse action

against an employee in retaliation for the employee having exercised rights protected by Title VII or

the ADEA.[46]  In particular, to prevail on a claim of retaliation, whether brought under Title VII or

---

[44]Exhibit "A," Attachment "A-1."

[45]See, e.g., Spuler v. Pickar, 958 F.2d 103, 106 (5th Cir. 1992).  ("Texas state courts . . . uniformly embrace the notion that employee handbooks or manuals, standing alone, constitute no more than general guidelines . . . ").

[46]Title VII prohibits retaliation at 42 U.S.C. 2000e-3(a). The ADEA prohibits retaliation at 29 U.S.C. §623(d).

the ADEA, a plaintiff must show that he or she engaged in some form of activity protected by either Title VII or the ADEA, that an adverse employment action *thereafter* occurred, and that a causal connection existed between the protected activity and the adverse action which *followed* it.[47]

26.     Plaintiff's pleadings, much like his earlier whistleblower claim, discuss at length the allegation that the Plaintiff disclosed to the government financial wrongdoing on the part of the Defendant and that he thereafter was discharged for doing so.  Although the Plaintiff, under oath, now admits that no such report of wrongdoing actually was made prior to his employment terminating,[48] such an allegation, even if supportable, would not in any event give rise to a claim of retaliation under Title VII or the ADEA, as the conduct which allegedly brought about the retaliation was not conduct which even remotely implicated either statute.[49]  The Plaintiff has admitted, moreover, under oath, that he did not at any time *prior* to his employment terminating ever once assert that he was being singled out and treated adversely on account of his national origin, gender or age.[50]

27.     In order, therefore, to make a cognizable claim of retaliation, the Plaintiff now attempts to argue that he protested his own dismissal and that such protests were in fact the protected activity which gave rise to the "retaliation."  Very obviously, however, such protests came *after* and not before his dismissal, and his discharge, therefore, could not conceivably have been in "retaliation" for protests which in fact had not yet occurred.  In order to explain such illogic, in turn, the Plaintiff alleges, at least in his pleadings, that Ms. Gomez on July 27, 2000 merely told him his employment "would be" terminated, and that his employment was not actually

---

[47]See, e.g., Nowlin v. Resolution Trust Corporation, 33 F.3d 498, 507 (5th Cir. 1994) (Title VII); Grizzle v. Travelers Health Network, Inc., 14 F.3d 261, 267 (5th Cir. 1994) (ADEA).

[48]Exhibit "B," pp. 56-59, 181-84, 196-97, 217, 219.

[49]See, e.g., Jamil v. Secretary, Dept. of Defense, 910 F.2d 1203, 1207 (4th Cir. 1990) ("Title VII is not a general 'bad acts' statute; it only addresses discrimination on the basis of race, sex, religion, and national origin, not discrimination for whistleblowing.")

[50]Exhibit "B," pp. 110, 191, 193.

terminated until he was told so some weeks later by the Defendant's Board of Directors.  As will be shown, however, such a characterization is pure fiction, and the Plaintiff knows it.

28.     For example, the Plaintiff now admits that Ms. Gomez told him on July 27, 2000 that his employment was *in fact* terminated, and *not* that it would be terminated.[51]  As far as he knows, moreover, Ms. Gomez, as the Executive Director, had complete authority to terminate his employment.[52]  Following his meeting with Ms. Gomez, in turn, the Plaintiff was allowed to remove his personal belongings, and did so.[53]  He was no longer allowed to work,[54] and he no longer was paid.[55]  He immediately thereafter applied for unemployment compensation benefits,[56] and did so on the basis of his own representation to the Texas Workforce Commission that he had been fired by Ms. Gomez on July 27, 2000.[57]  By anyone's account, therefore, his employment terminated on July 27, 2000.

29.     The Plaintiff argues, nonetheless, that he appealed his dismissal to the Defendant's Board of Directors and did not learn until weeks later that the discharge would stand.[58]  By his reasoning, therefore, his dismissal was not final until the Board ruled on it.  Once again, however, he knows better.

30.     In particular, the policy manual in effect at the time of the Plaintiff's dismissal provided, with respect to the finality of the Executive Director's actions in terminating him, that

---

[51]Exhibit "B," pp. 125-27, 129, 136, 161-62, 197, 219.

[52]Exhibit "B," pp. 127-28.

[53]Exhibit "B," pp. 129, 213.

[54]Exhibit "B," pp. 129.

[55]Exhibit "B," pp. 60, 129.

[56]Exhibit "A," Attachment "A-2."  Exhibit "B," pp. 198, 200.

[57]Exhibit "A," Attachment "A-2."  Exhibit "B," p. 200.

[58]Exhibit "B," pp. 60.

-12-

"[t]he Executive Director has the final decision on a grievance appeal."[59]  Although the Plaintiff

might argue that the Board's willingness nonetheless to give him an audience and to hear his appeal

in effect overrode the policy and allowed the appeal to occur, the response by the Board President

completely takes away any such argument.

31.    Specifically, the Board, at the Plaintiff's request[60], allowed the Plaintiff on August

16, 2000 to address the Board, and Dr. Juan Jose Martinez, the Board President, responded on

September 5, 2000, as follows:

> Please allow this to serve as a response to your recent inquiry regarding your
> termination on July 27, 2000 by Brownsville Community Health Center.
>
> As you know we allowed you an opportunity to present your arguments and
> discussion regarding your termination and why you felt same was not appropriate.
> The Board felt somewhat uncomfortable in providing such an opportunity, as the
> Board believes in following the bylaws and protocols established for the Board.
> **As you were told at the meeting, the decisions regarding the
> employment or termination of BCHC employees is left to the
> exclusive jurisdiction and discretion of the Executive Director.  As
> such the Board cannot circumvent the bylaws by allowing you or any
> other employee to present such situations to the Board.  The board
> wishes to establish no precedent contrary to the above.**
>
> However, the Board does have authority to scrutinize and observe the actions of the
> Executive Director.  It is under this directive that the Board determined it was
> appropriate to allow your presentation in order to determine whether Ms. Gomez
> had properly discharged her duties by investigating the situation thoroughly before
> taking action.
>
> After reviewing all the information available to the Board, the Board unanimously
> feels the actions taken by Ms. Gomez were proper and within her authority.  Her
> procedures were well within the boundaries of her duties.  The Board noted that she
> took additional steps to remedy the situation without terminating your employment
> by offering course, at no expense, to you that could possibly resolve the problem.
> She even offered the possibilities of a different employment position.  The attempts
> were futile.
>
> Based on the above, the Board stands behind the decision of Ms. Gomez, and
> wishes you great success in your future endeavors.[61]

---

[59]Exhibit "A," Attachment "A-1."  Exhibit "B," pp. 132-33, 135-36.

[60]Exhibit "B," pp. 142-43.

[61]Exhibit "A," Attachment "A-3." (emphasis added).  Exhibit "B," pp. 147-48.

32.     As shown, then, the Plaintiff was told explicitly on August 16, 2000 that the Board would listen to him but was not authorized to reinstate him or to otherwise affect his termination. Instead, the Board, by hearing him out, could only determine whether or not the Executive Director, who reports to the Board, had properly carried out the duties delegated to her. Thus, there was nothing either in the Defendant's policies or in the Board's response that would allow the Plaintiff to now argue that his dismissal was merely tentative until approved by the Board.

33.     Moreover, and very importantly, the Plaintiff did not, following his dismissal, allege in any fashion that he was dismissed on the basis of gender, age, national origin or other factor protected by either Title VII or the ADEA. By his own admission, for example, he never once mentioned national origin, gender or age when protesting his dismissal to the Board on August 16, 2000.[62]  He similarly did not mention national origin, age or gender anywhere in his 31 page single-spaced and typed grievance.[63]  Although he argues that such allegations are "implied," he admittedly nowhere mentioned anywhere in his grievance any facts from which one might infer such a complaint of discrimination on the basis of sex, age or national origin.[64] Instead, his grievance referred to alleged improprieties which were completely unrelated to employment discrimination and which the Plaintiff threatened to make known publicly, unless the Board was willing to pay him $2,000,000 for his "public silence."[65]  Very obviously, therefore, the Plaintiff, by filing his grievance, had objectives in mind which were far removed from complaining about discrimination in employment.

34.     The Plaintiff admits, moreover, that he did not, at any time prior to receiving the Board President's September 5, 2000 letter, make any allegation whatsoever either to the Board or to the Defendant's management that he had been discriminated against on account of his national

---

[62]Exhibit "B," pp. 154, 162-63.

[63]Exhibit "B," pp. 140-141.

[64]Exhibit "B," pp. 141-42.

[65]Exhibit "B," pp. 143-45, 155.  Exhibit "A;" Attachment "A-4."  Such a demand that $2,000,000 be paid for his "public silence" is found on page 30 of Attachment "A-4." The grievance is offered in its entirely for the limited purpose of showing what the Plaintiff alleged and did not allege, but expressly without admitting to the truth of such allegations, which are denied.

-14-

origin, gender or age.[66]  Once again, therefore, since the Plaintiff did not engage in any conduct

protected by Title VII or the ADEA before, or *even after,* Ms. Gomez fired him, he cannot

conceivably, under any scenario, claim retaliation by the Defendant for his having engaged in

conduct protected by Title VII or by the ADEA.

35.    As a final and feeble gesture, the Plaintiff also argued at his deposition that he was

"retaliated" against not for something he *did*, but rather simply for something he *was*; viz., a male,

non-Hispanic and over 40.[67]  Very obviously, however, being singled out and treated adversely on

account of one's personal characteristics rather than on account of one's conduct is not an

allegation of retaliation at all, but rather is a allegation of *discrimination,* a topic to be addressed

next.

## Legal Principles Applicable To Employment Discrimination Claims In The Summary Judgment Context

36.    The Plaintiff's discrimination claims allege *disparate treatment* on the part of the

Defendant, and thus require a showing by the Plaintiff of discriminatory intent,[68] which can be

shown either by direct evidence or can be shown circumstantially.[69]  "Direct evidence is evidence

which, if believed, proves the fact of [intentional discrimination] without inference or

presumption."[70]  Such evidence includes "any statement or written document showing a

discriminatory motive on its face."[71]  Moreover, in order to be direct evidence of discrimination,

---

[66]Exhibit "B," pp. 191, 193, 219-20.

[67]Exhibit "B," pp. 118-19.

[68]Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097, 2111 (2000).  ("The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination.")

[69]See, United States Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 714 n.3, 103 S.Ct. 1478, 1481 n.3 L.Ed.2d 401 (1983).

[70]See, Brown v. East Miss. Elec. Power Ass'n, 989 F.2d 858, 861 (5th Cir. 1993).

[71]Portis v. First Nat. Bank of New Albany, MS, 34 F.3d 325, 329 (5th Cir. 1994).

the "evidence must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question."[72]

37.    The evidentiary framework for showing discriminatory intent *circumstantially*, on the other hand, requires that the plaintiff first prove a prima facie case of discrimination. This may be done by showing (1) that the plaintiff is a member of a protected class, (2) that he sought or held a particular position and was qualified to fill it, (3) that he was rejected or removed from the position, and (4) that the employer thereafter sought applicants with the plaintiff's qualifications.[73]

38.    Once established, the plaintiff's prima facie case gives rise to an inference of discriminatory intent.[74] The burden then shifts to the employer to articulate, but not to prove, a reason which, if believed, would support a finding that the challenged employment action was not discriminatory.[75] Once the employer has done so, the inference raised by the plaintiff's prima facie case disappears, and the plaintiff then bears the ultimate burden of persuading the trier of fact that "the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination."[76] In order, in turn, to show pretext, a plaintiff ". . . must present facts to rebut each and every legitimate and non-discriminatory reason advanced by [the employer],"[77] either by showing that persons outside the plaintiff's protected class were similarly situated and yet were treated more favorably, or by showing that the employer's proffered reason for the challenged

---

[72]Randall v. La Salle Telecommunications, Inc., 876 F.2d 563, 569 (7th Cir. 1989).

[73]See, McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

[74]See, Rutherford v. Harris County, Texas, 197 F.3d 173, 179-80 (5th Cir. 1999).

[75]See, Byers v. Dallas Morning News, Inc., 209 F.3d 419, 425 (5th Cir. 2000).

[76]Tex. Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Such a burden-shifting evidentiary framework has been applied also to cases brought under the ADEA. See, Bodenheimer v. PPG Indus. Inc., 5 F.3d 955, 957 n.4 (5th Cir. 1993). The United States Supreme Court has yet to squarely address the issue. Reeves, 120 S.Ct. at 2105.

[77]Clay v. Holy Cross Hosp., 253 F.3d 1000, 1007 (7th Cir. 2001).

action is unworthy of belief.[78]  For persons outside the protected class to be "similarly situated," the misconduct for which the plaintiff was discharged must have been "*nearly identical*"[79] or "*essentially identical*"[80] to that committed by persons outside the protected class whom the employer did not discharge. As clarified recently by the Fifth Circuit:

> [T]he conduct at issue is not nearly identical when the difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer.[81]

39.     Moreover, in order to survive a summary judgment motion, there must be a conflict in *substantial* evidence to create a jury question.[82]  "In the employment discrimination context, evidence is 'substantial' if it is 'such as to allow a rational fact finder to make a reasonable inference that [an unlawful factor such as] age was a determinative reason for the employment decision"[83]  Although courts are to exercise caution in granting summary judgment whenever intent or motive is at issue, "even when motive is a critical issue, such as in a discriminatory discharge action, summary judgment is not precluded if plaintiff's claim rests solely on unsupported allegations of motive."[84]  Similarly, "[a]n employee's own subjective belief of . . .

---

[78]See, Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 156 F.3d 581, 589 (5th Cir. 1998), vacated by 169 F.3d 215 (1999) reinstated in pertinent part by 182 F.3d 333 (1999). See also, St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("[R]ejection of the defendant's proffered reason will permit the trier of fact to infer the ultimate fact of intentional discrimination."); Reeves, 120 S.Ct. at 2109 ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer lawfully discriminated.").

[79]Smith v. Wal-Mart Stores (No. 471), 891 F.2d 1177, 1180 (5th Cir. 1990).

[80]See, Barnes v. Yellow Freight Systems, Inc., 778 F.2d 1096, 1101 (5th Cir. 1985).

[81]Wallace v. Methodist Hosp. System, 271 F.3d 212, 221 (5th Cir. 2001).

[82]Auguster v. Vermillion Parish School Bd., 249 F.3d 400, 403 (5th Cir. 2001).

[83]Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 993 (5th Cir. 1996) (en banc) abrogated on other grounds in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097 (2000).

[84]Thacker v. Peak, 800 F.Supp. 372, 376 (S.D. W.Va. 1992)

discrimination, however genuine, cannot serve as the basis for judicial relief."[85]  Ultimately, the employer is entitled to summary judgment, even in the employment discrimination context, "where the record as a whole could not lead a rational trier of fact to find for the non-movant."[86]

40.     In the matter now before the Court, the evidence is undisputed that Plaintiff is non-Hispanic, male and was over the age of 40 at the time of his hire and dismissal, and thus was within various classes of persons protected by law from discrimination.  The evidence is further undisputed that his employment was in fact terminated by the Defendant, and that the person thereafter hired to replace him is Hispanic and is younger than the Plaintiff.  Although the Defendant maintains that the Plaintiff showed himself unsuited for the position, the Defendant does not, for purposes of the instant motion, take the position that the Plaintiff cannot make a prima facie case according to the McDonnell Douglas evidentiary framework.  Instead, the Defendant maintains, and will show herein, that the Plaintiff, as a matter of law, cannot sustain his burden to show pretext.

**The Plaintiff Has Nothing Beyond His Own Conjecture
To Support His Claims Of Discrimination On The
Bases Of National Origin, Age And Gender**

**National Origin**

41.     Title VII expressly prohibits discrimination in employment on the basis of, among other things, national origin.[87]  Section 1981,[88] on the other hand, is the codification of a post-Civil War statute intended to assure that African Americans would not be denied, on the basis of their race, the right to make and enforce contracts.[89]  Over time, however, §1981 was extended to

---

[85]Patton v. United Parcel Service, Inc., 910 F. Supp. 1250, 1263 (S.D. Tex. 1995).

[86]Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

[87]42 U.S.C. §2000e-2(a).

[88]42 U.S.C. §1981.

[89]("All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . ).  42 U.S.C. §1981(a).

apply in the employment termination context,[90] and furthermore has been interpreted broadly by some courts to encompass claims of discrimination on the basis of ethnicity, in addition to race.[91] Thus, the same discriminatory conduct which may give rise to a claim under Title VII may at times also be actionable under §1981, and the rules governing the presentation of a prima facie case, shifting burdens of production, and so forth are in fact the same under both statutes.[92] Accordingly, the Plaintiff's claims of discrimination on the basis of national origin, which he apparently has brought under both Title VII and §1981, will be discussed together and as one claim. As will be shown, in turn, such a claim is completely unsustainable, whether brought under one statute or the other or both.

42.    The Plaintiff in particular alleges that Paula Gomez, who is Hispanic, was motivated to fire him by the fact that he, by his own self-description, is "definitely" non-Hispanic.[93] Thus, even though it was the same Paula Gomez who initially told him of the opening within the organization and encouraged him to apply,[94] and even though the Plaintiff made no secret of being non-Hispanic when Ms. Gomez hired him instead of hiring a younger female Hispanic who applied for the same opening,[95] the Plaintiff asks this Court nonetheless to find that his dismissal may somehow have been motivated by his non-Hispanic national origin. As the following will show, however, he has no direct evidence of discrimination and is unable, in any event, to show pretext.

---

[90]See, Ferrill v. Parker Group, Inc., 967 F.Supp. 472, 474 (N.D. Ala. 1997), aff'd 168 F.3d 468 (1999).

[91]See, e.g., Ramos v. Flagship Intern, Inc., 612 F.Supp. 148 (D.C. N.Y. 1985).

[92]See, LaPierre v. Benson Nissan, Inc., 86 F.3d 444, 448 N.2 (5th Cir. 1996); Thomas v. Denny's Inc., 111 F.3d 1056 (10th Cir. 1997); cert denied 522 U.S. 1028, 118 S.Ct. 626, 139 L.Ed.2d 607 (1997).

[93]Exhibit "B," pp. 85, 86.

[94]Exhibit "B," p. 14.

[95]Exhibit "A."

43.     The Plaintiff has admitted, for example, that no mention was made of national origin, gender or age on those occasions when he was counseled or disciplined.[96] He similarly does not deny that, as the Defendant contends, he had problems communicating and at various times caused other employees to become upset at him and to complain.[97] Insofar, therefore, as he might try to show discrimination, he must do so, if at all, circumstantially, by showing that persons outside his particular class were similarly situated and yet were treated more favorably. And as the following will show, he cannot.

44.     When asked, for example, which employees had complaints made about them similar to the complaints made to management regarding himself, the Plaintiff admitted he knew of no one.[98] Moreover, when asked which Hispanic employees, whether similarly situated or not, were treated more favorably, he referred only to Dr. Luis Gaytan, a contract physician, and to Maria Castillo, a nurse practitioner.[99] In particular, he contended that they, like himself, had "communications problems," but unlike himself, were not disciplined or put at risk of termination.[100] When asked to describe what possible communications problems either of them had, he responded that he had learned from a memorandum circulated by Ms. Gomez that Dr. Gaytan had on one occasion expressed his frustrations loudly in the hallway while guests were present, and that Ms. Castillo had once been rude and disruptive by talking and not paying attention during an employee meeting.[101]

45.     Regarding each matter, the Plaintiff admitted that he was not present and therefore has no personal knowledge.[102] Moreover, he admittedly does not know if either individual was

---

[96]Exhibit "B," pp. 108-09.

[97]Exhibit "B," pp. 71, 74, 77, 80, 81, 82, 85.

[98]Exhibit "B," pp. 90.

[99]Exhibit "B," pp. 94, 97.

[100]Exhibit "B," pp. 92, 97.

[101]Exhibit "B," pp. 93-94, 96-98.

[102]Exhibit "B," pp. 96, 98.

reprimanded or disciplined in any way.[103]  Nonetheless, even assuming that the Plaintiff's

understanding of those matters is at all accurate, such isolated and one-time indiscretions of the

type referred to by the Plaintiff are in no way "essentially identical" to the continuous stream of

complaints, as well as a demonstrated unsuitability for supervision, which brought about his own

dismissal.  Thus, by referring to Dr. Gayton and Ms. Castillo, the Plaintiff has failed outright to

show a disparity in treatment that would give rise to any reasonable inference of discriminatory

intent.

     46.     In further support of his claim of discrimination, the Plaintiff alleges that the steps

of "progressive discipline" were not applied to him.[104]  When asked, however, which Hispanic

employees had similar deficiencies in performance and behavior and yet were given the benefit of

progressive steps of discipline, the Plaintiff admittedly could name no one, as shown by the

following:

> Q.     And I'm not asking that, Mr. Kavanaugh.  I'm asking what Hispanic employees, that you know of, had the disciplinary policies applied to them as written contrary to the way you were treated?
>
> A.     My colleagues were also immediate subordinates of Ms. Alpert, and she did not tell us how - - she did not tell us specifically what disciplinary action was taken against what specific individuals.
>
> Q.     If I ask the question, was there a single Hispanic employee who had the disciplinary policies applied as written to him or her, your answer would be "I don't know"; isn't that true?
>
> A     Yes.
>
> Q.     Okay.  So you cannot tell us a single Hispanic employee who was treated differently than you were with respect to the application of the disciplinary policies; isn't that true?
>
> A.     That is true.[105]

     47.     As his final evidence of an intent to discriminate, the Plaintiff contends that whereas

he admittedly failed to attend the communications seminars which management had scheduled and

---

[103]Exhibit "B," pp. 96-100.

[104]Exhibit "B," pp. 61, 65-66, 91, 100-01.

[105]Exhibit "B," p. 105.

paid for him to attend, others likely missed also and were not disciplined.[106] When asked, once again, which Hispanic employees missed the seminars, he again knew of no one, and could only surmise that some of them likely did.[107] When asked if those who may have missed were excused, he once again did not know.[108]

48.    As shown, then, the Plaintiff truly has nothing to bring before the Court to show that his dismissal was in fact not, as the Defendant contends, the result of his failure to conform his behavior to a level that others could accept, but rather was, as he contends, the result simply of being non-Hispanic. His efforts to show a disparity in treatment either lack any support whatsoever, or else are based purely on his own conjecture. Accordingly, and as a matter of law, the Court should grant summary judgment in favor of the Defendant on the claim of discrimination on the basis of national origin, irrespective of whether he asserts the claim under Title VII or §1981.

## The Plaintiff Has No Claim Of Age Discrimination

49.    The Plaintiff was born in 1955[109] and was just shy of his 44th birthday when hired by the Defendant on November 9, 1998. He was, in turn, barely 45 years old when fired nineteen months later. Inasmuch as the age group protected by the ADEA is 40 and over,[110] the Plaintiff asserts that age must have been a motivating factor in his dismissal. Once again, however, he has nothing to offer in support.

50.    Paula Gomez, who both hired and fired him, is herself 53 years old.[111] Emily Alpert, the Plaintiff's immediate superior, is 49.[112] Among those who, like the Plaintiff, reported

---

[106]Exhibit "B," pp. 90, 102-03.

[107]Exhibit "B," pp. 102-03.

[108]Exhibit "B," pp. 103-04.

[109]Exhibit "B," p. 86.

[110]29 U.S.C. §631(a).

[111]Exhibit "A."

directly to Ms. Alpert, one is a youthful 71 and another is in his 60's.[113]  The Plaintiff would be hard pressed, therefore, to explain why the people for whom he worked would have had a particular problem with his age.

      51.    Moreover, when asked which employees younger than himself were treated more favorably, the Plaintiff answered characteristically, as follows:

> Q.    Okay. Which employees younger than yourself were treated more favorably than you?
>
> A.    I don't know how everyone was treated so I don't' know.
>
> Q.    Okay. If I asked you to name for the Court one individual younger than yourself who was treated more favorably than you, could you do that?
>
> A.    Well, it's a - - that's a qualitative judgment that I can't answer.
>
> Q.    Okay. Do you allege or contend that there was a - - an employee younger than yourself treated more favorably than you?
>
> A.    I contend that I was treated differently because of my age.
>
> Q.    Differently than whom?
>
> A.    Differently than other staff members.
>
> Q.    Okay. And who are they?
>
> A.    I cannot name them at this time.
>
> Q.    Okay. So if I ask the question, can you tell the Court even one person younger than yourself treated more favorably than you, you cannot do that; isn't that true?
>
> A.    Not without access to personnel records, no.[114]

The Plaintiff, therefore, as shown, similarly cannot show pretext with respect to his age claim.

### The Plaintiff Has No Claim Of Sex Discrimination

      52.    The Plaintiff was male when Ms. Gomez hired him, and, as the Plaintiff himself asserts in his pleadings, Ms. Gomez hired another male to replace him.  He alleges, nonetheless,

---

[112]Exhibit "A."

[113]Exhibit "A."

[114]Exhibit "B," pp. 107-08.

that his dismissal surely was motivated by his gender. When asked, however, to identify for the Court which females were treated more favorably, he answered, again characteristically, as follows:

> Q.    Well, let me ask the question this way: Can you give to the Court the name of one female who was similarly situated to you that had complaints similar to those brought against you who was treated differently than you?
>
> A.    I don't know.
>
> Q.    Okay. In other words, you can't name a single person, isn't that true?
>
> A.    Well, I'm saying I don't know.[115]

53.    Ultimately, the Plaintiff has pinned his hopes for alleging sex discrimination on a remark he attributes to Emily Alpert, his immediate supervisor, to the effect that "too bad you're not Joan Dentler."[116] Ms. Dentler, in turns out, held the job previously, and the Plaintiff inferred from the alleged remark that Ms. Alpert was saying, in effect, that the Plaintiff's difficulties were compounded by the fact that he was not part of "the Club," which he described as the decision-making body made up of persons who were Hispanic and female.[117]

54.    Emily Alpert, the Plaintiff's immediate superior, is non-Hispanic.[118] Ms. Dentler, his predecessor, similarly is non-Hispanic.[119] Accordingly, if the Plaintiff is going to point to any unifying trait among the members of "the Club," he likely can point only to gender. When asked in what ways, then, Joan Dentler, as a female, may have been similarly situated and yet treated differently, the Plaintiff again answered with a characteristic lack of knowledge, as follows:

> Q.    Did Joan Dentler ever have complaints brought against her by her subordinates similar to those brought against you?
>
> A.    I'm not sure.

---

[115]Exhibit "B," pp. 113-14.

[116]Exhibit "B," pp. 114,

[117]Exhibit "B," pp. 114-15.

[118]Exhibit "A."

[119]Exhibit "A."

Q.      Did Joan Dentler ever fail to go to a seminar that she was scheduled to attend?

A.      I have no idea.

Q.      Did Joan Dentler ever engage in conduct which reasonably would make her susceptible to discipline?

A.      I don't know.[120]

55.     As shown, then, the Plaintiff once again cannot show that a female was similarly situated and yet was treated more favorably, and thus cannot show prextext. Moreover, as will be shown next, the vague remark to which he refers is not even evidence of discrimination under controlling Fifth Circuit precedent.

56.     Specifically, whether or not the alleged reference by Ms. Alpert to Joan Dentler should be regarded as evidence of an intent to discriminate should be analyzed according to what has come to be called the "stray remarks doctrine." In particular,

> for comments in the workplace to provide sufficient evidence of discrimination, they must be (1) related [to the protected class of persons of which the plaintiff is a member]; (2) proximate in time to the terminations; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue.[121]

Where comments are "vague and remote in time [they] are insufficient to establish discrimination. In contrast, specific comments made over a lengthy period of time are sufficient."[122] The Fifth Circuit, in turn, has further elaborated on the doctrine, as follows:

> In order for [a protected class-] based comment to be probative of an employer's discriminatory intent, it must be direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that [the employee's protected class] was a determinative factor in the decision to terminate the employee.[123]

---

[120]Exhibit "B," p. 115.

[121]Krystek v. Univ. So. Miss, 164 F.3d 251, 256 (5th Cir. 1999).

[122]Brown v. CSC Logic, Inc., 82 F.3d 651, 655-56 (5th Cir. 1996).

[123]Wyvill v. United Cas. Life Ins. Co., 212 F.3d 296, 304 (5th Cir. 2000).

57.     The remark relied on by the Plaintiff allegedly was made by Ms. Alpert.  The evidence is unrebutted, in turn, that only the Executive Director, and not Ms. Alpert, was authorized to terminate an employee, and that it was the Executive Director, and not Ms. Alpert, who actually terminated the Plaintiff.[124]  Moreover, the Plaintiff does not even contend that such a remark was made in the context of the termination of his employment.[125]  Moreover, any remark that the Plaintiff was not "a Joan Dentler" is far from direct and unambiguous, and instead would require more than a reasonable inference, but instead a vivid imagination, to derive from it any discriminatory connotation whatsoever.  Accordingly, such a vague and off-hand remark as alleged by the Plaintiff, even if actually made, would not constitute evidence of a discriminatory intent.[126]

58.     As shown, therefore, the Plaintiff truly has nothing to show the court which would allow a reasonable person to infer an unlawful intent to discriminate on the part of the Defendant.  Such is especially true, moreover, in light of the "same actor" inference of no discrimination, to be discussed next.

**The "Same Actor" Inference Further Compels The
Granting Of Summary Judgment**

59.     Logic would dictate that if the same person both hired and fired an individual, and did so with knowledge of the personal characteristic alleged to form the basis of the discrimination, then such a characteristic simply could not have motivated the firing.  Such logic, in fact, increasingly has been accepted as law, including in the Fifth Circuit.

---

[124]Exhibit "A."

[125]Exhibit "B," p. 114.

[126]The Fifth Circuit's application of the stray remarks doctrine was questioned by the United States Supreme Court in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 120 S.Ct. 2097 (2000).  The Supreme Court in Reeves, however, did not disavow the doctrine, but rather concluded that reasonable inferences of discrimination could have been drawn from the particular remarks reported in that case.  The Fifth Circuit, in turn, has subsequently regarded the doctrine as still intact, notwithstanding the Reeves decision.  Wallace v. Methodist Hosp. System, 271 F.3d 212, 222 (5th Cir. 2001).  See also, Rubinstein v. Administrators of Tulane Educ. Fund, 218 F.3d 392, 400-01 (5th Cir. 2000).

60.   In <u>Brown v. CSC Logic, Inc.</u>,[127] for example, the defendant's chief executive officer, who was 56 years old, hired the plaintiff, who was 54.  Some four years later, the plaintiff was discharged along with numerous others as part of a cost-cutting effort.  With respect to the age claim brought by the plaintiff, the Fifth Circuit had the following to say:

> We note that Davis was hired at the age of 54 by then the 56 year old Kimzy.  Davis was fired only four years later, by Kimzy who was then 60. This situation gives rise to an inference that age discrimination was not the motive behind Davis' termination . . . . The fact that the actor involved in both employment decisions is also a member of the protected class only enhances the inference.[128]

61.   In the matter now before this Court, Paula Gomez hired the Plaintiff and discharged him just 19 months later.  The Plaintiff was non-Hispanic, and male, and in his mid 40's when both hired and fired.  Without question, therefore, an inference arises that neither his national origin, age nor sex could possibly have affected or played any role at all in his dismissal. Such is especially true, moreover, with respect to the age claim, as both Ms. Gomez and Ms. Alpert are themselves not only within the protected age group but, in fact, are older than the Plaintiff.  Given, moreover, the abject lack of any evidence showing an unlawful intent to discriminate, the Plaintiff has not surmounted and indeed cannot surmount this "same actor" inference of no discrimination on the part of the Defendant.  Such an inference, therefore, should compel even further the granting of summary judgment in favor of the Defendant.

### Summary

62.   The Plaintiff, following his dismissal and continuing for months thereafter, alleged to anyone who would listen that he was dismissed in retaliation for his complaints about what he regarded as financial improprieties within the Defendant's organization.  Such, in fact, was the basis of the instant lawsuit, as originally filed in state district court.  When it was shown that such an allegation, even if taken as true, failed to state a cognizable claim, the Plaintiff completely changed directions and, for the first time ever, asserted that it was actually his gender or age or

---

[127] 82 F.3d 651 (5th Cir. 1996).

[128] <u>Id.</u> at 658.

national origin, or perhaps being made somehow unattractive by the combined effects of all three such factors, that motivated Ms. Gomez to discipline and ultimately discharge him, even though those same factors obviously posed no hindrance at all to his being hired by the very same individual a short time before. As might be expected, however, when trying to fashion a claim from thin air and after the fact, the Plaintiff can show the Court nothing from which a reasonable fact finder could infer discrimination on the basis of any unlawful factor. Ultimately, as revealed by his own deposition testimony, the Plaintiff, by recasting his whistleblower claim as a lawsuit implicating the Texas and United States Constitutions and a broad array of federal statutes, simply has tried to make bricks without straw. For the reasons set forth herein, therefore, summary judgment should be granted in favor of the Defendant.

63.     This motion is supported by the pleadings[129] and by the sworn evidence attached hereto. Insofar as the Court may not grant the complete summary judgment sought, the Court respectfully is asked to examine the pleadings and evidence, interrogate counsel and identify for the parties which material facts remain in good faith controverted such that the parties must proceed to trial.

WHEREFORE, BROWNSVILLE COMMUNITY HEALTH CLINIC CORPORATION, D/B/A BROWNSVILLE COMMUNITY HEALTH CENTER, Defendant herein, respectfully moves this Court to grant the motion and enter judgment that the Plaintiff take nothing. The Defendant further prays for its costs, and for general relief.

---

[129]Reference is made to the Plaintiff's pleadings for the limited purpose only of showing the nature of the claims asserted, but without admitting to the truth of those claims, which are denied.

Respectfully submitted,

Raymond A. Cowley
State Bar No. 04932400
Federal ID No. 8642
4900 N. 10th Street, Ste. A-2
McAllen, Texas 78504
Telephone: (956) 686-1287
Telecopier: (956) 686-6197

ATTORNE FOR DEFENDANT
BROWNSVILLE COMMUNITY HEALTH
CLINIC CORPORATION d/b/a
BROWNSVILLE COMMUNITY HEALTH
CENTER

OF COUNSEL:

**RODRIGUEZ, COLVIN & CHANEY, L.L.P.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded by certified mail, return receipt requested to the following counsel of record, on the _2 6_ day of _February_, 2002.

Mr. Francisco J. Zabarte
Sanchez, Whittington, Janis & Zabarte, LLP
100 North Expressway 83
Brownsville, Texas 78521-2284

Mr. David Horton
Neel & Horton
P.O. Box 2159
South Padre Island, Texas 78597

Raymond A. Cowley

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| PAUL CAMERON KAVANAUGH, | § | |
|     Plaintiff | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-01-104 |
| | § | |
| BROWNSVILLE COMMUNITY HEALTH | § | |
| CLINIC CORPORATION, D/B/A | § | JURY TRIAL DEMANDED |
| BROWNSVILLE COMMUNITY HEALTH | | § |
| CENTER | § | |
|     Defendant | § | |

## AFFIDAVIT OF PAULA S. GÓMEZ

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF CAMERON | § |

BEFORE ME, the undersigned authority, personally appeared PAULA S. GÓMEZ, who being by me duly sworn, deposed as follows:

"My name is Paula S. Gómez. I am over 21 years of age and have never been convicted of a felony. I am the Executive Director of Defendant Brownsville Community Health Center ("BCHC"), and held that position prior to, during and following the period the Plaintiff worked for BCHC. I therefore have personal knowledge of the facts stated herein, and those facts are true and correct.

"The BCHC is a private, nonprofit corporation organized for the purpose of providing medical and dental services to the indigent population in and around Brownsville, Texas. The clinic is located in Brownsville, Texas and satellite clinics, referred to as campus can facilities, are operated at various of the public schools in Brownsville. Paul Kavanaugh, the Plaintiff, was hired as the director of the Campus Care Facilities.

1



"I was the person who ultimately made the decision to hire the Plaintiff, whose employment began on November 9, 1998. I had, in fact, known the Plaintiff prior to his hire, and had encouraged him to apply for the opening. A Ms. Raquel Castillo, who is female and Hispanic, and who is considerably younger than the Plaintiff, also was a candidate, but I rejected her in favor of the Plaintiff.

"Although I initially believed the Plaintiff would be well suited for the position, I began in mid 1999 to learn of complaints by his subordinates and peers. The Plaintiff, for example, would make off-the-cuff remarks which at times were regarded as disrespectful and offensive. He responded to one subordinate's request for more pay, for example, by telling her to bend over and he would give her a raise, while indicating he would kick her in the rear. He did this, in fact, in the presence of her own peers. One group of employees complained that the Plaintiff threatened to withhold money from their paychecks if they did not volunteer to work for free after hours. Another group of employees complained that the Plaintiff accused them of being demonically possessed. Others complained that the Plaintiff, when confronted or challenged, would stand, shout and otherwise try to intimidate them. Contract professionals and others complained of what they regarded as flippancy, condescension and disorganization on the part of the Plaintiff.

"Emily Alpert, the Clinical Operations Director and the Plaintiff's immediate supervisor, and I met with the Plaintiff on March 23, 2000 to impress upon him the seriousness of his inability to get along with his subordinates and others. At that time I continued to believe that he had talents and could be useful to the organization. I therefore encouraged him to improve, but, at the same time, warned that his failure to

2

work effectively with others would result in his dismissal. As part of the specific objectives given him, he was scheduled to attend several seminars paid for by the Clinic. I did not learn until after his employment had terminated that he did not attend.

"When, by June 15, 2000, the complaints were not only continuing but becoming more frequent, I realized that, while the Plaintiff had certain abilities, he was not at all suited to supervise others. He was, therefore, given the option of working as a grant writer, at his same rate of pay. He asked for some time to consider the option, and I told him he could have three weeks.

"By July 26, 2000 I had not heard from the Plaintiff regarding the grant writer position, so I spoke with him in his office and asked again if he wanted the position. He responded that, in his estimation, he was working where he was best suited and therefore would not accept the grant writer job. I told him, then, to meet with me and Ms. Alpert the next morning at 8:00 a.m. in my office.

"At 8:00 a.m. the next morning, the Plaintiff did not appear for the meeting. I learned that he instead was conducting a meeting of his own. When I asked why he had not come in my office as instructed, he replied that his meetings were already scheduled and he saw no point in meeting with me. I informed him at that time that this employment was terminated.

"The Plaintiff's employment was terminated due to his inability and unwillingness to work effectively with subordinates and peers, and his demonstrated unsuitability for supervision of others. His resistance to instruction, typified by his failure to meet on July 27, 2000 as directed in my office, was part of the overall pattern of misbehavior that could no longer be tolerated. My efforts and Ms. Alpert's efforts to bring about changes

in his behavior and treatment of others were unsuccessful. When others attempted to offer criticism or to bring mistakes to his attention, he would almost always write lengthy memos denying wrongdoing or fault. I had become concerned, in fact, that talented people would leave the organization rather than continue to work with or for him.

"The Plaintiff's allegations that he was disciplined and ultimately fired for being non-Hispanic, male or over 40 years old are false and in fact ridiculous. Regarding age, the Plaintiff was only 45 years old at the time his employment was terminated. I am 53 years old, and Ms. Alpert will turn 50 in March 2002. Of those reporting to Ms. Alpert, just as the Plaintiff did, one is 71 years old and another in his 60's. Ms. Alpert is non-Hispanic, as was Joan Dentler, the individual who held the job just prior to the Plaintiff. Ms. Dentler also is several years older than the Plaintiff. Of the persons who reported to Ms. Alpert along with the Plaintiff, five (5) of them have been males.

"I personally made the decision to terminate the Plaintiff's employment. Although I consulted with Hilda Gonzalez, the Human Resources Director, and with Ms. Alpert, the decision was mine. Neither the Brownsville Independent School District nor any other governmental entity or official in any way took part in that decision. There similarly were no governmental guidelines, policies or statutes that I regarded as compelling or calling for the Plaintiff's dismissal.

"The documents attached hereto collectively as Attachment "A-1" are a true and correct copies of pages of the employee handbook which was in effect at the time of the Plaintiff's dismissal.

"The documents attached hereto collectively as Attachment "A-2" are true and correct copies of the documents provided by the Texas Workforce Commission, showing

the statements given by the Plaintiff to the Texas Workforce Commission regarding the termination of his employment, and also the date his employment terminated.

"The document attached hereto as Attachment "A-3" is a true and correct copy of the September 5, 2000 letter from the BCHC Board President to the Plaintiff regarding the Plaintiffs request to appear before the Board and regarding the Board's very restricted role at that hearing.

"The documents attached hereto collectively as Attachment "A-4" comprise a true and correct copy of the 31-page grievance submitted by the Plaintiff in protest of his dismissal."

Further affiant sayeth naught.

_____
PAULA S. GÓMEZ

SUBSCRIBED AND SWORN to before me on this __21st__ DAY OF __February__, 200_2_, to certify which witness my hand and official seal.

_____
Notary Public - State of Texas

CRISTELA GÓMEZ
Notary Public, State of Texas
My Commission Expires
OCTOBER 25, 2005

5

# INTRODUCTION

1.01        Statement of Purpose:

The Board of Directors of Brownsville Community Health Center, by federal regulation, is required to establish personnel policies and delegate their authority to the Executive Director for implementation. The Board of Directors has the absolute authority to hire/terminate the Executive Director. The Executive Director is empowered to hire/terminate all staff employed by BCHC. The Board of Directors reserves the right to suspend any benefits made available to employees or contractors by BCHC upon request from the granting agency and/or as a result of budgetary constraints.

1.02        Statement of Responsibility:

It is the responsibility of all staff, employed or under contract, to read and follow all policies and procedures as stated in this personnel manual.

1.03        Employee At-Will:

This employee manual does not constitute an employment contract and is not intended to create contractual obligations of any kind. No property right exists in continued employment with employer (BCHC) as all employees are considered "at-will". This means that said employment is not for any specific period of time and is terminable at the will of either the employer (BCHC) or the employee. "At-will" further indicates that, the employment can be terminated by either party; with or without cause, at any time during employment.

1.04        Equal Employment Opportunity and Affirmative Action

It is the policy of BCHC to employ positive business and human resources practices designed to ensure the full realization of equal employment opportunity without regard to race, color, age, religion, sex or national origin.

To implement this policy, BCHC will continue to:

-       Follow all federal, state and local laws regarding the employment relationship, including all laws regarding non-discrimination with respect to race, national origin, citizenship, color, religion, gender, age (over 40), or disability;

-       Comply with the provisions of the Americans with Disabilities Act (ADA), extending reasonable accommodations to applicants and employees with disabilities as provided for under the ADA.

-       Promote understanding and acceptance of the Center's policy on Equal



Revised: 4/00

grievance. If resolution at this level is not possible and the employee wishes to pursue the matter, or if the employee's supervisor has not responded to the employee within the required number of days, then the employee may appeal to the Human Resources Manager.

## Second Step

If an employee is dissatisfied with the supervisor's response, then the employee must appeal this response in writing to the Human Resources Manager within five (5) working days of receiving the supervisor's response or of the last day for the supervisor to respond. If the employee fails to communicate dissatisfaction with the supervisor's response within five (5) working days, then BCHC shall consider the matter settled and closed and no further appeal by the employee will be considered. The written grievance should include a thorough description of the problem, the employee's immediate supervisor's response, and any other circumstances. The Human Resources Manager generates a response to the grievance. The Human Resources Manager sends copies of the response concerning the grievance, to the employee and the supervisor. All documentation concerning the grievance is placed in the employee's personnel record.

## Third Step

If an employee is dissatisfied with the Human Resources Manager's response, then the employee must appeal to the Executive Director in writing within five (5) days of receiving the Human Resources Manager's response or of the last day for the Human Resources Manager to respond. If the employee fails to communicate dissatisfaction within five (5) working days, then BCHC shall consider the matter settled and closed and no further appeal by the employee will be considered.

The Human Resources Manager forwards all documentation to the Executive Director. The Executive Director must respond in writing to the third step appeal within five (5) working days of the filing of the appeal. The Executive Director reviews the grievance and makes a thorough investigation of the circumstances. Upon reaching a decision, the Executive Director meets with the supervisor and Human Resources Manager to review the decision. He/she then meets with the supervisor, Human Resources Manager and employee to review the decision. Immediately following the meeting, the Executive Director documents the decision and forwards the documentation to the Human Resources Manager. The Human Resources Manager sends copies of the decision to the employee and supervisor. The original response is filed in the employee's personnel record. The Executive Director has the final decision on a grievance appeal.

XIV.                              OTHER POLICIES

14.01        Dress Code:

BCHC is perceived as a professional institution for the provision of health care in the

Revised: 4/00

Case 1:01-cv-00104   Document 18   Filed in TXSD on 02/26/2002   Page 37 of 159

AUG 11 '00 05:04PM B'VILLE COMM. HEALTH   411-1 E6396

UI Support & Customer Service
TEXAS WORKFORCE COMMISSIO.
BOX 2211
MC ALLEN TX 78502-2211

K-8-14-00

## NOTICE OF APPLICATION FOR UNEMPLOYMENT BENEFITS
### Date Mailed: August 8, 2000

BROWNVILLE COMMUNITY HEALTH
CLINIC CORPORATION
2137 E 22ND ST
BROWNSVILLE TX 78521-2908

K-Determination
8-30-00 M

RECEIVED
AUG 1 1 2000
MCALLEN TELE-CENTER

Account Number: 01-748763-9
Name: PAUL C KAVANAUGH
Social Security Number: 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
All dates are shown in
month-day-year order.

**IMPORTANT**

**Protect your interests! Fax or have your response postmarked on or before 08-22-00.**

The person named above filed an application for unemployment benefits naming you and/or your organization as the last place worked before filing. State law requires we notify you of this action. If you are an employer covered by the Texas Unemployment Compensation Act, the decision TWC renders on this application could affect the amount of taxes or reimbursements you pay.

**How Do You Protect Your Appeal Rights?**

**What Do You Need To Do?**

To receive a copy of any determination TWC makes and to protect your right to appeal, answer the questions on the reverse of this page and respond on or before **08-22-00**. Mail a copy of this notice and any attachments to the Texas Workforce Commission address located in the upper left hand corner or FAX it to (956) 984-4701. When faxing, be sure to include both sides of the page. If you have any questions, please call (956) 984-4700 or (800) 819-9488

TWC will mail a copy of the decision to the address above unless you indicate an address change or correction below.

**Address Change:**

| Name: | |
|---|---|
| Address: | |
| Address: | |
| City, ST, Zip Code: | |

**Please Note:** We may allow the person an opportunity to respond in a fact finding interview, if the information you submitted does not agree with his/her initial statement. If you want to participate during the initial interview, please indicate so in your response. TWC will notify you of the time and date of the interview.

The person gave the following statement when he/she filed the application for unemployment benefits.

**REASON NO LONGER EMPLOYED**

FIRED
I WAS FIRED BY PAULA S GOMEZ, DIRECTOR, BECAUSE OF INSUBORDINATION.

## PLEASE ANSWER ALL QUESTIONS ON REVERSE

BD6102 2/11/99

**EXHIBIT**
**A-2**

Case No.: I
Claim ID : 08-06-2000
Claim Date: 08-06-00
Entity ID.:

FOR HEARING IMPAIRED CL
Relay Texas TDD No.:   1-800



| 08/07/2000 | 04:22 PM | ' | FIRED | Claimant | No | No | 1 / 2 |
|---|---|---|---|---|---|---|---|
| 08/28/2000 | 02:34 PM | | FIRED | Claimant | Yes | Yes | 2 / 2 |

Statement :1 / 2
Statements From:  PAUL C KAVANAUGH
What was reason for separation from work?
I WAS FIRED BY PAULA S GOMEZ, DIREC
TOR, BECAUSE OF INSUBORDINATION.
What was reason given to claimant?
SHE TOLD ME THAT I DID ATTEND A MEETING SH
E SCHEDULED WITH HER.
Name and title of person discharging claimant.
SAME AS ABOVE
When/how discharged?
072700, SHE GAVE A LETTER OF TERMINATION AND THAT WAS IT
.
Exactly what happened?
SUPPOSINGLY A MEETING WAS SET UP BUT I DID NOT KNOW AB
OUT IT OR IF ANY WAS SET UP THAT IS WHY I AM FIGHTING WITH THE BOARD OF DIREC
TORS.
Refuse to work as instructed?
N
If no, explain.
I DID MY BEST.
What exactly was said?
THAT I MISSED A MEETING WITH MS. GOMEZ.
Tone of voice?
VERY FLAT.
Struck supervisor/employer?
N
Proof relating to the accusation/incident?
NO PROOF THAT ANY MEETING WAS SET
UP, THERE IS A MEMO FROM THE EXECUTIVE DIRECTOR SHOWING I HAD A MEETING WITH
If yes, explain.
** MY STAFF AT THE TIME THIS MEETING WAS SUPPOSE TO HAVE HAP
PENED.
Time lapse between incident and discharge?
Y
If yes, explain.
ONE OR TWO DAYS.

_____END_____



# B. ɔwnsville Community .health Center

2137 E. 22nd St. • Brownsville, Texas 78521 • (956) 548-7400 • Fax (956) 546-2056

September 5, 2000

Paul C. Kavanaugh, Ph.D.
3744 Boca Chica, #100 D
Brownsville, Texas  78521

Dear Mr  Kavanaugh:

Please allow this to serve as a response to your recent inquiry regarding your termination on July 27, 2000 by Brownsville Community Health Center.

As you know we allowed you an opportunity to present your arguments and discussion regarding your termination and why you felt same was not appropriate.  The Board felt somewhat uncomfortable in providing such an opportunity, as the Board believes in following the bylaws and protocols established for the Board.  As you were told at the meeting, the decisions regarding the employment or termination of BCHC employees is left to the exclusive jurisdiction and discretion of the Executive Director.  As such the Board cannot circumvent the bylaws by allowing you or any other employee to present such situations to the Board.  The board wishes to establish no precedent contrary to the above.

However, the Board does have authority to scrutinize and observe the actions of the Executive Director.  It us under this directive that the Board determined it was appropriate to allow your presentation in order to determine whether Ms. Gomez had properly discharged her duties by investigating the situation thoroughly before taking action.

After reviewing all the information available to the Board, the Board unanimously feels the actions taken by Ms. Gomez were proper and within her authority.  Her procedures were well within the boundaries of her duties.  The Board noted that she took additional steps to remedy the situation without terminating your employment by offering courses, at no expense, to you that could possibly resolve the problem.  She even offered the possibilities of a different employment position.  The attempts were futile.

Based on the above, the Board stands behind the decision of Ms. Gomez, and  wishes you great success in your future endeavors

Sincerely,

*Juan Jóse Martinez*

Juan Jóse Martinez, Ph.D., J.D., L.C.D.C
BCHC Board Chairman

*AN EQUAL OPPORTUNITY EMPLOYER*

EXHIBIT
A-3

To: The Brownsville Community Health Center Board of Directors

From: Paul C. Kavanaugh, Ph.D. *Paul C. Kavanaugh*

Re: Wrongful Termination from employment at BCHC

Date: July 31, 2000

---

### Introduction

In order to come to a mutually acceptable agreement and to minimize any damage to the image of the Brownsville Community Health Center (BCHC) or quality of care that BCHC renders to its patients I offer my response to what I consider my wrongful termination from my position as director of Youth Services.

I enclose a copy of the letter of termination given to me by the Executive Director (ED) of BCHC so that you may follow my line by line response. This response is written without the aid of legal counsel. I assure you that, only as a last resort, will I obtain legal counsel. The Brownsville Community Health Center is an extremely important institution in the Brownsville community. My sincere and deep hope is that this current disagreeable situation will result in a stronger and more viable community health center.

### The ED addresses me as the "CCC Project Director" in the letter of termination.

- My official title is "Director, Youth Services".
- I question why the ED would not use my correct title when engaging in such an important act as dismissing me.

### In the first sentence of the letter the ED writes " In order to be fair to you...".

- According to my version of Webster's New Collegiate Dictionary the definition of the word "fair" is the following:
    1) "marked by impartiality and honesty: free from self-interest, prejudice or favoritism".
    2) "conforming with the established rules"


EXHIBIT
A-4

1

3) "fair implies an elimination of personal feelings"

- In the course of this response I will demonstrate that my wrongful termination
    1) was not impartial,
    2) it did not conform to the established rules for terminating a BCHC employee, and
    3) it was based on an excess of personal feelings.

<u>In the second sentence of the letter the ED states that "I have taken a long, hard look at your overall job performance,"</u>

- The ED uses the pronoun "I" in the second sentence of the letter. According to BCHC Board of Directors' approved policies (which the ED signed) the manual clearly states that "the job performance of each employee of BCHC shall be evaluated annually by the employee's immediate supervisor" (p.16). The ED is <u>not</u> my immediate supervisor. Because the letter comes only from the ED and is only signed by the ED I must assume that she is solely responsible for the contents of the letter. That is a clear and direct violation of your and BCHC's policies.

- The ED came unannounced into my office at Corporate Plaza on Tuesday, July 25 of last week and said that she would be "taking action (against me)". The letter of termination is dated for July 26. In my mind, one day of consideration does not constitute a long, hard look at anything.

- The BCHC personnel manual further states on page 16 that "The appraisal should be the supervisor's observation and judgment of the employee's actual job performance based on the written requirements of the job description". There was no reference in the ED's letter to the requirements of my job description. Since she did not address me in this letter according to my correct title I can only assume that she did not familiarize herself with the requirements of my job description.

- The ED writes that she looked at my "overall job performance". However, she did not supply me with a completed copy of the Employee Effectiveness Report (EER) she used to evaluate my overall performance. On the BCHC Employee Effectiveness Report it states that "The EER is the official mechanism for reporting an employee's performance, and is a critical part of the personnel

2

system". This step in the job performance process was completely ignored and is thus a violation of BCHC policies and procedures.

- According to the BCHC policies and procedures (p. 17) it states that "A performance evaluation will be completed within 30 days of the employee's anniversary date". I was scheduled to receive a performance evaluation on October 9, 2000 (since my anniversary date is November 9). The fact that I received this performance evaluation at the end of July is an additional violation of BCHC policies and procedures. I wonder why the ED was so anxious to terminate me. Was there self-interest involved? Did she work out some arrangement with the BISD director of health services or the BISD board of trustees? I have talked to senior management team members as well as members of the BCHC board of directors and everyone I talked to from BCHC was surprised by my termination. I do not have any answer to my rhetorical question but I am suspicious that something more than my job performance ultimately caused my termination.

<u>In the fourth sentence of the termination letter the ED states that "You (meaning me) responded successfully to the Title V audit".</u>

- When I became the Director of Youth Services, not just me, but the entire Campus Care Center staff was faced with the daunting prospect of responding to more than 50 citations of the Campus Care Center project by the quality assurance auditors from the Texas Department of Health office in Harlingen. Obviously, this very negative audit put at risk the Title V funds ($110,000) that the Campus Care Centers so desperately needed in order to operate. Because I was so new to the Campus Care Centers I mostly delegated and coordinated the response to the TDH auditors' concerns. I also approved reducing some clinic time so that CCC staff would have the time and energy to work on the response to TDH. My best recollection is that I simply wrote up what the staff had done. My memory is that Maria Castillo, Doricela Moody and Lisa Mitchell-Bennett put forth the most energy and effort to complete the response. In other words, it was not my response, but the entire staff's response to TDH. I was pleased when Ms. Cecilia Garza from TDH informed the CCC staff that she was indeed surprised that we had responded successfully to each and every one of the citations noted in the previous audit. I was obviously very impressed by how the CCC staff had worked so well together on such a critical project.

3

<u>In the fifth sentence of the termination letter the ED states that "You (meaning me) completed the task of getting the Lucio building constructed".</u>

- At one of my first meetings with the Campus Care Center staff I asked them what they considered to be my most important task. They were unanimous in telling me that the construction of the Lucio Campus Care Center was my most important task. We were at risk of losing $35,000 from the Texas Department of Health (TDH) because the money appropriated to the Campus Care Centers had not been spent.

  I met with Oscar Tapia (BISD director of facilities and maintenance) on numerous occasions to work out the arrangements for the transport of a BISD portable building to the place on the El Jardin campus where it would serve as the Lucio Campus Care Center. Because BISD was not willing to aid the project I became the liaison with Central Power and Light, the Cameron County building inspectors, and the utility company that managed the water supply and treatment of waste water. I communicated with numerous individuals, and regulators so that the Lucio building would comply with all county building codes. As the BCHC ED acknowledged all of these meetings concluded successfully.

  Working closely with Chayo and Enrique in the Finance Department we successfully convinced TDH to let us use the money in a fiscal year for which it was not appropriated.

  After we received notice that we could still use the money for constructing a new facility for the Campus Care Centers I worked closely with Enrique to make sure that we bid out the proposal according to all of the BCHC policies and procedures.

  I worked closely with the Campus Care Center staff at Lucio to make sure to design a facility that would accommodate their needs.

  The employee restroom is an example of a modification that the staff convinced me to add in the design.

  Windows that could open and let in fresh air were also added.

  Burglar bars over the windows and doors, an electronic security system and speed humps were added so that the facility was as safe and secure as it could be.

4

Afterwards the staff asked to have a fan put in the employee bathroom and we did it.

When the staff complained that the exam rooms were not soundproof enough I employed a contractor to improve the sound proofing.

When Rachel Eason complained that the ramp was slippery when wet I employed a contractor to put non-slip tape on the ramp.

I also informed the Lucio staff that they could decorate their work areas any way that they wanted before the building was finished. I told them that the inside would be painted white if they did not have suggestions for decorations.

I planted flowers to make the building an attractive place to work and to seek health care.

I worked closely with the BCHC MIS manager, Oscar Salinas to make sure that the building was wired appropriately for all of the necessary computers, telephones, etc.

I received a lot of important information from Nick Mitchell-Bennett regarding the construction of the building since I had never been responsible for a construction project before. He told me that I should make a sincere effort to hire a Historically Underutilized Business (HUB). He gave me the names of six HUBs and I notified each of them that the RFP for the Lucio building would be going out.

Eventually, Esteban Garza ( a HUB) submitted the low bid and renovated the portable building that BISD had donated to the Campus Care Centers.

Finally, I worked very closely with the purchasing coordinator, the finance department, the director of clinical operations and a number of other BCHC supervisors and providers to make sure that we spent the excess program income from the Lucio Campus Care Center in the most fiscally responsible manner possible. I spoke with numerous individuals throughout the BCHC organization for ideas on what we should do. By Chayo's calculations we spent more than $40,000 on medical and office equipment so that when the Lucio CCC was open for business it was fully equipped and operational (except for the telephone system). All told we spent more than $80,000 to build and equip a Campus Care Center which was originally budgeted for $35,000. The miracle is that all of this was done without money from either BISD or BCHC. The entire project was financed by TDH and program income from the TDH Lucio grant.

I was the motivating force behind the project but literally dozens of people contributed significantly to the completion of the project. Successful and persistent communication with extremely diverse groups of people (contractors, county inspectors, CCC staff, BCHC supervisors) allowed me to be successful.
<u>In sentence number 6 the ED writes that "You (meaning me) secured the funding from HRSA for mental health and dental services through Healthy Schools/Healthy Communities".</u>

To make sure that there is no misunderstanding the grant that I wrote came through the Healthy Schools/Healthy Communities program and is administered by personnel from the Bureau of Primary Health Care (BPHC) which is in the Health Resources Services Administration (HRSA)

I wrote the grant but I could not have written the grant without the invaluable assistance of the ED. In a two hour interview the BCHC ED gave me a great deal of information without which I would not have been able to write a solid program narrative.

In addition, much of the grant was based on hours of informal interviews that I completed with BISD school nurses. I asked them what they would most like the Campus Care Centers to offer and they said mental and dental services.

Finally, this grant would not have been completed if not for the encouragement of the BCHC ED. This, however, is the first time that the ED has informed me in writing that she is pleased that we received the grant.

When she first informed me, Emily Alpert and Enrique Garcia that we had gotten the grant she said "We have a problem - we've gotten this money and we need to decide how we are going to spend it." She made it sound like it was a bad thing that we had gotten it.

In spite of the fact that BCHC has no policy that indicates a flow chart for hiring new personnel and there is no policy for hiring contract employees I went about the task of putting together the mental and dental programs that we had proposed to the Bureau of Primary Health Care. (As a result of this grant the BCHC lawyer developed a new and more comprehensive contract for "Contract" employees.)

6

I recruited, interviewed, and hired Dr. Gloria Kury almost exclusively on the recommendation of the Director of Health Services, Ms. Ana Milan and her credentials.

I hired James Hamel based on the recommendation of Dr. Kury and his credentials.

I hired Candase Paz based on the recommendation of Delma Sanchez and her experience as a volunteer at BCHC.

I hired Steven Grant based on the recommendation of Dr. Kury and his credentials.

The dental program that currently exists is the result of innumerable conversations with Dr. Gordon, Dr. Howell and Dr. Luquis.

I hired Barbara Magallenes as a result of her fine reputation with the school district and I hired Johnny Flores on the recommendation of Barbara Magallanes and his credentials.

The point I am making is that I did not hire these contracted employees without the input of other people. In fact, the hiring process was quite collegial involving many peoples' opinions.

The Healthy Schools/Healthy Communities grant has required that I develop two new programs for the Campus Care Centers simultaneously. This program development required that I have advanced organizational design skills and that I interact intensively with a broad array of groups within the Brownsville Community.

As a result of these new programs the Campus Care Centers provide the most comprehensive array of health services to children in Cameron County.

In the last couple of months we have learned two additional pieces of information. The Healthy Schools/Healthy Communities (HSHC) grant is not just for mental and dental health. The project chief, Laverne Green, has informed us in writing that the funds ($200,000 a year) can be used for comprehensive school based health services. That means that we can pay social workers and medical providers out of these funds.

Finally, our JCAHO advisor, Barbara Garrison told us that these monies would most likely become part of the base funding of the Brownsville Community Health Center. As it stands the HSHC grant money is the largest award that the Campus Care Centers have

7

received ($566,000 over three years). But , over a period of years this grant could reach into a million dollars or more. In other words, this grant has the possibility of providing the financial stability that the Campus Care Centers so desperately need. Finally, you should know that only 75 of the 1200 school based health centers in the country are supported by the HSHC program.

**In sentence number 8 of the termination letter the ED states that "You (meaning me) successfully passed the PCER conducted by HRSA contractors".**

I need to emphasize that it was not "I" that passed the PCER audit. It was a total team effort that involved both Campus Care and BCHC staffs. I was merely the quarterback coordinating the plays, delegating the work and organizing the strategies.

- I am extremely beholden to all of the work that Enrique Garcia and Hilda Gonzalez did to ensure that we were viewed positively by the auditors. I would never have anticipated that Enrique and Hilda would have spent so much time with the auditors.
- I worked almost every day with Tita Lopez to make sure providers' credentials were in order.
- Again, Maria Castillo and Doricela Moody along with Erika Garcia did an outstanding job of ensuring that all of our policy and procedure manuals were in order for the audit.
- Emily Alpert contracted with Barbara Garrison who provided invaluable information on what we needed to do to make sure that our facilities passed inspection.
- Rosalva Escorza and Ricardo Salas (while Clara Salazar was on maternity leave) worked tirelessly to make sure that all three of the Campus Care Center labs were spotless and totally organized according to specifications.
- Dr. Imperial gladly filled in for Dr. Ali (the CCC medical director) while he was in Houston undergoing surgery.
- The CCC social workers and myself were able to arrange for 6 parents of CCC student patients to come and be interviewed by the auditors. This was one of the highlights of the PCER audit.

Other accomplishments that I am proud of while I was the Director of Youth Services that the ED either did not know about or has refused to acknowledge are:

- The Campus Care Centers were recently acknowledged as a recipient of the Safe Passage Award 2000 by the National Assembly on School Based Health Care as a model of excellence for school based health care. It was one of two school based health centers from more than 1000 in the country to receive this most prestigious award. The ED was extremely resistant to allowing me to go to Detroit to receive this award. Only after receiving a letter from Laverne Green did the ED capitulate and allow me to travel to receive the award.

- Campus Care Center finances were totally integrated into the BCHC finance department thus allowing the Director of Youth Services to put his efforts into running the Campus Care Centers.

- Delma Sanchez, the BCHC social services supervisor was named the immediate supervisor of the Campus Care Center social workers. The Campus Care Center social workers were thus integrated into BCHC.

- Dr. Ali, a BCHC pediatrician, was named the medical director of the Campus Care Centers, thus becoming the immediate medical supervisor of the Campus Care Center mid-level providers thus integrating them into BCHC.

- There is a member of the Campus Care Center staff person on each of the BCHC Continuous Quality Improvement sub-committees thus integrating the Quality Assurance program with that of BCHC; another example of the increasing integration of the Campus Care Centers into BCHC.

- During the month of July, 2000 many Campus Care Center personnel oriented and worked at the main clinic at BCHC (ie.CCC administrative and social service personnel). The supervisor of the BCHC front desk and the BCHC supervisor of social services supervised the CCC personnel assigned to BCHC during this time. The BCHC front desk supervisor has been given the duty of developing the templates so that CCC personnel can put patient appointments on the computer. The BCHC MIS manager, the BCHC billing supervisor and the BCHC purchasing clerk are responsible

for purchasing and installing the printers at the Lucio and Lopez Campus Care Centers. These activities will allow the Campus Care Center administrative activities to be much more integrated with those of BCHC.

All of the above activities aimed at integrating the Campus Care Centers more fully into the Brownsville Community Health Center has required that I communicate consistently both verbally and in writing with a number of members from the BCHC senior management team. By the results of the integrative activities I would say that my communication has been successful.

- The members of the Community Advisory Board (CAB) are finally taking a more active role proposing that BISD add the Campus Care Centers as a line item to the BISD budget.

- The CAB has also developed a new memorandum of understanding (MOU) for the collaboration between BISD and BCHC. I have argued for almost two years that the lack of an up-to-date MOU has been one of the principle causes of the communication problems between the two collaborating agencies.

- A Campus Care Center billing coordinator was named (Marisa De La Fuente). She is working directly under the BCHC billing and collections supervisor thus integrating the Campus Care Center billing and collections with those of BCHC.

- Regularly scheduled immunization clinics were established on Saturday mornings to address this most urgent need of the BISD and the families of Brownsville.

- When I became the Director of Youth Services the Campus Care Center at Clearwater was in a state of extreme disrepair. After much remodeling and renovation it is now a safe environment. A vast majority of the renovations were the result of suggestions made by the Campus Care Center staff themselves.

- The addition of mental health, dental health and substance abuse services has allowed the Campus Care Centers to be eligible for a greater array of funding than was previously possible. This has

10

enhanced the financial viability of the Campus Care Centers tremendously.

- I have maintained an excellent relationship with Campus Care Center funders including TDH personnel (including the TDH commissioner himself), the Bureau of Primary Health Care, the Robert Wood Johnson Foundation, and the Hogg Foundation.

- I have maintained an excellent relationship with the BISD school nurses, especially the three school nurses stationed at the schools where there are Campus Care Centers.

- I have maintained an excellent relationship with all of the members of the Campus Care Center Community Advisory Board with the exception of the BISD director of Health Services.

- As a result of my intense desire to be able to document the quality of health care delivery at the Campus Care Centers the Campus Care Centers are the only school based health centers in the country to be participating in both the Asthma and Depression Collaboratives sponsored by the Bureau of Primary Health Care. According to the CCC medical director our participation in these activities has already dramatically improved the treatment and management of care for asthmatic children. Our participation in these collaboratives again has required intense communication because everything is new. Dr. Ali has very enthusiastically taken a leadership role in the asthma collaborative and it has become very much of a team effort involving the CCC health education coordinator and the two mid-level providers.

- I wrote to the BPHC project officer, Susan Lumsden, when we were applying to be accepted into these collaboratives that engaging in quality improvement activities is essential if we are ever to be able to survive in a managed care environment. Again, I viewed the participation of the Campus Care Centers in these collaborative activities as a way to ensure financial viability in the future.

    In spite of the BCHC ED's resistance to the full and complete participation of the Campus Care Center personnel in these collaboratives we are continuing to participate as best as we can.

I assure you that this is only a partial list of my accomplishments. As I have more time to reflect on the past 21 months I am sure that I will think of additional accomplishments that I will be able to document in future communications with you. For the sake of brevity I will now respond to the rest of the letter.

<u>In the fourth paragraph on the first page of the letter of termination the ED writes, "... the problems that you have had communicating with *everyone* that you work for, with and supervise have compromised your job performance."</u>

Based on the evidence that I have presented in the first ten pages of my response it is clearly evident that I have not had problems communicating with *everyone* I have worked "for, with and supervise." I consider these comments by the ED to not only be inaccurate but slanderous.

It is true that Ms. Alpert scheduled me to attend a "communications workshop". When I questioned the quality of the course that she registered me in she told me to look for a course that I might want to participate in. I brought her information about a course in Dallas that was being sponsored by the American Society for Training and Development. She said that while it seemed to be a good choice from the description it was too expensive and that I should continue to look for something less expensive. When I was in the process of looking into other avenues "disciplinary action" was taken against me. One of the reasons for this disciplinary action was that I did not attend a "Communications workshop". I had every intention of attending a class as I had been instructed. However, I was not able to find a course that was mutually acceptable to both of us.

One of the requirements stated in the disciplinary action was that I attend such a course. Ms. Alpert enrolled me in such a course, sent me a memo to inform me that I was enrolled to attend a course on July 31 in McAllen. I was not able to attend that workshop because I was terminated last Thursday.

I have very much recognized and acknowledged the "communication problems" that I have experienced. I have asked both the ED and Ms. Alpert on numerous occasions to tell me what I could do to better communicate with the BISD director of health services. When communication was difficult between I and my staff I asked Ms. Alpert what I should be doing. She told me to put my communication with my staff in writing. She also told me to start inviting either the manager of human resources or herself

12

to Campus Care staff meetings. In addition, she asked that Campus Care staff meetings be scheduled at BCHC according to a regular schedule. I followed her suggestions explicitly. The medical coordinator started adding the Campus Care Center staff meetings to the memos that go out announcing the Wednesday morning meetings.

In the last sentence of the fourth paragraph the BCHC ED writes that "I can no longer excuse this behavior".

In the BCHC personnel and policy manual on page 32 it states "The Executive Director has delegated the initial authority to discipline employees to supervisors. In determining appropriate disciplinary actions, the supervisor considers the seriousness of the offense, and the employee's work record. Also, the supervisor is required to give the employee an opportunity to   present and explain his/her side of the case."

It is my belief that the BCHC ED subverted and undermined the legitimate authority of the Director of Clinical Operations in taking action against me. In addition I was terminated without being given the opportunity to tell my side of the story. In other words, I should have been given the opportunity to write this letter before I was terminated.

In the first two sentences of the fifth paragraph the ED writes that "Several staff and "both" providers who work at CCC have requested that they be transferred in to the clinic. Specifically they feel that they have been ignored and disrespected and communication with you results in misunderstandings."

I am confused by this statement. The ED implies that there are only  two providers at the Campus Care Centers. In fact, there are three medical providers, two social  service providers and there have been up to five mental  health providers. This makes me question whether the ED knows who all of the CCC providers are.
If there are two providers that want to work at the clinic they have not told their immediate supervisors (ie, Dr. Ali, Ms. Delma Sanchez or Ms. Emily Alpert) who in turn have not talked to me about their situation. In any case, if any BCHC employee that works at Campus Care Center is going directly to the ED without speaking to

13

their legitimate, immediate superiors they are violating the chain of command. If an employee refuses to speak with his/her supervisor about a complaint how can the supervisor reasonably be held responsible for the lack of communication that exists between the two parties?

I have to say that I am a bit shocked that, if there are indeed a number of BCHC employees that no longer want to work at the Campus Care Centers that they would not inform me. At no time has Dr. Ali, Ms. Sanchez or Ms. Alpert told me that a Campus Care Center medical provider, social service provider or mental health provider wanted to transfer to the BCHC main clinic.

In addition, none of the BCHC employees that I supervise has brought a grievance against me according to the grievance procedures outlined on pages 38 and 39 in the BCHC policy and procedure manual.

If Campus Care Center employees have made complaints against me they have done so outside the directives of the policies the BCHC board has established for such circumstances.

If the BCHC ED has listened to those complaints without instructing the employees to follow the grievance procedure established by the BCHC Board of Directors then her actions are in direct violation of your policies and procedures.

In the last sentence of the fifth paragraph the ED writes that, "you (meaning me) fail to maintain a relationship with your staff and communication is not consistent so confusion abounds."

If you look at the records of my mileage you will see that I am constantly traveling to the Campus Care Centers to speak with staff, pick up mail. etc.

I had a cell phone that the Campus Care Center staff can call me whenever they need to about whatever they want.

In addition, I have arranged for there to be electronic mail at each of the Campus Care Center sites so that CCC staff can write me a message if they need to.

There were regularly scheduled Campus Care Center meetings in which I asked all CCC staff to contribute to the agenda. Rarely if ever did I deny an item that the CCC staff presented for discussion.

14

I consistently informed the staff in memo form about changes in BCHC policies, upcoming meetings, etc.

When account #766 was unrestricted I paid for numerous continuing education experiences for the CCC staff.

I rarely denied requests for annual leave and I often encouraged CCC staff to take sick leave if I saw that they came to work sick. I believed that the CCC staff worked very hard and that they should be allowed to properly recover before returning to work. I explicitly told CCC employees not to return to work if they were not 100% well.

I paid for all of the food and drinks at a farewell party for Laura Showalter at the Palm Court when she was returning to school in Pennsylvania. The cost to me from my personal funds came to well over $100.

As a result of the evidence that I have presented I contend that I **did** maintain a relationship with my staff and my communication with them **was** consistent. Neither my relationship with them nor my communication with them was flawless but I was making continuing efforts to improve with them in both of these arenas.

It must be noted that the most inconsistent communication with the Campus Care Center staff that resulted in the most confusion came as a result of the ED's decision to announce to the staff in May of 2000 that the Campus Care Centers were going to be closed during the month of July and that all CCC staff were encouraged to take their annual leave at that time.

When the staff asked why the clinics were to be closed the ED stated that it was because CCC staff had not presented Title 1 bills in a timely and appropriate manner such that BISD would or could reimburse the Campus Care Centers for its services to the amount of more than $100,000.

The member of the CCC staff responsible for Title 1 billing afterwards wrote a scathing letter to me saying that what the ED had told the staff was untrue.

In fact, after all of the Title 1 bills had been presented to the ED, it was clear that the Title 1 billing was done in an appropriate and timely manner.

15

I was quite concerned that the CCC employee in question had grounds to grieve the statement of the executive director. Unfortunately there is still no policy in the BCHC policy manual which outlines the steps for grievances against the ED.

You can imagine how distressed the Campus Care staff was when the ED informed them that they would be laid off in the month of July. One staff member was so distraught that she left the room crying.

Several days later, when the BCHC ED informed the BCHC board of directors and the senior management team members present at the BCHC board meeting that the Campus Care Centers <u>would remain open in July</u> I was absolutely shocked to the point of being speechless. <u>The ED's words to the BCHC board were exactly the opposite from what she told the CCC staff!</u>  Personally, I was outraged.

When the ED informed the CCC staff the next day that the Campus Care Centers would remain open in July the CCC staff was angered that they had been mislead and deceived in such an absolutely blatant and uncaring manner.
You can understand my dismay and disbelief when the ED informs me that MY lack of communication skills cause misunderstandings and confusion among my staff.

I believe that the manner in which the ED treated the CCC staff in this situation is an abuse of the people working for the organization that she supposedly directs.  I also believe that it has given the CCC staff grounds to present a grievance against the ED and BCHC. The behavior of the ED was indeed unethical if not absolutely illegal. As one BCHC physician told me, "You just don't treat people like that".  I agree completely.

In the last paragraph on the first page of the termination letter the ED defines what she means by communication; "a verbal, two-way interaction, not a flurry of memos".

Again, according to my dictionary, it says that the word "communication" means
"a verbal or written message ", and
"the technology of the transmission of information as by the printed word, telecommunication, or the computer".

According to publicly accepted notions of the meaning of communication it includes both written and spoken communication. The ED is citing me for not communicating according to her definition of what the word "communication" means. Her definition of the word "communication" does not conform to publicly accepted standards of the definition of the word "communication". Therefore the ED's critique of my use of written memos to communicate with my staff is clearly invalid.

In any case, I communicated consistently with my staff both verbally and in writing. As proof of my verbal communications with my staff simply check the phone logs of my cellular phone  to verify how many times I called the Campus Care Centers and received phone calls from the Campus Care Centers.

The first sentence at the top of the second page of the termination letter the ED writes, "... for your staff to feel that they cannot talk to you is unacceptable."
Please refer to the above paragraphs as proof that my staff was constantly communicating with me.

In the second sentence of the first paragraph on page 2 of the termination letter the ED writes:  " They feel and I agree that you treat them (the CCC staff) like children and you are 'the father' who knows what is best instead of having a collaborative relationship.



When the ED uses the pronoun "they" I have absolutely no idea who she is referring to --- all twenty BCHC employees that work for the Campus Care Centers-- particular individuals or maybe just one individual.

17

I would like to state for the record that I have had numerous conversations with the Director of Clinical Operations about how difficult it is to work with <u>some</u> employees because they are constantly acting immature, whining and complaining about every little thing.

The fact is that, overall, I have treated the staff as mature adults who are capable of thinking and acting independently from me. That is why I do not feel compelled to spend hour after hour looking over their shoulders. They work very independently and very well in most cases without direct supervision from me. Proof of this is the fact that I have only received two patient complaints out of thousands of patient visits in the last twenty one months. I do not worry that the CCC staff do not know how to do their jobs. I have told them on numerous occasions how impressed I am with how intelligent, competent and hard working they are.

What distressed me most at times was <u>some</u> staff members' inability to get along with one another. I have tried to help the CCC staff solve their interpersonal problems by bringing in a licensed professional counselor to work with them and do a communications workshop. I have encouraged at least two CCC staff to talk to the BCHC Human Resources manager. But I have told the CCC staff that I can't solve their interpersonal problems with one another. These actions that I have taken indicate that I am attempting to treat the CCC staff as adults capable of solving their own problems.

With regard to having a collaborative relationship with the CCC staff all I can say is that 90% of the accomplishments of the Campus Care Centers in the last 21 months occurred because of the collaboration that exists between staff and myself. I refer you back to the section of this response in which I describe the accomplishments due to extensive collaborative efforts between all members of the Campus Care Center team.

<u>In the fourth line of the first paragraph the ED writes, "What is most distressing is that you (meaning me) are in denial about this (communication) problem".</u>

After 14 years of marriage to the same person I can assure the board that I am absolutely not in denial about any limitations I may have in the area of communication. In any relationship, family, work, friendship, there are communication problems. The truth is that I have made a concerted effort to address the concerns about communication problems that BCHC administrators have brought to my attention.

18

There have been numerous communication problems throughout the Brownsville Community Health Center (that can be documented if necessary) as well as between BCHC and BISD. I do not feel that any communication problems I have had are worse than any others.

In fact, if communication really is the issue, I am aware of several meetings that the ED has had with the BISD director of health services, the BISD superintendent and members of the BISD board of trustees concerning the Campus Care Centers in which the Director of Youth Services (me) was not informed of the substance of the meetings.

I wonder why the ED would have all of these meetings concerning the Campus care Centers without inviting the person responsible for directing those three clinics.

In the second paragraph on the second page the ED lists a number of incidents that were part of the reason that I was subjected to "disciplinary probation".

According to a memo that I received from the Director of Clinical Operations on March 3, 2000 entitled "RE: Disciplinary Action" I was warned that "Further communications will result in *disciplinary probation.*"

However, I have never received written notice that I am on disciplinary probation. Therefore the ED's contention that I was placed on disciplinary probation for infractions I may have committed were mistaken at best and an attempt to intimidate me at worst.

If I had been placed on disciplinary probation on March 3 as the ED contends then according to BCHC policies I should have received a letter telling me that I had passed or failed the probation period.

I never received any such letter.

The end result, however, was that I responded positively to the suggestions for improvement that the Director of Clinical Operations made in written form.

Additional proof that I was not on disciplinary probation at the time that I was terminated is that according to BCHC's travel policy

19

employees on disciplinary probation are not allowed to travel at the expense of the corporation. On the travel request form I submitted to the Director of Clinical Operations for permission to travel to Detroit to pick up the Campus Care Center award at the National Assembly on School Based Health Care the form is checked to indicate that I am not on probation. The ED, the director of clinical operations and the finance director all signed the forms giving me permission to travel at BCHC expense between June 24 and June 27.

Now I will respond specifically to some of the incidents that the ED notes:

"The incident involving inappropriate threats made to the Lucio staff".

In fact I believe that any and all threats by a supervisor to a subordinate are inappropriate. Semantics aside the "threat" that the ED refers to is when I told the Lucio staff that I would deduct the cost of the paint from their salaries that they asked me to buy to paint their offices. I told the staff that I would buy whatever supplies they wanted if they decorated their offices themselves. They agreed to those terms and then they didn't do the work that they promised me they would do. I thought if they did something to make their work environment the way they wanted it they would take more ownership in the building. In any case, the Director of clinical operations told me that BCHC could not withhold employee funds without the permission of the employees and  funds were never withheld.   The Lucio staff ultimately used the supplies we had bought with CCC funds for them to decorate their offices and the exam rooms.

"The incident involving inappropriate comments made to Dori Moody"

While in Atlanta at a conference together in early February I made what I thought was a joke with Ms. Dori Moody regarding her request for a salary increase that my father had made to me on many occasions when I wanted an increase in allowance. I had heard the same joke in the East, the Midwest and the West. I assumed that everyone knew what the joke, based on a play on words, referred to.

Ms. Moody misinterpreted the joke that I had made and assumed it had derogatory connotations. The Director of Clinical Operations understood that what I had said to Ms. Moody was a joke.

20

She told me how Ms. Moody had interpreted the joke. When I understood how she had interpreted what I had said I immediately apologized. I could not have imagined that she would have taken what I said to mean what she thought.

"Lack of timely communication (monthly activity reports) to Ana Milan".

On March 11, 2000 the BCHC ED wrote a letter to Ms. Milan stating that ..."I can see that things may have started out with a need to send you information. However, this has not been the case for over a year."

I am confused. Have I been communicating well with Ms. Milan or have I not been communicating well with Ms. Milan? The ED has given me two different answers to the same question.

"Comments made to the Brownsville Herald without clearance from BISD"

At the time that I wrote the letter to the editor that the ED is referring to I had never been told by the district that I was supposed to pass everything to the media through Drue Brown. Since that incident I have always complied with Ms. Milan's request.

I would like to inform the board that this is the first time the ED has reprimanded me for this incident. When the article came out both the ED and the Director of Clinical Operations said they thought it was a great article. Even Ms. Milan said in her letter to me that she agreed with the content of the letter. She told me that what she didn't like was that it did not receive approval from BISD public relations.

"Incident involving miscommunication with Dr. Gloria Kury"

The important point here is that BCHC has no policies covering the rights and privileges of "Contract" personnel. When Dr. Kury asked me if she could give a presentation in Portland at the beginning of May I said yes. However, she never filled out any travel request forms or expense report estimates. She had received a BCHC personnel manual and knew that she was responsible for the information contained therein.

21

Dr. Kury is not a full time permanent employee of BCHC. She works on a contract basis. She is not eligible for any benefits other than her salary.

When I told her that I would not be paying her for the time in which she was present during the conference because the conference did not contribute to patient care she became upset and said that I had been dishonest and misleading with her. She appealed the decision to the Director of Clinical Operations who reversed my decision (which is her prerogative).

Again, this is the first time that the ED has reprimanded me for this incident in writing.

I felt that Dr. Kury abused her permission to go to the conference in Portland when she decided to take several extra days after the conference was over to visit either friends or relatives in Portland. By staying those extra days in Portland she not only neglected her responsibilities to her patients. She missed the PCER visit of the two federal auditors in May. I felt that it was a gross neglect of duties for her not to be present during such an important activity that was meant to audit the grant out of which she was being paid.

## Failure to communicate with James Hamel

I am assuming that the ED is referring to the grant that Mr. Hamel submitted to the Lower Rio Grande Valley Development Council(LRGVDC).

Mr. Hamel had developed a proposal for funding that we both decided could be submitted to the LRGVDC. We visited the office of the LRGVDC together to become familiar with the people working there. We received an orientation to their grant submission process and funding sources and returned home.

Mr. Hamel submitted the proposal by mail after adjusting it to meet the LRGVDC criteria.

He also attended the first round of hearings and presented the proposal to a review panel by himself. We were told that we would be advised when the second hearing would be.

22

I then went to visit my mother in a nursing home in New York. When I returned I was going through my mail when I noticed a letter from the LRGVDC. I was shocked to learn that the second hearing was scheduled that same day and at the same hour that the ED and the Director of Clinical Operations had requested to see me about disciplinary matters. I immediately was able to get hold of Mr. Hamel by telephone. I explained the situation to him and he went to present the proposal to the review panel. Unfortunately, he was not able to stay at the hearing in Harlingen long enough to present the proposal because he needed to pick up his son from day care.

The end result was that our proposal was not considered by the LRGVDC for funding.

### "Lack of information to the mental health personnel"

I cannot respond to this comment because I do not know what it refers to.

### "Failure to admit responsibility involving lack of payments for Saturdays for Rachel"

The BCHC payroll clerk at Corporate Plaza was the person that brought to my attention in the early part of this calendar year that the ED had signed a separate contract with Maria Castillo for her work during the one Saturday a month that she worked at Clearwater. The contract that the ED and Ms. Castillo signed was not a BCHC attorney approved contract but it was a contract nonetheless. But it was a contract that I was not aware of until the BCHC payroll clerk brought it to my attention.

It was I that brought it to the attention of Ms. Eason and the ED that we needed to compensate Ms. Eason for her work on Saturdays as well.

Thus the underlined statement that the ED made in my letter of termination is blatantly false.

### The ED states at the beginning of the third paragraph that "This is only a partial list of documented problems".

In a matter as important as a dismissal why would the ED representing the corporation not present me with all of the charges and accusations against me. Is it because she does not know what all of the charges are or should be?

23

Again, I believe that this "partial" explanation for my termination admitted by the ED herself demonstrates that the ED was working under some clandestine agreed upon timeline for terminating me. If this letter of termination had been well thought out it would have included all of the criticisms which eventually led up to my termination.

In the third paragraph, second sentence of the second page of the letter of termination the ED writes that "Ms. Alpert or I must always be present to make sure that there are no major misstatements that will result in our having to correct the situation."

This is absolutely untrue. At several recent CCC staff meetings neither the ED or Ms. Alpert have been present and they have gone very well.

In the last sentence of the third paragraph of the second page the ED writes that "Either way we must do your job as well as ours".

After I was terminated last Thursday I wrote a list of approximately 50 items that were pending for me to do regarding the Campus Care Centers. I talked with Ms. Alpert about the list. That evening I received a call from Lisa Mitchell-Bennett. She told me that she had been given the list to work on. Therefore it is evident that neither the ED nor the Director of Clinical Operations are obliged to do my work. Over the past weekend I thought of 15 more activities pending so I met with Ms. Mitchell-Bennett to discuss them.

I was very disturbed that Ms. Mitchell-Bennett told me that she had been offered the position that I myself had occupied through Thursday of last week. It is a violation of BCHC policies and procedures to offer a position to an individual without advertising and interviewing for any position. This is also a violation of numerous equal employment opportunity laws and regulations.

In the first sentence of the fourth paragraph on the second page of the termination letter the ED writes that "most of your (meaning my) successes have involved extensive writing".

I disagree completely with this perception. I believe most of "my" successes are the result of excellent organizational development skills, trust in my staff to do the work that needs to get done,

24

presenting a vision for what the Campus Care Centers could be and providing leadership in the face of real resistance to change.

I refer to the accomplishments that I stated at the beginning of this documentation as proof of what I believe to be the real truth in this case.

<u>In the second line of the fourth paragraph on the second page the ED writes " I offered to transfer you into the grant writer/resource developer position".</u>

In fact the BCHC board of directors has not approved a grant writer/resource developer position at this point in time. There is no job description for the position which the ED refers to and most importantly the ED never told me what the salary for such a position would be if such a position were approved by the BCHC board.

Most importantly, it is a violation of EEOC rules and regulations to give preferential treatment to any individual regarding employment. BCHC had not advertised the position that the ED offered to me. Nor had the board developed the criteria or qualifications for such a position. The senior management team never discussed in concrete terms the creation of such a position. To develop a position for a particular individual is a gross violation of all employment laws in the public sector. If I did accept such a position it would have put at risk the liability of the entire BCHC Corporation.

I did not respond to the ED regarding her offer of the grant writer position because I thought that she was going to get approval from the senior management team to propose it to the BCHC board for their approval at which point the senior management team could develop the criteria for the position and BCHC could advertise and interview for the position so that there would be no perception of impropriety or favoritism.

Has anyone on the BCHC board ever accepted a position without knowing what the job required or what the salary for the position would be? That is the situation the ED put me in. My failure to get back to the ED about this proposal was not an instance of miscommunication. It was my effort to protect the corporation from violating federal laws and regulations to which the corporation is subject.

<u>In the second sentence of the last paragraph on the second page of the letter of termination the ED says that I am "the proverbial bull in the china closet".</u>

I have not the slightest idea what the ED means when she makes this comment. Does she mean to say that I have a total disregard for the policies and procedures established by the Board of directors of the BCHC? If so, I find that statement incongruous given the number of violations of procedures the ED herself has committed in order to justify my termination.

<u>In the third line of the last paragraph on the second page the ED says that my "methodology lacks acceptable business practices".</u>

What acceptable business practices is the ED referring to?

In the time that I have overseen the Campus Care Center project,
- the facilities of the clinics have expanded,
- the number of providers has expanded,
- the hours when the clinics are open have expanded,
- the array of services offered through the Campus Care Centers has expanded,
- the funding of the Campus Care Centers has expanded and
- the quality of services provided through the Campus Care Centers have improved.

How could my "lack of acceptable business practices" have resulted in such tremendous achievements for the Campus Care Centers and the Brownsville Community Health Center?

26

<u>The ED further states that my "methodology" "results in too many
casualties along the way".</u>

I would contend that the "methodologies" of the ED result in
many more casualties than my own.  In the 21 months that I have
directed the Campus Care Centers this is the turnover we have
experienced:

- Barbara Magallanes returned to the school district (contract)
  (With CCC less than two months)

- Johnny Flores did not have much time to devote to Campus
  Care (Contract)  (With CCC less than three months)

- Alma Barrera left to take a higher paying job (contract)
  (With CCC less than four months)

- James Hamel is resigning August 11 to take a position that
  would be better for his son of whom he is the principle
  caretaker (contract)     (With CCC less than 9 months)

- Monica Medina left to take a higher paying job (contract)
  (With CCC less than three months)

- Ricardo Salas left to return to school. (PRN) (With CCC
  approximately 1 and a half years)

- Doricela Moody left because of pressures she was feeling due to
  the loss of equipment she had been responsible for.
  (Permanent - full-time)  (With CCC for five years since the
  beginning of the project.)  Ms. Mitchell-Bennett has informed
  me that within the last week Ms. Moody has requested to be
  reinstated at her prvious position but that she was ineligible
  for re-hire because she did not give two weeks' notice when
  she resigned.

<u>In the first line of the first paragraph at the top of page three ED
says that "You (meaning me) have a difficult time with protocols and
authority".</u>

My response is that I have a great deal of difficulty with
protocols that do not exist because they have not been written and I
have many problems with people in authority that ignore the
protocols, policies and procedures that are written.

<u>FINALLY, I will respond to what the ED states in the last two
paragraphs of the letter of termination</u>

Two of the most important recommendations that the federal
auditors made during the Primary Care Effectiveness Review in May,
2000 was that

> 1) BCHC develop policies and procedures by which
> BCHC employees could express their grievances against
> the ED

> AND

> 2) that BCHC develop policies and procedures so that
> whenever a supervisor is engaged in a conversation with
> a subordinate concerning possible disciplinary action that
> a third party witness be present.

Neglecting the recommendations of the federal auditors BCHC
administrators have not developed the policies and procedures
necessary for those two areas of concern.

<u>In the first line of the second paragraph on the third page of
the letter of termination the ED says that "I was in your office before
lunch.."</u>
In this phrase the ED admits that she was alone with me.
She does not even infer that there was anyone in my office other
than she and myself.  As a result of this there was no witness
to the conversation that transpired between us!

The ED contends that she said "I want you to meet with myself
and Emily in my office in the morning at 8:00 A.M."

I contend that she said that she was going to post the grant
writer position as soon as possible, she was sorry to be losing my

28

talents as a writer and that she was sorry that I had forced her into taking action against me.

I do not recall responding in any manner to the threats of discipline that she would be carrying out toward me. Even the ED herself says that I did not verbally respond to what she said to me.

<u>What the ED does say is that "You (meaning me) acknowledged what I said by shaking your head".</u>

Since the ED does not have an expertise in non-verbal communication (that I know about) I seriously doubt what my shaking head meant if indeed it was shaking.

She does not mention whether I shook my head up and down or from side to side or whether I was shaking it in a circle.

Maybe my head was shaking because I was incredulous by what she was telling me.

Maybe my head was shaking because I was so incredibly angry by what she was telling me and I was trying to contain myself.

Since I was not able to observe myself during the conversation and there was no other person in my office at the time I do not even know if I shook my head at all. If I did I do not recall what the shaking meant if it meant anything at all.

I am absolutely positive that I could not have agreed to meet with the ED on Wednesday, July 26 at 8:00 AM. That is because I desperately needed to meet with the Campus Care Center staff regarding the August, 2000 Campus Care schedule.

I sent a memo to the CCC staff on July, 17 and I sent copies of the memo to Emily Alpert, Tita Lopez and Hilda Gonzalez.

On July 19 the ED herself and the medical director signed a memo sent out by the medical coordinator clearly stating that the CCC staff would be meeting on Wednesday, July 26 at 8:00 AM.

This meeting between myself and the CCC staff was so urgent that I sent out a reminder memo on the 25th of July

I have included copies of those three memos as part of this package that I am sending to you.

29

**The ED states that I did not let her know where I was on
Wednesday morning at 8:00 AM.**

In fact, her own memo to BCHC providers and staff on July 19
instructs me where to be.

According to my dictionary the word "insubordination" means
"Unwilling to submit to authority".

In fact, I was submitting to authority when I attended the
Campus Care Center staff meeting that the ED and medical director
had scheduled.

Therefore, I was not insubordinate as the ED claims.
Consequently, my termination for insubordination is invalid and a
violation of my civil rights and my rights as a full-time permanent
employee.

I strongly believe that the Brownsville Community Health
Center Board of Directors, as the immediate supervisors of the BCHC
Executive director, is wholly responsible for compensatory and
punitive damages that I have suffered at the hands of an executive
director that has consistently and blatantly acted without regard for
the legal and ethical rights of the employees she supervises and the
policies and procedures of the organization that she is supposed to
lead..

In return for my public silence regarding these issues and
others which compromise the integrity of the Brownsville
Community Health Center I am requesting three things of the BCHC
board of directors:

1) That all paperwork implying that I was terminated for cause from
BCHC be expunged from all personal and personnel files within and
without the confines of the Brownsville Community Health Center.

2) That I be given a positive final performance evaluation by my
former immediate superior and that the ED write me a favorable
letter of reference for the accomplishments I and the Campus care
Centers achieved during my 21 month tenure.

3) That I be paid $10,000 dollars a month for 200 consecutive
months out of the general operating funds of the BCHC.

30

I assure you that this thirty page response contains just a portion of the grievances that I (and many others) have to bring against the Executive director of BCHC.

I have not even addressed the issue of the conspiracy which exists between at least two BCHC administrators to redirect funds meant to support the Campus Care Centers to other BCHC activities.

I will only address those issues with legal counsel.

I also want to remind you that it is a criminal offense to tamper with the computer files or e-mails on the computer of an employee that is challenging a termination from employment for cause.

I will be happy to speak with you about these and other issues at your convenience.

Because I have not been prompt in getting this response to you I will delay contacting legal counsel until next Tuesday, August 8 at 5:00 pm.


CC:   Ms. Paula Gomez
      Ms. Emily Alpert
      Ms. Hilda Gonzalez

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PAUL CAMERON KAVANAUGH,           §
    Plaintiff                              §
                            §
VS.                                §          CIVIL ACTION NO. B-01-104
                            §
BROWNSVILLE COMMUNITY HEALTH §
CLINIC CORPORATION, D/B/A          §          JURY TRIAL DEMANDED
BROWNSVILLE COMMUNITY HEALTH §
CENTER                             §
    Defendant                              §

## AFFIDAVIT OF RAYMOND A. COWLEY

STATE OF TEXAS          §
                   §
COUNTY OF HIDALGO       §

      BEFORE ME the undersigned party on this day personally appeared RAYMOND A.

COWLEY, being known to me on his oath deposed and said as follows:

      "My name is Raymond A. Cowley. I am over 18 years of age and have never been

convicted of a felony. I am the attorney in charge for Defendant in the above-captioned matter, and

I personally took the deposition of Plaintiff Paul Cameron Kavanaugh on December 19, 2001. I

therefore have personal knowledge of the facts stated herein, and those facts are true and correct.

      "The documents attached hereto and referred to collectively as Exhibit "B" are true and

correct copies of excerpted portions of the deposition taken of Paul Cameron Kavanaugh on

December 19, 2001 and the court reporter's certificate."

      Further affiant sayeth naught.

                                RAYMOND A. COWLEY

      SUBSCRIBED AND SWORN TO BEFORE ME on the 25th day of February,
2002, to certify which witness my hand and official seal.

                                Notary Public, State Of Texas

MARIA L. SALINAS
MY COMMISSION EXPIRES
November 25, 2003



EXHIBIT
B

1

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PAUL CAMERON KAVANAUGH       X
                             X
                             X
                             X
VS.                          X   CASE NO. B-01-104
                             X
                             X
BROWNSVILLE COMMUNITY HEALTH  X
CLINIC CORPORATION, D/B/A     X
BROWNSVILLE COMMUNITY HEALTH  X
CENTER                        X

---

ORAL AND VIDEOTAPED DEPOSITION OF
PAUL KAVANAUGH
DECEMBER 19, 2001

# ORIGINAL

---

      ORAL AND VIDEOTAPED DEPOSITION OF PAUL

KAVANAUGH, produced as a witness at the instance of the

DEFENDANT, taken in the above styled and numbered cause

on DECEMBER 19, 2001, reported by SHELLEY STINGLEY,

Certified Court Reporter No. 5725, in and for the State

of Texas, at the offices of Sanchez, Whittington,

Janis, & Zabarte, 100 North Expressway 83, Brownsville,

Texas, pursuant to the Texas Rules of Civil Procedure.

1          PAUL KAVANAUGH,

2    having been duly sworn, testified as follows:

3                    EXAMINATION

4    BY MR. COWLEY:

5        Q.  Tell us your name, please.

6        A.  Paul Cameron Kavanaugh.

7        Q.  Mr. Kavanaugh, my name is Raymond Cowley.  I'm

8    an attorney.  I represent the defendant in this

9    lawsuit, which is Brownsville Community Health Center.

10   Do you understand, sir, that I am not your attorney?

11       A.  Yes.

12       Q.  Are you represented here today by attorneys?

13       A.  Yes.

14       Q.  And they are seated to your right?

15       A.  That's correct.

16       Q.  All right.  Has anyone explained to you what

17   the process or procedure will be today?

18       A.  Yes.

19       Q.  Okay.  You understand that you have taken your

20   oath to tell the truth here today the same as in a

21   court of law?

22       A.  Yes.

23       Q.  You understand that the penalty for lying here

24   today would be the same as if you lied in court?

25       A.  Yes.

1    did terminate and so I can't say.

2        Q.   Did you remain at the college beyond the time

3    that you were paid?

4        A.   No, I was paid for all time served.

5        Q.   How did you then come to apply at the

6    Brownsville Community Health Center?

7        A.   I told Ms. Gomez that my employment at the

8    university was coming to an end and I would be looking

9    for other employment.

10       Q.   And what did Ms. Gomez say to you?

11       A.   She said that there was a position open at the

12   Brownsville Community Center -- Health Center that she

13   suggested I apply for.

14       Q.   Okay.  And I take it you did that?

15       A.   Yes.

16       Q.   Okay.  I'll show you what I'll mark as

17   Kavanaugh Exhibit No. 2.  It consists of five pages,

18   and will ask you, if you would, to look at it.

19            Have you had an opportunity to look at

20   Exhibit No. 2?

21       A.   Yes, I have.

22       Q.   Does that appear to be a true and correct copy

23   of the application for employment that you submitted?

24       A.   Yes.

25       Q.   Are there any portions of it that you feel like

10:57:36 1    hiring relatives?

10:57:37 2        A.   No.

10:57:37 3        Q.   Okay.  All right, have you told us now

10:57:43 4    everything that happened during the time of your

10:57:45 5    employment that you regarded as improper?

10:57:49 6        A.   There may be more things that I consider

10:57:52 7    improper that I can't think of right now.

10:57:54 8        Q.   Okay.  You have told us all you can think of?

10:57:59 9        A.   Right now.

10:57:59 10       Q.   All right.  Now, with regard to -- well, let me

10:58:10 11   ask you this:  Who did you complain to -- with regard

10:58:13 12   to any of the six things that you have discussed here

10:58:17 13   in this deposition today, did you complain of any of

10:58:23 14   these things during the period of your employment to

10:58:25 15   anyone outside of the Brownsville Community Health

10:58:30 16   Center?

10:58:41 17       A.   I did complain to TDH personnel in Harlingen.

10:58:47 18       Q.   Okay.  Did you complain to anyone else during

10:58:52 19   the time of your employment outside of the Brownsville

10:58:57 20   Community Health Center, apart from the Harlingen

10:58:58 21   office of TDH?

10:59:01 22       A.   No.

10:59:01 23       Q.   Okay.  And what specifically did you complain

10:59:04 24   to the Harlingen office of TDH about?

10:59:08 25       A.   The personnel at TDH told me that we should

apply for more Title V money, and I told that

individual that I didn't believe that we were using the

money that we had appropriately.

Q.   Who was the individual at TDH?

A.   Sister Mary Nicolas Vincelli.

Q.   Nicolas?

A.   Sister Mary --

Q.   I'm sorry.

A.   Sister Mary Nicolas Vincelli, V-I-N-C-E-L-L-I.

Q.   Sister Mary Nicolas --

A.   Nicolas.

Q.   -- Vincelli.  And your testimony is that this

person was employed by TDH in Harlingen?

A.   Yes.

Q.   Okay.  To make sure I understand, then, what

caused, if you know, Ms. Vincelli to be speaking to you

in the first place?

A.   I was turning in a quarterly or yearly report

on Title V money, so it was just a casual conversation.

Q.   Okay.  You were turning in a report.  Sister

Mary -- if I may refer to her as Sister Mary -- said to

you, "You need to apply for more Title V money"?

A.   Uh-huh.

Q.   Is that right?

A.   Uh-huh.

11:00:40 1      Q.   Is that yes?

11:00:41 2      A.   Yes.

11:00:41 3      Q.   And your response was, "I don't believe we are

11:00:44 4   spending the title money -- or money that we have

11:00:47 5   properly"?

11:00:47 6      A.   Right.

11:00:47 7      Q.   Okay.   Was it your expectation that Sister Mary

11:00:50 8   would do something about it?

11:00:51 9      A.   No.

11:00:53 10     Q.   Were you lodging that as some type of

11:00:55 11  complaint?

11:00:55 12     A.   I was lodging it as my frustration.

11:01:00 13     Q.   Okay.   You referred to the conversation as just

11:01:03 14  a casual conversation?

11:01:03 15     A.   Correct.

11:01:04 16     Q.   Okay.   What else did you say other than, "I

11:01:06 17  don't believe we're spending the money we have

11:01:07 18  properly"?

11:01:09 19     A.   Nothing.

11:01:09 20     Q.   Okay.   What did Sister Mary say in return to

11:01:12 21  you?

11:01:13 22     A.   Well, she said that the State was going to be

11:01:14 23  cutting back on its Title V money.

11:01:17 24     Q.   Okay.   So you weren't lodging any -- you

11:01:20 25  weren't asking that Sister Mary intercede on your

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956) 618-2366    (956) 428-0755    (956) 542-1020

1   behalf, were you?

2       A.   No.

3       Q.   You weren't asking Mary -- Sister Mary to cause

4   the Texas Department of Health to undertake any kind of

5   investigation, were you?

6       A.   No.

7       Q.   You were just expressing your frustration?

8       A.   Yes.

9       Q.   You didn't regard that as any type of complaint

10  of wrongdoing on behalf of the Brownsville Community

11  Health Center, did you?

12      A.   No.

13      Q.   Okay.  Was that -- the remark that you made to

14  Sister Mary was the only time during your employment

15  that you made any type of complaint outside of the

16  organization itself?

17      A.   Yes.

18      Q.   And that was the only matter that you

19  complained of?

20      A.   Right.

21      Q.   Okay.  Am I correct, then, that any other

22  complaint that you made outside of Brownsville

23  Community Health Center would have occurred after your

24  employment had terminated?

25      A.   It occurred after July 27th, correct, 2000.

Q.  Well, your employment terminated on July 27th, 2000.

A.  Well, the board reviewed my termination and gave a final ruling on September 5th.

Q.  Okay.

A.  But I was not paid after July 27th.

Q.  Well, we will get to that, Mr. Kavanaugh. We'll get to that topic in a little bit.  So you have told us now everything that you can recall sitting here at this deposition today that happened while you were employed that you regarded as improper?

A.  It's not everything that I consider improper, but it's everything I can recall --

Q.  Okay.

A.  -- to be improper at this time.

Q.  And that was my question.  And you have told us everyone to whom you complained about those matters; am I right?

A.  While I was employed, yes.

Q.  Okay.  Now I would like to ask a different question.  During the period of your employment -- I'm not asking everything that you regarded as improper that you have reported or complained of, but what happened to you?  What did the Brownsville Community Health Center do to you that you regarded as

unjustified or improper?  What action was taken against you in any form that you regarded as unjustified or improper?

A.  I believe that the policies and procedures of the clinic were applied to me in a discriminatory manner.

Q.  Okay.  Okay, what is the first thing that happened to you that you regarded as improper or unjustified?

A.  I was disciplined for, quote, miscommunication when there had been a lot of miscommunication going on in the clinic and people weren't being disciplined.

Q.  Okay.  When was it during your employment that you were first disciplined for miscommunication?

A.  Can I look at my personnel file?

Q.  Well, you can look at whatever documents you like.  I will show you a document that I will mark as Kavanaugh Exhibit No. 6.

MR. ZABARTE:  For the record, he's requesting to look at his entire personnel file so that he can give you a response to your question, so I can produce the copy of the personnel file which was given to us on -- which we attached to the exhibit from Mrs. Gomez.

MR. COWLEY:  Well, he can always take

Q.   Okay.   Now, in -- is it your position that the disciplinary action taken was unjustified?

A.   Yes.

Q.   Okay.   You were put on probation at that time; am I right?

A.   Well, see, that's -- that's what's confusing. According to the policy and procedure manual, I was -- I remember having a meeting with Ms. Gomez and Ms. Alpert.   Ms. Alpert handed me this.

Q.   By "this," you're referring to the second and third pages --

A.   The second and third.

Q.   -- of Exhibit 6?

A.   Yes.

Q.   Okay.

A.   And, according to the progressive discipline outlined in the policy and procedure manual, disciplinary action follows a verbal warning.   And, in fact, this is dated "Disciplinary action," and it's disciplinary action, then disciplinary probation.   And when Ms. Alpert gave me this she said, "This means we're taking progressive discipline against you."

And during the meeting, Ms. Gomez says, "No, I think we need to put him on disciplinary probation," and so the progressive discipline wasn't

followed.  I mean, I was given a notice of disciplinary

action, but then I was put on disciplinary probation.

Q.  Okay.  And you regarded yourself as of March

23rd of 2000 as being on disciplinary probation?

A.  Correct.

Q.  Okay.  Now --

A.  This, in effect, became the disciplinary

probation.

Q.  All right.  Now, there are matters discussed in

Pages 2 and 3 of Exhibit 6; am I right?

A.  Uh-huh, yes.

Q.  Okay, and those were discussed with you by

Ms. Gomez and Ms. Alpert?

A.  I remember discussing them all with Ms. Alpert,

some of them with Ms. Gomez, but not all of them.

Q.  Did you meet with Ms. Alpert prior to meeting

with Ms. Gomez regarding these matters?

A.  My recollection is that Ms. Alpert gave me this

memo in Ms. Gomez's presence.

Q.  By "this memo," you're referring to Pages 2 and

3 of Exhibit 6?

A.  Yeah, March 3rd, the March 3rd memo.

Q.  Okay.  Now, if we look at Page 1 of Exhibit 6,

we see your signature, do we not?

A.  Yes.

1           Okay, now, she misunderstood that -- my

2      response, but she had initiated the response, and I

3      told her later that if I had known that -- if I had any

4      inkling that she didn't understand what the joke was

5      that I would never have said it.

6           Q.   Okay.   Prior to this meeting that you had with

7      Ms. Alpert and Ms. Gomez regarding, let's say, Pages 2

8      and 3 of Exhibit 6, were you aware that there was any

9      complaint by anyone regarding you?

10          A.   Oh, yes.

11          Q.   Okay.   And how were you aware of that?

12          A.   Well, we had built a new clinic, we were under

13     pressure to see more patients and to advertise what we

14     were doing.   I was asking the staff to work harder.

15     The social workers were being asked to do more

16     counseling.   I had asked the family nurse practitioner

17     and physician assistant to do more on-site supervision,

18     so, yes, I was aware that --

19          Q.   Okay.

20          A.   -- the people were complaining.

21          Q.   Were you aware of any complaints by Ms. Moody

22     regarding you before this bring -- brought to your

23     attention in the form of Exhibit 6?

24          A.   Well, before this exhibit, Ms. Alpert told me

25     that Ms. Moody had misunderstood what I had told her at

| | |
|---|---|
| 11.26.23 | 1 |

-- in Atlanta, and so we had a meeting and I apologized to her.

Q.   Okay.  Had there ever been any correspondence between you and Ms. Moody regarding her complaints with you?

A.   Not that I'm aware of.

Q.   Did you regard yourself as in any way at fault with regard to any problems between you and Ms. Moody?

A.   Yes, I mean, the comment I made was --

Q.   The comment in Atlanta?

A.   Was offensive, yeah.

Q.   Okay.  And you apologized?

A.   Yes.

Q.   Other than the comment in Atlanta, did you regard anything that -- any problem that you may have had with Ms. Moody as being your fault?

A.   Exclusively?

Q.   In part.

A.   Well, I mean, I know that the police investigation of she and her husband was difficult, and --

Q.   Okay.

A.   -- I was asked to do that.

Q.   Anything else?

A.   I can't think of anything else right now.

A.   Right.

Q.   Okay.

A.   And the same thing with the laptop.

Q.   Okay.  So that those could not have been referred to in -- at the meeting referenced in Kavanaugh Exhibit 6 because they hadn't happened yet?

A.   Uh-huh.

Q.   Is that right?

A.   That's correct.

Q.   So you didn't understand when there was discussion of complaints by Ms. Moody that she was referring to, the improper billing or the laptop, because those hadn't even happened yet?

A.   That's correct.

Q.   So what did you understand was being referred to with regard to Ms. Moody complaining about you?

A.   I do remember talking at this meeting about the comment that I made to Ms. Moody in Atlanta.

Q.   Okay.

A.   To which she referred to here.

Q.   All right.  Now, would it be a fair statement, Mr. Kavanaugh, that no one ever sent you anything criticizing you that you didn't respond to in writing? Isn't that true?

A.   That's not true.

Q.  Okay.

A.  Because I never responded to -- to this memo.

Q.  Okay.  Other than Kavanaugh Exhibit 6, was there ever anything that anyone sent to you in any way critical that you didn't respond to with a memo of your own?

A.  I can't say for certain, but I would say there were times that I did not respond.

Q.  Okay.  Your general practice was to respond; am I right?

A.  In most cases, I responded.

Q.  Okay.  Oftentimes writing far more pages than were sent to you; isn't that true?

MR. ZABARTE:  I object to the commentary on that.  That's just a matter of opinion, and it's a matter of -- it just mischaracterizes his responses to questions asked of him.

Q.  Isn't that true?

A.  It depends on what memo was sent to me.  I sent some two-sentence memos.

Q.  Okay.  Did you respond to the -- to Exhibit 7?

A.  Yes, by sitting down with Ms. Moody and Emily and apologizing to her.

Q.  Okay.  You didn't write anything in response?

A.  No.

1    he needs to look at them before giving any testimony.

2              Have you had a chance to look at

3    Exhibit 9?

4         A.   Yes.

5         Q.   Is that a document that you wrote?

6         A.   That I wrote?

7         Q.   I'm sorry, did you receive that document from

8    Ms. Moody?

9         A.   Yes.

10         Q.   Okay.  And you had received that document prior

11    to the -- getting the disciplinary writeup evidenced by

12    Exhibit 6?

13         A.   Yes.

14         Q.   Okay.  Did you understand that Exhibit 6 was

15    referring to the two memos from Ms. Moody?

16         A.   Could you repeat that again, please?

17         Q.   When you were -- when Exhibit 6 was discussed

18    with you, did you understand that reference was being

19    made to the documents you had received from Ms. Moody?

20         A.   No.

21         Q.   Okay.  Did Ms. Alpert state in there that

22    Ms. Moody had put her concerns in writing to you?

23         A.   Yes.

24         Q.   And you had received those writings?

25         A.   Yes.

Q.   Did anyone complain -- did any one of these people you have just named complain to you regarding that remark?

A.   Yes.

Q.   Okay.

A.   Glenda.

Q.   Did anyone else?

A.   I don't know.

Q.   Okay.   To your knowledge, did any of these people complain to anyone else regarding that remark?

A.   Yes.

Q.   And to whom did they complain as far as you know?

A.   Ms. Alpert.

Q.   Okay.   And how do you -- what caused you to say that?

A.   Because Ms. Alpert spoke to me about it.

Q.   Okay.   What did she say?

A.   She told me that she had heard that an employee had told her that I had said that the clinic at Clearwater needed to be exorcized or --

Q.   Okay.   And what did you say in response?

A.   I told her that I didn't say that at all, that I told her that I believed that there was evil in the world and that they were acting toward each other in

evil ways.

Q.   What did Ms. Alpert say?

A.   "Well, they didn't understand that."

Q.   What did she instruct you to do?

A.   I don't remember exactly.

Q.   Did you ever apologize to the employees?

A.   I know that I apologized to Glenda.

Q.   Did you ever apologize to them as a group?

A.   I believe so, but I don't remember.  I do remember meeting with them with Hilda Gonzalez.

Q.   If you were being reprimanded in March of 2000 with regard to the Clearwater staff, what did you understand you were being reprimanded about?

A.   For the comment that I made to them about believing that they were acting toward each other in evil ways.

Q.   Okay.  Did you regard the -- did you regard it as justified that you would be disciplined for that?

A.   No.

Q.   Okay.  There were also matters brought to your attention regarding the Lucio staff; am I right?

A.   Yes.

Q.   Okay.  What did you understand that that had to refer to?

A.   That referred to the fact that we were

finishing building the clinic and I wanted the staff to

feel as though that they had contributed and felt at

home in the clinic, and so I told them that they can

decorate the clinic any way they want to, if they tell

me what materials I should buy, I would buy the

materials and if they wanted to do the painting and

things of that nature, then that would be the

arrangement, I would spend the money and they would

provide the labor.

Q.   Okay.

A.   So I spent $300 or so.  I forget the exact

amount of money.  I bought the supplies, and they just

weren't doing anything with the supplies that I had

bought.  They weren't using them to decorate the

building.

Q.   Okay.  What did you tell them you were going to

do if they didn't decorate the building?

A.   I told them that they had caused me to spend

money so I was going to look into deducting the money

out of their paychecks.

Q.   Okay.  What else did you tell them you would

do?

A.   I don't know.

Q.   Okay.

A.   That's my -- that's my comment I made to them.

Q.  I'm sorry.  I apologize.  On disciplinary
probation.  Let me start over.  You have testified that
the conduct referred to in Exhibit No. 6 was, in your
mind, not what -- was not -- did not justify a
disciplinary probation, and my question is, what do you
believe or contend motivated Ms. Alpert or Ms. Gomez to
assess this discipline?

A.  I believe the disciplinary action probably was
appropriate but disciplinary probation was not.

Q.  Okay.  Do you believe that the incidents
referred to in Exhibit 6 were, in fact, the incidents
that motivated them to assess the discipline?

A.  I do not believe that they are all of the
incidents, and I do not believe that this contains all
of the motivation.

Q.  Okay.  What do you contend, apart from the
incidents cited in Exhibit 6, motivated Ms. Alpert or
Ms. Gomez to assess discipline against you at that
time?

A.  I believe that my gender and my race --

Q.  Okay.

A.  -- were motives.

Q.  Your gender and your race.  You regard your
race as what?

A.  Caucasian, white.

Q.   Okay.  And you regard Ms. Gomez's race as what?

A.   Hispanic.

Q.   Okay.  If maybe we could agree on terms, generally in terms of race, Caucasians refer also to Hispanics.  What differentiates a Hispanic from a non-Hispanic would be national origin.  Do you regard -- what do you regard your national origin to be?

A.   Irish and German.

Q.   Okay.  Would it be fair to say you regard yourself as non-Hispanic?

A.   Definitely.

Q.   Okay.  You're definitely non-Hispanic and you were born in 1955; am I right?

A.   That's correct.

Q.   Okay.  Now, I would like to ask you, Mr. Kavanaugh --

A.   Could I just take a quick bathroom break?

Q.   Sure.

A.   I'm sorry.

          (Brief recess)

Q.   Mr. Kavanaugh, we've just returned from our lunch break; is that right?

A.   That's correct.

Q.   Are you ready to continue?

A.   Yes.

1    employees that had complaints from their employees that

2    they felt like they were told that they were demon

3    possessed or needed an exorcism?

4         A.   No.

5         Q.   Are you aware of any complaints by employees

6    against supervisors or managers other than you that

7    part of their paycheck would be withheld if they didn't

8    do certain tasks?

9         A.   I don't know.

10        Q.   Okay.  Are you aware of any managerial or

11   supervisory employees, other than yourself, that were

12   written up for failing to attend planned seminars?

13        A.   No.

14        Q.   Okay.  Now, before lunch, I had asked you what

15   you felt like or you contend motivated either

16   Ms. Alpert or Ms. Gomez to put you on a disciplinary

17   probation, and how do you answer?

18        A.   I believe that I was put on disciplinary

19   probation because of my race and gender and in

20   retaliation for the complaints that I had lodged with

21   the management of the campus care centers by the

22   finance director.

23        Q.   Okay.  And those complaints that you're

24   referring to are the ones that you told us this

25   morning; am I right?

91

A.   In part.

Q.   Well, were there complaints that you made that you didn't tell us about this morning, that you feel like motivated your disciplinary probation?

A.   Well, as I said before, I was also -- I also believe that that took place in violation of the policies and procedures that had been written.

Q.   Okay.  In other words, you feel like you should have given -- been given additional steps in the disciplinary procedure?

A.   I feel that the disciplinary procedure should have been carried out according to how it had been written.

Q.   Okay.  If --

A.   And I believe that the disciplinary procedure should have been applied equally to all the staff.

Q.   Okay.  Now, when you talk about retaliation for the complaints you made, you're talking about the complaint with regard to Account 761?

A.   There were a number of complaints that I made, as you remember, the fact that -- the lack of direction with regard to the hiring process, selection process. There seemed to me -- my perception was that the hiring process was nepotistic, all right, and intentionally ill defined or undefined.  I believe that people were

being treated differently and unfairly, in the case of

the physician assistant and the nurse practitioner.

And although the procedure says that -- although the

policies and procedures say that employees are required

to bring forth complaints about the organization when

impropriety may be an issue, that they should do that,

and I feel like I was being told not to -- not to

complain.

Q.   When you say, though, that you were being

retaliated against for making complaints, you're

referring to those complaints that you testified about

this morning; am I right?

A.   Uh-huh.

Q.   Is that a yes?

A.   Yes.

Q.   Okay.  Now, then, you're saying that you feel

like that you were put on disciplinary probation

because you're non-Hispanic?

A.   Yes.

Q.   On what facts or evidence do you base that

contention?

A.   Because Hispanics who, for instance, had

problems with miscommunication were not written up,

that I'm aware of.

Q.   Okay.  All right, now, when I asked you about

1    what managerial or supervisory employees had problems

2    similar to those that you were reprimanded for, you

3    couldn't name anyone.  Do you recall that?

4        A.  No, I said I didn't -- no, I said I didn't

5    know.

6        Q.  Didn't know, all right.  Apart from that, what

7    employees, Hispanic employees, are you saying

8    miscommunicated and were not reprimanded in the manner

9    you were?

10       A.  Well, I don't know that they weren't.  I

11   suspect that they were not.

12       Q.  Okay.  And what Hispanic employees do you

13   suspect engaged in miscommunication and were not

14   reprimanded in the manner you were?

15       A.  Within four months of my coming to work at the

16   clinic, Ms. Gomez was giving a tour of the building to

17   some federal authorities and a Hispanic physician was

18   talking loudly to the patient in a decidedly

19   unprofessional manner.

20       Q.  Who was that physician --

21       A.  So we all got a memo.

22       Q.  I'm sorry.

23       A.  We all got a memo that stated we shouldn't act

24   that way.

25       Q.  I didn't mean to interrupt you.  Did you get an

1    opportunity to finish your answer?

2         A.   Yes.   Yes, I'm sorry.

3         Q.   So sometime, four months or so, after you were

4    hired, you observed Ms. Gomez with some federal

5    investigators.   What --

6         A.   I didn't observe.   I'm sorry.   I didn't

7    observe.   I was told.

8         Q.   Oh, you didn't see it?

9         A.   At a staff meeting, she told us that she saw

10   something and she didn't want to see that behavior

11   anymore.

12        Q.   All right.   Who did you understand the Hispanic

13   physician to be?

14        A.   Dr. Luis Gaytan.

15        Q.   Okay.   So Mrs. -- Ms. Gomez -- excuse me --

16   brought to the attention of, I understand -- I take it

17   the managerial staff?

18        A.   No, the whole staff at a normal staff meeting.

19        Q.   Okay.

20        A.   The entire staff.

21        Q.   And that would include about how many people?

22        A.   Gee, maybe a hundred.

23        Q.   Okay.

24        A.   However many staff there are.

25        Q.   All right.   Ms. Gomez said that Dr. Luis

miscommunication.  Miscommunication was throughout the entire organization.

Q.  Well, was there any -- do you believe that Ms. Gomez miscommunicated when she said, "I don't want that kind of behavior in my clinic"?

A.  No, but I believe that she miscommunicated on numerous other occasions.

Q.  Well, let's stick with the one you brought up. Why is it that you refer to Dr. Luis Gaytan when you say that you believe you were discriminated against for not being Hispanic?

A.  I believe that this particular physician spoke in an inappropriate manner to the patient and he was not disciplined in the same way that I was disciplined when it was brought to my attention that I had spoken inappropriately to an employee.

Q.  Okay, you didn't see what Dr. Luis Gaytan said or didn't say; isn't that true?

A.  That's correct.

Q.  You don't know if it was in a loud voice or not; isn't that true?

A.  That's correct.

Q.  You don't know if he was disciplined or not; isn't that true?

A.  That's correct.

Q.  You don't know if Ms. Gomez brought him into the office and chewed him out, do you?

A.  No.

Q.  Okay.  What else do you base your contention on that you believe that you were put on disciplinary probation because you're not Hispanic?

A.  On another occasion, Maria Castillo, I had received several complaints about her from the nursing staff at BCHC, and disciplinary action, to my knowledge, had not been taken against her.

Q.  Okay.  Who were the nurses that complained to you about Ms. Castillo?

A.  Terry Davis.

Q.  Who else?

A.  Carmen Guajardo.

Q.  Who else?

A.  Genie Lopez.  Genie Lopez -- no, Genie -- Terry -- no, it was Genie Guajardo, Carmen Lopez.  I'm sorry, not Carmen Guajardo, Carmen Lopez.

Q.  Okay.

A.  Genie Guajardo and Fran Zavala.

Q.  Okay.  Now, did -- so Terry Davis, Carmen Lopez, Genie Guajardo, and Fran Zavala?

A.  Yes.

Q.  Okay.  Did they all have the same complaints,

or were their complaints different?

A.  Yes, they all complained to me that Maria was disruptive during a nursing in-service.

Q.  So they were all referring to the same meeting?

A.  Yes.

Q.  Okay.  That Maria was disruptive during a meeting?

A.  During a nursing in-service that Terry was coordinating.

Q.  And what is it that you're -- what was your understanding that Maria did that was disruptive?

A.  She was talking while the presentation was going on, she wasn't paying attention to what the presentation was about, and she generally was distracting people.

Q.  And you weren't there?

A.  That's correct.

Q.  Okay.  So you have no personal knowledge of what she did or didn't do?

A.  Just what they wrote to me.

Q.  Okay.

A.  Just their written memos.

Q.  Okay.  Where are those written memos?

A.  At home.

Q.  Okay.  So your understanding was they were

1    referring to one event where Maria Castillo was talking

2    while the speaker was trying to give a presentation?

3         A.   Uh-huh.

4         Q.   Is that a yes?

5         A.   Yes.

6         Q.   Now, you wouldn't call that miscommunication,

7    would you?

8         A.   She was communicating inappropriately.

9         Q.   She was being rude?

10        A.   That's what the opinion of the people who wrote

11   the memos were.

12        Q.   Okay, but to you that's miscommunication?

13        A.   She was miscommunicating -- she was

14   communicating in an inappropriate manner.

15        Q.   Is that a yes or a no?

16        A.   Yes.

17        Q.   Okay, to you that's miscommunicating.  Was she

18   disciplined for it?

19        A.   No.

20        Q.   And how do you know that?

21        A.   Not that I'm aware of.

22        Q.   Okay.  Do you know if she was disciplined?

23        A.   No, I have never had access to her --

24        Q.   Did you ask --

25        A.   -- clinic personnel file.

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956) 618-2366   (956) 428-0755   (956) 542-1020

13:20:03  1    Q.  Did you ask Ms. Gomez if she was disciplined?

13:20:05  2    A.  No.

13:20:06  3    Q.  Did you ask Ms. Alpert if she was disciplined?

13:20:09  4    A.  No.

13:20:09  5    Q.  So that in truth you don't know; is that right?

13:20:10  6    A.  I don't know.

13:20:11  7    Q.  Okay.  All right, on what else do you base your

13:20:16  8    allegation that you feel like you were put on

13:20:19  9    disciplinary probation because you're not a Hispanic?

13:20:23 10    A.  I believe that the policies and procedures, as

13:20:29 11    they are written in the policy manual, were not applied

13:20:32 12    to me and I was not given due process.  In addition, I

13:20:37 13    do -- I believe that -- that the grants that I was in

13:20:45 14    charge of managing were -- I was being charged

13:21:04 15    administrative overhead when other grants written by

13:21:08 16    other departments were not being charged administrative

13:21:13 17    overhead, or the administrative overhead that was being

13:21:16 18    charged against different grants was being charged in a

13:21:19 19    different manner.

13:21:20 20    Q.  Okay.  You correct me if I'm wrong.  I believe

13:21:26 21    I understand from your testimony that you feel like

13:21:27 22    there should have been more disciplinary steps before

13:21:30 23    you were put on probation?

13:21:35 24    A.  I believe that the progressive discipline as

13:21:37 25    it's written in the manual was not applied.

Q. Okay. And who are the Hispanic employees that you say were treated differently than you and were similarly situated to you?

A. All of the Hispanics on the senior management team.

Q. Okay.

A. At that time.

Q. Okay. All of the senior management members had complaints against them similar to the ones that are put in the -- have been marked and made part of this deposition?

A. I don't know.

Q. Okay. What senior management members had complaints against them that had the disciplinary steps applied to them appropriately when you didn't?

A. All I can say is that the policies and procedures and the disciplinary procedures set forth were not applied to me the way they are written.

Q. Okay. Give us the names of all the Hispanics that were similarly situated to you -- I mean, by that I mean had disciplinary complaints -- not disciplinary, excuse me -- had complaints from subordinates similar to yours and that they had the discipline applied differently to them than was applied to you.

A. The incidents that I know of is that in the

1    disciplinary probation it said here that I was given

2    several opportunities to go to seminars.  Okay, the

3    second seminar that I was asked to go to was on July

4    28th or 29th, two days after I was terminated, or a day

5    after I was terminated, and approximately ten people

6    were supposed to go, ten or twelve people, and I have

7    knowledge that at least six of them didn't go to that

8    particular seminar.

9              I mean, I didn't go because I had been

10   terminated at that point, but four or five -- well, a

11   number of them were Hispanic that didn't go to that

12   seminar.

13        Q.  Okay.  Who were the Hispanics that were

14   scheduled to go to the seminar and didn't?

15        A.  I would have to refer back to that memo, which

16   I don't have on my person right now.

17        Q.  What memo are you referring to?

18        A.  The memo from -- I don't know if it's from

19   Ms. Gomez or Ms. Alpert -- to the individuals.

20        Q.  Okay.  Where was the seminar to be?

21        A.  I think in McAllen.

22        Q.  Okay.  And it would have been right around the

23   end of July?

24        A.  Yes.

25        Q.  Of 2000?

A.   The last days of July of 2000.

Q.   Okay.  Were there any non-Hispanics that were scheduled to to go?

A.   I believe so.  I don't -- I would have to look at the memo again.

Q.   Were there any non-Hispanics who were scheduled to go and didn't go besides yourself?

A.   To the second one?

Q.   Yes.

A.   At the end of July?

Q.   Yes.

A.   I would have to look at the -- I mean, I don't -- without looking at the memo, I can't tell you who was asked to go and who wasn't asked to go.

Q.   Okay.

A.   And I also don't know who eventually ended up going or not going.  I don't --

Q.   Okay.

A.   I don't have that information.

Q.   Do you know if any of them that didn't go brought it to their supervisor beforehand and gave reasons why they couldn't go?  Do you know that?

A.   No.

Q.   Do you know if any of them brought those reasons forward and were excused and then didn't go?

A.   No.

Q.   Okay.  And you don't know if there may have
been some non-Hispanics that were scheduled to go and
failed to go?  You don't know that?

A.   I don't know that.

Q.   Okay.  My --

A.   Could I be excused for just a moment?

Q.   Sure.

MR. HORTON:  Sure.

THE WITNESS:  I'm sorry.

(Brief recess)

Q.   Mr. Kavanaugh, before we took the break, the
question was on what else do you base your contention
that the reason you were put on a disciplinary
probation is because you are not Hispanic?  What other
reason -- what other evidence or information do you
point to in support of your contention?

A.   All I can say is what I said.  I believe that
the policies and procedures, as they were applied to
me, were different.

Q.   Well, you're saying they weren't applied
according -- as -- according to how they are written?

A.   Yes.

Q.   Okay.  What Hispanic employees had those
disciplinary policies applied to them as written,

contrary to the way you were treated?

A.  I'm not aware of all the personnel situations
in the entire clinic.  I'm not privy to that
information.

Q.  And I'm not asking that, Mr. Kavanaugh.  I'm
asking what Hispanic employees, that you know of, had
the disciplinary policies applied to them as written
contrary to the way you were treated?

A.  My colleagues were also immediate subordinates
of Ms. Alpert, and she did not tell us how -- she did
not tell us specifically what disciplinary action was
taken against what specific individuals.

Q.  If I ask the question, was there a single
Hispanic employee who had the disciplinary policies
applied as written to him or her, your answer would be
"I don't know"; isn't that true?

A.  Yes.

Q.  Okay.  So you cannot tell us a single Hispanic
employee who was treated differently than you were with
respect to the application of the disciplinary
policies; isn't that true?

A.  That is true.

Q.  Okay.  Is there anything else that causes you
to say that the reason you were put on disciplinary
probation is because you're not Hispanic?

A.   Probably not, but I don't know.

Q.   Okay.  Your answer was you're the oldest person on -- you were the oldest employee on the community campus --

A.   The campus care center staff.

Q.   Campus care center staff, okay.  Other than the fact that you were the oldest person on the campus care center staff, what else causes you to say that the reason you were put on disciplinary probation was your age?

A.   At this point, I cannot say.

Q.   Okay.  Which employees younger than yourself were treated more favorably than you?

A.   I don't know how everyone was treated so I don't know.

Q.   Okay.  If I asked you to name for the Court one individual younger than yourself who was treated more favorably than you, could you do that?

A.   Well, it's a -- that's a qualitative judgment that I can't answer.

Q.   Okay.  Do you allege or contend that there was a -- an employee younger than yourself treated more favorably than you?

A.   I contend that I was treated differently because of my age.

| | |
|---|---|
| 13:34:41 1 | Q.  Differently than whom? |
| 13:34:43 2 | A.  Differently than other staff members. |
| 13:34:45 3 | Q.  Okay.  And who are they? |
| 13:34:47 4 | A.  I cannot name them at this time. |

Q.  Differently than whom?

A.  Differently than other staff members.

Q.  Okay.  And who are they?

A.  I cannot name them at this time.

Q.  Okay.  So if I ask the question, can you tell the Court even one person younger than yourself treated more favorably than you, you cannot do that; isn't that true?

A.  Not without access to personnel records, no.

Q.  Okay.  During the time that you were -- during the meeting or meetings when you were being put on disciplinary probation in March of 2000, there was never any mention by anyone of your national origin; isn't that true?

A.  There was never any mention of my national origin by anyone?

Q.  At those disciplinary meetings, did Ms. Alpert make any mention of you being non-Hispanic?

A.  No.

Q.  Did Ms. Gomez make any mention of you being non-Hispanic?

A.  No.

Q.  Okay.  Did either Ms. Alpert or Ms. Gomez make any comment with regard to your age?

A.  No.

Q.   Okay.  And, by the same token, at those
disciplinary meetings, you never made any comment about
your national origin, did you?

A.   No.

Q.   You never said, "I feel like I'm being singled
out and treated differently because I'm Anglo"?  You
never said that, did you?

A.   I did say that I felt like I was being treated
differently.

Q.   Okay.  And when, by your testimony, did you say
that?

A.   I told Emily Alpert.

Q.   Okay.  You never once said, "I believe I'm
being singled out and treated differently because I'm
Anglo," did you?

A.   No.

Q.   Okay.  You never once during the time of your
employment with Brownsville Community Healthcare Center
made the assertion to anyone that you were being
singled out and treated differently because you were
Anglo; isn't that true?

A.   That's correct.

Q.   And during the entire time of your employment
with Hidalgo -- excuse me, with Brownsville Community
Health Center you never once made the assertion that

1    you were being singled out and treated differently

2    because of your age; isn't that true?

3        A.   Not specifically.

4        Q.   Well, let me ask a specific question.  You did

5    not at any time during the time you were employed by

6    Brownsville Community Health Center make the assertion

7    that you were being singled out and treated differently

8    because of your age; isn't that true?

9        A.   Yes.

10       Q.   Okay.  And you certainly never said to anyone

11   during the time you were employed with Brownsville

12   Community Health Center that you were being singled out

13   and treated differently because you were male, did you?

14       A.   My immediate supervisor told me I was being

15   treated differently because I was a male.

16       Q.   Okay.  Do you believe that you were put on

17   disciplinary probation because you were a male?

18       A.   I believe that I was put on disciplinary

19   probation in retaliation and -- for the complaints I

20   had registered and because of my gender.

21       Q.   Okay.

22       A.   My race, and my age.

23       Q.   Now --

24       A.   I was the only person like me in the entire

25   organization and in a very unique situation.

anything against a -- someone who happened to be white, male, and 45?

A.   Again, I was the only one in the institution like me.

Q.   Okay.  Is there anything else that causes you to say that?

A.   Yes, what I believe to be the discriminatory application of policies and procedures.

Q.   Okay.  Can you tell me the names of female employees who were similarly situated to you that had the complaints against them similar to those brought up about you that were treated differently?

A.   I don't know how everyone was treated.

Q.   Do you know how anyone was treated?

A.   Only by what -- do I know how anyone was treated?  Over a period of years -- over a period of a year do I know how anyone was treated?

Q.   Well, let me ask the question this way:  Can you give to the Court the name of one female who was similarly situated to you that had complaints similar to those brought against you who was treated differently than you?

A.   I don't know.

Q.   Okay.  In other words, you can't name a single person; isn't that true?

A.   Well, I'm saying I don't know.

Q.   Okay.  Besides the fact that you are one of a kind, male, white, and 45, is there anything else that causes you to believe that your gender had anything at all to do with the discipline assessed against you?

A.   Yes.

Q.   What's that?

A.   On numerous occasions, in talking to Emily Alpert, she would say to me, "You know what your problem is?  You're not Joan Dentler."

THE REPORTER:  "Not" -- I'm sorry?

THE WITNESS:  "You're not Joan Dentler."

A.   She was the previous director of the --

Q.   Okay.

A.   -- of the project.

Q.   What did you understand Emily Alpert to be saying?

A.   That I was not a member of the club.

Q.   Okay.

A.   The decision-making body.

Q.   What were the eligibility requirements to be part of the club?

A.   The decision makers at the Brownsville Community Health Center are Hispanic -- are Hispanics and women.

Q.   Okay.   So when Emily Alpert said, "You're not

Joan -- your problem is you're not Joan Dentler," you

understood her to be saying that -- understood her to

be saying what?

A.   I wouldn't be having the problems that I was

having if I was a woman.

Q.   What else do you base your contention on that

you were being disciplined because you're a man?

A.   I don't know right now.

Q.   Did Joan Dentler ever have complaints brought

against her by her subordinates similar to those

brought against you?

A.   I'm not sure.

Q.   Did Joan Dentler ever fail to go to a seminar

that she was scheduled to attend?

A.   I have no idea.

Q.   Did Joan Dentler ever engage in any conduct

which reasonably would make her susceptible to

discipline?

A.   I don't know.

Q.   Apart from what you have told us, is there

anything else that causes you to contend that the

reason you were put on disciplinary probation was

because you were either non-Hispanic, male, or 45 years

old?

A.   I believe that I was -- I was fired in retaliation for -- for who I was and for --

Q.   And for?

A.   And for whatever other reasons that reside within my superiors --

Q.   Okay.

A.   -- which lead them to believe that I was unacceptable because of my characteristics as a human being.

Q.   By "characteristics," national origin --

A.   Race.

Q.   -- gender --

A.   Gender.

Q.   -- and age?

A.   Age.

Q.   Okay.  All right.  But to say that you were disciplined or discharged in retaliation for something you did, from my understanding from your testimony, you're referring to those complaints or those reports of improper activity that you brought forward; am I right?

A.   Is this a new question or a --

Q.   Yes.

A.   -- rephrasing of the past question?

Q.   Either way.

A.   So could you ask the question again?

Q.   Okay.  I understand you to be saying that you believe you were being discriminated against because of your age, your national origin, and your gender.

A.   Uh-huh.

Q.   If you say you're being retaliated against, I'm asking what conduct did you engage in that you feel like you were being retaliated against for?

A.   I was being retaliated against for doing the job that I had been given.

Q.   Okay.

A.   Which was to make the program as successful as possible.

Q.   Okay.  In what -- obvious -- do you feel like -- and I'll just try to get an answer to this and I'll move on.  You brought forward complaints against the way -- certain things going on within the organization; am I right?

A.   That's correct.

Q.   Do you believe that you were disciplined and ultimately fired in retaliation for bringing forward those complaints?

A.   I believe that I was ultimately disciplined based on my characteristics as a white male, 45 years of age.

A.   Yes.

Q.   And you believe those were the only reasons why your employment was terminated?

A.   I believe that I was treated differently.

Q.   On account of those factors?

A.   Yes.

Q.   And nothing else?

A.   Yes.

Q.   Okay.  Now, I understand that along about June the 15th, you were told by Ms. Gomez that there was a position -- that you were offered the opportunity to become a grant writer; is that right?

A.   Yes.

Q.   Okay.  Who was present when you were told that you were being given that opportunity?

A.   Emily Alpert.

Q.   Okay.  Where did the meeting take place?

A.   My recollection was that it was either Paula's office or Emily's office.

Q.   Okay.  And if my information is that it was on June the 15th, does that sound about right?

A.   That's -- yeah, that sounds about right.

Q.   Okay.  What was your response immediately at the time that you were told that?

A.   I would have to think about it.

to you?

A. Gee, late July, a day or two before I was terminated.

Q. Okay. And what do you recall about that?

A. Ms. Gomez came into my office and asked me what I thought about the job, and I said nothing had been said about the job. I mean, there was no salary, there was no job description, there was no approval from the board. I thought that -- I thought that new jobs had to be approved by the board. I didn't see the board talking about it. I didn't see the job being budgeted.

Q. You're telling the members of the jury that that's what you told Ms. Gomez?

A. What I'm telling her is that -- what I told her was that I couldn't accept the job, but I couldn't accept it for those reasons.

Q. Did you tell Ms. Gomez -- all right, is it your testimony that you told Ms. Gomez those reasons, it wasn't an approved position, the board hadn't approved it? Is that what you're saying you told Ms. Gomez?

A. I'm saying I couldn't accept the job. That's what I'm telling you that I told her.

Q. Okay. Did you tell her that you thought about it and you felt like that you were best suited for the job you were in?

A.   I believe that after the meeting she did say that Ms. Gomez wanted to meet with me, yes.

Q.   Okay.  And did you meet with Ms. Gomez?

A.   Yes.

Q.   And Ms. Alpert was there?

A.   I don't think it was -- what day was that?  I'm not sure if it was the day of -- if it was that Wednesday or not.  That's when we had our meetings.

Q.   Okay.  Did the time come when you met with Ms. Gomez and she told you you were fired?

A.   Yes.

Q.   Okay.  Who was there?

A.   She and Ms. Alpert.

Q.   Okay.  What did Ms. Gomez say to you in that meeting?

A.   She said that she was terminating me for insubordination.

Q.   Did she say anything else?

A.   I can't remember all that was said.  It was a very short meeting.

Q.   Okay.  I'll show you what's marked as Kavanaugh Exhibit 11.

MR. HORTON:  Let me see it.

A.   It wasn't given to me on the 26th.  It's marked the 26th, but it wasn't given to me on the 26th.

Q.  Okay.  Could you take a look at what's marked
Kavanaugh Exhibit No. 11?

A.  Yes, "'I want you to meet with myself and Emily
in my office in the morning at 8:00 a.m.'  You
acknowledged what I said by shaking your head."

Q.  I'm sorry, if I have got that -- oh, let me
see, is that part of -- okay, I'm with you now.  All
right, go ahead.  I'm sorry if I interrupted.  Have you
had a chance to look at Deposition Exhibit No. 11?

A.  Yes.

Q.  Is that a document that was given to you before
today?

A.  Yes.

Q.  Okay.  Now your testimony, I think, a moment
ago was you were not given that document during the
meeting when your employment was terminated; is that
correct?

A.  It was given to me.

Q.  I'm sorry.

A.  But this is dated July 26th.  I wasn't
terminated on July 26th.

Q.  Well, at the meeting when the document marked
as Deposition Exhibit 11 was given to you, you were
told you were fired?

A.  Yes.

Q.  Okay.  By the executive director?

A.  Uh-huh.

Q.  Is that a yes?

A.  Yes.

Q.  So at the time that you were given the document marked as Exhibit No. 11, you were told by the executive director you were fired; isn't that true?

A.  Uh-huh.

Q.  Is that a yes?

A.  Yes.

Q.  Okay.  Now, is it your contention or belief that the executive director did not have authority to fire you?

A.  No.

Q.  Okay.  In other words, the executive director, as far as you know, has the authority to fire whomever she wants; isn't that true?

A.  I don't know.

Q.  Okay.  Do you believe or contend that the executive director lacked the authority to terminate your employment?

A.  I don't know.

Q.  Okay.  Do you have any evidence or information that would cause you to believe that the executive director didn't have complete authority to terminate

13:58:37 1    your employment?

13:59:40 2        A.  Well, the fact that the executive board

13:58:43 3    reviewed it.

13:58:44 4        Q.  Well, we will get to that.  Is that the only

13:58:46 5    thing that you would point to?

13:58:49 6        A.  She was not my immediate supervisor.

13:58:52 7        Q.  Well, she was your immediate supervisor's

13:58:55 8    immediate supervisor?

13:58:56 9        A.  That's correct.

13:58:58 10       Q.  Okay.  Once again, as far as you know, did the

13:58:59 11   executive director have the complete authority to

13:59:02 12   terminate your employment?

13:59:03 13       A.  I don't know.

13:59:05 14       Q.  Okay.  And do you have any information that

13:59:08 15   would cause you to say that she didn't have that

13:59:10 16   authority?

13:59:12 17       A.  I don't know if I have that information or not.

13:59:23 18       Q.  Well, who would know?

13:59:23 19       A.  The bureau of primary healthcare, the board of

13:59:23 20   directors --

13:59:23 21       Q.  No, I'm not asking what they --

13:59:23 22       A.  -- the president of the board.

13:59:23 23       Q.  I'm not asking what they know.  I'm asking what

13:59:27 24   you know.  Do you have any information or facts that

13:59:30 25   would cause you to say that the executive director did

1    not have authority to terminate your employment?

2         A.   I do not have information relevant to that

3    question.

4         Q.   Okay.   You understood that you were being

5    fired?

6         A.   Yes.

7         Q.   You were given an opportunity to gather your

8    belongings?

9         A.   Yes.

10        Q.   You left the premises?

11        A.   Yes.

12        Q.   You had no further expectation of pay?

13        A.   Yes, I did.

14        Q.   Well, were you allowed to continue working?

15        A.   No.

16        Q.   Were you doing any work?

17        A.   No.

18        Q.   Because you had been fired?

19        A.   Yes, but I hadn't received my entire wage owed

20   to me.

21        Q.   Well, you were entitled to wages up until the

22   time your employment terminated?

23        A.   Correct.

24        Q.   Which was in Ms. Gomez's office?

25        A.   Correct.

1  employment terminated that that was the grievance

2  procedure applicable to you?

3      A.  No.

4      Q.  Okay, and why was that grievance procedure not

5  applicable to you?

6      A.  No, by saying no I meant I was not sure because

7  the previous personnel manual had a specific policy

8  whereby an employee presented a grievance against the

9  executive director.  In this manual, that particular

10  policy was taken out.

11          Now, in the manual that was -- that was

12  recreated, the policy to grieve against the director

13  was put back in, and so I was uncertain -- since there

14  had been grievance policies in and grievance policies

15  out and grievance policies back in, I didn't know.

16      Q.  Well, you're saying that sometime after your

17  employment terminated the policy changed again?

18      A.  It changed from before my employment, after my

19  employment, and then after my employment it changed

20  again.

21      Q.  All right.  My question to you was at the time

22  your employment terminated, the policy manual that was

23  in effect was the one -- or the grievance procedure

24  that was in effect was the one that's marked as

25  Exhibit 14; isn't that true?

A.   Uh-huh.

Q.   Is that a yes?

A.   Yes.

Q.   Okay.  And the grievance procedure that was in effect at the time your employment terminated showed that the executive director would have the final word on any grievance; isn't that true?

A.   Well, see, that's what I'm unsure about.  After I was -- after I was terminated, I wrote on my final personnel action form that I felt that it was a wrongful termination and I started going to board members and asking for the bylaws of the organization.

Q.   Okay.

A.   One particular -- one particular board member said to me, "Well, you can present a grievance against the executive director."  Another one said, "Well, it's up to the executive" -- another board member said, "It's up to the executive director," and then another member said something else.

Q.   Okay.

A.   In fact, I had a great deal of difficulty even getting my personnel file because, what my rights were after termination, it didn't seem like anyone knew.

MR. COWLEY:  I'll object as nonresponsive. Would you read the last question?

yet happened?

A. Or she was unfamiliar with -- she felt -- and it was Ms. Margaret Howard. She felt that -- when I went to her, she felt that I had the ability to grieve the executive director. When I asked for a copy of the bylaws of the community health center, I wasn't given them.

Q. If we look at what's marked as Kavanaugh Exhibit 14, now, I believe you have testified that this is the grievance procedure in effect at the time your employment terminated; am I right?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. Okay. Now, if we look on -- the very last sentence of that policy, "The executive director has the final decision on a grievance appeal." Did I read that correctly?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. Okay. Now, then, the first step of the grievance procedure, if someone wanted to file a grievance, is to take the matter to their immediate supervisor; am I right?

A.   Yes.

Q.   Okay, which you didn't do?

A.   Well, on my personnel action form, I wrote that I felt that the termination was wrongful.

Q.   Well, the first step of the grievance procedure would be to present your grievance to Ms. Alpert?

A.   Uh-huh.

Q.   Is that right?

A.   Yes.

Q.   And you didn't do that?

A.   That's correct.

Q.   Okay.  The one who had told you your employment was terminated and who in fact terminated your employment was Ms. Gomez; isn't that true?

A.   That's correct.

Q.   Okay.  There was nothing within that grievance procedure that would allow you to go above Ms. Gomez to the board to protest your dismissal; isn't that true?

A.   That's correct.

Q.   Okay.  Nonetheless, you sent a memorandum to the board saying that you wanted to protest your termination; is that true?

A.   That's correct.

Q.   Okay.  I'll show you what we'll mark as Exhibit 15 and ask that you look at that.

allegation that you felt like that your employment was
terminated because you were non-Hispanic.

A.   On Page 31 I write that this response contains
a portion of my grievances against the clinic.  It does
not contain all of my grievances.

Q.   Okay.  Anywhere within the document marked as
Exhibit 17 do you make the allegation that you feel
like you were singled out and treated unfavorably
because you were not Hispanic?

A.   This is going to take a couple of minutes.

Q.   Take all the time you need.

A.   From my superficial review, I do not see that I
include that as one of the described grievances.

Q.   Okay.  Is there anywhere within the document
marked as Exhibit 17 where you complain that you were
singled out and treated adversely because you're male?

A.   Without reading the whole document, no.

Q.   Okay.

A.   I don't know.

Q.   Okay.  To your knowledge, is there anything
within Exhibit 17 -- is there anywhere in Exhibit 17
where you complain that you were singled out and
treated adversely because you were over 40?

A.   No.

Q.   Okay.  Would you agree with me, then, based

1  upon your reading of Exhibit 14 -- and I realize that

2  it was brief.  It was right here on the camera -- that

3  there was no complaint made to the board of directors

4  in Exhibit 17 that you were in any way mistreated on

5  account of either your national origin, your gender, or

6  your age?

7      A.  I believe that it's implied on every page that

8  I was mistreated because of my gender, race, and age,

9  and at the end I do note that that doesn't contain all

10  the grievances that I had.

11      Q.  You would expect someone to infer from each

12  page in here that you were mistreated on account of

13  your national origin, gender or age?

14      A.  I'm saying that my complaint of discrimination

15  is implied because what I do -- what I do state quite

16  clearly is that I was treated in a unique manner.

17      Q.  Do you say anywhere in there that the reason

18  that you were treated in a unique manner was either

19  national origin, age, or gender?

20      A.  I don't believe that I mentioned that

21  explicitly.

22      Q.  Okay.  Did you give any examples of people who

23  were non-Hispanic treated more favorably than you?

24      A.  No, I didn't speak about anyone in -- any

25  particular individual in there.

Q.  Did you give examples of anyone who was female treated more favorably than you?

A.  No.

Q.  Did you give any examples of anyone younger than you treated more favorably than you?

A.  No.

Q.  I'll show you a multi-page document marked as Exhibit 18.  And I will represent to you that it was given to me by you.

A.  What did you just say?

Q.  I will represent to you that the document marked as Exhibit 18 was given to me by you.

A.  I made it available as part of the documents.

Q.  Okay.  The top sheet of Exhibit 18 was prepared by you; am I correct?

A.  Yes.

Q.  To Dr. J. J. Martinez?

A.  Yes.

Q.  He was the president of the board of directors?

A.  Yes.

Q.  Okay.  And at the next to last paragraph -- tell me if I read this correctly -- "I am requesting therefore that the personnel committee of the board of directors of the Brownsville Community Healthcare Center convene as quickly as possible to address my

14:29:20 1  continuing complaints against the BCHC administration."

14:29:24 2  Did I read that correctly?

14:29:25 3      A.  Yes.

14:9:26 4       Q.  In other words, you were requesting that the

14:29:27 5  board allow -- give you an audience?

14:29:30 6      A.  Yes.

14:29:31 7      Q.  Okay.  Did that ultimately happen?

14:29:35 8      A.  Yes.

14:29:36 9      Q.  Okay.  Excuse me, let's go back a minute to

14:29:48 10 Exhibit 17.  And in particular I'm going to go to

14:29:55 11 Page 30 and ask you if -- to tell me if I read this

14:29:58 12 correctly.  The fourth paragraph from the bottom,

14:30:02 13 quoting, "In return for my public silence regarding

14:30:06 14 these issues and others which comprise" --

14:30:09 15     A.  "Compromise."

14:30:11 16     Q.  I'm sorry -- "Compromise the integrity of

14:30:14 17 Brownsville Community Health Center, I'm requesting

14:30:15 18 three things of the BCHC board of directors."  Did I

14:30:18 19 read that correctly?

14:30:19 20     A.  Yes.

14:30:19 21     Q.  One thing that you were requesting in return

14:30:21 22 for your public silence was "that all paperwork

14:30:26 23 implying that I was terminated for cause from BCHC be

14:30:28 24 expunged from all personnel -- personal and personnel

14:30:33 25 files within and without the confines of the

14:30:36  1   Brownsville Community Health Center."  Did I read that

14:30:38  2   correctly?

14:30:38  3       A.   Yes.

14:30:39  4       Q.   Second, "That I be given a positive final

14:30:43  5   performance evaluation by my former immediate superior

14:30:45  6   and that the ED write me a favorable letter of

14:30:50  7   reference for the accomplishments I and the campus care

14:30:54  8   centers achieved during my 21-month tenure."  Did I

14:30:54  9   read that correctly?

14:30:55 10       A.   Yes.

14:30:55 11       Q.   And, third, "That I be paid $10,000 a month for

14:30:59 12   200 consecutive months out of the general operating

14:31:02 13   funds of the BCHC."  Did I read that correctly?

14:31:04 14       A.   Yes.

14:31:05 15       Q.   You were telling the board of directors that

14:31:07 16   you would keep silent about your complaints if they

14:31:17 17   would give you 2 million dollars?

14:31:17 18       A.   What I was doing was I wanted an audience with

14:31:17 19   the board of directors.

14:31:19 20       Q.   But what you said was, "I will keep silent on

14:31:20 21   what I know about this organization if you will give me

14:31:23 22   2 million dollars"?

14:31:24 23       A.   What I was telling the board was I wanted to

14:31:29 24   speak with them and I wanted them to know about my

14:31:33 25   situation, and, unfortunately, I felt at the time that

I needed to put something outlandish to convince them
to give me an audience.

Q. Do you say anywhere, "I'm just joking"?

A. No.

Q. Okay. What you said is, "In return for my
public silence, I want three things. One of those
things is 2 million dollars." Is that what you said?

A. Yes.

Q. Okay. I'll show you a document marked as
Exhibit 19, and I would ask that you look at that.
Have you had a chance to look at Exhibit 19?

A. Yes.

Q. Okay. Was that a document that you prepared?

A. Yes.

Q. Okay. Now I show you a document marked as
Exhibit 20.

Have you had a chance to look at the
document marked as Exhibit 20?

A. Yes.

Q. Okay. It would appear to me that that's a
letter from the president of the board?

A. Yes.

Q. To you?

A. Of BCHC.

Q. Okay. The president of the board of BCHC to

14:35:10 1   tag-teamed, now.  You guys need to decide which one do

14:35:14 2   you want to be voicing your complaints.

14:35:15 3       Q.  Okay, "On behalf of the board of directors, I

14:35:17 4   am inviting you to come before the board on:

14:35:19 5   Wednesday, August 16th, 2000."  Did I read that

14:35:21 6   correctly?

14:35:22 7       A.  Yes.

14:35:22 8       Q.  "At the clinic conference room"?

14:35:24 9       A.  Yes.

14:35:25 10       Q.  "2137 East 22nd Street, Brownsville"?

14:35:28 11       A.  Yes.

14:35:29 12       Q.  "At 6:30 p.m."?

14:35:30 13       A.  Yes.

14:35:31 14       Q.  "We are willing to listen to your concerns at

14:35:33 15   that time."  Did I read that correctly?

14:35:34 16       A.  Yes.

14:35:34 17       Q.  Okay.  Did that meeting take place?

14:35:36 18       A.  Yes.

14:35:39 19       Q.  Okay.  Did you attend?

14:35:40 20       A.  Yes.

14:35:41 21       Q.  And I'll show you what I will mark as Kavanaugh

14:35:45 22   Exhibit -- well, excuse me.  Okay, I'll show you what

14:35:53 23   I'll mark as Kavanaugh Exhibit 21.

14:37:00 24            Have you had a chance to look at

14:37:01 25   Exhibit 21?

A.   Yes.

Q.   Is that a document that you presented to the board of directors on that occasion?

A.   I believe so.

Q.   Okay.  Do you have any reason to believe that it's not a true and correct copy?

A.   I don't have my copy to compare with it, but it seems all right.

Q.   Okay.  Did you in fact -- assuming that Kavanaugh Exhibit 21 is a true and correct copy, did you give the original or copies of the document marked as Exhibit 21 to the members of the board?

A.   Yes.

Q.   Were you allowed to make any oral presentation?

A.   Yes.

Q.   Did you do so?

A.   Yes.

Q.   Did you discuss the matters that are contained in Exhibit 21?

A.   Some of them.

Q.   Okay.  Did you discuss matters outside of what is in Exhibit 21?

A.   I don't remember all that I did discuss.

Q.   Okay.  How long were you before the board?

A.   15 to 20 minutes.

1   nothing keeping you from giving a copy to your

2   attorneys, is there?

3       A.  No.

4       Q.  Where within the document that you presented to

5   the board on August 16th do you say that your

6   employment was terminated because of your gender, your

7   national origin, or your age?

8               MR. ZABARTE:  Which document?  Which

9   exhibit?

10              THE WITNESS:  This.

11              MR. COWLEY:  Exhibit No. -- I'm sorry --

12   21.

13       A.  I don't address it in this document.

14       Q.  Okay.

15       A.  But I do say that there are additional

16   concerns.

17       Q.  Okay.  And you're saying the board of directors

18   is supposed to infer from "additional concerns" that

19   you're saying that you were discriminated against on

20   the basis of your age, national origin, or gender?

21       A.  I really can't say what the board of directors

22   should think or not think.

23       Q.  Okay.  I'll show you what we'll mark as

24   Exhibit 25.

25              The document marked as Exhibit 25 was

prepared by you?

 A. Yes.

 Q. And sent to the individuals shown?

 A. Yes.

 Q. Okay. At that time you were still requesting some kind of answer from the board?

 A. Yes.

 Q. Going back to Exhibit No. 22, tell me if I read this correctly. Next to last paragraph of Exhibit 22, "As I told you, I will halt filing complaints when and if the BCHC board of directors responds favorably to my requests." Did I read that correctly?

 A. Yes.

 Q. And your requests were that you be reinstated?

 A. My requests were that I be put on administrative leave.

 Q. And your -- the termination of your employment reversed?

 A. That my termination be investigated by the board.

 Q. Okay, was one of your requests that you be paid 2 million dollars?

 A. Yes.

 Q. Okay. And, unless those requests were

clear that the --

A. Dr. Gomez is?

Q. I'm sorry, Dr. Martinez.

A. Okay.

Q. -- made clear that the ultimate authority as to whether or not you were fired was with the executive director.

A. Well, that's what he wrote, but I haven't seen the bylaws.

Q. Well, okay. By September 5th, you were fully aware that the board was not going to take any action in your favor with respect to the termination of your employment; isn't that true?

A. Yes.

Q. And by September 5th, the board, at least by the document marked Exhibit 26, had told you that it was never within its authority to do so?

A. That's what they told me.

Q. Okay. Now, you tried to testify earlier, much earlier in the deposition, that you were simply told that maybe you were fired on July the 27th but it really didn't become final until later; is that your testimony?

A. No.

Q. You were fired on July the 27th?

A.   That is when I was given my letter of
termination by the executive director.

Q.   That's when she fired you; isn't that true?

A.   Yes.

Q.   Okay.  At no time when you protested your
dismissal before the board of directors did you ever
state that you felt like you were fired because you
were non-Hispanic; isn't that true?

A.   That is true.

Q.   And at no time did you ever, when protesting
your dismissal before the board of directors, make the
allegation that you were discharged because of your
age; isn't that true?

A.   That's true.

Q.   And at no time when you protested your
dismissal before the board of directors did you ever
make the allegation that you felt like you were
discharged because you were male; is that true?

A.   Not explicitly.

Q.   Did you ever say to the board of directors in
any fashion, "I believe I was fired because I was
male"?

A.   I did not use those words.

Q.   Okay.  Did you ever say to the board of
directors, "I believe that I was fired because female

employees are treated more favorably than I am"?

A.  I did not use those words.

Q.  Okay.  In what way did you apprise the board that you felt like that your employment was terminated because of your gender?

A.  I told them in both documents that I had concerns and complaints other than those stated.

Q.  Okay.  So by that general catchall you're saying the board should have inferred that maybe you had a complaint about discrimination?

A.  I cannot say what the board should have inferred and should not have inferred.

Q.  Okay.  Did you let it go once you had gotten the document marked as Exhibit 26, or did you keep writing to the board?

A.  What do you mean, "Did you let it go?"

Q.  Did you continue to protest your dismissal?

A.  I continued to voice my complaints to the board.

Q.  Regarding --

A.  After July 27th.

Q.  How about after September 5th?

A.  After September 5th, also.

Q.  You continued to voice your concerns to the board regarding your dismissal after September 5th?

Q.   You gave her the letter -- the same letter that you sent to them?

A.   I did not give them the exact same letter.

Q.   The day came when you filed a lawsuit against the Brownsville Community Health Center; am I right?

A.   Yes.

Q.   Something that is referred to as Plaintiff's Original Petition; am I correct?

A.   Yes.

Q.   Now, on a number of occasions you had made the representation to the board that you were not yet represented by counsel.  Do you recall that?

MR. HORTON:  Let me see that.

Q.   Do you recall making the statements to the board that you were not yet represented by counsel?

A.   Yes.

Q.   At the time that you filed what is before your attorney as Plaintiff's Original Petition, were you represented by an attorney?

A.   I was getting legal counsel, but I -- there was no attorney of record, no.

Q.   Okay.  When did you first seek an attorney with respect to the termination of your employment with the Brownsville Community Health Center?

A.   When did I begin seeking?

A.  Right.

Q.  -- lawsuit?  Okay, if I look at Section III, the third paragraph, "Beginning in the spring of 1999, the plaintiffs started reporting violations of law to the Texas Department of Health and other management officials."  Actually, you didn't make any report to the Texas Department of Health in the spring of 1999, did you?

A.  Only indirectly and --

Q.  To Sister Mary?

A.  Yes.

Q.  That was all?

A.  That's it.

Q.  Okay, and you didn't expect her to do anything about it, did you?

A.  I was doubtful that she would do anything about it.

Q.  Well, you didn't ask her to, did you?

A.  No.

Q.  Okay.  You referred to it as just a casual conversation; is that right?

A.  Yes.

Q.  Okay.  "Specifically, the plaintiff told the Texas Department of Health auditor that there were problems and complaints about misappropriation of

1   monies to the campus care centers."  That didn't

2   happen, did it?

3      A.  Yes.

4      Q.  When?

5      A.  It happened soon after I became employed at the

6   Brownsville Community Health Center when the TDH

7   auditor came in and I had an opportunity -- he wanted

8   to speak with me before the audit terminated, and I

9   spoke to him about the fact that other employees of

10  Brownsville Communication -- Brownsville Community

11  Health Center had had questions about finances and that

12  there were complaints about how the money was used.

13  And I was told by Ms. Alpert and Ms. Lisa Bennett that

14  one of the reasons Ms. Dentler resigned was over

15  disagreements about how campus care money was being

16  used.

17     Q.  Do you remember this morning you testified

18  under oath that the only report that you made of any

19  wrongdoing outside of the agency was to Sister Mary?

20  Do you recall that?

21     A.  This wasn't a report of wrongdoing.  This was

22  telling the auditor what I heard from other campus care

23  center employees and BCHC employees.

24     Q.  Okay.  The truth of the matter is you did not

25  report any impropriety to the Texas Department of

Health auditor; isn't that a fact?

　　A.　I would -- not when he came in spring of '99

because I was new.  I didn't know what --

　　Q.　You had nothing to report; isn't that true?

　　A.　Yes.

　　Q.　Okay.

　　A.　I was brand new.

　　Q.　So when your petition says that, "Specifically,

the plaintiff told the Texas Department of Health

auditor that there were problems and complaints about

misappropriations of money to the campus care centers,"

that's not true, is it?

　　A.　Well, I was telling him at that point that the

reason why people requested an audit from the

Brownsville Community Health Center was because there

were complaints about how the money was being used.

　　Q.　But you didn't know of any, did you?

　　A.　Only what I had been told.

　　Q.　Okay.  So you had nothing to report to any

auditor; isn't that true?

　　A.　Not in the spring of '99.

　　Q.　Okay.  In fact, you didn't make any specific

complaint of your own to the Texas Department of Health

until after your employment had terminated; isn't that

true?

A.   Any formal complaint, yes.

Q.   Okay.  It says here, "A report was generated by the auditor stating that income for the campus care centers should be divided into three separate accounts so that monies could be properly accounted for."  Did I read that correctly?

A.   Yes.

Q.   That wasn't as a result of anything you did, was it?

A.   No, that was a result of the previous audit.

Q.   Okay.  Quoting, "After said reports, plaintiff realized that the Brownsville Community Health Center had not complied with the auditor's request and wrote memos to his department supervisor stating his concerns."  Did I read that correctly?

A.   Yes.

Q.   The memos would be the October and the January memos that you wrote to Mr. Garcia?

A.   Right.

Q.   Am I right?

A.   About 761.

Q.   Okay.

A.   About Account 761.

Q.   Your concerns about Account 761 had nothing to do with the TDH auditor, did it?

MR. ZABARTE:  Ray, what was the question?

THE REPORTER:  "Would you agree with me that the lawsuit that you originally filed complained that you were fired because of reports you made of improprieties?"

A.  Right here, I referred to illegal discrimination.

Q.  I see.  Right above where it says the illegal discrimination, it says, "Whistle-Blower Act."  Do I read that correctly?

A.  Yes.

Q.  Okay.  And the illegal discrimination you refer to makes no mention whatsoever in the original petition of age, national origin, or gender; isn't that true?

A.  That's true.

Q.  What is alleged in your original petition was that you brought to light or to attention improprieties at the center; am I right?

A.  Correct.

Q.  Okay.  So the only discrimination you were referring to in Plaintiff's Original Petition was that you felt like you were being retaliated against because of your reports of improper activity.

A.  That did not contain the totality of my legal complaint.

she said to me, "Your problem is that you're not Joan Dentler."

Q. Well, you never said to Ms. Alpert, "I believe that I am being discriminated against because I'm male," did you?

A. No.

Q. You never said to Ms. Alpert, "I believe I'm being discriminated against because of national origin," did you?

A. No.

Q. You never said to her that you were being discriminated against on the basis of age, did you?

A. No.

Q. Okay. The only time you ever made the allegation to anyone that you felt like you were discriminated against at Brownsville Community Health Center was on the document marked as Exhibit 31; isn't that true?

A. I don't know.

Q. Well, can you point to a single document anywhere that would indicate where you made that complaint before April the 26th of 2001?

A. I have to review the documents and think about it.

Q. As far as you know, as we sit here today, the

1    representation to that you were being discriminated

2    against because of any of those three factors?

3         A.  To the best of my knowledge, in a formal and

4    legal way, with my attorneys.

5         Q.  Okay.  Other than your attorneys, the first

6    time you ever made the allegation to anyone that you

7    were discriminated against by the Brownsville Community

8    Health Center on the basis of national origin, age, or

9    gender was on the document marked Exhibit 31; isn't

10   that true?

11        A.  I cannot remember.

12        Q.  Okay.  As best you can recall, this was the

13   first time?

14        A.  This was the first time I put it in writing

15   with an agency explicitly, I believe.

16        Q.  Okay.

17        A.  But I'm not sure.

18        Q.  And you don't recall ever making even a verbal

19   allegation to any agency prior to this; isn't that

20   true?

21        A.  I do not recall at this time.

22        Q.  Okay.  Now, while your original petition was

23   pending, there was something called a motion for

24   summary judgment that was filed; do you recall that?

25        A.  Yes.

Q.   With the Texas Department of Health?

A.   Different members of the Texas Department of Health.

Q.   During the spring of 1999; is that your testimony?

A.   Yes.

Q.   Did you ever indicate to the Texas Department of Health during that period that you thought that funds were being improperly administered by the BCHC?

A.   Most of my conversations with them was -- had to do with asking them questions about how to properly expend the funds.

Q.   Do you recall this morning when you testified under oath that the only complaint that you made during your employment to the Texas Department of Health was just the remark you made to Sister Mary?

A.   Yes.

Q.   Was that a true testimony?

A.   Yes.

Q.   You never made any complaint regarding expenditure of funds to the Texas Department of Health during your employment, did you?

A.   I never made any complaints during -- are you referring to the spring of '99?

Q.   Yes, sir.

A.    I never made any complaints.  What I did was I was in constant contact with them about discussing how the money should be moved, what -- how the money should be moved around.  I was talking to -- because I never got the final auditor's report, from the spring of '99 I was talking to the auditor about what his intention was for the use of that money.

Q.    If we look at Paragraph 11, quoting, "Upon being advised that respondent" -- that would be the BCHC.

A.    Okay.

Q.    -- "would terminate CP, CP opposed respondent's conduct toward him both orally and in writing."  Did I read that correctly?

A.    Yes.

Q.    Now, in fact, you were told that you were terminated on July 27th; am I right?

A.    Uh-huh.

Q.    Is that a yes?

A.    Yes.

Q.    Not that you would be, that you were; isn't that true?

A.    That's correct.

Q.    Okay.  When your charge of discrimination refers to discrimination on the basis of national

1  origin, age, or gender, have you testified to the Court

2  today of all the matters -- or all the facts or

3  information you would point to to show why you believe

4  that you were discriminated against?

5     A.  I'm sure I have not testified about everything.

6     Q.  Have you told us everything you can remember?

7     A.  I have told you everything that I can remember

8  at the time that you asked it.

9     Q.  Okay.  You applied for unemployment following

10  the termination of your employment?

11     A.  That's correct.

12     Q.  Almost immediately; isn't that true?

13     A.  I would have to go back and look at the

14  records.

15     Q.  Okay.  And you stated to the Texas Workforce

16  Commission that you were terminated because of

17  insubordination; is that what you said?

18     A.  Like I said, I would have to go back and look.

19  I forget.  I don't have those documents here.

20     Q.  Okay.  Do you recall that when you made your

21  application for unemployment that you had to state to

22  the Texas Workforce Commission that you were capable of

23  working?  Do you recall that?

24     A.  I don't recall it, but it sounds reasonable.

25     Q.  Do you recall that there were certain questions

the Texas Workforce Commission.

MR. ZABARTE:  I think that in answers to discovery, I think he may have answered that directly to you.

Q.  I have got before me -- I won't make it an exhibit at this time -- your complete file from the Texas Workforce Commission.

A.  Okay.

Q.  As I look at it, it would indicate that you received $294 for 23 weeks.

A.  That sounds reasonable.

Q.  Okay.  And that you first applied for unemployment on August the 6th.  Does that sound about right?

A.  That sounds -- I mean, I can't say for sure, but that sounds about right.

Q.  The reason you applied for unemployment or regarded yourself as eligible for unemployment was because you had been fired; am I right?

A.  I had been terminated, that's correct.

Q.  Okay.  Now, when you -- you sent documentation to the Texas Workforce Commission.  Do you recall that?

A.  Yes.

Q.  And you even sent them a copy of the 31-page letter that you sent to the -- to the board of

Q.  I take it, then, that it has been -- it has been your decision to remain at Valley Doctors Clinic?

A.  Yes.

Q.  Okay.  Do you like working for Valley Doctors Clinic?

A.  Yes.

Q.  Okay.  Is it your intention, at least for the near future, to remain there?

A.  Yes.

Q.  You're not asking the Court in this lawsuit to have you reinstated back at BCHC, are you?

A.  No.

Q.  Okay.  How do you regard yourself as having been harmed by the termination of your employment?

A.  I'm -- don't understand the question.

Q.  Okay.  You obviously were out of work for about -- almost six months?

A.  Uh-huh.

Q.  Am I right?

A.  Yes.

Q.  Okay.  During which time you were receiving $294 a week in unemployment?

A.  Yes.

Q.  Okay.  And $294 a week was less than you made while working for BCHC?

Q.  Did she curse you?

A.  No.

Q.  Did she shout at you?

A.  No.

Q.  Was there anything uncivil or rude about her manner during that meeting?

A.  No.

Q.  Okay.  So when you complain about your employment being terminated, you're complaining about the fact of the termination, not the way in which Ms. Gomez carried it out; am I correct?

A.  Could you ask that question again, please?

Q.  Well, there was nothing rude or -- there was nothing about the manner in which your employment was carried out that you would complain of, is there?

A.  At the meeting of the termination, it was less than three minutes long, and I do not recall any uncivil behavior by anyone present.

Q.  It was done in private; am I right?

A.  Yes.

Q.  Door closed?

A.  Yes.

Q.  You were told that you would have an opportunity to remove your personal belongings?

A.  Yes.

16:15:40  1   to the Texas Department of Health, did you?

16:15:43  2       A.   I did not make a formal complaint.   What I did

16:15:46  3   was I sought continuous advice from them on what I was

16:15:53  4   supposed to do, given the results of their audit.

16:16:07  5       Q.   You never made any -- you never reported any

16:16:07  6   violation of law to the Texas Department of Health, did

16:16:07  7   you?

16:16:07  8           MR. ZABARTE:   You know, the question has

16:16:07  9   been asked and answered in different times --

16:16:10 10           MR. COWLEY:   Okay.

16:16:11 11           MR. ZABARTE:   -- during this deposition.

16:16:12 12       Q.   Let's look at Paragraph 7, "Beginning in the

16:16:15 13   spring of 1999, the plaintiff began reporting

16:16:18 14   violations of law to the Texas Department of Health,"

16:16:20 15   and the question is simply, you never made any reports

16:16:23 16   of violations of the law to the Texas Department of

16:16:25 17   Health, did you?

16:16:29 18       A.   I would have to go back and look at my E-mails.

16:16:32 19       Q.   As far as you know, you didn't; isn't that

16:16:34 20   true?

16:16:35 21       A.   I would have to go back and look at my E-mails

16:16:39 22   to answer that question.

16:16:51 23       Q.   If we look at Paragraph 8, it says, "Later

16:16:54 24   plaintiff spoke to the Texas Department of Health and

16:16:57 25   complained of similar problems and concerns of

Q. And you complied?

A. Yes.

Q. Okay. If we look at Paragraph 16 of the amended complaint, it says, "Upon being advised that defendant would terminate him, plaintiff opposed defendant's conduct toward him both orally and in writing." Did I read that correctly?

A. Yes.

Q. Actually, once again, Ms. Gomez told you you were fired; am I right?

A. Uh-huh.

Q. Is that yes?

A. Yes.

Q. She didn't tell you you would be. She told you you were; isn't that true?

A. Yes.

Q. Okay. The next sentence says, "Thus, plaintiff asserted his rights under the applicable federal statutes by opposing a practice made unlawful thereunder."

You never complained following the termination of your employment of discrimination on the basis of age, national origin, or gender until you filed your charge that's marked as Exhibit 31; isn't that true?

A. I never included this as part of the complaint, no.

Q. You never included discrimination on those bases as part of your complaint; isn't that true?

A. Yes.

Q. Okay.

A. Could you just give me one more break?

Q. Sure. We'll take a break.

(Brief recess)

A. Mr. Kavanaugh, I'm going to show you a multi-page document marked as Exhibit 32, and I'll represent to you that it only came into my possession more recently than I answered discovery. Your attorney may want to look at it.

MR. ZABARTE: The only objection I make is if it's something that was requested and it's not in response to a specific discovery request, then I would object to this production at this time, but you can ask him questions about it.

Q. Have you had a chance to look at Exhibit 32?

A. Yes.

Q. Is the document marked as Exhibit 32 something that you prepared?

A. Yes, it appears so.

Q. And it is a document that you sent to the

16:28:02  1    senior management team; am I right?

16:28:05  2         A.   Yes.

16:28:06  3         Q.   Okay.   Now, at the time you sent the document

16:28:09  4    marked as Exhibit 32, you had been working some eight

16:28:13  5    months or thereabouts for your new employer; am I

16:28:17  6    right?

16:28:17  7         A.   Yes.

16:28:17  8         Q.   And you're not in any way seeking

16:28:19  9    reinstatement.   You testified to that; do you recall

16:28:23 10    that?

16:28:24 11         A.   Yes.

16:28:24 12         Q.   You had earlier made clear to the board that

16:28:27 13    unless they met your demands, you would keep

16:29:40 14    complaining.   Do you recall that?

16:28:31 15         A.   Yes.

16:28:32 16         Q.   The board didn't pay you the 2 million dollars,

16:28:36 17    did they?

16:28:37 18         A.   I do not believe that they investigated my

16:28:40 19    complaints.

16:28:41 20         Q.   Okay.   And so you're continuing to complain?

16:28:47 21         A.   Yes.

16:28:51 22         Q.   And I'll show you a multi-page document marked

16:28:55 23    as Exhibit 33 and would ask that you look at that.

16:29:19 24              MR. ZABARTE:   I'm going to make the same

16:29:20 25    objection I made on Exhibit No. 32.

232

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PAUL CAMERON KAVANAUGH            X
                                  X
                                  X
                                  X
VS.                               X    CASE NO. B-01-104
                                  X
                                  X
BROWNSVILLE COMMUNITY HEALTH      X
CLINIC CORPORATION, D/B/A         X
BROWNSVILLE COMMUNITY HEALTH      X
CENTER                            X

REPORTER'S CERTIFICATE

        I, SHELLEY STINGLEY, Certified Court
Reporter, certify that the witness, PAUL KAVANAUGH, was
duly sworn by me, and that the deposition is a true and
correct record of the testimony given by the witness on
DECEMBER 19, 2001; that the deposition was reported by
me in stenograph and was subsequently transcribed under
my supervision.

        I FURTHER CERTIFY that I am not a
relative, employee, attorney or counsel of any of the
parties, nor a relative or employee of such attorney or
counsel, nor am I financially interested in the action.

        WITNESS MY HAND on this the 11th day of
January, 2002.

                    _Shelley Stingley by: Rosk_
                    SHELLEY STINGLEY, CSR NO. 5725
                    Expiration Date: 12/31/02
                    Bryant & Stingley, Inc.
                    2010 East Harrison
                    Harlingen, Texas  78550