30

United States District Court
Southern District of Texas
FILED

MAR 2 5 2002

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| PAUL CAMERON KAVANAUGH,<br>Plaintiff, | §<br>§<br>§ | |
| VS.<br>BROWNSVILLE COMMUNITY HEALTH CLINIC CORPORATION, D/B/A BROWNSVILLE COMMUNITY HEALTH CENTER,<br>Defendant. | §<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. B-01-104<br><br>JURY TRIAL DEMANDED |

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT

1. COMES NOW PAUL CAMERON KAVANAUGH,Ph.D., Plaintiff in the above referenced case, and files his response to the Defendant's Motion for Summary Judgment, and in support thereof respectfully shows unto the Court as follows:

2. Defendant Brownsville Community Health Clinic Corporation, D/B/A Brownsville Community Health Center is a private non-profit corporation which functions as public entity predominantly serving low-income individuals by providing indigent health care (medical and dental). It operates three clinics referred to as campus care centers at various public schools.

3. Paul Kavanaugh was hired to be the director in charge of the satellite clinics, referred to as the Campus Care Centers. From the moment that Dr. Kavanaugh began his employment, he noticed and was informed of problems at the clinic. He reported the problems including problems with regard to inconsistencies between the recommendations made by the Texas Department of Health with respect

to handling of funds for the accounts of the three clinics, and the manner in which the administration was handling the funds for said accounts. (Exhibit "B", P. Kavanaugh p.20-48,57). He also recognized problems with regard to nepotism at the Brownsville Community Health Center. (Exhibit "B", P. Kavanaugh p.51-57). All instances of such "nepotism" involved Mexican-American employees and Mexican-American relatives of same.

4. He began to believe he was receiving unequal treatment by Enrique Garcia, the Finance Director and Hilda Gonzalez, the Human Resources Director (his immediate supervisor) and Paula Gomez, the Executive Director. He also received no support from the administration, and the employees sensed that, and used it in their favor against Dr. Kavanaugh. (Exhibit "A"). He was discriminated against and disciplined for having reported various improprieties mentioned above regarding use of public funds, along with repeated some improprieties to the Texas Department of Health. (Exhibit "A"). He was told by the Executive Director not to let Brownsville Independent School District know what was going on. (Exhibit "B", P. Kavanaugh p.23).

5. During the time that he worked with Defendant, he saw disparate treatment between himself other employees who were Hispanic, who were female, and who were younger. (Exhibit "A"). He was the only full time man working in the Campus Care Centers. (Exhibit "B", P. Kavanaugh p. 111). Was also told by his

immediate supervisor, Emily Alpert that he was being treated differently because he was "not Joan Dentler", a female. (Exhibit "B", P. Kavanaugh p. 110 and 114). The message he received was that he was not a member of the "club". (Exhibit "B", P. Kavanaugh p. 114). Plaintiff states that it was very difficult to deal with situations when his supervisor's felt that he was not acceptable because of his characteristics. (Exhibit "B", P. Kavanaugh p.119). Though Paula Gomez did not know who the decision makers at the clinic were when Mr. Kavanaugh was terminated, the decision makers at the clinic today, according to Ms. Gomez, are all either female or Hispanic, and the only person who is non-Hispanic is considered by Ms. Gomez to be "Jewish". (Exhibit "C", P. Gomez p.96-98).

6. Before Dr. Kavanaugh's termination, Ms. Gomez offered Plaintiff a job as a grant writer because he was good at that (Exhibit "C", P. Gomez p.54) though she criticized him for his abilities on same (Exhibit "C", P. Gomez p.47). Dr. Kavanaugh believed that after the way he had been treated thus far that this was a pretext to eventually fire him. The reasons for this are that there was a person who was under contract to do the job of grant writing, there was no job description, there was no discussion with regard to salary approval of the board for the job description, and there was no assurance that such position was budgeted. (Exhibit "B", P. Kavanaugh p.121-123); (Exhibit "C", P. Gomez p. 54-56),(Exhibit "A"). That position does not even exist

today (Exhibit "C", P. Gomez p.56).  In short, he felt that the Executive Director was trying to railroad him to accept a new position which eventually would not be authorized. (Exhibit "A").

7.   Ms. Gomez has offered various reasons for Plaintiff's termination, all of which are easily controverted by her own testimony (Exhibit "C", P. Gomez' deposition in entirety).  What cannot be denied by her is her admission that Plaintiff's job description was not completed until one month before his termination (Exhibit "C", P. Gomez p.42), that alleged write up for things done as months before were not signed by his supervisor until right before his termination (Exhibit "C", P. Gomez p. 80), that Plaintiff was the only person she terminated for being late for a meeting (Exhibit "C", P. Gomez p.41), and that he received a national award for his work while he was supposedly on probation (Exhibit "C", P. Gomez p. 77).

8.   The person who was hired in Plaintiff's place is Hispanic and is less than 40 years old. (Exhibit "C", P. Gomez p.108).  In fact, at the time the young Mexican-American replaced Dr. Kavanaugh, the person was 29 or in his early 30's.

9.   Plaintiff originally filed suit in Texas State Court under the Whistleblower Act pro se, addressing free speech violations.  Since then, he has brought claims alleging that he was terminated not only because of such free speech claims but because of his national origin, age, and gender.  He has recently amended his

complaint to include violations of ERISA, COBRA and HIPPA.

10.   He appealed his termination to the Board. He was told that he had no right to appeal according to the policy. However, the policy was changed a few months before his termination to exclude an appeal to the Board, allowing the Executive Director, the person about whom Dr. Kavanaugh had complaints, to be the final arbiter of the complains which ultimately lead to Plaintiff's termination. (Exhibit "B", P. Kavanaugh p. 132,133); (Exhibit "A"). This policy itself raises issues of procedure due process".

II.

11. Summary Judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter or law. Celotex Corp. v. Catrett ,477 U.S. 317,323-25, 106 S. Ct. 2548,252-54, 91 L.Ed.2d 265 (1968). A dispute about a material fact is "genuine" when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

12. Conclusive assertions, unsupported by specific facts presented in affidavits, are insufficient to either support or defeat a motion for summary judgment. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888, 110 S. Ct 3177, 3188, 111 L. Ed 2d 695

(1990).

13. All evidence and the inferences to be drawn from the evidence produced in the motion for summary judgment must be viewed in light most favorable to the party opposing the motion. United States v. Diebold, 369 U.S. 654,655, 82 S.Ct. 993, 994, 8 L.Ed. 2d 176 (1962); Marshall v. Victoria Transp. Co., 603 F.2d 1122, 1123 (5th Cir. 1979).

III.

Plaintiff can prevail on claims brought under the Texas and United States Constitutions.

14. The Supreme Court has a enumerated situations in which a private entity may be found to be a state actor. First, the private entity can be found to be a state actor where there is a sufficiently close nexus between a state and challenged action of the private party such that the private party's actions can be treated as if it is the action of the state. Blum v. Yaretsky, 457 U.S. 991, 1004 (1981); Jackson v. Metropolitan Edison Co., 419 U.S. 345, 350 (1974). The second situation allowing a private entity to be found to be a state actor arises when the state provides significant encouragement either overtly or covertly, or when a private actor operates as a willing participant in joint activity with state or is agents. Brentwood Academy v. Tennessee Secondary School Athletic Association, 121 S.Ct. 924 (2001). Also, Pennsylvania v. Board of Director of City Truss, 353 U.S. 230,231

(1957)(holding that normally if a private entity is controlled by the state, it is a state actor); Edmondson v. Leesville Concrete Co., 500 U.S. 614, 627-28 (1991)(holding that a private entity can be a state actor when it has been delegated a public function by the State); Evans v. Newton, 382 U.S. 296,299-301 (1996)(holding that when the Government is entwined in management or control, private industry can be a state actor).

15. The third manner in which an entity may be found to be a state actor is through the "public function" test. Simply put, if a private entity engages in functions that are "essentially public in nature" then it may be "subject to the enforcement of first amendment rights." State v. Schmid, 423 A. 2nd 615,622-630 (N.J.1980). The courts have listed factors which may be considered in determining whether a private entity (a hospital) functions as a public entity. These factors are:

(a) the extent to which the hospital may have received aid from governmental sources;

(b) the extent to which the hospital is subject to state regulation and inspection;

(c) whether the hospital is licensed or accredited to provide health care to the public;

(d) whether the hospital operates under a lease or grant from the state;

(e) the extent to which the hospital or its staff enjoys a

monopolistic position in the community;

(f) the public purpose or function being served by the hospital;

(g) whether the hospital performs services previously performed by the state;

(h) the extent to which the hospital's governing board and staff are involved in a public function;

(i) any tax exemptions or benefits enjoyed by the hospital;

(j) the extent to which the hospital may be invested with governmental powers; and

(k) whether the hospital may deny access to medical staff or health services to the public at large. 42 A.L.R. Fed. 463 (1979).

16. Thus far, discovery has shown the following facts. Defendant has admitted in deposition that at least 50% of the FUNDS it receives is from governmental sources (Exhibit "C", P. Gomez p. 120). Arguably, the grant writing position which was tauntingly "offered" to Plaintiff dealt with obtaining such funds. (Exhibit "C", P. Gomez p.47,54-56, 14,15). The patient fees generate only 37%. (Exhibit "C", P. Gomez, p.120). The clinic receives approximately three to four million dollars in grants from the Bureau of Primary Health Care/Department of Health and Human Services, and grants from the Texas Department of Health, from the City of Brownsville and from Cameron County in addition thereto. (Exhibit A). All such funds are tax dollars.

17. There is no question that the clinic is subject to state

regulations and inspection in that it is licensed and/or accredited to provide health care to the public. (Exhibit "C", P. Gomez p.47).(Exhibit A).  It is about the impropriety of usage of Title V money, which Plaintiff reported to the Texas Department of Health representative, and the impropriety about campus care centers not separating accounts as per the recommendations of the Texas Department of Health, that he was told by Ms. Gomez to stop writing memos and that he also believes he was being punished. (Exhibit "B", P. Kavanaugh p.20-48,57). These are legitimate matters of public concern.

18.  There is ample evidence which points the fact that the clinic and its staff enjoy a monopolistic position in the community, and that the public function of the clinics is for the purpose of helping the public. (Exhibit "A"). Furthermore, these kinds of services were performed by the City of Brownsville before the clinic came into existence. (Exhibit "A"). In effect, the Clinic is the successor to the City's clinic.

19.  Similarly, the Clinic's governing board and staff perform a public function, the clinic receives tax exemptions or benefits because of the nature of its activities and the clinics are invested with some type of governmental power by virtue of the fact the BISD has been involved with some internal matters there, including hiring and firing of employees of the clinic. A BISD employee actually serves on the clinic's hiring committee. (Exhibit

"C", P. Gomez p. 106, 118, 119). (Exhibit "A").

20. Though the hospital may deny access to the public at large it cannot deny access to certain segments of the community which it is required to serve per the state and federal grants it receives. (Exhibit "A"). Though all of the factors need not be met in order for the court to determine that this "private" entity may be found to be a state actor, all the factors are met in this case.

IV.

The Texas Constitution provides greater guarantees than the Federal Constitution.

21. In Jones v. Memorial Hospital System, the Defendant filed a Motion for Summary Judgment on a basis that the Plaintiff did not have a cause of action for infringement of her constitutional right of free speech under Article 1, Section 8 of the Texas Constitution. 748 S.W. 2nd 891, 893(Tex.Civ.App.-Houston[1st Dist]1998, no writ). However, the court in discussing the factor analysis in the paragraph above, decided that the jury should have the right to determine the law and the facts under the direction of the court as in other cases.

The court noted the distinction between the federal and state free speech guarantees and basically stated that the Texas Constitution provided free speech in positive terms, i.e., every person has the right to speak, as opposed to the United States Constitution which is couched in terms of restriction of

governmental interference with such freedoms. Id. at 893-94. As such the court concluded that the Texas Constitution laid out an independent and legal basis for a cause of action claiming an infringement of the right of free speech, Id. at 893-94.

Finally, the court in discussing the "public function test" concluded that the test that it would adopt was the one requiring the lowest threshold of public activity. As such, the standard used in the Jones case was "whether the hospital was so substantially involved with state and federal activity, that its actions should be treated as those of a public entity for the purposes of constitutional adjudication." Id. at 893-4. "It also concluded that the question whether a private entity has actually functioned as a public entity involves mixed questions of law and fact, and as such requires full development of all relevant facts and careful consideration of all pertinent laws". Id. at 896.

22. In the context of this case, discovery thus far indicates that the clinic should be treated as a public entity. The clinic is inextricably involved with State and Federal activity and with State entities such as BISD. The clinic is a state actor.

23. Simple Shepardizing of the cases cited by Defendant, such as Blum v. Yaretsky, 102 S. Ct. 2777 (1982), and Randell-Baker v. Kohn, 102 S.Ct. 2764 (1982), show an extensive history of case which distinguish them within a context of their facts. Therefore, based on the factors listed in paragraph III above, this court

should deny the Defendant's Motion for Summary Judgment. Plaintiff Paul Kavanaugh had a right to speak out about matters of public concern such as commingling of accounts.

24. Additional discovery and additional facts will likely show the relationship of the clinic with state and federal agencies. To this end, Plaintiff requests that the court continue ruling on this motion for summary judgment, as allowed by Rule 56(f) of the Federal Rules of Civil Procedure, until such time as additional depositions and discovery be made with regard to the foregoing facts.

V.

Plaintiff has been systematically discriminated against and retaliated against in violation of Title VII and under the ADEA.

25. Plaintiff reported to the state government monitoring agency, the Defendant's financial wrong doings, Plaintiff also complained internally to Defendant. Paula Gomez even asked him to stop writing memos about the matter so that nobody, including the Brownsville Independent School District, would ever find out about improprieties which Plaintiff had brought to her along with other members of the clinic.

Plaintiff did not have to tell anyone prior to his termination that he was being singled out or treated adversely on account of national origin, gender and age because he was told on numerous times that he was not a woman and that was part of his problem. In

addition, the letter of his supervisor terminating him calls him a "bull in a china closet". (Exhibit "1" to Exhibit "A"). In other words he is a man in a female's world. Finally, by virtue of the fact that Defendant hired a Hispanic person under the age of 40 years to take over Plaintiff's job, and that individual along with six other individuals wound up having to do the obligations which Plaintiff had to do before (P. Gomez p. 108 & 45), clearly gives rise to the claims which Plaintiff brings before this court.

It is too bad that Dr. Kavanaugh was not an attorney in order to couch his complaints and his perceptions in the form that Defendant wishes for him to have done prior to and immediately after his termination. All of the foregoing, along with the facts that (1) the policy manual was changed within weeks before his termination, in order for him not to grieve his appeal to the Commission, (2) the position offered to him continues not to exist even today, (3) some of the writeups/memorandums concerning Dr. Kavanaugh were not signed by the supervisors until days before his termination (4) there was no documentation that Plaintiff was ever lifted from probation after it was completed, (Exhibit "C", P. Gomez p. 77) and (5) other employees in the past have successfully sued and/or settled suits for age and race discrimination by Defendant (Exhibit "C", P. Gomez p.5), militate towards the denial of the Motion for Summary Judgment requested by Defendant. Any action which Plaintiff felt he needed to do in order for him to be

heard by the Board is completely understandable in light of the matter in which he was treated.

VI.

Plaintiff's Claims are based on more than Conjecture, Discovery is Continuing, and Continuance of this Motion under Rule 56(f) is proper

26. Plaintiff has presented much more then his own conjecture to support his claims of discrimination of the basis of natural origin, age and gender. The fact that Plaintiff cannot be specific as to certain individuals which he believes have been favored by the administration and who have received disparate treatment under similar circumstances is not his fault. It is the fault of the Defendant in resisting discovery request. As such, discovery is continuing and is not complete.

After Plaintiff files his Motion to Compel, Plaintiff believes discovery, including depositions and disclosure of personnel records of various individuals, will prove Plaintiff's case. The fact that the very employees which Plaintiff believes have received preferential treatment are still employed shows the discrimination of an organization as Defendant.(Exhibit "A"). Furthermore, Defendant should not be allowed to use the fact that Plaintiff does not have all the examples Defendant requests to show disparage treatment when Defendant has resisted discovery in the manner in which it has. As such, Defendant's continuation of this motion

pursuant to Federal Rule 56(f) is appropriate.

VII.

Plaintiff's claims under ERISA, COBRA, and HIPPA.

27. After Defendant filed its Motion for Summary Judgment, Plaintiff amended his complaints alleging violations of ERISA, COBRA, and HIPPA. Specifically, Defendant has provided no documentation requested pursuant to discovery that certain required forms were provided to Plaintiff as requested by these statutes. In the depositions of Paula Gomez, Defendant's Executive Director, she refused to answer such questions alleging that other persons are responsible. (Exhibit "C", P. Gomez p.23, 100, and 15). Violations of these statues give rise to claims for civil penalties in Plaintiff's favor. Plaintiff's Motion for Summary Judgment does not address this part of the amended complaint. In addition to the paragraphs above, this is yet another reason to deny Plaintiff's Motion for Summary Judgment.

28. WHEREFORE, premises considered, Plaintiff respectfully, requests this Honorable Court, to deny Defendant's Motion for Summary Judgment, or alternatively defer ruling on Defendant's Motion for Summary Judgment until such further facts are developed or affidavits are presented pursuant Federal Rules of Civil Procedure 56(f). Plaintiff further prays for such other further relief, at law and equity to which Plaintiff maybe justly entitled.

Respectfully submitted,

SANCHEZ, WHITTINGTON, JANIS
& ZABARTE, L.L.P.
100 North Expressway 83
Brownsville, Texas 78521-2284
Telephone: 956/546-3731
Telecopier: 956/546-3765

By: ______________________
Francisco J. Zabarte
State Bar No. 22235300
ATTORNEYS FOR DEFENDANT

Neel & Horton, L.L.P.
David Horton
P.O. Box 2159
South Padre Island, Texas 78597
Telephone: (956) 761-6644
Telefax: (956)761-7424

By: ______________________
David Horton
State Bar I.D. No. 10014500
ATTORNEYS FOR DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of March, 2002, a true and correct copy of the above and foregoing discovery request was served upon opposing counsel, Mr. Raymond A. Cowley, 4900 A-3 N. 10th St., McAllen, Texas 78504, via U. S. certified mail, return receipt requested.

______________________
Francisco J. Zabarte

AFFIDAVIT OF PAUL KAVANAUGH

THE STATE OF TEXAS §
§
COUNTY OF CAMERON §

BEFORE ME, the undersigned authority, on this day personally appeared PAUL CAMERON KAVANAUGH who is personally known to me and first being duly sworn according to law upon his oath swore to the facts stated herein as true and correct based on personal knowledge and said:

"In November 1998 I was hired to be the director of Campus Care Centers (CCC) for the Brownsville Community Health Clinic d/b/a Brownsville Community Health Center (BCHC). After three (3) months, I was evaluated in a very positive manner by my supervisor, Ms. Emily Alpert. It was around that time that I noticed problems at the CCC with regard to inconsistencies between recommendations made by the Texas Department of Health, with respect to funds in accounts of the three CCC's I supervised. I also noticed problems in the manner in which the BCHC administration was handling the funds designated for the CCC's. Furthermore, I noticed problems with regard to favoritism of employees and nepotism at the BCHC. I discussed these issues with my supervisor, Ms. Alpert."

"Beginning early in 1999, BCHC management began to treat me differently compared to other employees. I was beginning to feel

EXHIBIT

that I received little support from the administration.  This lack of support no doubt was also noticed by my subordinates at the CCCs who used this in their favor against the decisions I was making. I was eventually discriminated against and disciplined for having reported various improprieties regarding funding mentioned above, along with reporting some impropriety regarding handling funds to the Texas Department of Health.  I was told by the Executive Director not to let Brownsville Independent School District know what was going on at the clinic or about my concerns.  I was being written up for incidences that other Hispanics and females were not being written up for."

"During the time that I worked with the Brownsville Community Health Corporation d/b/a Brownsville Community Health Center, I noticed disparate treatment between myself and other employees who were Hispanic or female and who were younger.  I know that many of the individuals who did similar things that I was allegedly reprimanded for are still employed with the CCC."

"I was the only permanent full-time white male working in the Campus Care Centers between November 1998 and July 2000.  I was also the only permanent full time white male in the BCHC senior management team I was told by my immediate supervisor Emily Alpert that I was being treated differently because I was not Joan Dentler, a female.  The message I received was that I was not a member of "the Club."  The decision makers at the BCHC are all

either female or Hispanic.  It was very difficult to deal with the situations that were coming up when my supervisors felt that I was not acceptable because of my characteristics as a human being."

"Before my termination, Ms. Paula Gomez, Executive Director of BCHC offered me a job as a grant writer.  However, I believe that after the way I had been treated this 'offer' was only a pretext to eventually fire me.  There was a person who was already under contract to do the job of grant writer.  I was not given a job description nor was I given a salary approval from the BCHC Board of Directors with regard to this job.  It is my understanding that this position still does not exist today at the BCHC.  In short, I felt that I was being pushed toward accepting a position which eventually was not even authorized, and I was given no assurances of that job from Ms. Gomez."

"Even though I've been offered various reasons for my termination, I believe that they are all pretexts.  I did not even have an established job description until approximately two (2) month before my termination.  Shortly, prior to my termination, the CCCs that I directed received national recognition for the work that was being done at the Campus Health Centers under my direction."

"The person who was hired in my place is Hispanic and is less than forty years old. In fact, at the time he replaced me I believe he was 29 or in his early 30's."

"Almost all of the BCHC's operating revenues originate from the City, County, State and Federal Government as well as BISD. BCHC also receives revenue from two federal programs, Medicaid and Medicare, meaning that over 90% of BCHC's operating revenue comes from publicly funded, taxpayer supported entities.   As a recipient of tax dollars, the BCHC is subject to extensive state and federal regulations.   It is subject to quality assurance inspections in order to provide health care to the public.   The BCHC is the dominant federally funded community health center in Brownsville. The City of Brownsville and Cameron County operated the BCHC before it became federally funded.   The BCHC serves a public function for the purpose of providing health care to low income residents.   The BCHC cannot deny access to certain segments in the community which it is required to serve because of the state and federal grants that it receives.   The BCHC  receives tax exemptions and public subsidies because of its mission. Furthermore, it is very intertwined with local quasi governmental agencies.   For example, BISD has been involved with internal matters at the CCCs including the hiring and firing of employees. A BISD employee serves on the clinic's hiring committee for the CCCs." At the time that I was terminated the BISD Director of Health Services was on the CCC Community Advisory Board after having served as the President of the BCHC Board of Directors.

"I knew things were going to become difficult for me when the

BCHC Board of Directors allowed a policy manual change before my termination.  It did not allow me to grieve my appeal to the Board even though my complaint would be about the Executive Director, the person making the decision to terminate me.  Since I was terminated the BCHC Board of Directors has reinstated grievance procedures BCHC employees can use regarding the BCHC Executive Director."

"After my termination, I do not believe that I was given forms which the BCHC  is required to do, allowing me and my wife to continue our insurance benefits.  Similarly, when I became eligible for membership in the group's insurance plan, the BCHC did not give me such notice.  No documents were given to me to show the time period in which I was a plan member.  To date, no forms have been shown to me that such documents were sent to me."

Therefore, my experience at the BCHC supports my claims toward discrimination on the basis of national origin, age, and gender, and the fact that I spoke out with regard to matters public concern when I felt it was necessary, especially with regard to the clinic's handling of public funds and various policies at the clinic."

"Attached is Exhibit '1' to this affidavit is a copy of the letter of termination which I received by Paula Gomez stating that I was a 'Bull in the China Closet'.  It is interesting to note her use of the gender specified 'Bull'."

FURTHER AFFIANT SAYETH NOT.

Paul C. Kavanaugh
PAUL CAMERON KAVANAUGH

SUBSCRIBED AND SWORN to before me, a Notary Public, on this 25 day of March, 2002.

Alma B. Barron
Notary Public, State of Texas
My Commission Expires:

ALMA B. BARRON
MY COMMISSION EXPIRES
March 17, 2005

Brownsville Community Health Center
2137 E. 22nd St. • Brownsville, Texas 78521 • (956) 548-7400 • Fax (956) 546-2056

BCHC BROWNSVILLE COMMUNITY HEALTH CENTER

MEMORANDUM

**To:** Paul Kavanaugh, CCC Project Director

**From:** Paula S. Gómez, Executive Director

**Re:** Job Performance

**Date:** July 26, 2000

In order to be fair to you and the Brownsville Community Health Center, I have taken a long, hard look at your overall job performance. You have accomplished some really positive things:

- You successfully responded to the Title V audit.
- You completed the task of getting the Lucio building constructed.
- You secured the funding from HRSA for mental health and dental services through Healthy Schools/Healthy Communities.
- You successfully passed the PCER conducted by HRSA contractors.

These accomplishments are worthy and you should be proud of what you have achieved.

However, along the way, the problems you have had communicating with everyone that you work for, with, and supervise have compromised your job performance. Your supervisor, Emily Alpert, has attempted to rectify this problem by scheduling you for seminars that could help you improve. She states that to her knowledge you have not attended anything that has been scheduled for you. In fact, it appears you do not perceive that you have a problem. I can no longer excuse this behavior.

Several staff and both providers who work at CCC have requested that they be transferred in to the clinic. Specifically they feel that they have been ignored and disrespected and communication with you results in misunderstandings. While I recognize that there are many times things that are not certain regarding the funding and scheduling of CCC, you fail to maintain a relationship with your staff and communication is not consistent so confusion abounds.

When I refer to communication, I mean verbal, two-way interaction, not a flurry of memos which results in a defensive negative relationship preventing positive growth for those involved including yourself. For you

EXHIBIT

to be a supervisor and for your staff to feel that they cannot talk to you is unacceptable. They feel and I agree that you treat them like children and you are "the father" who knows what is best instead of having a collaborative relationship. What is most distressing is that you are in denial about this problem. You continue to believe you are "making great progress."

You have been warned, written up and put on disciplinary probation for the following:
- Incident involving inappropriate statements made to the Clearwater staff
- Incident involving inappropriate threats made to the Lucio staff.
- Incident involving inappropriate comments made to Dori Moody.
- Incident of miscommunication involving Ms. Alpert and Lisa Mitchell-Bennett.
- Lack of timely communication (monthly activity reports) to Ana Milan.
- Comments made to the Brownsville Herald without clearance from BISD
- Incident involving miscommunication with Dr. Gloria Kury
- Failure to communicate with James Hamel
- Lack of information to mental health personnel
- Failure to admit responsibility involving lack of payment for Saturdays for Rachel Eason
- Failure to attend three seminars that you were scheduled for to improve your communication skills.

This is only a partial list of documented problems. By continuing to deny that there is a problem necessitates that Ms. Alpert or I must always be present to make sure that there are no major misstatements that will result in our having to correct the situation. Either way we must do your job as well as ours.

Recognizing your commitment and that most of your successes have involved extensive writing, I offered to transfer you into the grant-writer/resource developer position so your strengths could be utilized to the benefit of the corporation. You asked me if you could think about your decision and I advised you to take three weeks. It is well past three weeks and until I approached you yesterday, I had not heard from you (another failure to communicate).

I appreciate your commitment to the program and your desire to stick with it. However, you are the proverbial bull in the china closet. You can be good at completing concrete tasks, but your methodology lacks acceptable business practices and results in too many casualties along

the way. You have a difficult time with protocols and authority. You continue to have difficulty with authority and directives.

Yesterday, I was in your office before lunch and my parting words to you were, "I want you to meet with myself and Emily in my office in the morning at 8:00 A.M." You acknowledged what I said by shaking your head and yet this morning you were not here and you did not let me know where you were.

This lack of action constitutes insubordination and is a violation of rule 1 of Major Violations on page 34 of the BCHC personnel manual. You are hereby terminated from your position of CCC Project Director. Please take the rest of the day to gather your belongings and exit with Hilda Gonzalez in Human Resources.

Cc    Emily Alpert
      Hilda Gonzalez

**AFFIDAVIT OF FRANCISCO J. ZABARTE**

THE STATE OF TEXAS §
§
COUNTY OF CAMERON §

BEFORE ME, the undersigned authority, on this day personally appeared FRANCISCO J. ZABARTE, known to me to be the person whose name is subscribed hereto, who after being first duly sworn on oath, stated and said:

"My name is Francisco J. Zabarte. I am licensed attorney and I represented the Plaintiff in the above-entitled and numbered cause. I attended the deposition of Plaintiff, Paul Cameron Kavanaugh, taken on the 19th of December, 2001. I have read the deposition transcript provided to me by Shelly Stingley, a certified shorthand reporter. Such deposition transcript is a true record of the testimony given by Plaintiff on the aforementioned date. Furthermore, I certify that the copied materials attached hereto as part of the deposition of Plaintiff are true and correct copies of the deposition transcript provided to me by the certified shorthand reporter.

FURTHER AFFIANT SAYETH NOT.

Francisco J. Zabarte

SUBSCRIBED and SWORN to before me, a Notary Public, on this 25th day of March, 2002.

Alma B. Barron

Notary Public, State of Texas

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PAUL CAMERON KAVANAUGH X
X
X
X
VS. X CASE NO. B-01-104
X
X
BROWNSVILLE COMMUNITY HEALTH X
CLINIC CORPORATION, D/B/A X
BROWNSVILLE COMMUNITY HEALTH X
CENTER X

---

ORAL AND VIDEOTAPED DEPOSITION OF
PAUL KAVANAUGH
DECEMBER 19, 2001

---

ORAL AND VIDEOTAPED DEPOSITION OF PAUL KAVANAUGH, produced as a witness at the instance of the DEFENDANT, taken in the above styled and numbered cause on DECEMBER 19, 2001, reported by SHELLEY STINGLEY, Certified Court Reporter No. 5725, in and for the State of Texas, at the offices of Sanchez, Whittington, Janis, & Zabarte, 100 North Expressway 83, Brownsville, Texas, pursuant to the Texas Rules of Civil Procedure.

APPEARANCES

COUNSEL FOR PLAINTIFF

FRANCISCO J ZABARTE
SANCHEZ, WHITTINGTON, JANIS & ZABARTE
100 North Expressway 83
Brownsville, Texas 78521

DAVID HORTON
LAW OFFICES OF NEEL & HORTON
105 West Morningside Drive
South Padre Island, Texas 78597

COUNSEL FOR DEFENDANT.

RAYMOND A. COWLEY
RODRIGUEZ, COLVIN & CHANEY
4900 North Tenth Street, Building A, Suite 2
McAllen, Texas 78504

ALSO PRESENT

Paula Gomez
Chad Newman, Videographer

INDEX

| | PAGE |
|---|---|
| Appearances . ... . . | 2 |
| PAUL KAVANAUGH<br>Examination by Mr Cowley .. | 8 |
| Errata Sheet/Signature Page . ...... ... .. | 230 |
| Reporter's Certificate . | 231 |

Attached to the end of the transcript: Stipulations

EXHIBITS

| NUMBER | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 1 | Resume of Paul Kavanaugh, Ph D .. .... | 9 |
| 2 | Application for Employment at BCHC ..... | 14 |
| 3 | Memorandum from Mr. Kavanaugh to Mr Garcia dated 10-29-99 . ........ . | 33 |
| 4 | Memorandum from Mr. Kavanaugh to Mr. Garcia dated 1-31-00 ..... .......... | 33 |
| 5 | Memorandum from Mr. Garcia to Mr. Kavanaugh dated 1-26-00 . .... . . .. | 34 |
| 6 | Notice; Memorandum from Ms. Alpert to Mr. Kavanaugh dated 3-3-00 .............. | 61 |
| 7 | Memorandum from Ms. Moody to Mr. Kavanaugh dated 2-16-00 ..... ....... | 72 |
| 8 | Memorandum from Mr. Kavanaugh to Ms. Moody dated 2-17-00 ................. | 76 |
| 9 | Memorandum from Ms. Moody to Mr. Kavanaugh dated 2-28-00 ............. | 76 |
| 10 | Memorandum from Ms. Cavazos to Mr. Kavanaugh dated 7-31-99 ............. | 87 |
| 11 | Memorandum from Ms. Gomez to Mr. Kavanaugh dated 7-26-00 ............. | 125 |
| 12 | Acknowledgment of Receipt dated 5-24-00 | 130 |
| 13 | Page 9 of policy manual ................. | 130 |
| 14 | Pages 37 through 39 of policy manual .... | 131 |
| 15 | Memorandum from Mr. Kavanaugh to The Senior Management Team of BCHC and The BCHC Board of Directors dated 7-28-00 | 136 |
| 16 | Memorandum from Mr. Kavanaugh to All Campus Care Center Staff dated 7-30-00 ..................... ........... | 138 |

| NUMBER | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 17 | Memorandum from Mr Kavanaugh to The Brownsville Community Health Center Board of Directors dated 7-31-00 | 138 |
| 18 | Memorandum from Mr Kavanaugh to Dr J J Martinez dated 8-3-00, Personnel Action Notice; Notice; Memorandum from Ms Alpert to Ms Gomez dated 7-21-00; Memorandum from Ms Alpert to Mr Kavanaugh dated 7-21-00 .. | 142 |
| 19 | Memorandum from Mr Kavanaugh to Senior Management Team dated 8-7-00 . | 145 |
| 20 | Letter from Mr Martinez to Mr Kavanaugh dated 8-10-00 | 145 |
| 21 | Memorandum from Mr Kavanaugh to The Board of Directors, Brownsville Community Health Center dated 8-16-00 | 147 |
| 22 | Memorandum from Mr Kavanaugh to Mr. Martinez dated 8-21-00 .. . | 151 |
| 23 | Memorandum from Mr. Kavanaugh to Dr. Imperial dated 8-23-00 ..... . . | 152 |
| 24 | Memorandum from Mr Kavanaugh to Dr Gonzalez dated 8-29-00 . | 152 |
| 25 | Memorandum from Mr. Kavanaugh to Members of BCHC Board of Directors dated 9-4-00 | 154 |
| 26 | Letter from Mr Martinez to Mr Kavanaugh dated 9-5-00 . . ... . | 156 |
| 27 | Memorandum from Mr Kavanaugh to Mr Martinez dated 9-24-00 . . | 164 |
| 28 | Letter from Mr. Kavanaugh to Mr. Green dated 10-23-00 ... .... .. .. .... . . | 167 |
| 29 | Letter from Mr. Kavanaugh to Ms Wanser dated 3-9-01 ... .. ... .. | 167 |
| 30 | Memorandum from Mr. Kavanaugh to The Brownsville Community Health Center Board of Directors dated 7-31-00 ..... . . ... | 173 |

| NUMBER | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 31 | Charge of Employment Discrimination .. .. | 187 |
| 32 | Memorandum from Mr. Kavanaugh to Senior Management Team, Brownsville Community Health Center dated 9-11-01; various E-mails and letters ........ ........ ... | 220 |
| 33 | Memorandum from Mr. Kavanaugh to Members of the BISD Board of Trustees dated 10-1-01 ................................ | 221 |
| 34 | Memorandum from Mr. Hamel to Mr. Kavanaugh dated 3-20-00 ........... | 224 |
| 35 | Memorandum from Ms. Kury to Ms. Alpert dated 4-12-00 ........................... | 225 |

PAUL KAVANAUGH,

having been duly sworn, testified as follows:

EXAMINATION

BY MR. COWLEY:

Q Tell us your name, please.
A Paul Cameron Kavanaugh.
Q Mr Kavanaugh, my name is Raymond Cowley I'm an attorney. I represent the defendant in this lawsuit, which is Brownsville Community Health Center. Do you understand, sir, that I am not your attorney?
A. Yes.
Q. Are you represented here today by attorneys?
A. Yes.
Q And they are seated to your right?
A. That's correct.
Q. All right. Has anyone explained to you what the process or procedure will be today?
A. Yes.
Q. Okay. You understand that you have taken your oath to tell the truth here today the same as in a court of law?
A. Yes.
Q. You understand that the penalty for lying here today would be the same as if you lied in court?
A. Yes.

Q. Have you ever given your deposition before?
A. No.
Q. Okay. Everything I ask you and everything you answer will be taken down by the court reporter. Do you understand that?
A. Yes.
Q. The court reporter cannot make a record if we both talk at one time. Would you wait until I finish asking a question before you begin answering?
A. Yes.
Q. By the same token, if I ever begin asking a question and you haven't finished answering, would you let me know that?
A. Yes.
Q. It's not my intention at any time to interrupt you.
A. Okay.
Q. If you ever feel that you have been interrupted, will you please let me know and I will stop and you can finish your answer, okay?
A. All right.
Q. Is that acceptable?
A. Yes.
Q. I will ask you, sir, to please answer out loud and with words rather than with movements or sounds.

Would you do that?
A. Yes.
Q. Okay. There may be times that I will ask you to give a verbal answer. I'm not trying to be rude. I'm just trying to make a complete record.
A. Okay.
Q. Have you taken any medication within the last 24 hours?
A. Only aspirin.
Q. Okay. Do you know of any reason why you would not be able to understand my questions and give accurate and truthful answers?
A. No.
Q. Where do you reside?
A. Brownsville, Texas.
Q. Can you tell us your address?
A. 3744 Boca Chica Boulevard.
Q. And how long have you lived at that address?
A. Since 1996.
Q. Okay. Are you a married man?
A. Yes.
Q. Who is your wife?
A. Pamela.
Q. Okay. Her name is Pamela Kavanaugh?
A. Pamela Knoll Kavanaugh, yes.

Q. And just briefly, what are the names and ages of your children?
A. I have a daughter Emily, 14, and son Jonah, 7.
Q. Is this your first marriage?
A. Yes.
Q. Okay. Do you have children outside of your marriage?
A. No.
Q. Is this your wife's first marriage?
A. Yes.
Q. Okay. I know that at some time you applied for employment with the Brownsville Community Health Center. Am I right?
A. Yes.
Q. Okay. And you submitted a resume?
A. Yes.
Q. Okay. Rather than go through your background, I'm going to mark as Exhibit 1 what I will represent to you to be, at least by my understanding, the resume that you submitted upon applying with the Brownsville Community Health Center. By the way, if ever I refer to "the health center," "the Brownsville Community Health Center," "BCHC," will you know what I'm referring to?
A. Yes, I will know.

Q Okay, all right. I'm going to hand you what I will mark as Kavanaugh Exhibit No. 1 and ask you if that would be a true and correct copy of your resume.
A. Yes.
Q Okay. Would you like to look at the pages? You certainly may.
A. This appears to be my resume.
Q. All right. Without going into detail, what would you describe as your longest period of employment, let's say since you became an adult?
A. My longest period of employment, it was probably my association with the Catholic Church as a seminarian.
Q Okay. Apart from employment with the church, what was your longest employment?
A. Can I look at my --
Q. Sure can.
A. -- resume? The University of Iowa.
Q. Okay. And your position there?
A. My last position or my history?
Q Well, would you tell us what you did for the University of Iowa?
A Okay, I was a nursing assistant for one year in the medical psychiatric unit, and then after that I became a clinic clerk at the college of dentistry, and

I was there for a year or year and a half, and then I was in a supervisory position at the college of dentistry for almost two years.
Q. So all together, maybe four years --
A. Yes.
Q. -- thereabouts?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. And that would have been your longest employment as an adult outside of the church?
A. At one place, right.
Q. At one place, uh-huh, okay. You moved to Brownsville when?
A. In February of 1991.
Q. Okay. When did you first -- you know Paula Gomez?
A. Yes.
Q. Seated here to my left?
A. Yes.
Q. When did you first come to know Ms. Gomez?
A. Probably in '91.
Q. Okay. And is it my understanding that at some point you went to work for -- was it the Texas Southmost College or UT Brownsville?

A. Yes
Q. All right. What role did Ms Gomez play in assisting you in getting that employment?
A. I told her that my one-year employment at the university was running out, and she suggested to me that I apply for the director of health services position
Q. Okay. Maybe my question wasn't clear. What I'm asking now is did Mrs. Gomez assist you in getting the employment at the college before working for her?
A. No.
Q. She had no role or no introductory role at all?
A. No, not that I'm aware of. I mean, I applied for the job and I was called
Q Did Ms. Gomez recommend to you that you apply?
A I was applying to so many places then. I don't remember.
Q Okay. How long were you employed by the college?
A. For one year and two months.
Q. Okay What was the period of time you were hired for? Was it for a definite period?
A It was for one year.
Q. Okay. And one year to do what?
A. Be the director of assessment and evaluation.

Q. Okay. What was the reason, if you know, of why your employment continued beyond one year?
A. They asked me to -- they were evaluating the enrollment process and so they asked me to become involved in researching how to streamline employment -- enrollment and student services.
Q. Who was your immediate supervisor at the college?
A. Dr. Ramond Rodriguez.
Q. Ramond Rodriguez?
A. (Moving head up and down)
Q. What is his title?
A. Now?
Q. Or what was it then?
A. It was vice president for academic affairs, and I believe that he was promoted to provost.
Q. Did you apply for any type of extended employment beyond that with the college?
A. No.
Q. Okay. Were you offered any continued employment beyond that at the college?
A. No.
Q. Did you continue to office at the college after your employment had terminated?
A. It wasn't exactly clear when my -- when my job

did terminate and so I can't say

Q. Did you remain at the college beyond the time that you were paid?

A. No, I was paid for all time served.

Q. How did you then come to apply at the Brownsville Community Health Center?

A. I told Ms. Gomez that my employment at the university was coming to an end and I would be looking for other employment.

Q. And what did Ms. Gomez say to you?

A. She said that there was a position open at the Brownsville Community Center -- Health Center that she suggested I apply for.

Q. Okay. And I take it you did that?

A. Yes.

Q. Okay. I'll show you what I'll mark as Kavanaugh Exhibit No. 2. It consists of five pages, and will ask you, if you would, to look at it

Have you had an opportunity to look at Exhibit No. 2?

A. Yes, I have

Q. Does that appear to be a true and correct copy of the application for employment that you submitted?

A. Yes.

Q. Are there any portions of it that you feel like

you did not put on the application?

A. Is there anything here that I did not put on?

Q. Yes, sir.

A. No, it appears that that's my writing.

Q. All right. Looking at the date, it would appear that you were applying for work in the latter part of October of 1998.

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. And you remained with Brownsville Community Health Center until July 27th of the year 2000?

A. That's correct.

Q. During the 19 or so months that you worked for the Brownsville Community Health Center, did you ever tape-record any conversation in which any employee of the center was speaking?

A. No.

Q. Did you ever tape-record any conversation in which any member of the board of directors was speaking?

A. No.

Q. Have you at any time since your employment terminated tape-recorded any conversation in which any employee or director of the Brownsville Community

Health Center was speaking?

A. No.

Q. Did you tape-record the exit interview that you went to?

A. The exit interview I went to?

Q. Yes.

A. Was there an exit interview?

Q. Well, we will get to your discovery answers shortly, but I had asked the question there and you indicated that there was some type of exit process that was tape-recorded, and I'm trying to determine the --

A. What --

Q. Well, we'll get -- you're saying you have no recollection of that answer?

A. No, I have no recollection of tape -- making any tape recording of any conversation that I had with any employee.

Q. Okay. And it may be that I misread your discovery answer.

A. Okay.

Q. We'll look at it.

A. There is a tape recording in question, but it wasn't made by me.

Q. Okay, and what is the tape recording you're referring to?

A. The tape recording is of the exit interview with the federal auditors who conducted a primary care effectiveness review of the campus care centers in May of 2000.

Q. Okay. And how did you come to get that?

A. It was given to me.

Q. Okay. And who has -- who is in possession of your copy?

A. I have it.

Q. And were I to ask for it, how would you describe it so you would know what I'm asking for?

A. The tape recording of the exit interview with -- of the PCER, Primary Care Effectiveness Review, PCER. And I think it was May 10th or 11th or -- it was May of 2000.

Q. And what is that, with the Department of Health & Human Services, or what branch of the government is that of, if you know?

A. The PCER was conducted by the Bureau of Primary Healthcare. They were contracted employees of the Bureau of Primary Healthcare.

Q. Which in turn is part of Health & Human Services?

A. Yes.

Q. When you began your employment with the

Page 18

Brownsville Community Health Center, your salary was at $45,000?
A. I believe so
Q. And, as I understand, you received an increase referred to as cost of living in February or thereabouts of 2000?
A. Right.
Q And your salary had gone up some five percent; am I right?
A. That sounds correct.
Q And that remained your salary until your employment terminated?
A. That's correct.
Q Mr Kavanaugh, I would like for you to tell us what the first thing is during -- was during your 19 months or so of employment that happened that you knew of while employed that you regarded was improper on behalf of Brownsville Community Health Center.
MR. ZABARTE: I object. I find the question very overbroad, and it's not -- it's just very general and I don't know what question you're really asking.
Q. Do you understand the question?
A. No, I don't.
Q. Okay. You have brought a lawsuit claiming that

Page 19

there were improprieties within the Brownsville Community Health Center that you knew of and that you brought to someone's attention. Do you understand that?
A. Yes.
Q. All right. What I'm asking is, would you tell the members of the court, the members of the jury, what is the first thing that happened at the Brownsville Community Health Center that you regarded as improper?
A. Are you asking me why I brought the suit against --
Q. No, sir. During the course of your employment, was there ever anything that anyone associated with Brownsville Community Health Center did or failed to do that you regarded as improper?
A. I don't remember the first thing.
Q. All right. Tell us the first thing you remember.
A. The first thing that comes to mind at this point is that I was told that I would be getting monthly financial statements on the accounts that I managed and I rarely got them.
Q. Who told you you would get them?
A. My recollection is that my supervisor.
Q. That would be Ms. Alpert?

Page 20

A Yes, my immediate supervisor was Ms. Alpert.
Q All right. Who did you regard as responsible for getting you the monthly financial statements?
A. The finance department.
Q. Okay. Anyone in particular?
A. I didn't know how the duties of the finance department were divided between the personnel.
Q. Okay. Did you bring to anyone's attention the -- your failure to get monthly financial statements?
A. Yes.
Q. And to whose attention did you bring it?
A. Ms. Alpert.
Q. Okay. And what was her response?
A. She told me that the finance director was incompetent.
Q. Did she say anything else?
A. She told me that all the departments have problems in getting their monthly financial statements and she doesn't understand why it can't just become part of the normal ordinary operating procedures.
Q. So your understanding was that not only you but other department heads were not receiving them?
A. Uh-huh.
Q. Is that a yes?
A. Yes.

Page 21

Q. All right. Was that problem ever resolved or in any way improved?
A. No.
Q. It remained the same during the term of your employment?
A. Yes.
Q. Did you bring the matter to anyone's attention besides Ms. Alpert?
A. Yes.
Q. And who was that?
A. The people in the finance department.
Q. And who would that be?
A. Maria Reyna, the controller.
Q. I'm sorry, Maria?
A. Reyna.
Q. Okay.
A. R-E-Y-N-A.
Q. Uh-huh.
A. And Enrique Garcia.
Q. And he would be the finance director?
A. Yes.
Q. All right. What was Ms. Reyna's response?
A. I don't remember.
Q. What was Mr. Garcia's response?
A. I don't remember.

Page 22

Q. Okay. Did anyone criticize you for bringing this impropriety to someone's attention?
A. No.
Q. Okay. In your mind did anyone take any adverse action against you for doing so?
A. Not that I remember.
Q. Okay.
A. Or not that I know of.
Q. All right. Other than the -- your failure to receive monthly financial statements, what else happened while you worked at Brownsville Community Health Center that you regarded as improper or wrong while you worked there?
A. As soon as I became the director of youth health services, an audit was being taken place -- or was initiated by the Texas Department of Health of the financial situation.
Q. All right.
A. And all the program income from all three of the campus care centers had been deposited into one account, and one of the recommendations was that -- was that one large program income account needed to be divided between the three clinics so that expenses and revenues could be kept track of by clinic.
Q. Now, this Texas Department of Health audit was

Page 23

not something that you initiated; am I right?
A. That's correct.
Q. There was nothing that you did that, in your mind, caused that audit to take place; is that true?
A. That's correct.
Q. All right.
A. That was planned before I was employed there.
Q. All right.
A. May I ask, could I get some more water?
Q. At any time you want water, we can stop.
A. Okay, I'm sorry.
Q. You don't have to have my permission.
A. Okay.
MR. ZABARTE: Do you need to take a break or something like that?
THE WITNESS: No, no, I just --
MR. ZABARTE: Okay.
Q. Would you want to wait for your water before we --
A. No, that's fine.
Q. All right. Now, the account that all the money was being put into had a number, I take it?
A. Uh-huh.
Q. Is that a yes?
A. Yes.

Page 24

Q. All right. And I take it that was Account 761?
A. That's correct.
Q. All right. So your understanding was that someone from the Texas Department of Health had recommended that rather than having the revenue go into one account it go into account by campus?
A. Correct.
Q. All right. And the person in particular with the Texas Department of Health was who?
A. Mr. Ken Carroll.
Q. Okay. Do you have any documentation to show us that that was in fact his recommendation?
A. His final recommendations weren't given to me so I do not have any documentation, no.
THE WITNESS: Thank you, David.
MR. HORTON: Sure.
Q. Your understanding was that that recommendation was made. Is it your understanding that recommendation was followed?
A. I don't believe that the recommendation was followed.
Q. Okay. And on what do you base your answer that you don't believe the recommendation was followed?
A. Because I don't believe that the money was divided equally between the three accounts.

Page 25

Q. Okay. What do you believe happened?
A. I believe that money was taken out of those accounts.
Q. Now, you're saying "accounts." Let's stay with Account 761. Are you saying that there was money in 761 to begin with?
A. Yes.
Q. And what is your -- if we could get your glass out of the camera --
A. Oh, I'm sorry.
Q. -- view, you can keep it handy. What is your understanding or contention happened to the money that was in Account 761?
A. I believe that $150,000 was taken out of Account 761 before any accounts were divided up.
Q. Okay.
A. Before any monies were divided into separate accounts.
Q. All right. What is your understanding of where the $150,000 came from that was in Account 761?
A. My understanding is that the money in Account 761 accounted for the program income from the three different clinics.
Q. In other words, as medical services were provided, this was revenue that those services --

Page 26

A. Right.
Q. -- generated?
A. Right.
Q. Okay. And your understanding is that it was in Account 761?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. All right. And what are you saying happened to it?
A. Well, I was told that -- by the finance director that the $150,000 was taken out to pay for administrative overhead of the previous three years.
Q. Okay. Do you believe that to be true?
A. No.
Q. Okay. What do you believe the truth to be?
A. I don't know how the $150,000 was used.
Q. Okay. On what basis do you say that what Mr. -- I assume when you said "finance director," Mr. Enrique Garcia?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. On what basis do you contend that what Mr. Enrique Garcia told you was untrue?

Page 27

A. Well, there was no paper trail for the expenditure of the $150,000. I mean, accounts had been closed, personnel expenses had already been costed out to different accounts. There was no -- there were no personnel actions from those previous three years to indicate that percentages of people's salaries were being paid through Account 761.
Q. What are you telling the members of the jury happened to that $150,000?
A. I don't know.
Q. On -- do you believe something improper was done with it?
A. I don't know what happened to the $150,000 except that they were taken out of the accounts that I was directing at the time.
Q. Well, they were taken out of just one account; am I right?
A. I believe so.
Q. All right. Do you believe there was anything improper about taking the money out of Account 761?
A. I do feel it was improper.
Q. Okay. And why, in your mind, was it improper?
A. Well, for the reasons that I stated, paying for things that had already been paid for, which was personnel's salaries.

Page 28

Q. Okay. Have you ever expressed any opinion to others as to what you think happened to that 150,000?
A. Yes, I told TDH.
Q. And what did you tell TDH?
A. Well, the board had approved raises for employees, so I don't know if the money went there. The physicians had gotten raises so I don't know if the money went there. Insurance was going up, the cost of insurance was going up, so I don't know if the money went there.
Q. You were guessing; am I right?
A. Oh, definitely. I have no idea where the money went.
Q. Okay. And is it your testimony --
A. Except that I was told that it was used to pay personnel expenses that had already been costed out.
Q. Okay. And you were told that by Mr. Garcia?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Okay. To whom did you complain about the $150,000 being taken out of Account 761?
A. Besides the board and the senior management team and TDH?
Q. Well, let's say during your employment, during the time that you were an employee of Brownsville Community Health Center, to whom did you complain, let's say, within the organization regarding the 150,000?

Page 29

A. To the director of clinical operations, to the executive director, to the finance director, and to the controller.
Q. And what in particular was your report or complaint to them?
A. My complaint to them was that I felt that it was -- I felt that it was wrong.
Q. And it was wrong why?
A. Because the money was allegedly going to pay for expenses that had already been costed out, had already been paid for.
Q. Who did you regard the $150,000 as belonging to?
A. The campus care centers.
Q. As a separate entity from Brownsville Community Health Center?
A. The campus care centers are a department in the Brownsville Community Health Center.
Q. The money belonged to the Brownsville Community Health Center?
A. Yes, all the monies of the organization belong

to the Brownsville Community Health Center.
Q. Are you saying it was beyond the authority of the finance director to make that transfer of money?
A. I believe that what the finance director did was wrong and I told him.
Q. Okay. And what was Mr. Garcia's response?
A. He said that he didn't feel it was wrong.
Q. Okay. And what was Ms. Alpert's response?
A. She was quite frustrated, too, because her contention all along was that we needed to develop funds for the campus care center so that they could continue to maintain themselves, which was the directive in the job description of May the 10th, sustainability. I mean, you can't sustain a program if the finances are going to be depleted.
Q. Okay. Is it your contention to the Court that the $150,000 that had been in 761 was no longer available for use by the campus care center program?
A. I believe that the monies in 761 should have been used directly and wholly for the maintenance of the campus care centers, and I believe that it was money that was diverted from the maintenance of the campus care centers and just -- and therefore made them much less viable financially.
Q. Is it your testimony that the $150,000 were no

longer available to you, had you asked for it?
A. Yes.
Q. Okay. And why do you say that?
A. Because they had been taken out of the accounts and supposedly expended.
Q. Okay.
A. Or so I had been told.
Q. Is it your testimony that by taking $150,000 out of Account 761 that the campus care center program was somehow affected?
A. Yes.
Q. In what way?
A. Well, it's difficult to run a program when it's running on a shoelace to begin with and you take 150,000 away from it.
Q. So your testimony is you no longer had the use of the $150,000; at least that was your understanding?
A. Yes.
Q. Okay. Your testimony earlier was that you brought your concern to the attention of the executive director?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. And that would be Ms. Gomez?

A. Yes.
Q. And what, by your testimony, was Ms. Gomez' response?
A. At the meeting that I had with herself and Ms. Alpert and Mr. Garcia, I told her that I felt it was inappropriate, and I said that it would look very bad in the community, it would appear very bad to the Brownsville Independent School District. And she said, "Well, how is anyone in the community ever going to find out?"
Q. What else did Ms. Gomez say, by your testimony?
A. She told me to stop writing memos.
Q. What else did Ms. Gomez say?
A. Those are the two things that I remember.
Q. Okay. Now, we will look at your discovery answers later today, but I had asked the question regarding what documents would exist that would indicate that you made any complaint with regard to the misuse of money. Do you recall my question asking that? If you don't, we can --
A. Today?
Q. No, sir, when I sent written questions to your attorneys.
A. I don't remember the exact question but --
Q. All right. I will represent to you -- and we

can look in a minute -- that there were two documents referred to. One was a memo dated October 29th, 1999, and I'll show you that as Kavanaugh Exhibit No. 3.
MR. HORTON: What's the date?
THE WITNESS: October 29th.
MR. ZABARTE: October 29th.
Q. The document marked as Kavanaugh Exhibit 3, does that appear to be a true and correct copy of a memorandum you would have sent to Mr. Garcia?
A. Yes.
Q. Okay, with respect to the money that you believed was taken out of Account 761?
A. Yes.
Q. All right. And the other document that was referred to was a memo dated January 31st, 2000, and I have marked a three-page -- I'm sorry, four-page document as Exhibit 4 and would ask if you would look at that.
MR. HORTON: Let me see.
Q. Does the document marked Exhibit 4 appear to be a true and correct copy of a memorandum you would have written to Mr. Garcia?
A. Yes.
Q. On January 31st of 2000?
A. Yes.

Q All right. Now, your document refers to addressing matters raised in a memorandum that he sent to you dated January 26th; am I right?
A. Yes, and there's an inconsistency there.
Q I'm sorry, what is the inconsistency?
A. In the upper part, I put, "Your memo of 1-19," and then in the first sentence I say, "I will respond to your 1-26 memo."
Q. All right. Simply a typographical error?
A. I assume so.
Q. All right. I am going to show you a document that I will mark as Kavanaugh Exhibit No. 5, and it consists of three pages, and I ask that you look at that.
A. Okay.
Q Does the document marked as Exhibit 5 appear to be a true and correct copy of the January 26th memorandum that you referred to in Kavanaugh Exhibit No. 4?
A. It does appear to be the memo that I was responding to.
Q. Okay. I understand you're not a lawyer; am I right?
A. That's correct.
Q. And I am not going to ask you to be a lawyer,

but I am entitled to know what you believe or contend to be true. Do you believe or contend that there was anything unlawful that Mr. Garcia did with regard to the money in Account 761?
A. What do you mean by "unlawful"?
Q Do you believe that what Mr. Garcia did violated any criminal statute?
A. I don't know.
Q. Okay. Do you believe that what Mr. Garcia did violated any regulation promulgated by any governmental entity?
A. I don't know.
Q. Okay. Have you ever made the assertion to people outside the organization that a criminal act was committed by Mr. Garcia?
A. Criminal act?
Q. Yes, sir.
A. So you're asking if I ever said to anyone that he was a criminal?
Q. No, sir. Did you ever make the representation to anyone that what Mr. Garcia did by transferring the money out of Account 761 was a criminal act?
A. What I have done is I have said that it's inappropriate.
Q. You have never used the word "criminal"?

A I said -- I have said that violations of the law may have occurred.
Q. You never used the word "criminal"?
A. I'm not sure. I don't know.
Q. But you don't know of any criminal law that he broke, do you?
A I'm not a lawyer.
Q. Is that a yes or a no?
A. Ask the question again.
Q. You don't know of any criminal law that he broke, do you?
A. No.
Q. Okay. What criminal statute did Ms. Alpert ever violate, with regard to Account 761?
A. I don't know.
Q. What criminal statute did Ms. Gomez ever violate?
A. I don't know.
Q. What criminal statute did Ms. Reyna ever violate?
A. I don't know.
Q. Okay. Apart from the money taken out of Account 761, was there anything else that occurred during your employment with Brownsville Community Health Center that you regarded as improper?

A. The thing that seemed most improper to me was that when I asked the human resources manager to give me a flow sheet of how to advertise, select, interview, and offer employment to people, she told me that they had not developed a flow sheet for employment procedures, and it was very difficult for me to understand how to appropriately expend the monies from the $600,000 grant that I had written in order to hire people because I was given different information from different sources.
I mean, I found out at that time that there was a staff requisition form, and my assumption was that all -- all new positions developed had to be approved by the senior management team. But in any case, it was very -- it was very difficult for me to -- to be involved in the employment process when there wasn't a flow sheet of how to do that.
Q. Is it your contention or belief that when -- you said the HR manager. That would be Ms. Hilda Gonzalez?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Is it your contention or belief that when Hilda Gonzalez told you that there was no flow sheet that she

Page 38

was lying?
A No, I assumed that she was telling me the truth, that there was no flow sheet on how to go through --
Q Okay.
A -- the selection in employment
Q All right. So as far as you know, no such flow sheet existed; am I right?
A. Yes.
Q. Okay. Is it your contention or belief that there is any requirement under the law that such a flow sheet exist?
A. I don't know.
Q Okay. Is it your contention or belief -- well -- is it your contention or belief that there is anything improper about not having a flow sheet?
A Well, what seemed inappropriate to me was that on all of the BCHC stationery it says, "Equal Opportunity Employer," and so it would seem to me that the organization would have defined policies and procedures for developing jobs, getting jobs approved, advertising positions, interviewing for positions, and then eventually selecting, and it was -- it was very frustrating for me because I wanted to do things according -- correctly, but it was very difficult for

Page 39

me to find out what the correct thing was to do.
Q. Okay. Is it your contention or belief that the failure to have such a flow sheet or hiring procedure was in violation of any law?
A. I don't know. I don't know the law.
Q. Okay. Have you ever described Ms. Gonzalez to people outside the organization as incompetent?
A. Yes.
Q. Okay. As someone really not qualified to run the department?
A. Yes.
Q. You have made those comments about her?
A. Yes.
Q. Okay. Did you ever make the representation that Ms. Gonzalez, by her conduct at work, had violated the equal employment opportunity law?
A. Yes.
Q. Yet you don't know of a single law she ever violated; isn't that true?
A. That's true.
Q. Besides not having a flow sheet, what else were you aware of during your employment that you -- well, excuse me. Let me back up. Did you report to anyone or complain to anyone within the organization with regard to this lack of a flow sheet?

Page 40

A. I spoke with my immediate supervisor, Ms. Alpert.
Q. Okay.
A. And Ms. Gonzalez.
Q All right. What did Ms. Alpert say in return?
A. She advised me to talk to Hilda and to take Hilda's recommendation -- Ms. Gonzalez's recommendations for how to begin the process.
Q. The hiring process?
A. Uh-huh.
Q. Is that right?
A. Yes.
Q. Okay.
A. No, the job development and advertising, to talk about the steps, staff requisition forms.
Q. Did Ms. Alpert in any way scold you or reprimand you for bringing this concern to her attention?
A. No.
Q. Okay. How about Ms. Gomez, when you brought this to her attention, what did she say?
A. I didn't bring this to her attention.
Q Okay. To whose -- who else did you bring this -- to who else's attention did you bring this?
A. Ms. Gonzalez and Ms. Alpert.

Page 41

Q. Okay. What was Ms. Gonzalez's response?
A. She said there wasn't a board-approved flow sheet for developing jobs, but she felt that all the new jobs had to be approved by the board.
Q. Did she say anything else?
A. She did produce the staff requisition form.
Q. Okay. Did she have anything else to say?
A. No, not that I remember. I mean, she may have. I don't remember anything else.
Q. Okay. What else did you observe or come to know during the time of your employment that you regarded as improper on behalf of the Brownsville Community Health Center?
A. One thing that I found disturbing was that the full-time nurse practitioner who worked at Clearwater Elementary School had a separate contract on the side with the community health center to receive extra monies for weekend work in addition to her work at the campus care centers, and this contract was brought to my attention by the -- by the payroll clerk, so I was a little bit disconcerted to find out that there had been a contract -- that she had a separate contract in addition to her full-time contract. I felt that, as exempt employees, medical providers could be asked to work weekends and it wouldn't be a problem and it

Page 42

wouldn't be a violation of any federal labor standard act or anything like that.
So it was -- so I needed to develop -- I mean, I couldn't void the contract with Ms. Castillo, so I needed to develop a contract with Ms. Eason, which meant an extra expenditure of money. But what most concerned me was that -- my assumption was that I was being asked to manage an account and yet I didn't have knowledge of what was coming out of the account.
Q Okay. The full-time nurse practitioner you're referring to is Maria Castillo?
A. Castillo, yes.
Q Okay. And your understanding was that some arrangement was made whereby she would receive something extra for working on weekends?
A. Well, my only -- my only knowledge was that she had a contract, that she had a separate one-page contract in addition to her normal and regular contract --
Q. Okay.
A. -- with the clinic.
Q. All right. Now, did you understand her to be an employee from the standpoint that she was paid a salary and taxes were withheld from her salary? In other words, she was on the payroll of the center, or

Page 43

did you understand her to be an independent contractor?
A. No, she was a full-time employee with --
Q. Okay.
A. -- full-time benefits.
Q. All right, so she was an employee that also had some type of employment contract; am I right?
A. Yes.
Q. Okay.
A. Well, no, she had her normal provider, medical provider contract.
Q. Okay.
A. And then she had this little one-page addendum.
Q. Okay. Now, your understanding was that under the federal laws there was no requirement to pay anything extra for work done on a weekend; that was your understanding?
A. My understanding was, as a full-time exempt employee, she could have been asked to work more than 40 hours a week because she was on salary --
Q. Okay.
A. -- without getting paid extra. The problem was that she was not being treated in the same way as the other medical provider, who was the physician assistant.
Q. Okay. In your mind, is there anything unlawful

Page 44

about paying a nurse practitioner extra for working on a weekend?
A. No
Q Okay Is there anything unlawful about, in your mind, paying the nurse practitioner extra on a weekend but not doing the same for a physician assistant?
A. Well, see, that's where I felt that they were both being treated differently
Q. Well, in your mind, is there anything under the law that would require that they be treated the same?
A. I don't know. I'm not an attorney.
Q Okay. Was there anything improper about paying one of them extra on a weekend and not the other?
A. I personally felt and believed that it was improper.
Q. Okay, and why was it improper?
A. Because it was treating them differently, compensating them differently for basically the same work.
Q. Okay Do you believe there's anything improper about an organization paying more to somebody that they feel like they need or maybe will have to pay more to keep?
A. Any organization that comes to an agreement

Page 45

with any individual is -- if they both agree on the compensation, I believe that that's fair.
Q. Perfectly proper?
A. I don't know if it's perfectly proper, but it's --
Q. Certainly not improper, is it?
A. Well, in this particular instance, I felt that it was improper.
Q. Okay.
A. It was improper that I didn't know about it.
Q. Okay.
A. And I felt that it was improper because two people were being treated different -- were being compensated differently.
Q. Okay, so in your mind it was improper?
A. Right.
Q. To whose attention did you bring this?
A. Ms. Alpert.
Q. Okay. And what was her response?
A. "Well, develop a contract for Rachel."
Q. Okay.
A. "Similar to the one with -- similar to the one that Maria had."
Q. Okay. And then so you told Ms. Rachel Eason that she would begin getting compensation for weekends?

Page 46

A. Right.
Q. Okay.
A. At her hourly rate.
Q. All right. And did you feel like it was improper that you did that?
A. That I told her?
Q. Yes.
A. I felt as though I was obeying the directive of my immediate supervisor.
Q. Okay. Well, you had told Ms. Alpert that Maria Castillo, as a nurse practitioner, was getting paid extra for the weekend and Rachel Eason, the physician's assistant, was not?
A. Yes.
Q. And her response was, "Well, go ahead and pay the physician assistant extra for the weekend"?
A. Uh-huh.
Q. Is that yes?
A. Well, what she said was, "Develop a contract for Rachel."
Q. Okay. And you did that?
A. Yes.
Q. Okay. Did you report this to anyone else besides Ms. Alpert?
A. Just Ms. Alpert and Ms. Eason.

Page 47

Q. Okay.
A. Well, and the payroll clerk and -- I mean --
Q. Okay.
A. -- she needed to start --
Q. Sure.
A. She needed to be aware of it.
Q. All right. Did you ever voice this as any type of complaint to anyone, that you thought it was improper that a nurse practitioner should be paid something for weekend work while the physician's assistant wasn't?
A. Well, I told Ms. Alpert.
Q. That you thought it was unfair?
A. Yeah.
Q. Okay. And she said, "Fix it"?
A. Yeah.
Q. Okay. What else happened that you thought was improper while you worked at the Brownsville Community Health Center?
A. After the -- after the across-the-board raises were given to all employees, a number of my employees came to me and said that they had heard that particular individuals in the organization were given merit raises in addition to across-the-board raises, and they asked me if I knew anything about that, and I -- I mean, I

Page 48

didn't. But I did go to the assistant controller.
Q Who was that?
A. Who at that time was Ms. Dalia Elizondo, and I said, "Is it true that certain individuals have gotten merit increases in addition to across-the-board cost-of-living increases," the five percent that you referred to. And she said yes. And I said, "Well, what were the criteria that were used for the merit increases?"

And she said to me that she didn't know but that she also thought that, in addition to across-the-board raises, certain individuals got merit increases, but -- and so when my employees came back to me and said, "Well, what have you found out," I said, "All I found out is that I think certain people have gotten merit increases, but I don't know what the criteria are and I don't know who got them."
Q. Okay. Did you report that or complain about that to anyone?
A. No.
Q In other words, you heard about it, you asked Ms. Elizondo, who confirmed it, you reported back to your employees that it appeared to be so?
A. Uh-huh
Q. Is that a yes?

Page 49

A. Yes.
Q. But you never brought it to someone's attention in the form of some type of complaint?
A. No.
Q. Do you believe there is anything unlawful about an organization deciding to give merit increases to some but not all employees?
A. I'm not a lawyer so I can't comment on the law.
Q. And you never made that in the form of a complaint in any event?
A. No.
Q. Okay.
A. Not a written complaint, no.
Q. Did you complain orally?
A. Well, I told my employees, I said, "If people are given merit increases and the criteria aren't being stated, I don't know who got them, I don't know how much they got, I don't know why they got them." I said to my employees, I said, "All I can tell you is I didn't get one."
Q. Okay, but you weren't making that in the form of a complaint where you were asking that they do something to affirmatively fixing it. You didn't regarding your employees as able to fix it, did you?
A. I didn't regard my employees as being able to

fix?
Q. This complaint In other words, there was nothing your employees could do about it, was there?
A. No.
Q. You didn't expect them to do anything about it, did you?
A. No
Q. Okay.
A. Except, I mean, my employees could always talk to -- could always voice their complaints in the organization. I mean --
Q. It's their right?
A. Correct.
Q. What else happened while you were employed with Brownsville Community Health Center that you regarded as improper?
A. Can I have a couple of minutes?
Q. Yes.
A. Okay.
MR. ZABARTE: Can we take a break for a little bit while he thinks about it?
MR COWLEY: Your lawyer would like to take a break. How about you?
THE WITNESS: That's fine.
(Brief recess)

Q. Mr. Kavanaugh, we just took a break, did we not?
A. Yes.
Q. Okay, before the break, I had asked you what else happened during the time that you were employed at Brownsville Community Health Center that you regarded as improper and you wanted time to think. Do you recall that?
A. Yes.
Q. And then we took a break.
A. Yes.
Q. Okay. Do you have anything else to report?
A. The last thing I can think of right now is that I believe that it was improper that several family members of the human resources manager were employed by the Brownsville Community Health Center.
Q. Okay, now, the human resource manager that you're referring to is Hilda Gonzalez?
A. Yes.
Q. All right. Who was hired that you regard as related to Ms. Gonzalez?
A. I don't know all of the family members.
Q. Okay. Tell us the ones you do know.
A. Anna Lucio and Luis Lucio.
Q. Okay. I'm asking because I don't know, are

Anna Lucio and Luis Lucio themselves related?
A. I believe that Anna is Ms. Gonzalez's sister
Q. Well, okay, are Anna Lucio and Luis Lucio related to one other?
A Yes, they are -- no, they are in-laws, I think.
Q. Okay.
A. And then there's Lucy Lucio, I think.
Q. Okay. So your understanding is Anna Lucio was Ms. Gonzalez's sister?
A. Yes.
Q. Okay. And is it your testimony that she was hired during the time that Hilda Gonzalez was the human resource manager?
A. Yes.
Q Okay. And in what position was Ms. Lucio hired?
A. I don't know.
Q. How do you know she was hired?
A. Because people told me that she worked as a receptionist there.
Q So your understanding was that she was a receptionist?
A. Yes.
Q. Okay. Was she working there the entire time you were there?

A. I don't know.
Q. Was she working there before Ms. Gonzalez became the human resource manager?
A. I don't know.
Q. So you don't know if it was Ms. Gonzalez that hired her or someone else?
A. That's correct.
Q. Okay. And Luis Lucio is what relation to Hilda Gonzalez?
A. I think a brother-in-law.
Q. Okay. Is it your understanding that Luis Lucio and Anna Lucio are husband and wife?
A. I think he's the husband of Lucy.
Q. I see. What is your understanding was the job that Luis Lucio was hired to do?
A. Maintenance.
Q. Okay. And when was he hired?
A. He was hired after November of '98 because that's -- he was new.
Q. Okay. By maintenance, what did you understand him to do?
A. Housekeeping, cleaning.
Q. Okay. And it's your understanding that Ms. Gonzalez was responsible for his hire?
A. I don't know.

Q. Okay. Who is Lucy Lucio?
A. Luis's wife.
Q. Okay. How is she related, if you know, to Hilda Gonzalez?
A. I believe she is her sister.
Q. Okay. And what was Lucy Lucio hired to do?
A. I think the receptionist.
Q. And by whom was she hired?
A. I don't know.
Q. Okay. Are there any other people that you regard as family members of Hilda Gonzalez that were hired to work there?
A. I don't know of any others.
Q. Okay.
A. There may be, but I don't know.
Q. Okay. Is it your contention or belief that Anna Lucio, Lucy Lucio or Luis Lucio were in any way unqualified for the jobs that they were hired to do?
A. I don't know.
Q. Okay. Is it your contention or belief that they were hired in favor of other applicants who applied?
A. Yes.
Q. Okay. Who applied along with them that was rejected in favor of them?

A. I don't know.
Q. Did you ever ask?
A. No.
Q. Okay. So when you say that you believe there were other applicants that were rejected, you're just guessing?
A. Yes.
Q. Okay. Did you ever complain or bring to anyone's attention your contention or belief that Hilda Gonzalez was hiring relatives?
A. It was other people complaining to me. I --
Q. My question was did you ever bring, in the form of a complaint or a report, Ms. Gonzalez' hiring of her relatives?
A. Yes.
Q. And to whose attention did you bring that?
A. The Texas Department of Health.
Q. Okay. Now, during the time that you were employed --
A. And JCO.
Q. Okay.
A. The joint commission.
Q. All right. Did you complaining to anyone within the Brownsville Community Health Center during the period of your employment regarding Ms. Gonzalez

hiring relatives?
A. No.
Q. Okay. All right, have you told us now everything that happened during the time of your employment that you regarded as improper?
A. There may be more things that I consider improper that I can't think of right now.
Q. Okay. You have told us all you can think of?
A. Right now.
Q. All right. Now, with regard to -- well, let me ask you this: Who did you complain to -- with regard to any of the six things that you have discussed here in this deposition today, did you complain of any of these things during the period of your employment to anyone outside of the Brownsville Community Health Center?
A. I did complain to TDH personnel in Harlingen.
Q. Okay. Did you complain to anyone else during the time of your employment outside of the Brownsville Community Health Center, apart from the Harlingen office of TDH?
A. No.
Q. Okay. And what specifically did you complain to the Harlingen office of TDH about?
A. The personnel at TDH told me that we should

apply for more Title V money, and I told that individual that I didn't believe that we were using the money that we had appropriately.
Q. Who was the individual at TDH?
A. Sister Mary Nicolas Vincelli.
Q. Nicolas?
A. Sister Mary --
Q. I'm sorry.
A. Sister Mary Nicolas Vincelli, V-I-N-C-E-L-L-I.
Q. Sister Mary Nicolas --
A. Nicolas.
Q. -- Vincelli. And your testimony is that this person was employed by TDH in Harlingen?
A. Yes.
Q. Okay. To make sure I understand, then, what caused, if you know, Ms. Vincelli to be speaking to you in the first place?
A. I was turning in a quarterly or yearly report on Title V money, so it was just a casual conversation.
Q. Okay. You were turning in a report. Sister Mary -- if I may refer to her as Sister Mary -- said to you, "You need to apply for more Title V money"?
A. Uh-huh.
Q. Is that right?
A. Uh-huh.

Q Is that yes?
A. Yes.
Q And your response was, "I don't believe we are spending the title money -- or money that we have properly"?
A. Right.
Q. Okay. Was it your expectation that Sister Mary would do something about it?
A. No.
Q. Were you lodging that as some type of complaint?
A. I was lodging it as my frustration.
Q. Okay. You referred to the conversation as just a casual conversation?
A. Correct.
Q. Okay. What else did you say other than, "I don't believe we're spending the money we have properly"?
A. Nothing.
Q Okay. What did Sister Mary say in return to you?
A Well, she said that the State was going to be cutting back on its Title V money.
Q Okay. So you weren't lodging any -- you weren't asking that Sister Mary intercede on your

behalf, were you?
A. No.
Q. You weren't asking Mary -- Sister Mary to cause the Texas Department of Health to undertake any kind of investigation, were you?
A. No
Q. You were just expressing your frustration?
A. Yes.
Q. You didn't regard that as any type of complaint of wrongdoing on behalf of the Brownsville Community Health Center, did you?
A. No.
Q. Okay. Was that -- the remark that you made to Sister Mary was the only time during your employment that you made any type of complaint outside of the organization itself?
A. Yes.
Q. And that was the only matter that you complained of?
A. Right.
Q. Okay. Am I correct, then, that any other complaint that you made outside of Brownsville Community Health Center would have occurred after your employment had terminated?
A. It occurred after July 27th, correct, 2000.

Q. Well, your employment terminated on July 27th, 2000.
A. Well, the board reviewed my termination and gave a final ruling on September 5th.
Q. Okay.
A. But I was not paid after July 27th.
Q Well, we will get to that, Mr. Kavanaugh. We'll get to that topic in a little bit. So you have told us now everything that you can recall sitting here at this deposition today that happened while you were employed that you regarded as improper?
A. It's not everything that I consider improper, but it's everything I can recall --
Q Okay
A. -- to be improper at this time.
Q. And that was my question. And you have told us everyone to whom you complained about those matters; am I right?
A. While I was employed, yes.
Q. Okay. Now I would like to ask a different question. During the period of your employment -- I'm not asking everything that you regarded as improper that you have reported or complained of, but what happened to you? What did the Brownsville Community Health Center do to you that you regarded as

unjustified or improper? What action was taken against you in any form that you regarded as unjustified or improper?
A. I believe that the policies and procedures of the clinic were applied to me in a discriminatory manner.
Q. Okay. Okay, what is the first thing that happened to you that you regarded as improper or unjustified?
A. I was disciplined for, quote, miscommunication when there had been a lot of miscommunication going on in the clinic and people weren't being disciplined.
Q. Okay. When was it during your employment that you were first disciplined for miscommunication?
A. Can I look at my personnel file?
Q. Well, you can look at whatever documents you like. I will show you a document that I will mark as Kavanaugh Exhibit No. 6.
MR. ZABARTE: For the record, he's requesting to look at his entire personnel file so that he can give you a response to your question, so I can produce the copy of the personnel file which was given to us on -- which we attached to the exhibit from Mrs. Gomez.
MR. COWLEY: Well, he can always take

Page 62

whatever time he wants. I was proposing that I show him a document marked as Exhibit 6. If after looking at it he would still like to look at his file, he can. That would be my proposal.

MR. ZABARTE: That's fine. That's fine.

Q I'll show you a document marked as Kavanaugh Exhibit 6 consisting of three pages.

Have you had a chance to look at the document marked as Kavanaugh Exhibit No. 6?

A. Yes.

Q Okay. Mr. Kavanaugh, after looking at Exhibit 6, do you still feel like you would like to look through your personnel file?

A. Yes, because I'm unsure about whether this page goes with this memo.

Q. All I have produced to your attorneys are the documents that were given to me as contained within your personnel file. I can't vouch for the order, proper order of them, either. If you feel it would be helpful to you to look through that, we can certainly go off the record and you will be given that opportunity.

A. Yeah, I would like to do that.

MR. ZABARTE: Okay.

(Brief recess)

Page 63

Q. Mr. Kavanaugh, we just took a break so that you could look at your personnel file?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. The question before was, having looked at what's marked as Kavanaugh Exhibit 6, are you able to tell us -- well, let me ask you, have you seen what's marked as Exhibit 6 before?

A. Yes.

Q. Okay. When you testified earlier that you were disciplined for miscommunication, is it your testimony that that disciplinary action was in any way related to what's marked as Deposition Exhibit 6?

A. Yes.

Q. Okay. The three documents that comprise Deposition Exhibit 6, were you shown those before?

A. The three documents that comprise Exhibit 6?

Q. Yes, sir, the ones in your hand.

A. Oh, the three pages.

Q. Yes.

A. Or all three of these?

Q. No, I'm referring to the three pages --

A. Okay.

Q. -- in Exhibit 6.

Page 64

A Just this one document, then?

Q Yes, sir.

A Yes.

Q Okay. And at the time that you were shown Exhibit 6, those two pages were attached to it? Well, okay, the --

A Well, see, that's what I'm unsure of

Q. Okay. You don't remember?

A. This one is dated March 3rd, this one March 16th, and March 23rd.

Q. Okay. Do you remember being shown two disciplinary documents, say the first page, and then the two pages to follow in Exhibit 6, or do you recall seeing them all at once, or what do you recall?

A. I recall getting this one and then -- unattached and then writing, "A response will be forthcoming" when I saw a memo attached. I'm not sure that this was given to me at the same time that this was.

Q. You're just not sure?

A. Yes.

Q. Okay. But at some point during your employment, you were given the three pages that comprise Exhibit 6?

A. Yes.

Page 65

Q. Okay. Now, in -- is it your position that the disciplinary action taken was unjustified?

A. Yes.

Q. Okay. You were put on probation at that time; am I right?

A. Well, see, that's -- that's what's confusing. According to the policy and procedure manual, I was -- I remember having a meeting with Ms. Gomez and Ms. Alpert. Ms. Alpert handed me this.

Q. By "this," you're referring to the second and third pages --

A. The second and third.

Q. -- of Exhibit 6?

A. Yes.

Q. Okay.

A. And, according to the progressive discipline outlined in the policy and procedure manual, disciplinary action follows a verbal warning. And, in fact, this is dated "Disciplinary action," and it's disciplinary action, then disciplinary probation. And when Ms. Alpert gave me this she said, "This means we're taking progressive discipline against you."

And during the meeting, Ms. Gomez says, "No, I think we need to put him on disciplinary probation," and so the progressive discipline wasn't

Page 66

followed. I mean, I was given a notice of disciplinary action, but then I was put on disciplinary probation.
Q. Okay. And you regarded yourself as of March 23rd of 2000 as being on disciplinary probation?
A. Correct.
Q. Okay. Now --
A. This, in effect, became the disciplinary probation.
Q. All right. Now, there are matters discussed in Pages 2 and 3 of Exhibit 6; am I right?
A. Uh-huh, yes.
Q. Okay, and those were discussed with you by Ms. Gomez and Ms. Alpert?
A. I remember discussing them all with Ms. Alpert, some of them with Ms. Gomez, but not all of them.
Q. Did you meet with Ms. Alpert prior to meeting with Ms. Gomez regarding these matters?
A. My recollection is that Ms. Alpert gave me this memo in Ms. Gomez's presence.
Q. By "this memo," you're referring to Pages 2 and 3 of Exhibit 6?
A. Yeah, March 3rd, the March 3rd memo.
Q. Okay. Now, if we look at Page 1 of Exhibit 6, we see your signature, do we not?
A. Yes.

Page 67

Q. And it's dated?
A. Yes, 3-23.
Q. All right. If you recall, were you given Pages 2 and 3 of Exhibit 6 on 3-23 at the time that you signed that or was it on another occasion?
A. Well, see, that's what I'm unsure of.
Q. Okay.
A. I mean, I did sign it on March 23rd.
Q. Okay, and you might have seen --
A. I signed -- I signed this --
Q. Page 1?
A. -- piece of paper.
Q. Okay. And you might have been shown the other two pages on a prior date?
A. My belief is that we talked about this and this came with -- we talked about the second and third pages, and then this came later.
Q. Okay. And your recollection is you talked about the second and third pages with Ms. Alpert and Ms. Gomez?
A. Yes.
Q. Okay. Now, there are matters referred to in the second and third pages that are referred to as the reason for the discipline, and I would like to discuss those with you this morning. One of the complaints

Page 68

against you would seem to be -- to relate to a matter occurring -- and if I may look on it with you -- as some type of misunderstanding with Ms Moody
A. Uh-huh.
Q. Am I correct?
A. Uh-huh.
Q. Is that a yes?
A. Yes
Q. Okay What did you understand was being referred to between you and Ms. Moody?
A. You're asking me to give my best guess?
Q. Well, what did you understand that the complaint was about you from Ms. Moody, or, to be more specific, what did you understand Ms. Alpert was referring to when she referred to Ms. Moody?
A. Well, it says here that, "Ms. Moody is a supporter of yours and would not have put her concerns" about you "in writing unless she was extremely frustrated," so you're asking me to guess why she was frustrated.
Q. I'm asking for your best understanding of why
A. Okay. The clinic -- and I'm just guessing. The clinic had hired Ms. Moody's husband to do maintenance, and after several months he was fired for -- for some reason that I wasn't privy to. I mean,

Page 69

people said that he was fired because he had borrowed tools from the clinic and not returned them. I mean, that's -- that's hearsay. That's not my -- I didn't experience that.

Then when Ms. Moody went on extended sick leave and came back, the laptop computer that she had been assigned to use was missing, and Ms. Alpert told me to initiate an investigation of that. And so I reported it to the police, and I know that she felt that she was being accused of the -- of the loss of the computer.

In addition, she was -- when she was on sick leave, Ms. Gomez met with the campus care staff and told them that several employees would have to be laid off during July of 2000 because we had not submitted Title I bills appropriately to the school district and so they hadn't reimbursed those bills, and so Ms. Moody felt as though she was being blamed for the potential layoff.

Finally, at a -- at a conference in Atlanta, I asked her to attend a session that would mean her work responsibilities were increased, and she jokingly said to me, "Well, that means you have to give me a raise," and I jokingly responded by saying that, "If you bend over, I'll give you a raise."

Okay, now, she misunderstood that -- my response, but she had initiated the response, and I told her later that if I had known that -- if I had any inkling that she didn't understand what the joke was that I would never have said it

Q. Okay. Prior to this meeting that you had with Ms Alpert and Ms Gomez regarding, let's say, Pages 2 and 3 of Exhibit 6, were you aware that there was any complaint by anyone regarding you?

A. Oh, yes.

Q Okay. And how were you aware of that?

A. Well, we had built a new clinic, we were under pressure to see more patients and to advertise what we were doing. I was asking the staff to work harder. The social workers were being asked to do more counseling. I had asked the family nurse practitioner and physician assistant to do more on-site supervision, so, yes, I was aware that --

Q. Okay.

A. -- the people were complaining.

Q Were you aware of any complaints by Ms. Moody regarding you before this bring -- brought to your attention in the form of Exhibit 6?

A. Well, before this exhibit, Ms. Alpert told me that Ms. Moody had misunderstood what I had told her at

-- in Atlanta, and so we had a meeting and I apologized to her.

Q. Okay Had there ever been any correspondence between you and Ms. Moody regarding her complaints with you?

A. Not that I'm aware of.

Q. Did you regard yourself as in any way at fault with regard to any problems between you and Ms. Moody?

A. Yes, I mean, the comment I made was --

Q. The comment in Atlanta?

A. Was offensive, yeah.

Q. Okay. And you apologized?

A. Yes.

Q. Other than the comment in Atlanta, did you regard anything that -- any problem that you may have had with Ms. Moody as being your fault?

A. Exclusively?

Q. In part.

A. Well, I mean, I know that the police investigation of she and her husband was difficult, and --

Q. Okay.

A. -- I was asked to do that.

Q. Anything else?

A. I can't think of anything else right now.

Q Okay. I'll show you what I'll mark as Kavanaugh Exhibit 7. It's just a one-page -- if you would look at that.

MR. ZABARTE: This is something that's not been produced pursuant to any discovery we've had; is that correct?

MR. COWLEY: It came from you.

MR. ZABARTE: But not pursuant --

MR. COWLEY: Pursuant to discovery.

MR. ZABARTE: Okay. This is one of the things that you --

MR. COWLEY: Now that I looked at that, I see a piece of a fax legend. That may have been sent to me by the client. If it was, I apologize. If it's within any discovery request you sent me, I don't know why it wouldn't have been produced. I don't recall if it was or not. I would have to look.

MR. ZABARTE: Have you ever seen this? Did she give you that?

THE WITNESS: You know, I don't remember. I mean, I remember talking about the fact that she was frustrated that I was not giving her a raise. I know that she worked on job descriptions. I know that she was one of the people who asked about why were some people given merit increases --

MR. HORTON: Answer his question.

MR. ZABARTE: Okay, answer his question.

THE WITNESS: Okay, okay, okay.

Q. Okay, have you ever seen the document before marked as Kavanaugh Exhibit 7?

A. I'm not sure.

Q. It would appear, on its face, to be addressed to you?

A. Yes.

Q. Okay. And it would appear to itemize complaints that Ms. Moody had with you?

A. Well, some are addressed to me and some to the organization.

Q. Okay, nothing in there about a laptop; am I right?

A. No.

Q. Okay. Nothing in there complaining of Ms. Gomez?

A. Not directly. She's just wondering about the pay increases and the merit increases.

Q. Okay. No complaint about being blamed for a failure to properly bill?

A. The meeting at which that occurred occurred in May. It wasn't in February.

Q. Okay. It hadn't happened?

Page 74

A. Right.
Q. Okay.
A. And the same thing with the laptop.
Q. Okay. So that those could not have been referred to in -- at the meeting referenced in Kavanaugh Exhibit 6 because they hadn't happened yet?
A. Uh-huh.
Q. Is that right?
A. That's correct.
Q. So you didn't understand when there was discussion of complaints by Ms. Moody that she was referring to, the improper billing or the laptop, because those hadn't even happened yet?
A. That's correct.
Q. So what did you understand was being referred to with regard to Ms. Moody complaining about you?
A. I do remember talking at this meeting about the comment that I made to Ms. Moody in Atlanta.
Q. Okay.
A. To which she referred to here.
Q. All right. Now, would it be a fair statement, Mr. Kavanaugh, that no one ever sent you anything criticizing you that you didn't respond to in writing? Isn't that true?
A. That's not true.

Page 75

Q. Okay.
A. Because I never responded to -- to this memo.
Q. Okay. Other than Kavanaugh Exhibit 6, was there ever anything that anyone sent to you in any way critical that you didn't respond to with a memo of your own?
A. I can't say for certain, but I would say there were times that I did not respond.
Q. Okay. Your general practice was to respond; am I right?
A. In most cases, I responded.
Q. Okay. Oftentimes writing far more pages than were sent to you; isn't that true?
MR. ZABARTE: I object to the commentary on that. That's just a matter of opinion, and it's a matter of -- it just mischaracterizes his responses to questions asked of him.
Q. Isn't that true?
A. It depends on what memo was sent to me. I sent some two-sentence memos.
Q. Okay. Did you respond to the -- to Exhibit 7?
A. Yes, by sitting down with Ms. Moody and Emily and apologizing to her.
Q. Okay. You didn't write anything in response?
A. No.

Page 76

Q. Okay. Could you look at what's marked as Exhibit 8?
MR. HORTON: Could we see that?
MR. COWLEY: Sure.
MR. ZABARTE: Again, I want to make an objection on the record. This is something that I don't believe has been produced pursuant to discovery.
Q. Have you had a chance to look at the document marked as Exhibit No. 8?
A. Yes.
Q. Is that a document that you wrote?
A. Yes.
Q. Okay. And it would appear to be responsive to Kavanaugh Exhibit 7?
A. Yes.
Q. Okay. And I'll ask you to look at Kavanaugh Exhibit 9.
MR. ZABARTE: Again, I assert the same objection. These are documents that have been not produced in responses to discovery, and, in all fairness, he should have had an opportunity to have looked at them before his deposition.
MR. COWLEY: Well, I don't know that they were requested, and I can't say for sure that I didn't get them from you, but he can certainly take what time

Page 77

he needs to look at them before giving any testimony
Have you had a chance to look at Exhibit 9?
A. Yes.
Q. Is that a document that you wrote?
A. That I wrote?
Q. I'm sorry, did you receive that document from Ms. Moody?
A. Yes.
Q. Okay. And you had received that document prior to the -- getting the disciplinary writeup evidenced by Exhibit 6?
A. Yes.
Q. Okay. Did you understand that Exhibit 6 was referring to the two memos from Ms. Moody?
A. Could you repeat that again, please?
Q. When you were -- when Exhibit 6 was discussed with you, did you understand that reference was being made to the documents you had received from Ms. Moody?
A. No.
Q. Okay. Did Ms. Alpert state in there that Ms. Moody had put her concerns in writing to you?
A. Yes.
Q. And you had received those writings?
A. Yes.

Q But you didn't understand that she was referring to the complaints you had received from Ms. Moody?
A That's correct.
Q Okay. There was discussion during that meeting about complaints of the employees at the Clearwater campus?
A. Uh-huh, yes.
Q Is that a yes?
A. Yes.
Q. Did you ever meet with Ms. Gomez to discuss your employees at the Clearwater campus?
A No, I met with Ms. Alpert.
Q Okay. Did you ever say to Paula Gomez that you believed that your employees at the Clearwater campus were demon possessed?
A. No.
Q. Did you ever have any conversation whatsoever with Ms. Gomez regarding demonic possession of your employees?
A. No.
Q. Did you have any conversation with Ms. Gomez relating at all to the spirituality of your employees?
A. What does that mean?
Q. Did you ever say to Ms. Gomez that you felt

like that you needed to have an exorcism performed?
A. No.
Q. Okay. Did Ms. -- so you had no conversation with Ms. Gomez at all regarding, let's say, demon possession or demon influence of your employees?
A. No.
Q. Did you ever say to Ms. Gomez that you had seen demonic possession in Peru?
A. I was present at a -- at an exorcism in Peru.
Q. My question was did you ever say to Ms. Gomez that you had seen demonic possession when you were in Peru?
A. No.
Q. Okay. By your testimony, what did you say to your employees at the Clearwater campus with regard to whether or not they were demon possessed?
A. I said that, "My experience in Peru leads me to believe that there is evil in the world, and the way you are treating one another is an indication of evil. You are treating each other in evil ways."
Q. Who did you say that to?
A. The Clearwater staff.
Q. Who would that be?
A. Ceci Gomez, Marisa de la Fuente, Glenda Reiff, Maria Castillo, Rosalba Esparza.

Q Did anyone complain -- did any one of these people you have just named complain to you regarding that remark?
A. Yes.
Q Okay.
A. Glenda.
Q Did anyone else?
A. I don't know.
Q. Okay. To your knowledge, did any of these people complain to anyone else regarding that remark?
A. Yes.
Q. And to whom did they complain as far as you know?
A. Ms. Alpert.
Q. Okay. And how do you -- what caused you to say that?
A. Because Ms. Alpert spoke to me about it.
Q Okay. What did she say?
A. She told me that she had heard that an employee had told her that I had said that the clinic at Clearwater needed to be exorcized or --
Q. Okay. And what did you say in response?
A I told her that I didn't say that at all, that I told her that I believed that there was evil in the world and that they were acting toward each other in

evil ways.
Q. What did Ms. Alpert say?
A. "Well, they didn't understand that."
Q. What did she instruct you to do?
A. I don't remember exactly.
Q. Did you ever apologize to the employees?
A. I know that I apologized to Glenda.
Q. Did you ever apologize to them as a group?
A. I believe so, but I don't remember. I do remember meeting with them with Hilda Gonzalez.
Q. If you were being reprimanded in March of 2000 with regard to the Clearwater staff, what did you understand you were being reprimanded about?
A. For the comment that I made to them about believing that they were acting toward each other in evil ways.
Q. Okay. Did you regard the -- did you regard it as justified that you would be disciplined for that?
A. No.
Q. Okay. There were also matters brought to your attention regarding the Lucio staff; am I right?
A. Yes.
Q. Okay. What did you understand that that had to refer to?
A. That referred to the fact that we were

finishing building the clinic and I wanted the staff to feel as though that they had contributed and felt at home in the clinic, and so I told them that they can decorate the clinic any way they want to, if they tell me what materials I should buy, I would buy the materials and if they wanted to do the painting and things of that nature, then that would be the arrangement, I would spend the money and they would provide the labor.

Q Okay.

A So I spent $300 or so. I forget the exact amount of money. I bought the supplies, and they just weren't doing anything with the supplies that I had bought. They weren't using them to decorate the building.

Q. Okay. What did you tell them you were going to do if they didn't decorate the building?

A. I told them that they had caused me to spend money so I was going to look into deducting the money out of their paychecks.

Q. Okay. What else did you tell them you would do?

A. I don't know.

Q. Okay.

A. That's my -- that's my comment I made to them.

Q. Okay.

A. That I remember.

Q. All right. Do you recall any other problem between you and the Lucio staff?

A. There was a question about who should be supervising whom.

Q And who raised that question?

A. The staff themselves.

Q. Okay. And what in particular was the question?

A. The question was, who is in charge of any particular site, and I met with the staff and the medical director of the campus care centers, and we decided that the medical provider was the person who should supervise and who should determine what's appropriate and what's not.

Q. To your knowledge, was there any complaint about that?

A. There was -- the providers were reluctant to become supervisors, yes.

Q. Did you understand that that was part of what you were being reprimanded for in March?

A. What?

Q. Any complaint by the medical providers as being in charge.

A. I don't see where that showed up here.

Q. Okay. If I may look at this with you. It is your testimony, I take it, that the discipline that you were assessed in the form of that written reprimand and the suspension was unjustified by your conduct?

MR. ZABARTE: Excuse me. Did you say "suspension"?

MR. COWLEY: Yes.

MR. ZABARTE: There's no suspension.

THE WITNESS: There was no suspension.

MR. COWLEY: I'm sorry. My mistake.

Q. Is it your position that the disciplinary probation that you were given was not justified by your conduct or behavior?

A. Yes.

Q. Okay. What do you believe was what motivated Ms. Alpert or Ms. Gomez to assess this discipline and put you on probation?

A. I believe that the disciplinary policies and procedures were not applied to me in the manner in which they were written.

Q. Okay. My question was, what do you believe caused Ms. Alpert or Ms. Gomez to put you on disciplinary suspension if it wasn't the conduct that's referred to in here?

A. I wasn't put on disciplinary suspension.

Q. I'm sorry. I apologize. On disciplinary probation. Let me start over. You have testified that the conduct referred to in Exhibit No. 6 was, in your mind, not what -- was not -- did not justify a disciplinary probation, and my question is, what do you believe or contend motivated Ms. Alpert or Ms. Gomez to assess this discipline?

A. I believe the disciplinary action probably was appropriate but disciplinary probation was not.

Q. Okay. Do you believe that the incidents referred to in Exhibit 6 were, in fact, the incidents that motivated them to assess the discipline?

A. I do not believe that they are all of the incidents, and I do not believe that this contains all of the motivation.

Q. Okay. What do you contend, apart from the incidents cited in Exhibit 6, motivated Ms. Alpert or Ms. Gomez to assess discipline against you at that time?

A. I believe that my gender and my race --

Q. Okay.

A. -- were motives.

Q. Your gender and your race. You regard your race as what?

A. Caucasian, white.

Page 86

Q. Okay. And you regard Ms. Gomez's race as what?
A. Hispanic.
Q. Okay. If maybe we could agree on terms, generally in terms of race, Caucasians refer also to Hispanics. What differentiates a Hispanic from a non-Hispanic would be national origin. Do you regard -- what do you regard your national origin to be?
A. Irish and German.
Q. Okay. Would it be fair to say you regard yourself as non-Hispanic?
A. Definitely.
Q. Okay. You're definitely non-Hispanic and you were born in 1955; am I right?
A. That's correct.
Q. Okay. Now, I would like to ask you, Mr. Kavanaugh --
A. Could I just take a quick bathroom break?
Q. Sure.
A. I'm sorry.
(Brief recess)
Q. Mr. Kavanaugh, we've just returned from our lunch break; is that right?
A. That's correct.
Q. Are you ready to continue?
A. Yes.

Page 87

Q. Okay. I would just like to show you one document that I will mark as Exhibit No. 10 and ask, if you would, to look at that.
MR. ZABARTE: I'm going to make an objection to this particular document, that it has not been produced prior to this deposition in responses to discovery requests, but, you know, I want you to go ahead and look at it.
THE WITNESS: Okay.
Q. Mr. Kavanaugh, have you had a chance to look at the document marked as Exhibit 10?
A. Yes.
Q. Is that a document that you had received while you worked for the Brownsville Community Health Center?
A. I may have. I don't remember.
Q. Do you have that document in your possession?
A. Not that I'm aware.
Q. Okay. Do you have your response to that document in your possession?
A. Not that I'm aware.
Q. Okay. To your knowledge, were there any other managerial employees that Doricela Moody had any problem with?
A. From Dori's point of -- from Ms. Moody's point of view?

Page 88

Q. From whatever point of view you would choose
A. Ms. Gomez did mention to me on at least one occasion that she was upset with Ms Moody for not getting the Title I bills in when she said that she was
Q. Okay. Other than Ms. Gomez, are you aware of any supervisory or managerial employees that Ms. Moody complained of?
A. I'm not aware of any I don't know
Q. Okay. Are you aware of any managerial employees who received complaints similar to those that Ms. Moody made with respect to you?
A. Could you ask that again, please?
Q. Yeah. Are you aware of any --
MR ZABARTE: This -- excuse me, Ray, but this is a memo from Cecilia Cavazos?
MR. COWLEY: Yes.
MR. ZABARTE: Okay.
MR. COWLEY: Yeah.
Q. If we refer back to Exhibit No. 7, are you aware of any employees within the organization who had complaints similar to Mrs Moody's with respect to any supervisory employee?
A. Are you asking me if Ms. Moody complained about any other managerial person?

Page 89

Q. Well, let's start there. Do you know if Ms. Moody made complaints similar to those she lodged against you with respect to any other supervisory employee?
A. The only thing I know is that once in a while she talked to me about her frustration with the medical provider at Clearwater Elementary School. Now, whether she was managerial or not, she had supervisory capacity.
Q. What did you understand those frustrations were about?
A. She told me that that medical provider didn't like to become involved in settling staff disagreements.
Q. Okay. Didn't want to manage?
A. All I know is that she was reluctant to settle disagreements between the staff for whatever reason.
Q. And what was the name of that medical provider?
A. Maria Castillo.
Q. Okay. Are you aware of any supervisory or managerial employees who had complaints lodged against them similar to the ones that Ms. Moody lodged against you, not necessarily from Ms. Moody, but from anyone?
A. No, I'm not aware.
Q. Are you aware of any supervisory or managerial

Page 90

employees that had complaints from their employees that they felt like they were told that they were demon possessed or needed an exorcism?

A. No.

Q Are you aware of any complaints by employees against supervisors or managers other than you that part of their paycheck would be withheld if they didn't do certain tasks?

A. I don't know.

Q. Okay. Are you aware of any managerial or supervisory employees, other than yourself, that were written up for failing to attend planned seminars?

A. No.

Q. Okay Now, before lunch, I had asked you what you felt like or you contend motivated either Ms. Alpert or Ms. Gomez to put you on a disciplinary probation, and how do you answer?

A. I believe that I was put on disciplinary probation because of my race and gender and in retaliation for the complaints that I had lodged with the management of the campus care centers by the finance director.

Q Okay. And those complaints that you're referring to are the ones that you told us this morning; am I right?

Page 91

A. In part.

Q. Well, were there complaints that you made that you didn't tell us about this morning, that you feel like motivated your disciplinary probation?

A. Well, as I said before, I was also -- I also believe that that took place in violation of the policies and procedures that had been written.

Q. Okay. In other words, you feel like you should have given -- been given additional steps in the disciplinary procedure?

A. I feel that the disciplinary procedure should have been carried out according to how it had been written.

Q. Okay. If --

A. And I believe that the disciplinary procedure should have been applied equally to all the staff.

Q. Okay. Now, when you talk about retaliation for the complaints you made, you're talking about the complaint with regard to Account 761?

A. There were a number of complaints that I made, as you remember, the fact that -- the lack of direction with regard to the hiring process, selection process. There seemed to me -- my perception was that the hiring process was nepotistic, all right, and intentionally ill defined or undefined. I believe that people were

Page 92

being treated differently and unfairly, in the case of the physician assistant and the nurse practitioner. And although the procedure says that -- although the policies and procedures say that employees are required to bring forth complaints about the organization when impropriety may be an issue, that they should do that, and I feel like I was being told not to -- not to complain.

Q. When you say, though, that you were being retaliated against for making complaints, you're referring to those complaints that you testified about this morning; am I right?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. Okay. Now, then, you're saying that you feel like that you were put on disciplinary probation because you're non-Hispanic?

A. Yes.

Q. On what facts or evidence do you base that contention?

A. Because Hispanics who, for instance, had problems with miscommunication were not written up, that I'm aware of.

Q. Okay. All right, now, when I asked you about

Page 93

what managerial or supervisory employees had problems similar to those that you were reprimanded for, you couldn't name anyone. Do you recall that?

A. No, I said I didn't -- no, I said I didn't know.

Q. Didn't know, all right. Apart from that, what employees, Hispanic employees, are you saying miscommunicated and were not reprimanded in the manner you were?

A. Well, I don't know that they weren't. I suspect that they were not.

Q. Okay. And what Hispanic employees do you suspect engaged in miscommunication and were not reprimanded in the manner you were?

A. Within four months of my coming to work at the clinic, Ms. Gomez was giving a tour of the building to some federal authorities and a Hispanic physician was talking loudly to the patient in a decidedly unprofessional manner.

Q. Who was that physician --

A. So we all got a memo.

Q. I'm sorry.

A. We all got a memo that stated we shouldn't act that way.

Q. I didn't mean to interrupt you. Did you get an

Page 94

opportunity to finish your answer?
A. Yes. Yes, I'm sorry.
Q. So sometime, four months or so, after you were hired, you observed Ms. Gomez with some federal investigators. What --
A. I didn't observe. I'm sorry. I didn't observe. I was told.
Q: Oh, you didn't see it?
A. At a staff meeting, she told us that she saw something and she didn't want to see that behavior anymore.
Q. All right. Who did you understand the Hispanic physician to be?
A. Dr. Luis Gaytan.
Q. Okay. So Mrs. -- Ms. Gomez -- excuse me -- brought to the attention of, I understand -- I take it the managerial staff?
A. No, the whole staff at a normal staff meeting.
Q. Okay.
A. The entire staff.
Q. And that would include about how many people?
A. Gee, maybe a hundred.
Q. Okay.
A. However many staff there are.
Q. All right. Ms. Gomez said that Dr. Luis

Page 95

Gaytan was --
A. No, she didn't say Dr. Luis Gaytan. She said she witnessed a physician.
Q. And it was your understanding it was Dr. Gaytan?
A. Yes.
Q. Okay. And she said to everyone, "I don't want that to happen"; is that right?
A. We all got a written memo on it, yes.
Q. Okay. Now, did that memo only go to the non-Hispanic staff members?
A. No.
Q. It went to Hispanics as well?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. And your understanding was that the individual that she was specifically referring to who was acting inappropriately was himself Hispanic?
A. Yes.
Q. Okay. And so on the basis of Ms. Gomez stating that behavior such as that of Dr. Luis Gaytan is unacceptable, you believe you were singled out because you were Anglo?
A. I believe that I was singled out for

Page 96

miscommunication. Miscommunication was throughout the entire organization
Q. Well, was there any -- do you believe that Ms. Gomez miscommunicated when she said, "I don't want that kind of behavior in my clinic"?
A. No, but I believe that she miscommunicated on numerous other occasions.
Q. Well, let's stick with the one you brought up. Why is it that you refer to Dr. Luis Gaytan when you say that you believe you were discriminated against for not being Hispanic?
A. I believe that this particular physician spoke in an inappropriate manner to the patient and he was not disciplined in the same way that I was disciplined when it was brought to my attention that I had spoken inappropriately to an employee
Q. Okay, you didn't see what Dr. Luis Gaytan said or didn't say; isn't that true?
A. That's correct.
Q. You don't know if it was in a loud voice or not; isn't that true?
A That's correct.
Q You don't know if he was disciplined or not; isn't that true?
A. That's correct.

Page 97

Q. You don't know if Ms. Gomez brought him into the office and chewed him out, do you?
A. No.
Q. Okay. What else do you base your contention on that you believe that you were put on disciplinary probation because you're not Hispanic?
A. On another occasion, Maria Castillo, I had received several complaints about her from the nursing staff at BCHC, and disciplinary action, to my knowledge, had not been taken against her.
Q. Okay. Who were the nurses that complained to you about Ms. Castillo?
A. Terry Davis.
Q. Who else?
A. Carmen Guajardo.
Q. Who else?
A. Genie Lopez. Genie Lopez -- no, Genie -- Terry -- no, it was Genie Guajardo, Carmen Lopez. I'm sorry, not Carmen Guajardo, Carmen Lopez.
Q. Okay.
A. Genie Guajardo and Fran Zavala.
Q. Okay. Now, did -- so Terry Davis, Carmen Lopez, Genie Guajardo, and Fran Zavala?
A. Yes.
Q. Okay. Did they all have the same complaints,

Page 98

or were their complaints different?
A. Yes, they all complained to me that Maria was disruptive during a nursing in-service.
Q. So they were all referring to the same meeting?
A. Yes.
Q. Okay. That Maria was disruptive during a meeting?
A. During a nursing in-service that Terry was coordinating.
Q. And what is it that you're -- what was your understanding that Maria did that was disruptive?
A. She was talking while the presentation was going on, she wasn't paying attention to what the presentation was about, and she generally was distracting people.
Q. And you weren't there?
A. That's correct.
Q. Okay. So you have no personal knowledge of what she did or didn't do?
A. Just what they wrote to me.
Q. Okay.
A. Just their written memos.
Q. Okay. Where are those written memos?
A. At home.
Q. Okay. So your understanding was they were

Page 99

referring to one event where Maria Castillo was talking while the speaker was trying to give a presentation?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Now, you wouldn't call that miscommunication, would you?
A. She was communicating inappropriately.
Q. She was being rude?
A. That's what the opinion of the people who wrote the memos were.
Q. Okay, but to you that's miscommunication?
A. She was miscommunicating -- she was communicating in an inappropriate manner.
Q. Is that a yes or a no?
A. Yes.
Q. Okay, to you that's miscommunicating. Was she disciplined for it?
A. No.
Q. And how do you know that?
A. Not that I'm aware of.
Q. Okay. Do you know if she was disciplined?
A. No, I have never had access to her --
Q. Did you ask --
A. -- clinic personnel file.

Page 100

Q. Did you ask Ms. Gomez if she was disciplined?
A. No.
Q. Did you ask Ms. Alpert if she was disciplined?
A. No.
Q. So that in truth you don't know; is that right?
A. I don't know.
Q. Okay. All right, on what else do you base your allegation that you feel like you were put on disciplinary probation because you're not a Hispanic?
A. I believe that the policies and procedures, as they are written in the policy manual, were not applied to me and I was not given due process. In addition, I do -- I believe that -- that the grants that I was in charge of managing were -- I was being charged administrative overhead when other grants written by other departments were not being charged administrative overhead, or the administrative overhead that was being charged against different grants was being charged in a different manner.
Q. Okay. You correct me if I'm wrong. I believe I understand from your testimony that you feel like there should have been more disciplinary steps before you were put on probation?
A. I believe that the progressive discipline as it's written in the manual was not applied.

Page 101

Q. Okay. And who are the Hispanic employees that you say were treated differently than you and were similarly situated to you?
A. All of the Hispanics on the senior management team.
Q. Okay.
A. At that time.
Q. Okay. All of the senior management members had complaints against them similar to the ones that are put in the -- have been marked and made part of this deposition?
A. I don't know.
Q. Okay. What senior management members had complaints against them that had the disciplinary steps applied to them appropriately when you didn't?
A. All I can say is that the policies and procedures and the disciplinary procedures set forth were not applied to me the way they are written.
Q. Okay. Give us the names of all the Hispanics that were similarly situated to you -- I mean, by that I mean had disciplinary complaints -- not disciplinary, excuse me -- had complaints from subordinates similar to yours and that they had the discipline applied differently to them than was applied to you.
A. The incidents that I know of is that in the

Page 102

disciplinary probation it said here that I was given several opportunities to go to seminars. Okay, the second seminar that I was asked to go to was on July 28th or 29th, two days after I was terminated, or a day after I was terminated, and approximately ten people were supposed to go, ten or twelve people, and I have knowledge that at least six of them didn't go to that particular seminar.

I mean, I didn't go because I had been terminated at that point, but four or five -- well, a number of them were Hispanic that didn't go to that seminar.

Q Okay. Who were the Hispanics that were scheduled to go to the seminar and didn't?

A. I would have to refer back to that memo, which I don't have on my person right now.

Q What memo are you referring to?

A. The memo from -- I don't know if it's from Ms. Gomez or Ms. Alpert -- to the individuals.

Q. Okay. Where was the seminar to be?

A. I think in McAllen.

Q Okay. And it would have been right around the end of July?

A. Yes.

Q. Of 2000?

Page 103

A. The last days of July of 2000.

Q. Okay. Were there any non-Hispanics that were scheduled to go?

A. I believe so. I don't -- I would have to look at the memo again.

Q. Were there any non-Hispanics who were scheduled to go and didn't go besides yourself?

A. To the second one?

Q. Yes.

A. At the end of July?

Q. Yes.

A. I would have to look at the -- I mean, I don't -- without looking at the memo, I can't tell you who was asked to go and who wasn't asked to go.

Q. Okay.

A. And I also don't know who eventually ended up going or not going. I don't --

Q. Okay.

A. I don't have that information.

Q. Do you know if any of them that didn't go brought it to their supervisor beforehand and gave reasons why they couldn't go? Do you know that?

A. No.

Q. Do you know if any of them brought those reasons forward and were excused and then didn't go?

Page 104

A No.

Q Okay. And you don't know if there may have been some non-Hispanics that were scheduled to go and failed to go? You don't know that?

A. I don't know that.

Q. Okay. My --

A Could I be excused for just a moment?

Q. Sure.

MR. HORTON: Sure.

THE WITNESS: I'm sorry.

(Brief recess)

Q. Mr. Kavanaugh, before we took the break, the question was on what else do you base your contention that the reason you were put on a disciplinary probation is because you are not Hispanic? What other reason -- what other evidence or information do you point to in support of your contention?

A All I can say is what I said. I believe that the policies and procedures, as they were applied to me, were different.

Q. Well, you're saying they weren't applied according -- as -- according to how they are written?

A. Yes.

Q Okay. What Hispanic employees had those disciplinary policies applied to them as written,

Page 105

contrary to the way you were treated?

A. I'm not aware of all the personnel situations in the entire clinic. I'm not privy to that information.

Q. And I'm not asking that, Mr. Kavanaugh. I'm asking what Hispanic employees, that you know of, had the disciplinary policies applied to them as written contrary to the way you were treated?

A. My colleagues were also immediate subordinates of Ms. Alpert, and she did not tell us how -- she did not tell us specifically what disciplinary action was taken against what specific individuals.

Q. If I ask the question, was there a single Hispanic employee who had the disciplinary policies applied as written to him or her, your answer would be "I don't know"; isn't that true?

A. Yes.

Q. Okay. So you cannot tell us a single Hispanic employee who was treated differently than you were with respect to the application of the disciplinary policies; isn't that true?

A. That is true.

Q. Okay. Is there anything else that causes you to say that the reason you were put on disciplinary probation is because you're not Hispanic?

Page 106

A I can't think of anything right now.
Q Okay. Now, you also mentioned, I believe, your age; is that right?
A Yes.
Q. Okay. You were born in 1955?
A That's correct.
Q Okay. On what facts or information do you base your contention that the reason why you were placed on disciplinary probation was your age?
A. Because I was the oldest person in the campus care center staff.
Q And that staff consisted of how many people?
A. 15 or 16.
Q Okay. Were you the oldest person in Brownsville Community Health Center?
A. No.
Q. Do you regard yourself as older than Ms. Gomez?
A. No.
Q. Do you regard yourself as older than Ms. Alpert?
A. We may be similar in age. I don't know.
Q. Okay. If I told you that she's six years older than you, would you believe that?
A. I could believe that.
Q Okay. Are you older than Ms. Klug?

Page 107

A. Probably not, but I don't know.
Q. Okay. Your answer was you're the oldest person on -- you were the oldest employee on the community campus --
A. The campus care center staff.
Q. Campus care center staff, okay. Other than the fact that you were the oldest person on the campus care center staff, what else causes you to say that the reason you were put on disciplinary probation was your age?
A. At this point, I cannot say.
Q. Okay. Which employees younger than yourself were treated more favorably than you?
A. I don't know how everyone was treated so I don't know.
Q. Okay. If I asked you to name for the Court one individual younger than yourself who was treated more favorably than you, could you do that?
A. Well, it's a -- that's a qualitative judgment that I can't answer.
Q. Okay. Do you allege or contend that there was a -- an employee younger than yourself treated more favorably than you?
A. I contend that I was treated differently because of my age.

Page 108

Q. Differently than whom?
A. Differently than other staff members.
Q. Okay. And who are they?
A I cannot name them at this time.
Q. Okay. So if I ask the question, can you tell the Court even one person younger than yourself treated more favorably than you, you cannot do that; isn't that true?
A. Not without access to personnel records, no.
Q. Okay. During the time that you were -- during the meeting or meetings when you were being put on disciplinary probation in March of 2000, there was never any mention by anyone of your national origin; isn't that true?
A. There was never any mention of my national origin by anyone?
Q. At those disciplinary meetings, did Ms. Alpert make any mention of you being non-Hispanic?
A. No.
Q. Did Ms. Gomez make any mention of you being non-Hispanic?
A. No.
Q. Okay. Did either Ms. Alpert or Ms. Gomez make any comment with regard to your age?
A. No.

Page 109

Q. Okay. And, by the same token, at those disciplinary meetings, you never made any comment about your national origin, did you?
A. No.
Q. You never said, "I feel like I'm being singled out and treated differently because I'm Anglo"? You never said that, did you?
A. I did say that I felt like I was being treated differently.
Q. Okay. And when, by your testimony, did you say that?
A. I told Emily Alpert.
Q. Okay. You never once said, "I believe I'm being singled out and treated differently because I'm Anglo," did you?
A. No.
Q. Okay. You never once during the time of your employment with Brownsville Community Healthcare Center made the assertion to anyone that you were being singled out and treated differently because you were Anglo; isn't that true?
A. That's correct.
Q. And during the entire time of your employment with Hidalgo -- excuse me, with Brownsville Community Health Center you never once made the assertion that

Page 110

you were being singled out and treated differently because of your age; isn't that true?
A Not specifically
Q. Well, let me ask a specific question. You did not at any time during the time you were employed by Brownsville Community Health Center make the assertion that you were being singled out and treated differently because of your age; isn't that true?
A. Yes.
Q Okay. And you certainly never said to anyone during the time you were employed with Brownsville Community Health Center that you were being singled out and treated differently because you were male, did you?
A My immediate supervisor told me I was being treated differently because I was a male.
Q. Okay. Do you believe that you were put on disciplinary probation because you were a male?
A. I believe that I was put on disciplinary probation in retaliation and -- for the complaints I had registered and because of my gender.
Q Okay
A. My race, and my age.
Q Now --
A. I was the only person like me in the entire organization and in a very unique situation.

Page 111

Q. Okay. Now, earlier you made mention of national origin and age. You didn't say gender. You're saying gender now?
A. I believe that's in my --
Q. Okay.
A. -- EEOC complaint.
Q. When I had asked you earlier, "Why do you believe you were put on disciplinary probation," apart from what you called retaliation, was, you said, because of your -- first you said race and then you said age. I was the one that brought up gender. Are you saying that it's because you're a man that you were put on disciplinary probation?
A. I'm saying it's because of race, gender, and age.
Q. Well, we've already talked about national origin and age. Let's talk about gender.
A. Uh-huh.
Q. On what basis do you feel like you were put on disciplinary probation because you were a man?
A. Because I was in a unique situation as a man.
Q. Well, were you the only man working at Brownsville Community Health Center?
A. I was the only man working at the campus care centers except for a part-time medical assistant, who

Page 112

was a Hispanic male
Q Okay All right, on what basis -- what evidence or facts do you point to to say that you were treated differently and put on disciplinary probation because you were a man?
A. Because I was the only person like me
Q. And like --
A. With my characteristics, regarding race, gender and age.
Q. Okay In other words, when you say like you, what are you referring to?
A. White, male, 45.
Q. Okay. So you were the only white male, 45. In your mind, why would being white, male, and 45 motivate people to treat you differently than others?
A. Well, I would have to -- what motivates any discrimination.
Q. Okay. On what facts --
A. I don't know.
Q. On what facts or information would you base your contention that Paula Gomez had anything against anyone that was white, male, and 45 years old?
A. I was the only one in the institution like me.
Q. Okay. All right, on what facts or information would you base the contention that Emily Alpert had

Page 113

anything against a -- someone who happened to be white, male, and 45?
A. Again, I was the only one in the institution like me.
Q. Okay. Is there anything else that causes you to say that?
A. Yes, what I believe to be the discriminatory application of policies and procedures.
Q. Okay. Can you tell me the names of female employees who were similarly situated to you that had the complaints against them similar to those brought up about you that were treated differently?
A. I don't know how everyone was treated.
Q. Do you know how anyone was treated?
A. Only by what -- do I know how anyone was treated? Over a period of years -- over a period of a year do I know how anyone was treated?
Q. Well, let me ask the question this way: Can you give to the Court the name of one female who was similarly situated to you that had complaints similar to those brought against you who was treated differently than you?
A. I don't know.
Q. Okay. In other words, you can't name a single person; isn't that true?

A. Well, I'm saying I don't know.
Q. Okay. Besides the fact that you are one of a kind, male, white, and 45, is there anything else that causes you to believe that your gender had anything at all to do with the discipline assessed against you?
A. Yes.
Q. What's that?
A. On numerous occasions, in talking to Emily Alpert, she would say to me, "You know what your problem is? You're not Joan Dentler."
THE REPORTER: "Not" -- I'm sorry?
THE WITNESS: "You're not Joan Dentler."
A. She was the previous director of the --
Q. Okay.
A. -- of the project.
Q. What did you understand Emily Alpert to be saying?
A. That I was not a member of the club.
Q. Okay.
A. The decision-making body.
Q. What were the eligibility requirements to be part of the club?
A. The decision makers at the Brownsville Community Health Center are Hispanic -- are Hispanics and women.

Q. Okay. So when Emily Alpert said, "You're not Joan -- your problem is you're not Joan Dentler," you understood her to be saying that -- understood her to be saying what?
A. I wouldn't be having the problems that I was having if I was a woman.
Q. What else do you base your contention on that you were being disciplined because you're a man?
A. I don't know right now.
Q. Did Joan Dentler ever have complaints brought against her by her subordinates similar to those brought against you?
A. I'm not sure.
Q. Did Joan Dentler ever fail to go to a seminar that she was scheduled to attend?
A. I have no idea.
Q. Did Joan Dentler ever engage in any conduct which reasonably would make her susceptible to discipline?
A. I don't know.
Q. Apart from what you have told us, is there anything else that causes you to contend that the reason you were put on disciplinary probation was because you were either non-Hispanic, male, or 45 years old?

A. I believe that I was retaliated against because of those three factors.
Q. When you say "retaliated against," now, you're using a new word. Are you saying you were -- you believe you were being discriminated against because of those factors?
A. Yes.
Q. Okay. In other words, what does "retaliation" mean to you?
A. In my particular instance, I believe that the unequal application of policies and procedures constituted retaliation.
Q. What did you do to cause that retaliation?
A. What causes people to act out of discrimination?
Q. Well, okay.
A. I mean, I don't -- I can't read people's minds.
Q. Okay.
A. I don't know.
Q. Let's take two different words, discrimination and retaliation.
A. Uh-huh.
Q. If I said to you discrimination would be to be treated -- or consisted of being treated differently because of certain factors that you were born with,

non-Hispanic, male, and obviously you weren't born 45 years old, but you got there through no fault of your own?
A. Uh-huh.
Q. Would you agree?
A. Yes.
Q. So to be singled out and treated differently because of factors that you were either born with or acquired by passage of time would be discrimination; would you agree?
A. Well, discrimination can take lots of different --
Q. Okay.
A. -- faces.
Q. Now, if I said to you retaliation means you engaged in conduct that the law should protect and were treated adversely because of the conduct you engaged in -- as I understand your testimony, the conduct that you engaged in was to come forward with complaints about the financing or other complaints that you talked about this morning; am I correct?
A. Uh-huh, yes.
Q. Okay. And if you were being retaliated against, you were being retaliated against because of that conduct you described this morning; is that right?

Page 118

A. I believe that I was -- I was fired in retaliation for -- for who I was and for --
Q. And for?
A. And for whatever other reasons that reside within my superiors --
Q. Okay.
A. -- which lead them to believe that I was unacceptable because of my characteristics as a human being.
Q. By "characteristics," national origin --
A. Race.
Q. -- gender --
A. Gender.
Q. -- and age?
A. Age.
Q. Okay. All right. But to say that you were disciplined or discharged in retaliation for something you did, from my understanding from your testimony, you're referring to those complaints or those reports of improper activity that you brought forward; am I right?
A. Is this a new question or a --
Q. Yes.
A. -- rephrasing of the past question?
Q. Either way.

Page 119

A. So could you ask the question again?
Q. Okay. I understand you to be saying that you believe you were being discriminated against because of your age, your national origin, and your gender.
A. Uh-huh.
Q. If you say you're being retaliated against, I'm asking what conduct did you engage in that you feel like you were being retaliated against for?
A. I was being retaliated against for doing the job that I had been given.
Q. Okay.
A. Which was to make the program as successful as possible.
Q. Okay. In what -- obvious -- do you feel like -- and I'll just try to get an answer to this and I'll move on. You brought forward complaints against the way -- certain things going on within the organization; am I right?
A. That's correct.
Q. Do you believe that you were disciplined and ultimately fired in retaliation for bringing forward those complaints?
A. I believe that I was ultimately disciplined based on my characteristics as a white male, 45 years of age.

Page 120

Q. Do you believe that's the only reason you were fired?
A. There may be -- I would need to be a mind reader. I don't know.
Q. Okay. And I know you can't read minds and I won't ask you to, but I'm entitled to know what you contend or believe to be true. So if the question is asked, why were you disciplined and why were you discharged, is your answer because you are a male, you are a non-Hispanic, and you are over 40?
A. Yes.
Q. Anything else that you contend motivated your discipline or dismissal?
A. Well, like I say, there could be other things that I'm not aware of at this point in time.
Q. Okay. I'm just asking what you contend motivated this employer to discipline you and ultimately discharge you. Are those the only things?
A. Well, and my response is that I can't contend everything that may be.
Q. I understand, but you have brought a lawsuit and you are making allegations, and I just want to know what your allegations are. You believe you were fired because you were male, because you were non-Hispanic, and because you were over 40?

Page 121

A. Yes.
Q. And you believe those were the only reasons why your employment was terminated?
A. I believe that I was treated differently.
Q. On account of those factors?
A. Yes.
Q. And nothing else?
A. Yes.
Q. Okay. Now, I understand that along about June the 15th, you were told by Ms. Gomez that there was a position -- that you were offered the opportunity to become a grant writer; is that right?
A. Yes.
Q. Okay. Who was present when you were told that you were being given that opportunity?
A. Emily Alpert.
Q. Okay. Where did the meeting take place?
A. My recollection was that it was either Paula's office or Emily's office.
Q. Okay. And if my information is that it was on June the 15th, does that sound about right?
A. That's -- yeah, that sounds about right.
Q. Okay. What was your response immediately at the time that you were told that?
A. I would have to think about it.

Q. Okay. Were you allowed to think about it?
A. If think about it means just wait, yes, I did, but there was nothing -- there was no job to think about. There was nothing written, there was no job description, there was no salary, there was no approval.
Q Was anything said about what your salary would be if you took this position?
A. No.
Q Were you ever told that it would be a lateral move?
A. No.
Q Okay. Were you told that you would have three weeks to think about whether or not you wanted to take it?
A. I forget. I don't remember.
Q Okay, did you ever make any response after that meeting with regard to whether or not you would accept that assignment?
A. No.
Q. Okay. Could I ask you to put your glass just out of view of the camera?
A Oh, okay.
Q. Thank you. When was the next time that the matter of the position as a grant writer was brought up

to you?
A. Gee, late July, a day or two before I was terminated.
Q. Okay. And what do you recall about that?
A. Ms. Gomez came into my office and asked me what I thought about the job, and I said nothing had been said about the job. I mean, there was no salary, there was no job description, there was no approval from the board. I thought that -- I thought that new jobs had to be approved by the board. I didn't see the board talking about it. I didn't see the job being budgeted.
Q. You're telling the members of the jury that that's what you told Ms. Gomez?
A. What I'm telling her is that -- what I told her was that I couldn't accept the job, but I couldn't accept it for those reasons.
Q. Did you tell Ms. Gomez -- all right, is it your testimony that you told Ms. Gomez those reasons, it wasn't an approved position, the board hadn't approved it? Is that what you're saying you told Ms. Gomez?
A. I'm saying I couldn't accept the job. That's what I'm telling you that I told her.
Q. Okay. Did you tell her that you thought about it and you felt like that you were best suited for the job you were in?

A. I don't remember.
Q Okay. What did Ms. Gomez say in response to you?
A. Something to the nature of, "Well, I have to do what I have to do. Well, I have to take action," something like that.
Q. Okay. Did you ask her what she meant?
A. No.
Q. By your testimony, did Ms. Gomez say to you, "I want you to meet with Emily and with me at 8:00 tomorrow"?
A. I do not remember her saying that.
Q. Okay. What happened on the day following?
A. The day following, I met with my campus care center staff, as I was directed to by the medical director and the executive director, in a memo.
Q. Okay. And what happened, other than that, on that day? Did Ms. Alpert locate you that morning?
A. She knew where I was going to be.
Q. Well --
A. Yes, she did locate me.
Q. Okay.
A. She did know where I was.
Q. Well, did she direct you to meet with Ms. Gomez?

A. I believe that after the meeting she did say that Ms. Gomez wanted to meet with me, yes.
Q. Okay. And did you meet with Ms. Gomez?
A. Yes.
Q. And Ms. Alpert was there?
A. I don't think it was -- what day was that? I'm not sure if it was the day of -- if it was that Wednesday or not. That's when we had our meetings.
Q. Okay. Did the time come when you met with Ms. Gomez and she told you you were fired?
A. Yes.
Q. Okay. Who was there?
A. She and Ms. Alpert.
Q. Okay. What did Ms. Gomez say to you in that meeting?
A. She said that she was terminating me for insubordination.
Q. Did she say anything else?
A. I can't remember all that was said. It was a very short meeting.
Q. Okay. I'll show you what's marked as Kavanaugh Exhibit 11.
MR. HORTON: Let me see it.
A. It wasn't given to me on the 26th. It's marked the 26th, but it wasn't given to me on the 26th.

Q Okay. Could you take a look at what's marked Kavanaugh Exhibit No. 11?
A. Yes, "'I want you to meet with myself and Emily in my office in the morning at 8:00 a.m.' You acknowledged what I said by shaking your head."
Q. I'm sorry, if I have got that -- oh, let me see, is that part of -- okay, I'm with you now. All right, go ahead. I'm sorry if I interrupted. Have you had a chance to look at Deposition Exhibit No. 11?
A. Yes.
Q Is that a document that was given to you before today?
A. Yes.
Q Okay. Now your testimony, I think, a moment ago was you were not given that document during the meeting when your employment was terminated; is that correct?
A It was given to me.
Q. I'm sorry.
A. But this is dated July 26th. I wasn't terminated on July 26th.
Q Well, at the meeting when the document marked as Deposition Exhibit 11 was given to you, you were told you were fired?
A. Yes.

Q. Okay. By the executive director?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. So at the time that you were given the document marked as Exhibit No. 11, you were told by the executive director you were fired; isn't that true?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Okay. Now, is it your contention or belief that the executive director did not have authority to fire you?
A. No.
Q. Okay. In other words, the executive director, as far as you know, has the authority to fire whomever she wants; isn't that true?
A. I don't know.
Q. Okay. Do you believe or contend that the executive director lacked the authority to terminate your employment?
A. I don't know.
Q. Okay. Do you have any evidence or information that would cause you to believe that the executive director didn't have complete authority to terminate

your employment?
A. Well, the fact that the executive board reviewed it.
Q Well, we will get to that. Is that the only thing that you would point to?
A. She was not my immediate supervisor.
Q. Well, she was your immediate supervisor's immediate supervisor?
A That's correct.
Q. Okay. Once again, as far as you know, did the executive director have the complete authority to terminate your employment?
A. I don't know.
Q. Okay. And do you have any information that would cause you to say that she didn't have that authority?
A. I don't know if I have that information or not.
Q. Well, who would know?
A The bureau of primary healthcare, the board of directors --
Q No, I'm not asking what they --
A. -- the president of the board.
Q. I'm not asking what they know. I'm asking what you know. Do you have any information or facts that would cause you to say that the executive director did

not have authority to terminate your employment?
A. I do not have information relevant to that question.
Q. Okay. You understood that you were being fired?
A. Yes.
Q. You were given an opportunity to gather your belongings?
A. Yes.
Q. You left the premises?
A. Yes.
Q. You had no further expectation of pay?
A. Yes, I did.
Q. Well, were you allowed to continue working?
A. No.
Q. Were you doing any work?
A. No.
Q. Because you had been fired?
A. Yes, but I hadn't received my entire wage owed to me.
Q. Well, you were entitled to wages up until the time your employment terminated?
A. Correct.
Q. Which was in Ms. Gomez's office?
A. Correct.

Page 130

Q. Okay. Did you in any way protest or complain of your dismissal?
A. Yes.
Q. Okay. You were given an employment manual at the time you were hired, a policy manual; am I right?
A. Yes.
Q. And later on you were given a revised version?
A. Yes.
Q. I'll mark a one-page document as Exhibit 12. Is that your signature on Exhibit 12?
A. Yes.
Q. Okay. And I will mark as Exhibit 13 what I will represent to you is a page out of the policy manual --
MR. HORTON: May we see it, Ray?
MR. COWLEY: Sure.
MR. HORTON: We would like to see everything before it goes to the witness, if you would.
THE WITNESS: Can I just have 30 seconds?
MR. HORTON: Sure.
(Off the record)
Q. Are you ready to continue?
A. Yes, I am.
Q. Okay. I have given you what's marked as Deposition Exhibit 13 and represented to you that

Page 131

that's a page out of the employee handbook or policy manual showing the revision in April of 2000. Do you see the portion of it entitled "Employment At-Will"?
A. Yes.
Q. Had you read that?
A. Yes.
Q. Okay. Did you understand that it applied to you?
A. Yes.
Q. You don't believe or contend that your employment was other than at will, do you?
A. No.
Q. Okay. Similarly, I'll show you what I'm going to mark as Kavanaugh Exhibit 14 and will represent to you that these are Pages 37, 38, and 39 out of the same policy handbook.
And I'm referring in particular to "Employee Grievances." Do you see that at the bottom of the first page?
A. Yes.
Q. And you had been given the employee handbook containing that grievance procedure that you signed for in May; am I correct?
A. Yes.
Q. All right. And you knew that at the time your

Page 132

employment terminated that that was the grievance procedure applicable to you?
A. No.
Q. Okay, and why was that grievance procedure not applicable to you?
A. No, by saying no I meant I was not sure because the previous personnel manual had a specific policy whereby an employee presented a grievance against the executive director. In this manual, that particular policy was taken out.
Now, in the manual that was -- that was recreated, the policy to grieve against the director was put back in, and so I was uncertain -- since there had been grievance policies in and grievance policies out and grievance policies back in, I didn't know
Q. Well, you're saying that sometime after your employment terminated the policy changed again?
A. It changed from before my employment, after my employment, and then after my employment it changed again.
Q. All right My question to you was at the time your employment terminated, the policy manual that was in effect was the one -- or the grievance procedure that was in effect was the one that's marked as Exhibit 14; isn't that true?

Page 133

A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Okay. And the grievance procedure that was in effect at the time your employment terminated showed that the executive director would have the final word on any grievance; isn't that true?
A. Well, see, that's what I'm unsure about. After I was -- after I was terminated, I wrote on my final personnel action form that I felt that it was a wrongful termination and I started going to board members and asking for the bylaws of the organization.
Q. Okay.
A. One particular -- one particular board member said to me, "Well, you can present a grievance against the executive director." Another one said, "Well, it's up to the executive" -- another board member said, "It's up to the executive director," and then another member said something else.
Q. Okay.
A. In fact, I had a great deal of difficulty even getting my personnel file because, what my rights were after termination, it didn't seem like anyone knew.
MR. COWLEY: I'll object as nonresponsive. Would you read the last question?

THE REPORTER. Sure Excuse me Question, "Okay. And the grievance procedure that was in effect at the time your employment terminated showed that the executive director would have the final word on any grievance; isn't that true?"

Q And your answer is?

A. This particular version of the policies and procedures seems to indicate that However, what I'm saying is there was a different policy and procedure in place before this. In this policy and procedure manual, the grievance procedure against the executive director was taken out. Then after I was terminated, it was put back in again. And I'm telling you, with all due respect, that when I went to the board members there was a great deal of confusion

Q Well, the --

A. About -- I was getting different direction from different board members

Q. The grievance procedure that you say was changed later, after your employment terminated, didn't exist at the time your employment terminated; isn't that true?

A. Well, according to one board member, it did exist.

Q He was referring to a policy change that hadn't

yet happened?

A. Or she was unfamiliar with -- she felt -- and it was Ms. Margaret Howard. She felt that -- when I went to her, she felt that I had the ability to grieve the executive director. When I asked for a copy of the bylaws of the community health center, I wasn't given them.

Q. If we look at what's marked as Kavanaugh Exhibit 14, now, I believe you have testified that this is the grievance procedure in effect at the time your employment terminated; am I right?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. Okay. Now, if we look on -- the very last sentence of that policy, "The executive director has the final decision on a grievance appeal." Did I read that correctly?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q. Okay. Now, then, the first step of the grievance procedure, if someone wanted to file a grievance, is to take the matter to their immediate supervisor; am I right?

A Yes

Q Okay, which you didn't do?

A. Well, on my personnel action form, I wrote that I felt that the termination was wrongful.

Q Well, the first step of the grievance procedure would be to present your grievance to Ms Alpert?

A. Uh-huh.

Q Is that right?

A. Yes.

Q. And you didn't do that?

A. That's correct.

Q. Okay. The one who had told you your employment was terminated and who in fact terminated your employment was Ms Gomez; isn't that true?

A. That's correct.

Q. Okay. There was nothing within that grievance procedure that would allow you to go above Ms. Gomez to the board to protest your dismissal; isn't that true?

A. That's correct.

Q. Okay. Nonetheless, you sent a memorandum to the board saying that you wanted to protest your termination; is that true?

A. That's correct.

Q. Okay. I'll show you what we'll mark as Exhibit 15 and ask that you look at that.

MR. ZABARTE: Again, I couch my objection that this is a document that's not been produced in responses to discovery.

MR. COWLEY: I believe I could show you some initial disclosures that your client made before I became the attorney of record that contained that, so you may want to think about that.

MR. ZABARTE: Okay.

Q. Have you had a chance to look at Exhibit No. 15?

A. Yes.

Q. Okay. Is that a memorandum that you sent to the board of directors?

A. Yes.

Q. Okay.

MR. HORTON: What's the date on that?

MR. ZABARTE: July 28th.

Q. In your memorandum to the board of directors did you refer to any provision of the grievance procedure that would allow them to review the decision to terminate your employment?

A. No.

Q. In truth, there was no provision of the grievance procedure, then, in effect that would allow them to do that; isn't that true?

A. I don't know.
Q. Okay. Just to move quickly, I'll show you a two-page document I'll mark as Kavanaugh Exhibit No. 16.
MR. ZABARTE: I'll make the same objection as to that exhibit.
Q. Have you had a chance to look at Exhibit 16?
A. Yes.
Q. Okay. Is Exhibit 16 a document that you wrote?
A. Yes.
Q. And sent to the employees?
A. Yes, the campus care center staff.
Q. Okay. Did you on July 31st, 2000, send a 31-page document to the board of directors regarding the termination of your employment?
MR. HORTON: May I see it?
Q. I'll hand you what's marked as Deposition Exhibit 17.
Mr. Kavanaugh, I would point out to you -- and I apologize for this -- as I was looking through the document marked as Exhibit 17, there are telefax legends at top of the pages and also there are within the document a few handwritten comments that I am aware are not yours. But apart from the telefax legends and any scribbling there may be in the margin, I would like

for you to take your time and look at Exhibit 17 and tell me if that is a true and correct copy of a letter or memorandum you wrote to the board of directors on July 31st of 2000.
A. Yes, that appears to be what I sent to the board of directors.
Q. Okay. I take it that the document marked Exhibit 17 was a document that you intended for the board of directors to read?
A. Yes.
Q. And it was a document you intended as a protest or complaint regarding the termination of your employment?
A. That is correct.
Q. Okay. And the document marked as Exhibit 17 goes into considerable detail to point out why you believed your letter of termination was inaccurate or unjustified; would you agree?
A. Yes.
Q. Okay. The purpose of Exhibit 17 was to show the members of the board of directors that it certainly was your opinion that your dismissal was not justified?
A. That's correct.
Q. Okay. Show the members of the jury, Mr. Kavanaugh, where within Exhibit No. 17 you made the

allegation that you felt like that your employment was terminated because you were non-Hispanic.
A. On Page 31 I write that this response contains a portion of my grievances against the clinic. It does not contain all of my grievances.
Q. Okay. Anywhere within the document marked as Exhibit 17 do you make the allegation that you feel like you were singled out and treated unfavorably because you were not Hispanic?
A. This is going to take a couple of minutes.
Q. Take all the time you need.
A. From my superficial review, I do not see that I include that as one of the described grievances.
Q. Okay. Is there anywhere within the document marked as Exhibit 17 where you complain that you were singled out and treated adversely because you're male?
A. Without reading the whole document, no.
Q. Okay.
A. I don't know.
Q. Okay. To your knowledge, is there anything within Exhibit 17 -- is there anywhere in Exhibit 17 where you complain that you were singled out and treated adversely because you were over 40?
A. No.
Q. Okay. Would you agree with me, then, based

upon your reading of Exhibit 14 -- and I realize that it was brief. It was right here on the camera -- that there was no complaint made to the board of directors in Exhibit 17 that you were in any way mistreated on account of either your national origin, your gender, or your age?
A. I believe that it's implied on every page that I was mistreated because of my gender, race, and age, and at the end I do note that that doesn't contain all the grievances that I had.
Q. You would expect someone to infer from each page in here that you were mistreated on account of your national origin, gender or age?
A. I'm saying that my complaint of discrimination is implied because what I do -- what I do state quite clearly is that I was treated in a unique manner.
Q. Do you say anywhere in there that the reason that you were treated in a unique manner was either national origin, age, or gender?
A. I don't believe that I mentioned that explicitly.
Q. Okay. Did you give any examples of people who were non-Hispanic treated more favorably than you?
A. No, I didn't speak about anyone in -- any particular individual in there.

Page 142

Q Did you give examples of anyone who was female treated more favorably than you?
A No.
Q. Did you give any examples of anyone younger than you treated more favorably than you?
A. No.
Q I'll show you a multi-page document marked as Exhibit 18. And I will represent to you that it was given to me by you.
A What did you just say?
Q. I will represent to you that the document marked as Exhibit 18 was given to me by you.
A. I made it available as part of the documents.
Q Okay. The top sheet of Exhibit 18 was prepared by you; am I correct?
A. Yes.
Q. To Dr. J. J. Martinez?
A. Yes.
Q. He was the president of the board of directors?
A. Yes.
Q. Okay. And at the next to last paragraph -- tell me if I read this correctly -- "I am requesting therefore that the personnel committee of the board of directors of the Brownsville Community Healthcare Center convene as quickly as possible to address my

Page 143

continuing complaints against the BCHC administration." Did I read that correctly?
A. Yes.
Q. In other words, you were requesting that the board allow -- give you an audience?
A. Yes.
Q. Okay. Did that ultimately happen?
A. Yes.
Q. Okay. Excuse me, let's go back a minute to Exhibit 17. And in particular I'm going to go to Page 30 and ask you if -- to tell me if I read this correctly. The fourth paragraph from the bottom, quoting, "In return for my public silence regarding these issues and others which comprise" --
A. "Compromise."
Q. I'm sorry -- "Compromise the integrity of Brownsville Community Health Center, I'm requesting three things of the BCHC board of directors." Did I read that correctly?
A. Yes.
Q. One thing that you were requesting in return for your public silence was "that all paperwork implying that I was terminated for cause from BCHC be expunged from all personnel -- personal and personnel files within and without the confines of the

Page 144

Brownsville Community Health Center." Did I read that correctly?
A Yes
Q. Second, "That I be given a positive final performance evaluation by my former immediate superior and that the ED write me a favorable letter of reference for the accomplishments I and the campus care centers achieved during my 21-month tenure " Did I read that correctly?
A. Yes.
Q And, third, "That I be paid S10,000 a month for 200 consecutive months out of the general operating funds of the BCHC " Did I read that correctly?
A. Yes
Q. You were telling the board of directors that you would keep silent about your complaints if they would give you 2 million dollars?
A. What I was doing was I wanted an audience with the board of directors.
Q. But what you said was, "I will keep silent on what I know about this organization if you will give me 2 million dollars"?
A. What I was telling the board was I wanted to speak with them and I wanted them to know about my situation, and, unfortunately, I felt at the time that

Page 145

I needed to put something outlandish to convince them to give me an audience.
Q. Do you say anywhere, "I'm just joking"?
A. No.
Q. Okay. What you said is, "In return for my public silence, I want three things. One of those things is 2 million dollars." Is that what you said?
A. Yes.
Q. Okay. I'll show you a document marked as Exhibit 19, and I would ask that you look at that. Have you had a chance to look at Exhibit 19?
A. Yes.
Q. Okay. Was that a document that you prepared?
A. Yes.
Q. Okay. Now I show you a document marked as Exhibit 20.
Have you had a chance to look at the document marked as Exhibit 20?
A. Yes.
Q. Okay. It would appear to me that that's a letter from the president of the board?
A. Yes.
Q. To you?
A. Of BCHC.
Q. Okay. The president of the board of BCHC to

Page 146

you --
A. Uh-huh.
Q. -- dated August 10th, 2000?
A. Yes.
Q. Okay. Indicating that -- let me read it. Tell me if I read this correctly. "Dear Mr. Kavanaugh, On behalf of the board of directors, I am inviting you to come before the board on" -- and then it gives a date and a time and a place; is that correct?
A. Yes.
Q. "We are willing" --
MR. HORTON: Excuse me. It's not correct if you will read the text there.
MR. COWLEY: Okay. "Wednesday" -- by the way, which one of you will be objecting?
MR. HORTON: No, I'm just saying it's not correct for the record. It's not correct. I'm not objecting. I'm just saying that it's not correct, from the text, on the face of your exhibit.
MR. COWLEY: Do you want to testify?
MR. HORTON: No, sir.
MR. COWLEY: Okay.
MR. HORTON: I'm just saying it's not correct.
MR. COWLEY: I'm not going to be

Page 147

tag-teamed, now. You guys need to decide which one do you want to be voicing your complaints.
Q. Okay, "On behalf of the board of directors, I am inviting you to come before the board on: Wednesday, August 16th, 2000." Did I read that correctly?
A. Yes.
Q. "At the clinic conference room"?
A. Yes.
Q. "2137 East 22nd Street, Brownsville"?
A. Yes.
Q. "At 6:30 p.m."?
A. Yes.
Q. "We are willing to listen to your concerns at that time." Did I read that correctly?
A. Yes.
Q. Okay. Did that meeting take place?
A. Yes.
Q. Okay. Did you attend?
A. Yes.
Q. And I'll show you what I will mark as Kavanaugh Exhibit -- well, excuse me. Okay, I'll show you what I'll mark as Kavanaugh Exhibit 21.
Have you had a chance to look at Exhibit 21?

Page 148

A. Yes.
Q. Is that a document that you presented to the board of directors on that occasion?
A. I believe so.
Q. Okay. Do you have any reason to believe that it's not a true and correct copy?
A. I don't have my copy to compare with it, but it seems all right.
Q. Okay. Did you in fact -- assuming that Kavanaugh Exhibit 21 is a true and correct copy, did you give the original or copies of the document marked as Exhibit 21 to the members of the board?
A. Yes.
Q. Were you allowed to make any oral presentation?
A. Yes.
Q. Did you do so?
A. Yes.
Q. Did you discuss the matters that are contained in Exhibit 21?
A. Some of them.
Q. Okay. Did you discuss matters outside of what is in Exhibit 21?
A. I don't remember all that I did discuss.
Q. Okay. How long were you before the board?
A. 15 to 20 minutes.

Page 149

Q. Okay. Was anything said to you by the board?
A. My recollection is that there were a couple of questions about fact, like, "When were you terminated exactly?" I don't remember that there were many questions from the board.
Q. I'm sorry. I didn't mean to interrupt you. Were you able to finish your answer?
A. I don't remember that there were many questions from the board.
Q. Okay. If you could look on the last page of Exhibit 21, tell me if I read this correctly. This would be the -- what I would call the third paragraph at the bottom. "If the BCHC board of directors does not overturn my termination and place me on paid administrative leave immediately (August 17, 2000), I will continue to place my complaints with the following regulatory agencies:" Did I read that correctly?
A. Uh-huh.
Q. Is that yes?
A. Yes.
Q. And then you listed 18 different names of people or entities; is that correct?
A. That's what the document states.
Q. Okay. So you were stating to the board that unless they overturned your termination and put you on

Page 150

an administrative leave, you would contact the Joint Commission on Accreditation of Healthcare Organizations?
A Yes.
Q The attorney general of the State of Texas?
A Yes.
Q The National Association of Community Health Centers?
A. Yes.
Q. The Texas Association of Community Health Centers; is that right?
A. Yes.
Q. And so on, all 18; is that correct?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Okay. I take it that what you were saying by Exhibit 21 is, "Unless you give me my job back, I'm going to go tell what I know to all these agencies"?
A What I was trying to communicate to the board was that I wanted them to do a thorough investigation of my termination.
Q. Okay. But what you asked for was your job back.
A. And to be placed on administrative leave.

Page 151

Q. Okay. To overturn your termination and put you on administrative leave.
A. (Moving head up and down)
Q. That's giving you your job back?
A. That's paying me while they investigate.
Q. Okay. Did you ever get an answer?
A. Yes.
Q. Did you ever write to the board and ask for an answer?
A. Yes.
Q Okay. I show you what --
A. I believe. I don't know how it all --
Q. Okay.
A. I mean, I don't remember the exact sequence of events. I believe that I -- I asked for a response and then I got a response.
Q. I'll show you what we'll mark as Kavanaugh Exhibit 22.
A. Okay.
Q. The document marked as Kavanaugh 22 was prepared by you; am I correct?
A. Yes.
Q. To Mr. -- to Dr. Martinez?
A. Yes.
Q And you were saying that you wanted an answer

Page 152

from the board?
A. Correct.
Q. Okay. I'll show you a document we'll mark as Kavanaugh 23.
MR. ZABARTE: For the record, I want to make an objection. As to this document, I'm not sure if this thing was tendered in responses to discovery, and if you make a representation, Ray, that we gave those to you, then that's fine. I just want to make my objection for the record.
Q Have you had a chance to look at the document marked as Exhibit 23?
A. Yes.
Q Is that a document prepared by you?
A. It appears to be.
Q. You were sending it to Dr. Henry Imperial?
A. Yes.
Q. And you sent copies to a number of people; is that correct?
A. Yes.
Q. And is it your recollection that you did in fact send copies to those individuals?
A. Yes.
Q. Okay. And I'll show you a two-page document marked as Kavanaugh 24.

Page 153

MR. ZABARTE: Let me go ahead and lodge that same objection as to this document as I did to No. 23.
A. Okay.
Q Was the document marked as Exhibit 24 prepared by you?
A. Yes.
Q. And was it sent to the individuals shown?
A. Yes.
Q. Okay. By the way, in the document marked as Kavanaugh Exhibit 21, do you -- do you disagree that that's a document that you yourself provided to me?
A. Provided to you directly?
Q. Through your attorneys.
A. Without looking at my original copy, it looks --
Q. Do you remember providing a white notebook?
A. Yes.
Q. And looking under Tab O, does that look like the same document?
A. Yes.
Q. Okay. Certainly you have a copy, don't you?
A. Yes.
Q. Okay. Certainly you could have made it available to your attorneys if you chose to? There's

Page 154

nothing keeping you from giving a copy to your attorneys, is there?

A. No.

Q. Where within the document that you presented to the board on August 16th do you say that your employment was terminated because of your gender, your national origin, or your age?

MR. ZABARTE: Which document? Which exhibit?

THE WITNESS: This.

MR. COWLEY: Exhibit No. -- I'm sorry -- 21.

A. I don't address it in this document.

Q. Okay

A. But I do say that there are additional concerns.

Q. Okay And you're saying the board of directors is supposed to infer from "additional concerns" that you're saying that you were discriminated against on the basis of your age, national origin, or gender?

A. I really can't say what the board of directors should think or not think.

Q. Okay I'll show you what we'll mark as Exhibit 25.

The document marked as Exhibit 25 was

Page 155

prepared by you?

A. Yes.

Q. And sent to the individuals shown?

A. Yes.

Q. Okay. At that time you were still requesting some kind of answer from the board?

A. Yes.

Q. Going back to Exhibit No. 22, tell me if I read this correctly. Next to last paragraph of Exhibit 22, "As I told you, I will halt filing complaints when and if the BCHC board of directors responds favorably to my requests." Did I read that correctly?

A. Yes.

Q. And your requests were that you be reinstated?

A. My requests were that I be put on administrative leave.

Q. And your -- the termination of your employment reversed?

A. That my termination be investigated by the board.

Q. Okay, was one of your requests that you be paid 2 million dollars?

A. Yes.

Q. Okay. And, unless those requests were

Page 156

favorably granted, you were going to continue making your complaints?

A. What I wanted was to be heard by the board and for the board to investigate.

Q I guess the document says what it says; am I right?

A It says what it says.

Q. Okay, thank you. Did the board ever respond to you after you appeared on August 16th?

A. Yes.

Q. Okay. In writing?

A. Yes.

Q. Okay, I'll show you what we'll mark as Exhibit 26. Have you had a chance to look at the document numbered Kavanaugh 26?

A. Yes.

Q Does that appear to be a true and correct copy of the response that you were given by the board?

A. Yes.

Q. If I may look on it with you, it's dated September 5th; am I right?

A. Yes.

Q. Okay. Tell me if I read this correctly, starting at the very top, "Dear Mr. Kavanaugh." Did I read that correctly?

Page 157

A. Yes.

Q. "Please allow this to serve as a response to your recent inquiry regarding your termination on July 27, 2000 by Brownsville Community Health Center." Did I read that correctly?

A. Yes.

Q. "As you know, we allowed you an opportunity to present your arguments and discussion regarding your termination and why you felt same was not appropriate." Did I read that correctly?

A. Yes.

Q. "The board felt somewhat uncomfortable in providing such an opportunity, as the board believes in following the bylaws and protocols established for the board." Did I read that correctly?

A. Yes.

Q. "As you were told at the meeting, the decisions regarding the employment or termination of BCHC employees is left to the exclusive jurisdiction and discretion of the executive director." Did I read that correctly?

A. Yes.

Q. "As such the board cannot circumvent the bylaws by allowing you or any other employee to present such situations to the board." Did I read that correctly?

A. Yes.
Q. "The board wishes to establish no precedent contrary to the above." Did I read that correctly?
A. Yes.
Q. "However, the board does have authority to scrutinize and observe the actions of the executive director." Did I read that correctly?
A. Yes.
Q. "It is under this directive that the board determined it was appropriate to allow your presentation in order to determine whether Ms. Gomez had acted properly" -- I'm sorry, that -- "whether Ms. Gomez had properly discharged her duties by investigating the situation thoroughly before taking action." Did I read that correctly?
A. Yes.
Q. Okay. The board made very clear to you that it was not its function to determine whether or not you were to be fired; isn't that true?
A. Yes.
Q. Okay. All in the world the board was going to do was to allow you to present your concerns in order to determine whether or not Mrs. Gomez, in terminating your employment, had done a proper investigation; isn't that right?

A. That's what it says, yes.
Q. Okay. There was never anything in either the policies or from the board that would indicate that your termination was anything other than final the day you were fired; isn't that true?
A. I don't know.
Q. Okay. Well, the board certainly never gave you the impression that they were there to determine whether or not your termination was final or not, did they?
A. I believe that they did by circumventing their bylaws.
Q. You asked for an audience before the board; is that true?
A. That's correct.
Q. And you're complaining because they gave you one?
A. No.
Q. Okay.
A. Never.
Q. They allowed you to come before them and express your concerns; isn't that true?
A. Yes.
Q. And they stated to you very specifically they had no authority to override the decision that was made

by the executive director; isn't that true?
MR. ZABARTE: When? After this or before?
MR. COWLEY: Well --
MR. ZABARTE: After the meeting?
Q. Let's say in Deposition Exhibit 26, there's nothing there to indicate that the board was going to second guess the executive director, is there?
A. I don't know.
Q. Can you read it?
A. I don't know why the president of the board of directors gave me the opportunity to come before the board and present my case if there was not a possibility that they were doing their own investigation.
Q. Well, I think maybe he gives us the answer. Look at the third paragraph. "However, the board does have authority to scrutinize and observe the actions of the executive director. It is under this directive that the board determined it was appropriate to allow your presentation in order to determine whether Ms. Gomez had properly discharged her duties by investigating the situation thoroughly before taking action." Did I read that correctly?
A. Yes.
Q. And in the paragraph above, Dr. Gomez made

clear that the --
A. Dr. Gomez is?
Q. I'm sorry, Dr. Martinez.
A. Okay.
Q. -- made clear that the ultimate authority as to whether or not you were fired was with the executive director.
A. Well, that's what he wrote, but I haven't seen the bylaws.
Q. Well, okay. By September 5th, you were fully aware that the board was not going to take any action in your favor with respect to the termination of your employment; isn't that true?
A. Yes.
Q. And by September 5th, the board, at least by the document marked Exhibit 26, had told you that it was never within its authority to do so?
A. That's what they told me.
Q. Okay. Now, you tried to testify earlier, much earlier in the deposition, that you were simply told that maybe you were fired on July the 27th but it really didn't become final until later; is that your testimony?
A. No.
Q. You were fired on July the 27th?

A. That is when I was given my letter of termination by the executive director.

Q That's when she fired you; isn't that true?

A Yes.

Q Okay. At no time when you protested your dismissal before the board of directors did you ever state that you felt like you were fired because you were non-Hispanic; isn't that true?

A That is true.

Q. And at no time did you ever, when protesting your dismissal before the board of directors, make the allegation that you were discharged because of your age; isn't that true?

A That's true.

Q. And at no time when you protested your dismissal before the board of directors did you ever make the allegation that you felt like you were discharged because you were male; is that true?

A. Not explicitly.

Q. Did you ever say to the board of directors in any fashion, "I believe I was fired because I was male"?

A. I did not use those words.

Q. Okay. Did you ever say to the board of directors, "I believe that I was fired because female

employees are treated more favorably than I am"?

A. I did not use those words.

Q. Okay. In what way did you apprise the board that you felt like that your employment was terminated because of your gender?

A. I told them in both documents that I had concerns and complaints other than those stated.

Q. Okay. So by that general catchall you're saying the board should have inferred that maybe you had a complaint about discrimination?

A. I cannot say what the board should have inferred and should not have inferred.

Q. Okay. Did you let it go once you had gotten the document marked as Exhibit 26, or did you keep writing to the board?

A. What do you mean, "Did you let it go?"

Q. Did you continue to protest your dismissal?

A. I continued to voice my complaints to the board.

Q. Regarding --

A. After July 27th.

Q. How about after September 5th?

A. After September 5th, also.

Q. You continued to voice your concerns to the board regarding your dismissal after September 5th?

A I wrote a number of memos to the board after September 5th, and I would have to look at each memo to see what I -- what I told them.

Q Okay. I'll hand you what we'll mark as Exhibit 27

Have you had a chance to look at the document marked as Exhibit 27?

A. Yes.

Q. Is the document marked as Exhibit 27 a document that you prepared?

A It appears so.

Q. Do you recall preparing it?

A. Yes.

Q Did you send it to Mr -- or Dr Martinez?

A. Yes.

Q. Did you also send it to the individuals listed on the memorandum?

A. Yes.

Q. Okay. I take it by September 5th you were aware that the board was not going to favorably grant the measures that you demanded in your protest; am I right?

A. I didn't know what the board was going to do. The only communication I received was what Dr. Martinez sent to me.

Q. Okay. Was there something unclear about what Dr. Martinez sent you?

A. Well, as I recall, there were a number of changes taking place on the board and so I didn't know what was --

Q. Okay. Now, look at the next to last paragraph of Exhibit 26, the September 5th letter, "After reviewing all the information available to the board, the board unanimously feels the actions taken by Ms. Gomez were proper and within her authority." Did I read that correctly?

A. Yes.

Q. Were you confused by that?

A. No, but it's incorrect.

Q. Okay. And why is it incorrect?

A. It's incorrect because it was not a unanimous decision.

Q. Okay.

A. If by unanimous you mean all the members of the board because all of the members of the board were not there.

Q. What if it was all the members of the board who were there voted in favor? Do you know if that happened or not?

A. Yes, I know that that did not happen.

Q You're saying that there were some members of the board who voted differently?
A. I know that there was at least one member of the board that did not vote for my termination.
Q Well, you had already been terminated.
A Yes. All I'm saying is I know one member of the board did not vote the way the president says the vote occurred.
Q Okay. And was that -- and it's your testimony that that individual was there that evening?
A. No.
Q. Okay, that individual wasn't there?
A. That individual was not there.
Q Okay. Do you know if there were any of the individual board members that were there, do you know of any that voted differently than what Dr. Martinez said?
A. I do not know what the vote was.
Q. Okay. Are you saying, though, that you were confused after getting the letter dated September 25th -- excuse me, September 5th, 2000 as to what the board's position was?
A It was very clear what Dr. Martinez's position was.
Q. Okay, as the chair?

A. As the president of the board of directors.
Q. I'll show you what we'll mark as Exhibit 28.
A. Excuse me. Can I take another --
Q. Sure.
A. -- 30-second break?
(Brief recess)
Q. Have you had a chance, Mr. Kavanaugh, to look at what's been marked as Exhibit 28?
A. Yes.
Q. Is that a document prepared by you?
A. Yes.
Q. Okay. That was to Mr. Joseph Green; am I right?
A. Yes.
Q. With the Department of Health & Human Services?
A. Yes.
Q. Was that one of the agencies that you threatened that you would go to if your demands were not met?
A. I believe so.
Q. Okay. Does the document marked as Exhibit 28 appear to be a true and correct copy both of your letter and of your return receipt?
A. Yes.
Q. Okay. I'll show you a document that I'll mark

as Exhibit 29. It consists of one, two, three pages.
Have you had a chance to look at the document marked as Exhibit 29?
A Yes.
Q Do you see handwriting at the top right-hand corner of the first page?
A. Yes.
Q. Is that your handwriting?
A. That appears to be my handwriting.
Q. Okay. I'm going to show you, sir -- and maybe we can have it shown in the camera -- a white notebook that says, "Notebook B." Do you see that?
A. Yes.
Q Who prepared this notebook?
A. It looks like a notebook that I prepared.
Q. Okay. Is that your handwriting on the front?
A. No.
Q. Okay. All the documents contained in it, though, are documents that, I take it, you provided to your attorneys?
A. I would have to look at all of that and see what I provided.
Q. Okay. I will represent to you that this is one of two notebooks that were provided to the prior attorney in this case as the initial disclosures.

There was a blue notebook. Have you seen that before?
A. Yes.
Q. Who prepared this blue notebook called Notebook A?
A. It appears as though I did.
Q. Okay. And I will represent to you that the prior attorney in this case was presented with initial disclosures that accompanied these two notebooks.
MR. ZABARTE: The prior attorney being --
MR. COWLEY: Mr. Adobbati.
MR. ZABARTE: Okay.
Q. If I look at the very first document in Notebook B, it would appear to be the same as what we've marked as Exhibit 29; am I correct?
A. Yes.
Q. Okay. And the handwriting says, "Copies of this notebook went to Michelle McComb and Ken Carroll, the two individuals I listed as expert witnesses." Did I read that correctly?
A. Yes.
Q. Okay. Now, did this handwritten notation also go on the letter to Ms. Wanser?
A. I don't know.
Q. Okay. Now, this letter -- excuse me. If you would, tell us, did you prepare this document marked as

Page 170

Exhibit 29?
A Yes.
Q Okay. And you sent it to Debra Wanser; am I correct?
A. I sent a copy of it to her, yes.
Q. Okay. Now, the letter that you sent to Debra Wanser had a number of exhibits attached to it; am I right?
A Uh-huh.
Q. Is that a yes?
A. Yes, yes.
Q. Just like the one I have here; am I right?
A. Yes.
Q Okay. And in your letter to Ms. Wanser -- and Ms. Wanser is some type of government official; am I right?
A. Ms. Wanser is the director of the Title V program --
Q. Okay.
A. -- which funded in part the campus care centers.
Q. Okay. And your -- the -- Title V was one of the entities that you threatened that you would write to if your demands were not met?
A. She's part of the Texas Department of Health,

Page 171

so I said I was going to write to the Texas Department of Health.
Q. Okay. So the document marked as Exhibit 29, along with the numerous exhibits behind it, the colored tabs and documents with it, were sent to the Texas Department of Health and the person of Debra Wanser?
A. Yes, she was one of the recipients.
Q. Okay. And in your letter you referred -- you describe what the various documents were that you sent with it; am I right?
A. Yes.
Q. Okay. So I take it, assuming that the document is just as it was given to me -- I have made no changes to it -- what we have here in this white notebook would be what you sent to the Texas Department of Health?
A. Yes.
Q. And your intention in sending this document to the Texas Department of Health was what?
A. To make them aware of some of what I considered to be problems at the Brownsville Community Health Center.
Q. Okay. One question, sir, there's a Tab G that I opened and it says -- it's a multi-page document that would appear to be a letter to the Brownsville Community Health Center Board of Directors. Do you see

Page 172

that?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Dated July 31st, 2000; am I right?
A. Yes.
Q And if we go back to your letter, Exhibit G, you describe to Ms. Wanser, "A letter from me to the BCHC board of directors on July 31, 2000 explaining why I believe my termination was wrongful." Did I read that correctly?
A. Yes.
Q. But in fact the letter you -- the Exhibit G is not the document that you gave to the board of directors, is it?
A. What do you mean?
Q. Well, the document that you gave to the board of directors is Exhibit 17; am I right?
A. Okay.
Q. And the document -- and the Exhibit 17 has 31 pages or it ends on Page 31, am I right?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Okay. And it shows copies to Paula Gomez,

Page 173

Emily Alpert and Hilda Gonzalez; am I right?
A. Yes.
Q. Okay. Now, the document that you sent to Ms. Wanser ends on Page 30.
A. That's true.
Q. At some point you changed it.
A. It's true that those are not the same two documents.
Q. Okay. I'm going to --
MR. ZABARTE: Does it seem right?
THE WITNESS: Pardon?
A. I was doing a lot of copying and collating and putting things together. I don't know. I mean, I can see what you're saying.
Q. Mr. Kavanaugh, I'm going to show you what I have marked as Kavanaugh Exhibit 30. I'll show it to your attorneys.
A. Okay.
Q. And I will represent to you that what I have given your attorneys as Exhibit 30 is an exact duplicate of what you sent Ms. Wanser as Exhibit G.
A. Well, if it has a different number of pages, it's not an exact duplicate.
Q. No, sir, what I'm saying is that Exhibit 30 and your Exhibit G to Ms. Wanser are the same. They both

Page 174

have 30 pages.
A. Well, how could they be the same if they have a different number of pages?
Q. Well, listen to what I'm saying. Do you see Exhibit G that you sent to Ms. Wanser?
A. Yes.
Q. It ends on Page 30?
A. That's correct.
Q. Here is Exhibit 30 that ends on Page 30.
A. Uh-huh.
Q. And what I'm telling you is that your Exhibit G and my Exhibit 30 are the same.
A. Okay.
Q. And what I'm saying to you is that Exhibit 17, which you gave to the board, and Exhibit G, which you represented to Ms. Wanser was a copy of your letter to the board, aren't the same. You changed it.
MR. ZABARTE: If you know -- if you know you changed it --
THE WITNESS: I don't know.
MR. ZABARTE: I mean, it could be a printout because to me it looks personally that it's a different print.
THE WITNESS: Well, I was doing so much copying. I mean, I did go back on another occasion and

Page 175

see that -- if some inserts were missing or --
MR. ZABARTE: I mean, I'm just --
THE WITNESS: I mean, I can see that they are not the same because they don't have the same number of pages.
MR. ZABARTE: He's answered the question, I believe.
Q. Mr. Kavanaugh, if we look -- if we go to -- would your attorney like time to look?
MR. ZABARTE: Yeah, I'm just comparing them.
Q. Okay. We'll wait while your attorney looks.
A. Well, I didn't feel the need to tell Ms. Wanser what my demands for the board were because that was meant for the board.
Q. Mr. Kavanaugh, you told Ms. Wanser that you were giving her a copy of what you gave the board, didn't you?
A. Yes.
Q. And you didn't, did you?
A. I gave her a copy of everything -- of all my complaints with the board except this one part.
Q. What you left out was, "In return for my public silence regarding these and other -- these issues and others which comprise -- compromise the integrity of

Page 176

the Brownsville Community Health Center, I am requesting three things from the BCHC board of directors." You left that out, didn't you?
A. Yes.
Q. You left out your demands which included 2 million dollars in return for your public silence, didn't you?
A. Yes.
Q. Because you didn't want Ms. Wanser to see that you did that; isn't that true?
A. I didn't -- it wasn't part of my complaint. It was part of my strategy to get the board to listen to me and to hear me out.
Q. When you told Mrs. Wanser that you were giving her a copy of what you gave the board, you weren't; isn't that a fact?
A. I gave Ms. Wanser a copy of what -- of all of my complaints against BCHC.
Q. Exhibit G, quote, "A letter from me to the BCHC board of directors on July 31, 2000 explaining why I believe my termination was wrongful." Did I read that correctly?
A. Yes.
Q. And you didn't do that, did you?
A. Yes, I did.

Page 177

Q. You gave her the letter -- the same letter that you sent to them?
A. I did not give them the exact same letter.
Q. The day came when you filed a lawsuit against the Brownsville Community Health Center; am I right?
A. Yes.
Q. Something that is referred to as Plaintiff's Original Petition; am I correct?
A. Yes.
Q. Now, on a number of occasions you had made the representation to the board that you were not yet represented by counsel. Do you recall that?
MR. HORTON: Let me see that.
Q. Do you recall making the statements to the board that you were not yet represented by counsel?
A. Yes.
Q. At the time that you filed what is before your attorney as Plaintiff's Original Petition, were you represented by an attorney?
A. I was getting legal counsel, but I -- there was no attorney of record, no.
Q. Okay. When did you first seek an attorney with respect to the termination of your employment with the Brownsville Community Health Center?
A. When did I begin seeking?

Q Or when did you -- I don't want to know what you said to an attorney or what an attorney said to you, but I do want to know the date on which you first consulted an attorney.
MR. ZABARTE: Now, I'll object to this --
A Gee, I don't really -- I don't really know.
MR. ZABARTE: -- as a chain of questions that is really irrelevant to the substance of this particular case, and I just want the record to reflect that.
Q Can you answer?
A. The exact date when I first spoke to an attorney?
Q It doesn't have to be exact.
A. I think it was before the end of the year in 1998.
Q. Okay, now, your employment terminated in 2000.
A. Oh, I mean -- I'm sorry. Yes, it was before the end of the year of 2000.
Q. Okay, and who was the first attorney?
A There were two attorneys in Corpus Christi.
MR. ZABARTE: Yeah, and if you remember.
A. Yeah.
Q. You're saying you don't remember their names?
A. Well, I do remember one of their names, and I have the name of the other one at home.

Q. What's the name you do remember?
A. His name was Truss Wright, W-R-I-G-H-T.
Q. Okay.
A. And he had a formal first name, but he went by Truss.
Q. All right. Who was the first attorney that you consulted in the Valley?
A. A guy by the name of -- I talked with someone from Pena's office in McAllen.
Q. Would that be Edinburg?
A. Edinburg.
Q. Okay.
A. Aaron Pena.
Q. Okay.
A. In Brownsville it was -- I spoke with Miguel Saldana.
Q. Who else?
A. And I spoke with Ernesto Gamez.
Q. Okay.
A. And I believe there was one other, but I can't remember his name.
Q. What was the name of the first attorney to actually represent you?
A. Mr. Zabarte.

Q. Okay. Were you represented by an attorney when you filed the document marked Plaintiff's Original Petition?
A. Well, I guess what do you mean by representation? I think Mr. Zabarte helped me but --
Q. Okay.
A. You made it clear at that point that --
MR. HORTON: No, don't say --
Q. No, no, don't tell us what --
A. Okay, okay.
Q. -- you and Mr. Zabarte talked about. Okay. Now, if we look at what's marked as Plaintiff's Original Petition --
MR. HORTON: Ray, is that an exhibit?
MR. COWLEY: We can make it an exhibit.
MR. HORTON: I don't care. I'm just keeping track of the exhibits.
MR. COWLEY: I wasn't planning to make a pleading an exhibit, but I think we can all agree that this is a true and correct copy of the Plaintiff's Original Petition.
Q. Would you agree?
A. Well, I can assume -- yeah, well, I can assume that.
Q. Okay, that's on file with this --

A. Right.
Q. -- lawsuit? Okay, if I look at Section III, the third paragraph, "Beginning in the spring of 1999, the plaintiffs started reporting violations of law to the Texas Department of Health and other management officials." Actually, you didn't make any report to the Texas Department of Health in the spring of 1999, did you?
A. Only indirectly and --
Q. To Sister Mary?
A. Yes.
Q. That was all?
A. That's it.
Q. Okay, and you didn't expect her to do anything about it, did you?
A. I was doubtful that she would do anything about it.
Q. Well, you didn't ask her to, did you?
A. No.
Q. Okay. You referred to it as just a casual conversation; is that right?
A. Yes.
Q. Okay. "Specifically, the plaintiff told the Texas Department of Health auditor that there were problems and complaints about misappropriation of

monies to the campus care centers." That didn't happen, did it?

A. Yes.

Q When?

A. It happened soon after I became employed at the Brownsville Community Health Center when the TDH auditor came in and I had an opportunity -- he wanted to speak with me before the audit terminated, and I spoke to him about the fact that other employees of Brownsville Communication -- Brownsville Community Health Center had had questions about finances and that there were complaints about how the money was used. And I was told by Ms. Alpert and Ms. Lisa Bennett that one of the reasons Ms. Dentler resigned was over disagreements about how campus care money was being used.

Q. Do you remember this morning you testified under oath that the only report that you made of any wrongdoing outside of the agency was to Sister Mary? Do you recall that?

A This wasn't a report of wrongdoing. This was telling the auditor what I heard from other campus care center employees and BCHC employees.

Q. Okay. The truth of the matter is you did not report any impropriety to the Texas Department of

Health auditor; isn't that a fact?

A. I would -- not when he came in spring of '99 because I was new. I didn't know what --

Q. You had nothing to report; isn't that true?

A. Yes.

Q. Okay.

A. I was brand new.

Q. So when your petition says that, "Specifically, the plaintiff told the Texas Department of Health auditor that there were problems and complaints about misappropriations of money to the campus care centers," that's not true, is it?

A. Well, I was telling him at that point that the reason why people requested an audit from the Brownsville Community Health Center was because there were complaints about how the money was being used.

Q. But you didn't know of any, did you?

A. Only what I had been told.

Q. Okay. So you had nothing to report to any auditor; isn't that true?

A. Not in the spring of '99.

Q. Okay. In fact, you didn't make any specific complaint of your own to the Texas Department of Health until after your employment had terminated; isn't that true?

A Any formal complaint, yes.

Q. Okay. It says here, "A report was generated by the auditor stating that income for the campus care centers should be divided into three separate accounts so that monies could be properly accounted for." Did I read that correctly?

A Yes.

Q That wasn't as a result of anything you did, was it?

A No, that was a result of the previous audit.

Q. Okay. Quoting, "After said reports, plaintiff realized that the Brownsville Community Health Center had not complied with the auditor's request and wrote memos to his department supervisor stating his concerns." Did I read that correctly?

A. Yes.

Q The memos would be the October and the January memos that you wrote to Mr. Garcia?

A. Right.

Q. Am I right?

A. About 761.

Q Okay.

A. About Account 761.

Q Your concerns about Account 761 had nothing to do with the TDH auditor, did it?

A. Well, at the spring 1999 audit, the auditor recommended that the funds from 761 be divided proportionately among three separate accounts, and they never were.

Q Now, is there anywhere within Plaintiff's Original Petition where you made the allegation that your employment was terminated on account of your age, your national origin, or your gender?

A. No.

Q. What you alleged in your lawsuit, as you originally filed it, was that you were fired because of what you said were reports to the Texas Department of Health regarding improprieties and in the handling of finances; isn't that true?

A. At this point I was acting under legal counsel.

Q. Okay. Well --

A. And so this was the advice that I had received --

MR. HORTON: Don't get into what advice --

MR. ZABARTE: Don't talk about what you talked about with me.

THE WITNESS: Okay.

Q. Would you agree with me that the lawsuit that you originally filed complained that you were fired because of reports you made of improprieties?

MR. ZABARTE: Ray, what was the question?

THE REPORTER: "Would you agree with me that the lawsuit that you originally filed complained that you were fired because of reports you made of improprieties?"

A. Right here, I referred to illegal discrimination.

Q. I see. Right above where it says the illegal discrimination, it says, "Whistle-Blower Act." Do I read that correctly?

A. Yes.

Q. Okay. And the illegal discrimination you refer to makes no mention whatsoever in the original petition of age, national origin, or gender; isn't that true?

A. That's true.

Q. What is alleged in your original petition was that you brought to light or to attention improprieties at the center; am I right?

A. Correct.

Q. Okay. So the only discrimination you were referring to in Plaintiff's Original Petition was that you felt like you were being retaliated against because of your reports of improper activity.

A. That did not contain the totality of my legal complaint.

Q. Looking at the third -- fourth page of Plaintiff's Original Petition, tell me if I read this correctly. "At this time plaintiff hereby gives notice to all that he only alleges state causes of action detailed in this petition." Did I read that correctly?

A. "In his petition."

Q. All right, sir. So in your lawsuit as you filed it, the only thing you were alleging was that you were fired for reporting improprieties at this center; am I right?

A. No.

Q. Okay. What else were you alleging?

A. I was alleging that there was illegal discrimination.

Q. Of what type?

A. Race, gender, age.

Q. Can you show us where within there that it says that?

A. No.

Q. It doesn't say it, does it?

A. It refers to illegal discrimination.

Q. But you would agree with me in the factual recitation, or the alleged facts, at no point in the original petition do you allege that you were treated unfairly on account of either your race, gender, or

national origin; isn't that true?

A. What I'm alleging is that there was illegal discrimination.

Q. And you're telling the Court that the discrimination you're referring to under the words "Whistle-Blower Act" was on account of race --

MR. ZABARTE: Ray, Ray, you're arguing with him. Basically, he's -- you have asked the question, they can see for themselves, he has a perfect right to amend the petition --

MR. HORTON: He's not a lawyer.

MR. ZABARTE: -- and he has amended the petition, and you're dealing under a new petition.

Q. Okay. All right, I can probably move on. What you're telling the Court is, under oath, that your intention when you referred to illegal discrimination in the Plaintiff's Original Petition was to refer to race, gender, and national origin -- I mean, national origin, gender, and age?

A. What I'm saying is that that original petition did not contain the totality of my complaints under the law.

Q. Did you believe when it was filed that what it said was true?

A. Yes.

Q. You believed that you were fired for bringing to public attention matters that you thought were improper?

A. I felt that I was fired because of my race, gender, age, yes.

Q. That's not my question.

A. Uh-huh.

Q. Plaintiff's Original Petition doesn't say that you were fired because of race, national origin, age, or gender. It says you were fired because you brought to light financial improprieties. Isn't that what it says?

A. That's what it says, in part.

Q. Do you -- did you believe that was true when you alleged it?

A. Yes, but I didn't believe it contained the totality of my complaints --

Q. Okay.

A. -- and concerns.

Q. All right. I'm going to show you a document I'll mark as Exhibit 31.

Have you had a chance to look at the document marked as Exhibit 31?

A. Yes.

Q. Okay, and that was prepared by Mr. Horton; am I

right?
A. And Mr. Zabarte, I believe.
Q. Okay. The document marked as Exhibit 31 is the first time that you ever specifically complained to anyone that you felt like that you were discriminated against or discharged because of either your national origin, your age, or your gender; isn't that true?
A. Ever?
Q. Ever.
A. No.
Q. Okay. With respect to your employment at Brownsville Community Health Center, the document marked as Exhibit 31 is the first time you specifically referred to your age, your gender, or your national origin as being a factor in your dismissal; isn't that true?
A. No.
Q. To whom did you make that complaint before?
A. I had spoken with Ms. Emily Alpert about it.
Q. Okay, now, you testified earlier -- do you recall that -- that you had at no time ever made the allegation that your employment was -- that you were either disciplined or discharged on account of either of those three factors. Do you recall that?
A. Well, I'm referring back to the incident where

she said to me, "Your problem is that you're not Joan Dentler."
Q. Well, you never said to Ms. Alpert, "I believe that I am being discriminated against because I'm male," did you?
A. No.
Q. You never said to Ms. Alpert, "I believe I'm being discriminated against because of national origin," did you?
A. No.
Q. You never said to her that you were being discriminated against on the basis of age, did you?
A. No.
Q. Okay. The only time you ever made the allegation to anyone that you felt like you were discriminated against at Brownsville Community Health Center was on the document marked as Exhibit 31; isn't that true?
A. I don't know.
Q. Well, can you point to a single document anywhere that would indicate where you made that complaint before April the 26th of 2001?
A. I have to review the documents and think about it.
Q. As far as you know, as we sit here today, the

first time that you ever made the complaint that you were discriminated against on the basis of national origin, age, or gender was on the document marked Exhibit 31; isn't that true?
A. That was my first complaint to the EEOC, yes.
Q. Okay. And it was your first complaint to anyone of discrimination on the basis of any of those three factors; isn't that true?
A. No, I told lots of people that we were being discriminated against.
Q. Okay.
A. The policies and procedures weren't being applied in a consistent manner.
MR. COWLEY: I'll object as nonresponsive.
Q. Before April 26th, 2001, you had never made the specific complaint to anyone that you were discriminated against because of race -- national origin, age, or gender; isn't that true?
A. No.
Q. Who did you make the complaint to before then?
A. Make the complaint to or talk to about it?
Q. Make the complaint to.
A. Well, in the original question, I believe, was, "Did you talk to anyone about this?"
Q. Who did you first -- who did you first make the

representation to that you were being discriminated against because of any of those three factors?
A. To the best of my knowledge, in a formal and legal way, with my attorneys.
Q. Okay. Other than your attorneys, the first time you ever made the allegation to anyone that you were discriminated against by the Brownsville Community Health Center on the basis of national origin, age, or gender was on the document marked Exhibit 31; isn't that true?
A. I cannot remember.
Q. Okay. As best you can recall, this was the first time?
A. This was the first time I put it in writing with an agency explicitly, I believe.
Q. Okay.
A. But I'm not sure.
Q. And you don't recall ever making even a verbal allegation to any agency prior to this; isn't that true?
A. I do not recall at this time.
Q. Okay. Now, while your original petition was pending, there was something called a motion for summary judgment that was filed; do you recall that?
A. Yes.

Page 194

Q And since you were pro se, a copy of it went to you; is that true?
A I believe so.
Q Okay. And you abandoned that whistle-blower claim; isn't that true?
A. Abandoned. I abandoned it?
Q If you know. If you don't know --
MR. HORTON: He's not a lawyer. He's not a lawyer.
MR. ZABARTE: If you don't know.
A. I'm not a lawyer.
Q. Okay. Is it your understanding or belief that you are still asserting that claim?
A. What?
Q The whistle-blower claim.
A It's my understanding that --
MR. ZABARTE: As your attorney, I mean, look at the pleadings that we started to file for you.
THE WITNESS: Right.
MR. ZABARTE: Okay, and refer him to the pleadings.
A. I guess it's all there in the pleadings.
Q. Okay. I would like to look at what's been marked as Exhibit 31. Look at Paragraph 8 of Exhibit 31, quoting, "Consistent with his professional

Page 195

responsibilities, beginning in the spring of 1999 CP began expressing concerning regarding how state funds were being administered."
Next sentence, "CP contacted the Texas Department of Health regarding such matters, which confirmed that the clinic was not administering the state funds per the department's guidelines." Did I read that correctly?
A. Yes.
Q. You never contacted the Texas Department of Health regarding that in the spring of 1999, did you?
A. I was speaking to so many people from the Texas Department of Health because we had two significant grants from the Texas Department of Health so I was -- I was speaking with a Ruth Anderson, who oversaw the school-based health center program. There was someone over her, and then there was Ken Carroll, and then periodically I would talk to Cecilia Garza about the expenditure of funds. So there were a number of people I was expressing my concern to.
Q. You never expressed any concern of any impropriety on the part of the center during the spring of 1999, did you?
A. I expressed usually via E-mail lots of concerns about expenditures of funds.

Page 196

Q With the Texas Department of Health?
A. Different members of the Texas Department of Health
Q During the spring of 1999; is that your testimony?
A. Yes.
Q Did you ever indicate to the Texas Department of Health during that period that you thought that funds were being improperly administered by the BCHC?
A. Most of my conversations with them was -- had to do with asking them questions about how to properly expend the funds.
Q. Do you recall this morning when you testified under oath that the only complaint that you made during your employment to the Texas Department of Health was just the remark you made to Sister Mary?
A. Yes.
Q. Was that a true testimony?
A. Yes.
Q. You never made any complaint regarding expenditure of funds to the Texas Department of Health during your employment, did you?
A. I never made any complaints during -- are you referring to the spring of '99?
Q. Yes, sir.

Page 197

A. I never made any complaints. What I did was I was in constant contact with them about discussing how the money should be moved, what -- how the money should be moved around. I was talking to -- because I never got the final auditor's report, from the spring of '99 I was talking to the auditor about what his intention was for the use of that money.
Q. If we look at Paragraph 11, quoting, "Upon being advised that respondent" -- that would be the BCHC.
A. Okay.
Q. -- "would terminate CP, CP opposed respondent's conduct toward him both orally and in writing." Did I read that correctly?
A. Yes.
Q. Now, in fact, you were told that you were terminated on July 27th; am I right?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. Not that you would be, that you were; isn't that true?
A. That's correct.
Q. Okay. When your charge of discrimination refers to discrimination on the basis of national

origin, age, or gender, have you testified to the Court today of all the matters -- or all the facts or information you would point to to show why you believe that you were discriminated against?

A I'm sure I have not testified about everything.

Q Have you told us everything you can remember?

A I have told you everything that I can remember at the time that you asked it.

Q Okay You applied for unemployment following the termination of your employment?

A. That's correct.

Q. Almost immediately; isn't that true?

A I would have to go back and look at the records

Q Okay And you stated to the Texas Workforce Commission that you were terminated because of insubordination; is that what you said?

A. Like I said, I would have to go back and look. I forget. I don't have those documents here.

Q. Okay. Do you recall that when you made your application for unemployment that you had to state to the Texas Workforce Commission that you were capable of working? Do you recall that?

A. I don't recall it, but it sounds reasonable.

Q. Do you recall that there were certain questions

you had to answer over the telephone every two weeks either yes or no?

A Yes.

Q. Okay. And do you recall stating that, yes, you were fully capable of working?

A. Yes.

Q. And you were asked the question, "Are you actively seeking work?" Do you recall that?

A. Uh-huh, yes.

Q. Okay, and each time you answered yes; is that true?

A. Yes.

Q. Okay. You were paid $294 a week in unemployment benefits; is that true?

A. I would have to go back and look, but, yes.

Q. Does that sound right?

A. That sounds approximately true.

Q. And you received those benefits for 23 weeks?

A. I would have to -- less than six months, so I would have to -- I would have to check.

Q. Okay. Would you argue with me if I said that you received $294 for 23 weeks?

A. I would have to go back and look.

Q. What would you look at?

A. I would have to go look at the statements from

the Texas Workforce Commission

MR. ZABARTE: I think that in answers to discovery, I think he may have answered that directly to you.

Q. I have got before me -- I won't make it an exhibit at this time -- your complete file from the Texas Workforce Commission

A. Okay.

Q. As I look at it, it would indicate that you received $294 for 23 weeks

A. That sounds reasonable.

Q. Okay. And that you first applied for unemployment on August the 6th. Does that sound about right?

A. That sounds -- I mean, I can't say for sure, but that sounds about right.

Q. The reason you applied for unemployment or regarded yourself as eligible for unemployment was because you had been fired; am I right?

A. I had been terminated, that's correct.

Q Okay. Now, when you -- you sent documentation to the Texas Workforce Commission. Do you recall that?

A. Yes.

Q. And you even sent them a copy of the 31-page letter that you sent to the -- to the board of

directors. Do you recall that?

A. They asked for my response to my termination, so I believe that I sent them that, yes.

Q. And you actually sent the 31-page version. Do you recall that?

A. I don't recall.

Q. Okay. If I represent to you that the document in the file has 31 pages with the copies to Ms. Gomez, Ms. Alpert and Ms. Gonzalez, does that sound right to you?

A. If that's what's in the file, that's --

Q. Okay. When you changed the version, the one that you sent to Ms. --

A. Wanser.

Q. -- Ms. Wanser, did you also send copies to Ms. Gomez and Ms. Gonzalez and Ms. Alpert?

A. No.

Q. When you made the statement to the Texas Workforce Commission that you were actively seeking other employment, was it a true statement?

A. Yes.

Q. What did you do to seek other employment?

A. I spoke to friends working in different agencies, I spoke with numerous individuals at UTB to see -- UTB/TSC to see what would be available.

Page 202

Q. Where was the first place that you went and applied for employment?
A. Formally applied, I think it was UTB. I'm not sure. I would have to go back and look.
Q. I'm sorry. Did you say UTB?
A. Yes.
Q. Okay. Did you fill out an application there?
A. I'm not sure.
Q. Okay.
A. I spoke to a number of individuals there.
Q. Okay. What type of position were you looking for?
A. An administrative or teaching position.
Q. Okay. Where was the next place you applied?
A. The next place where I sought work?
Q. Okay.
A. I sought work at UTPA.
Q. Okay. Did you fill out an application?
A. No.
Q. Okay.
A. But I did look at what employment opportunities they had available.
Q. Did you speak to anyone there about possible employment?
A. No.

Page 203

Q. Okay. Where else did you seek employment?
A. I talked to some people at both hospitals.
Q. That would be what, Brownsville Medical Center?
A. Yes.
Q. And Valley Regional?
A. Yes.
Q. Okay. Did you fill out an application?
A. No.
Q. What type of work were you seeking?
A. Administration, administrative work.
Q. Okay. Was there a reason why you didn't fill out an application?
A. Well, because they didn't have anything available.
Q. Okay. Where else did you look?
A. I was checking the want ads every day, checked with the City and the County.
Q. City of Brownsville?
A. Yes.
Q. Did you send a resume?
A. No.
Q. Cameron County, did you send a resume?
A. No.
Q. Okay. Where did you send your resume?
A. To UTB/TSC.

Page 204

Q. Anywhere else?
A. I don't believe so.
Q. So you just sent your resume to one place?
A. That's correct.
Q. Okay Did you contact any search firm to help you find a job?
A. No
Q. Okay. Where else did you look for work?
A. Just in Brownsville, Harlingen, McAllen. I looked in The Monitor want ads and Valley Morning Star in the library
Q. Was there any place that you went and asked for work besides what you have told us?
A. No
Q Okay. So you sought work at UTB, UTPA, Brownsville Medical Center, Valley Regional Medical Center, and that's it?
A. And the others that I have listed there.
Q. Well, you never contacted anyone at the City of Brownsville seeking work; isn't that true?
A. Well, I contacted their Web page and --
Q. Okay.
A. -- saw what their announcements were.
Q. Okay. Was there only one place that you -- or UTB and the two hospitals were the only places you

Page 205

actually went and presented yourself to see if there was employment?
A. I don't remember all the places I went to.
Q. Okay. Are those all that you can remember?
A. Right now.
Q. So over a period of 23 weeks you presented yourself to three different places looking for work?
A. No, I can't remember all the places that I went.
Q. You have told us all you can remember?
A. Yes.
Q. Okay. Where was the first place to offer you employment?
A. Where I'm presently working.
Q. And where is that?
A. The Valley Doctors Clinic.
Q. And, if you know, who owns Valley Doctors Clinic?
A. Dr. Lorenzo Pelly.
Q. And he spells his last name how?
A. P-E-L-L-Y.
Q. Okay. As far as you know, he's the sole owner?
A. The sole proprietor.
Q. Okay. How -- approximately how many employees work there?

Page 206

A. Including physicians or not including physicians?
Q. Let's say anyone that's other than an owner.
A. Okay, approximately 20.
Q. Okay. And when were you hired to work for this clinic?
A. Around January 15th of this year.
Q. Okay. And what is your title?
A. Administrator.
Q. And what was your salary at the time you were hired?
A. 50,000.
Q. And, as I recall, your salary at the time your employment terminated with BCHC was just under 48,000?
A. Correct.
Q. Are you paid a salary irrespective of the time you work, or does it vary according to your hours?
A. I get paid a salary with no overtime.
Q. Okay. If you have partial-day absences for emergencies or whatnot, your salary isn't affected; am I right?
A. Well, I have sick time and personal time.
Q. Okay. Has the time ever -- has it ever occurred that you have exhausted your sick time and personal time?

Page 207

A. No.
Q. Okay. As far as you know, if your sick time and personal time were exhausted, would you still be paid your full salary?
A. I'm not sure.
Q. Okay. Has your salary ever changed since you started there?
A. Well, I earn a bonus, also.
Q. Okay. How often is the bonus paid?
A. Once a quarter.
Q. Okay. And what have your bonuses been during calendar year 2001?
A. First quarter it was 1,800, the second quarter it was 1,800 and the third quarter it was 1,500.
Q. Are you anticipating a bonus for the fourth quarter?
A. Well, they gave us an end-of-the-year gift.
Q. Okay. Do you anticipate that --
A. Of a thousand dollars.
Q. Okay. Do you anticipate a bonus being calculated, though, on your productivity for the last three months of the year?
A. Yes, and it will be payable in January.
Q. Okay. Did you have any bonus potential working for BCHC?

Page 208

A. Not that I was aware of.
Q. Okay. What benefits are you provided at Valley Doctors Clinic?
A. Vacation time, personal time, health insurance.
Q. How much vacation do you have?
A. 20 days a year.
Q. How much vacation did you have at BCHC?
A. I'm not sure. It accumulated biweekly.
Q. Okay. You have group health benefits?
A. Right.
Q. Okay. When you were employed by BCHC, am I correct that your wife was also employed?
A. Yes.
Q. Okay. Were you provided with group health benefits by BCHC?
A. I was.
Q. Okay. And your wife, also?
A. I don't believe so. She's a part-time employee. I don't think she is entitled.
Q. Was your wife a dependent under your group healthcare plan?
A. I don't remember, but I don't believe so.
Q. Okay. Was there a reason why she wasn't?
A. It was too expensive.
Q. Okay. Were your children carried under your

Page 209

group plan?
A. No.
Q. Okay. At the time your employment terminated, were you given an opportunity at your own expense to continue the group health benefits?
A. I forget.
Q. Okay. Did you elect to continue the group health benefits after your employment terminated?
A. No.
Q. Okay. Did you have group healthcare coverage between the time your employment terminated with BCHC and when you started with Valley Doctors Clinic?
A. No.
Q. Were your children covered?
A. Yes.
Q. And how were your children covered?
A. Through the Children's Health Insurance Program.
Q. Okay. Was your wife covered?
A. No.
Q. Okay, is she covered today?
A. Yes.
Q. As a dependent under your coverage?
A. Yes.
Q. Okay. Are your children now covered under your

Page 210

plan?
A. Not yet.
Q. Okay. Was there ever a time between the time your employment terminated with BCHC and when you started with Valley Doctors Clinic that you incurred medical costs that went uncovered?
A. No.
Q. Okay.
A. You're referring to me personally?
Q. Yes, sir.
A. No.
Q. Okay. And you were the only one that was ever covered under the BCHC plan; am I right?
A. I believe so. I'm not -- I don't believe that my wife has ever been covered.
Q. Okay. And similarly your children were never covered?
A. I don't believe so.
Q. Okay. You have been with Valley Doctors Clinic since January 15th of 2001?
A. Yes.
Q. Okay. During the time that you have been employed at Valley Doctors Clinic, have you sought employment elsewhere?
A. No.

Page 211

Q. I take it, then, that it has been -- it has been your decision to remain at Valley Doctors Clinic?
A. Yes.
Q. Okay. Do you like working for Valley Doctors Clinic?
A. Yes.
Q. Okay. Is it your intention, at least for the near future, to remain there?
A. Yes.
Q. You're not asking the Court in this lawsuit to have you reinstated back at BCHC, are you?
A. No.
Q. Okay. How do you regard yourself as having been harmed by the termination of your employment?
A. I'm -- don't understand the question.
Q. Okay. You obviously were out of work for about -- almost six months?
A. Uh-huh.
Q. Am I right?
A. Yes.
Q. Okay. During which time you were receiving $294 a week in unemployment?
A. Yes.
Q. Okay. And $294 a week was less than you made while working for BCHC?

Page 212

A. Yes
Q. So you -- you -- financially you lost the difference between what you had made while working and what you received on unemployment; am I right?
A. Correct
Q. Okay. Other than that financial difference, do you regard yourself as having been harmed in any other way by the termination of your employment?
A. Emotionally, psychologically, professionally, is that how you mean it?
Q. Well, how do you regard yourself as being harmed by the termination of your employment?
A. It was a humiliating experience and so I felt emotionally harmed. Professionally, it was very -- it was very demeaning and it was -- it was very difficult to be in a circumstance where you didn't know if you were going to be able to sustain your family.
Q. You felt that way because you lost your job; am I right?
A. I felt that way because I was terminated under the conditions in which I was terminated.
Q. Okay. Now, going back to January -- excuse me, July the 26th, it was Ms Gomez who told you that your employment was terminated. Do you recall that?
A. Yes.

Page 213

Q. Did she curse you?
A. No.
Q. Did she shout at you?
A. No.
Q. Was there anything uncivil or rude about her manner during that meeting?
A. No.
Q. Okay. So when you complain about your employment being terminated, you're complaining about the fact of the termination, not the way in which Ms. Gomez carried it out; am I correct?
A. Could you ask that question again, please?
Q. Well, there was nothing rude or -- there was nothing about the manner in which your employment was carried out that you would complain of, is there?
A. At the meeting of the termination, it was less than three minutes long, and I do not recall any uncivil behavior by anyone present.
Q. It was done in private; am I right?
A. Yes.
Q. Door closed?
A. Yes.
Q. You were told that you would have an opportunity to remove your personal belongings?
A. Yes.

Page 214

Q. Okay. I had sent questions to your attorneys asking if you had ever seen any -- any doctor or psychologist or psychiatrist as a result of anything that BCHC either did or failed to do, and the answer I was given was no. Is that still your answer?
A. That's correct.
Q. Have you seen anyone -- have you been treated for depression?
A. No.
Q. Have you seen any doctor or psychologist or other professional with respect to your emotional state?
A. No.
Q. Have you been given any medication for anything relating to your emotional state?
A. No.
Q. Okay. Have you seen a doctor of any kind as a result of anything that happened to you at BCHC including the termination of your employment?
A. No.
Q. Who is your normal doctor, everyday doctor?
A. Francis Gumbel.
Q. Francis, I'm sorry?
A. Gumbel, G-U-M-B-E-L.
Q. Is that a man or a woman?

Page 215

A. A man.
Q. Okay. And where is he located?
A. Over on Villa Maria across from BMC. That's one of his offices.
Q. All right. What have you seen Dr. Gumbel for?
A. Just normal physical exams, lab tests, just physical exams.
Q. Okay. Have you ever seen Dr. Gumbel regarding your emotional state?
A. No.
Q. Have you ever at any time been given something called a Minnesota Multiphasic Personality Inventory Test?
A. When I was in college and going into the seminary, I was given lots of tests. I forget all of them.
Q. In the last five years, have you been given such a test?
A. No, not that I'm -- not that I remember or am aware of.
Q. Okay. Mr. Kavanaugh, did you in fact send some type of written communication to each of the agencies that you threatened to notify with regard to the Brownsville Community Health Center?
A. I would need to see a complete list.

Page 216

Q. Well, let me ask you this. We've established by the documents that have been marked in this deposition that you did send a number of written communications to various agencies after your employment terminated with respect to the Brownsville Community Health Center; is that right?
A. Yes.
Q. Has the Brownsville Community Health Center in any way ever been cited or reprimanded for any of the notifications that you have made?
A. I don't know.
Q. Okay. As far as you know, they haven't; is that true?
A. I don't know.
Q. Okay. There has never been any official determination by anyone that anything improper was done by that agency, by the BCHC; isn't that true?
A. I don't know.
Q. Your most recent pleading is something called Second Amended Complaint. And looking at Paragraph 7 of your second amended complaint, it says, "Beginning in the spring of 1999, the plaintiff began reporting violations of law to the Texas Department of Health and other management officials." In the spring of 1999, you never made any report of any violation of the law

Page 217

to the Texas Department of Health, did you?
A. I did not make a formal complaint. What I did was I sought continuous advice from them on what I was supposed to do, given the results of their audit.
Q. You never made any -- you never reported any violation of law to the Texas Department of Health, did you?
MR. ZABARTE: You know, the question has been asked and answered in different times --
MR. COWLEY: Okay.
MR. ZABARTE: -- during this deposition.
Q. Let's look at Paragraph 7, "Beginning in the spring of 1999, the plaintiff began reporting violations of law to the Texas Department of Health," and the question is simply, you never made any reports of violations of the law to the Texas Department of Health, did you?
A. I would have to go back and look at my E-mails.
Q. As far as you know, you didn't; isn't that true?
A. I would have to go back and look at my E-mails to answer that question.
Q. If we look at Paragraph 8, it says, "Later plaintiff spoke to the Texas Department of Health and complained of similar problems and concerns of

Page 218

continued misappropriations concerning the campus care centers." Did I read that correctly?
A. Uh-huh.
Q Is that a yes?
A. Yes, you read it correctly.
Q And, actually, you never made any further complaints to the Texas Department of Health until after your employment had terminated; isn't that true?
A. Again, I don't know. I would need to go back and look at my communications.
Q If you look at Paragraph 11 of the second amended complaint, it says, "The project assistant of the campus care centers informed plaintiff that she could not resolve communication problems between employees." Did I read that correctly?
A. Yes.
Q. Who are you referring to?
A. Ms. Moody.
Q Okay. And you're saying, "She asked plaintiff to intervene and plaintiff complied." Did I read that correctly?
A. Yes.
Q You're saying that Ms. Moody asked for your intervention?
A. Yes.

Page 219

Q. And you complied?
A. Yes.
Q. Okay. If we look at Paragraph 16 of the amended complaint, it says, "Upon being advised that defendant would terminate him, plaintiff opposed defendant's conduct toward him both orally and in writing." Did I read that correctly?
A. Yes.
Q. Actually, once again, Ms. Gomez told you you were fired; am I right?
A. Uh-huh.
Q. Is that yes?
A. Yes.
Q. She didn't tell you you would be. She told you you were; isn't that true?
A. Yes.
Q. Okay. The next sentence says, "Thus, plaintiff asserted his rights under the applicable federal statutes by opposing a practice made unlawful thereunder."
You never complained following the termination of your employment of discrimination on the basis of age, national origin, or gender until you filed your charge that's marked as Exhibit 31; isn't that true?

Page 220

A. I never included this as part of the complaint, no.
Q. You never included discrimination on those bases as part of your complaint; isn't that true?
A. Yes.
Q. Okay.
A. Could you just give me one more break?
Q. Sure. We'll take a break.
(Brief recess)
A. Mr. Kavanaugh, I'm going to show you a multi-page document marked as Exhibit 32, and I'll represent to you that it only came into my possession more recently than I answered discovery. Your attorney may want to look at it.
MR. ZABARTE: The only objection I make is if it's something that was requested and it's not in response to a specific discovery request, then I would object to this production at this time, but you can ask him questions about it.
Q. Have you had a chance to look at Exhibit 32?
A. Yes.
Q. Is the document marked as Exhibit 32 something that you prepared?
A. Yes, it appears so.
Q. And it is a document that you sent to the

Page 221

senior management team; am I right?
A. Yes.
Q. Okay. Now, at the time you sent the document marked as Exhibit 32, you had been working some eight months or thereabouts for your new employer; am I right?
A. Yes.
Q. And you're not in any way seeking reinstatement. You testified to that; do you recall that?
A. Yes.
Q. You had earlier made clear to the board that unless they met your demands, you would keep complaining. Do you recall that?
A. Yes.
Q. The board didn't pay you the 2 million dollars, did they?
A. I do not believe that they investigated my complaints.
Q. Okay. And so you're continuing to complain?
A. Yes.
Q. And I'll show you a multi-page document marked as Exhibit 33 and would ask that you look at that.
MR. ZABARTE: I'm going to make the same objection I made on Exhibit No. 32.

Page 222

Q Have you had a chance to look at Exhibit 33?
A. Yes.
Q Now, Exhibit 33 -- you prepared Exhibit 33; isn't that true?
A Yes.
Q And you sent it to all the members of the board of trustees of Brownsville Independent School District; am I right?
A. Yes.
Q. And you sent it to all the members of the BCHC board of directors; is that true?
A. I sent a copy of the cover letter and the exhibits to these people. I did not send a copy of the exhibits to all those people, but I think I sent at least a copy of the cover letter.
Q Okay. You're saying but maybe you sent the exhibits, as well, to all of them?
A I didn't send a copy of the -- I know for sure that I didn't send a copy of the exhibits to all of the board of trustees at BCHC.
Q Okay.
A. But I told them who I sent copies of the exhibits to.
Q. You would agree with me that the document marked as Exhibit 33 had with it extensive exhibits; is

Page 223

that true?
A. Yes.
Q. Okay. And all those exhibits, along with the document marked as Exhibit 33, went to the BISD board of trustees; am I right?
A. Yes.
Q. And some of the members of the board of directors of BCHC also got the exhibits --
A. Yes.
Q. -- in addition?
A. Yes.
Q. How about to the members of the campus care centers community advisory board. What did you send them?
A. I sent -- I believe -- I'm trying to remember. I believe that I sent Alejandro Coronado and Alix Flores a complete copy of everything, and then the campus care center advisory board members that I could remember, I sent a copy of the cover letter. But I didn't send a copy of the exhibits to all of the community advisory board members.
Q. What did you send to the Bureau of Primary Healthcare?
A. I'm not sure.
Q. At least Exhibit 33?

Page 224

A I can't remember.
MR. ZABARTE: Do you remember if you even sent it to them?
THE WITNESS: I can't remember if I even sent it to them. I do remember sending it to members of the board of trustees of BISD, board of directors of BCHC, the community advisory board, the Texas Department of Health, TEA, The Brownsville Herald, Dr. Sauceda, and Mr. Pineda.
Q. Just to run over some other documents right quick, the document marked as Exhibit 34, I believe that one has been provided to your attorney.
MR. ZABARTE: No, I do not believe this is part of his personnel file that was provided to me. Is that --
MR. COWLEY: I believe it was provided separately, and I know it's part of documents that your own client has produced.
MR. ZABARTE: I'll just make the same objection as I had on Exhibit No. 32 and 33, but go ahead and look at it, Paul.
THE WITNESS: Uh-huh.
Q. You have seen the document marked as Exhibit 34 before; am I right?
A. I cannot absolutely recall that I did, that I

Page 225

have. I mean, James Hamel was someone who I was working with on developing grant ideas.
Q. The document marked as Exhibit 35 was used as an exhibit in the deposition of Ms. Gomez. Have you seen that document before?
A. No.
Q. If you need time to look at it, you can tell me. Tell me if I'm reading this correctly, "This memo is subsequent to our meeting with Paul Kavanaugh on March 31, 2000." Did I read that correctly?
A. Yes.
Q. Do you recall a meeting with Gloria Kury and Emily Alpert on that day?
A. I remember we had a number of meetings.
Q. Were such matters as dissemination of health schools/health communities, grants to mental health personnel discussed with you?
A. Yes, Dr. Kury was a contract employee who was paid out of the grant whose contract did not go beyond the grant period, and she wanted to know if her contract was going to be renewed. And the agency that was funding us was changing -- was giving us different information about what the grant could be used for, and so I had to tell her that I didn't know if the contract was going to be renewed or not or under what

conditions.

Q Were there concerns expressed by Ms Kury at the March 31st, 2000 meeting -- or let me ask the question differently. Were you under the impression there were matters brought up at that meeting that were to be addressed by you?

A It was not solely my responsibility to -- and this is what I tried to explain to Gloria because there was the matter of hiring new people, doing advertisements and things like that. It wasn't just up to me And I was still at this point unclear about how to most efficiently and effectively develop the job descriptions and do the appropriate advertising And at the same time our funder was changing information on us on what the money could be used for. So my response to her was -- I mean, was vague, and she was very unhappy about that.

Q. A moment ago we looked at what was marked as Exhibit 33. Do you recall that?

A. Yes.

Q A memo of some 15 pages, plus lengthy exhibits that you sent to numerous people; am I right?

A. Uh-huh.

Q. Is that a yes?

A. Yes.

Q Your intention is to continue making such complaints about the Brownsville Community Health Center?

A. My intention? As long as my wife and children remain as patients there and as long as it delivers services by using federal, state, and county money, I feel it's the responsibility of the citizens that support the institution to bring institutional inadequacies to light.

Q. But all that could have been avoided if you had gotten your job back and 2 million dollars; isn't that true?

A. You're asking me to re-invent the past or to --

Q. Well, didn't you offer to keep quiet if only you would get your job back and 2 million dollars?

A. You're asking me to guess about the future.

Q. I'm asking you about the past.

A. Or back to the future.

Q. Did you --

A. Or a past that doesn't exist.

MR. ZABARTE: I believe his testimony -- this is characterizing his testimony, but his testimony was that the 2 million dollars that he was talking about was to get their attention to have a meeting.

MR. COWLEY: Well, very obvious --

MR. ZABARTE: That's the ultimate reason for it.

Q. Very obviously, you offered to keep your public silence if they would meet your conditions; isn't that true?

MR. ZABARTE: If they went and investigated the matters which they thought they would be able to discuss --

MR. COWLEY: Do you want to be sworn and testify, Mr. Zabarte?

MR. ZABARTE: Well, I mean, you have asked him questions over and over again about the same thing. And, you know, he's not an attorney. He doesn't know how to couch his responses in the same way, but I know what you're getting at, and that -- you're trying to make a game out of something, and it's not a game for him. It's a very serious matter.

MR. COWLEY: I object to the sidebar and the testimony, Mr. Zabarte.

Q. Who is Nyla Gordon?

A. She's a dentist in town who I believe is a member of the board of directors.

Q. Okay.

A. At BCHC.

Q. And you were aware that she studied at the

University of Iowa?

A. Yes, I was.

Q. Okay. You're aware that letters were written to individuals within Brownsville stating that she was not licensed as a dentist. You're aware of that?

A. No, I was not aware of that.

Q. You're unaware that letters were sent from places like Dallas and Nebraska stating that?

A. I have absolutely no information about Dr. Gordon's licensure.

Q. Did you write or cause to be written those letters about her?

A. Not in the least.

Q. Okay.

A. Not in the least.

MR. COWLEY: I'll pass the witness.

MR. ZABARTE: We'll reserve our questions until the time of trial.

MR. COWLEY: Thank you, sir.

THE WITNESS: Thank you.

MR. ZABARTE: Thank you.

(Deposition concluded)

PAUL KAVANAUGH - ERRATA SHEET

Reasons for changes (1) Clarify the record
(2) Conform to the facts
(3) Correct transcription errors

PAGE LINE CHANGE FROM/CHANGE TO REASON

PAUL KAVANAUGH

SIGNATURE OF PAUL KAVANAUGH

I have read the foregoing transcript of my deposition and it is a true and accurate record of my testimony given on DECEMBER 19, 2001, except as to any corrections I have listed on page 230 herein.

PAUL KAVANAUGH

THE STATE OF TEXAS
COUNTY OF CAMERON

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this the ________ day of ______________________, 2002.

Notary Public in and for
The State of Texas

My commission expires:
________________

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PAUL CAMERON KAVANAUGH X
X
X
X
VS X CASE NO B-01-104
X
X
BROWNSVILLE COMMUNITY HEALTH X
CLINIC CORPORATION, D/B/A X
BROWNSVILLE COMMUNITY HEALTH X
CENTER X

REPORTER'S CERTIFICATE

I, SHELLEY STINGLEY, Certified Court Reporter, certify that the witness, PAUL KAVANAUGH, was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on DECEMBER 19, 2001, that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this the _____ day of ____________________, 2002.

SHELLEY STINGLEY, CSR NO. 5725
Expiration Date: 12/31/02
Bryant & Stingley, Inc.
2010 East Harrison
Harlingen, Texas 78550

BRYANT & STINGLEY, INC.
CERTIFIED COURT REPORTERS
2010 East Harrison Street
Harlingen, Texas 78550

McAllen Office
(956) 618-2367 Fax: (956) 618-0087

Harlingen Office
(956) 428-0755 Fax: (956) 428-7133

E-Mail: bryantstingley@bryantstingley.com
Texas: (800) 462-0253

March 7, 2002

Raymond A. Cowley
RODRIGUEZ, COLVIN & CHANEY
4900 North 10th St., Bldg. A-3
McAllen, Texas 78504

RE: CIVIL ACTION NO: B-01-104
PAUL CAMERON KAVANAUGH VS. BROWNSVILLE COMMUNITY HEALTH CLINIC CORP., ET AL.
IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS BROWNSVILLE DIVISION

Name of Deponent(s): Paul Kavanaugh
Date Taken: December 19, 2001

Enclosed are the following items:

☑ Original Errata Sheet/Signature Page
XXXX Signed & Notarized
______ Exhibit(s) provided by Deponent
______ Signed, not notarized
______ Unsigned

☐ ______ Unclaimed al Documents

Sincerely,

BRYANT & STINGLEY, INC.

Yadi Jauregui
Enclosures

cc: Francisco J. Zabarte

PAUL KAVANAUGH - ERRATA SHEET

Reasons for changes: (1) Clarify the record
(2) Conform to the facts
(3) Correct transcription errors

| PAGE | LINE | CHANGE FROM/CHANGE TO | REASON |
|---|---|---|---|
| 208 | 22 | From - "I don't remember... believe so." | |
| | | To - Yes, as a dependent | 1 |

Paul C. Kavanaugh
PAUL KAVANAUGH

BRYANT & STINGLEY, INC. RECEIVED 2-11-02 DATE

DDB-2/11/02

ALMA B. BARRON MY COMMISSION EXPIRES March 17, 2005

ORIGINAL

SIGNATURE OF PAUL KAVANAUGH

I have read the foregoing transcript of my deposition and it is a true and accurate record of may testimony given on December 19, 2001, except as to any corrections I have listed on page 208 line 22 herein.



Paul Kavanaugh

THE STATE OF TEXAS

COUNTY OF CAMERON

SUBSCRIBED AND SWORN TO BEFORE, ME, the undersigned authority on this 11th day of February, 2002.

Notary Public in and for
The State of Texas

My Commission expires:

ALMA B. BARRON
MY COMMISSION EXPIRES
March 17, 2005

BRYANT & STINGLEY, INC.
RECEIVED
2-12-02
DATE

BRYANT & STINGLEY, INC.
RECEIVED
2-11-02 FAX
DATE

SIGNATURE OF PAUL KAVANAUGH

I have read the foregoing transcript of my deposition and it is a true and accurate record of my testimony given on DECEMBER 19, 2001, except as to any corrections I have listed on page 230 herein.

Paul C. Kavanaugh
PAUL KAVANAUGH

THE STATE OF TEXAS

COUNTY OF CAMERON

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this the 11th day of February, 2002.

Alma B. Barron
Notary Public in and for
The State of Texas

My commission expires:

ALMA B. BARRON
MY COMMISSION EXPIRES
March 17, 2005

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| PAUL CAMERON KAVANAUGH | X | |
| | X | |
| | X | |
| | X | |
| VS. | X | CASE NO. B-01-104 |
| | X | |
| | X | |
| BROWNSVILLE COMMUNITY HEALTH | X | |
| CLINIC CORPORATION, D/B/A | X | |
| BROWNSVILLE COMMUNITY HEALTH | X | |
| CENTER | X | |

REPORTER'S CERTIFICATE

I, SHELLEY STINGLEY, Certified Court Reporter, certify that the witness, PAUL KAVANAUGH, was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on DECEMBER 19, 2001; that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this the 11th day of January, 2002.

Shelley Stingley by: Rook
SHELLEY STINGLEY, CSR NO. 5725
Expiration Date: 12/31/02
Bryant & Stingley, Inc.
2010 East Harrison
Harlingen, Texas 78550

**AFFIDAVIT OF FRANCISCO J. ZABARTE**

THE STATE OF TEXAS §
§
COUNTY OF CAMERON §

BEFORE ME, the undersigned authority, on this day personally appeared FRANCISCO J. ZABARTE, known to me to be the person whose name is subscribed hereto, who after being first duly sworn on oath, stated and said:

"My name is Francisco J. Zabarte. I am licensed attorney and I represented the Plaintiff in the above-entitled and numbered cause. I attended the deposition of Defendant, Paula Gomez, taken on the 18th of December, 2001. I have read the deposition transcript provided to me by Shelly Stingley, a certified shorthand reporter. Such deposition transcript is a true record of the testimony given by Defendant on the aforementioned date. Furthermore, I certify that the copied materials attached hereto as part of the deposition of Defendant are true and correct copies of the deposition transcript provided to me by the certified shorthand reporter.

FURTHER AFFIANT SAYETH NOT.

Francisco J. Zabarte



SUBSCRIBED and SWORN to before me, a Notary Public, on this 25th day of March, 2002.

ALMA B. BARRON
MY COMMISSION EXPIRES
March 17, 2005

Alma B. Barron

Notary Public, State of Texas

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PAUL CAMERON KAVANAUGH X
X
X
X
VS. X CASE NO. B-01-104
X
X
BROWNSVILLE COMMUNITY HEALTH X
CLINIC CORPORATION, D/B/A X
BROWNSVILLE COMMUNITY HEALTH X
CENTER X

---

ORAL AND VIDEOTAPED DEPOSITION OF
PAULA GOMEZ
DECEMBER 18, 2001

---

ORAL AND VIDEOTAPED DEPOSITION OF PAULA GOMEZ, produced as a witness at the instance of the PLAINTIFF, taken in the above styled and numbered cause on DECEMBER 18, 2001, reported by SHELLEY STINGLEY, Certified Court Reporter No. 5725, in and for the State of Texas, at the offices of Sanchez, Whittington, Janis, & Zabarte, 100 North Expressway 83, Brownsville, Texas, pursuant to the Texas Rules of Civil Procedure.

| | | |
|---|---|---|
| 1 | Policy Manual | 24 |
| 2 | Personnel File of Mr Kavanaugh | 31 |
| 2a | Memorandum from Ms Gomez to Mr Kavanaugh dated 7-26-00 | 31 |
| 3 | Chart entitled "Exempt Employees" | 93 |
| 4 | Request Nos 14 and 20 | 109 |

PAULA GOMEZ,
having been duly sworn, testified as follows:
EXAMINATION
BY MR. ZABARTE:
Q. Can you please state your name for the record?
A. Sure, Paula Gomez Anzaldua.
Q. Ms. Gomez, you know I represent Paul Kavanaugh in an action that he's filed against the clinic; is that right?
A. As far as I know, yes.
Q. Okay. Have you ever had your deposition taken before?
A. Yes.
Q. When have you had a deposition taken before?
A. I don't have exact dates, but it's been maybe four years, five years, something like that.
Q. Okay. With regard to what matter, what particular matter?
A. This was a lawsuit between the clinic and a dentist.
Q. Okay. And what was the dentist's name?
A. George Angelos.
Q. Okay, any other depositions you have been involved in?
A. No.

Q. Okay. Did he file a lawsuit?
A. Yes, he did.
Q. Okay. Was it here in Cameron County?
A. Yes.
Q. Okay. State or federal court, do you remember?
A. Actually, there were two. One was state and one was federal.
MR. COWLEY: I have given you those cause numbers, if it would help you to move on, so you have that.
MR. ZABARTE: Well, I just wanted to make sure because I don't know much about it. All I got was, I think, the EEOC complaints or something like that. That's about it.
Q. Mr. Angelos --
A. Dr. Angelos.
Q. Okay. What was the reason for his termination?
A. You know, I can't give you that information because I don't remember exactly. I don't remember the wording.
Q. Okay. Would the -- I'll give you -- let me show you what you gave me, but it's not -- this is the information that you gave me in responses to request for production.
A. This is -- these are not the reasons why he was terminated.

Q. Okay. What was his complaint?
A. His complaint was that we had discriminated against him because of his age and ethnicity.
Q. Okay. Was that lawsuit settled?
A. Yes.
Q. How much did it settle for?
MR. COWLEY: I'm going to instruct her not to answer.
Q. Was there money paid to him?
A. Yes.
Q. Okay. And is that your only deposition that you have ever been involved in?
A. As far as I can remember, yes.
Q. Okay. Have you -- do you understand what we're going to be doing today? I'm going to be asking you some questions in which I need a response from you.
A. Yes.
Q. That you are under oath to say the whole truth and nothing but the truth, that that information which we obtain from you we can use in a court of law, in trial; do you understand that?
A. Yes.
Q. The one thing that I would like is for you to give me a verbal response. You have been doing fine so

Page 6

far. And if you do not understand my question, please tell me that you don't understand the question. Is that okay?

A Sure, uh-huh.

Q Are you under any type of medication or any kind of emotional problem in which you don't feel like you can testify fully today?

A. No.

Q Okay. Where do you live?

A 318 West Adams.

Q Okay, and what is your marital status?

A. I'm single.

Q Okay. Do you have any children?

A. No.

Q Okay. As far as your educational background, where did you go to high school?

A. Brownsville High.

Q Okay. And did you go to college?

A. Yes.

Q Where did you go?

A. I went to Texas Southmost College and Texas A&I. I did a -- I had a fellowship to Trinity University and a fellowship to Harvard.

Q. And where else?

A. Harvard.

Page 7

Q. Okay. What was your degree from at Southmost, Texas Southmost?

A. I was -- I started out pre-med and changed to journalism.

Q. Okay, so your degree was in journalism?

A. Uh-huh.

Q. Okay. At Texas --

A. I'm sorry. It was journalism when I finished. I started out --

Q. Pre-med.

A. -- pre-med or biology and finished in journalism.

Q. Okay. Was that a B --

A. A BA.

Q. -- A? At Texas A&I what did you study? What is the --

A. I studied journalism and biology.

Q. Oh, how many years did you go to Texas Southmost?

A. One and a half years.

Q. Got you. And you concluded your degree, studies --

A. Right.

Q. -- at Texas A&I?

A. Right.

Page 8

Q What were your fellowships for at Trinity and at Harvard?

A. At Trinity it was a new program in community health administration.

Q Okay. And what did you do there? I mean, what kind of a --

A. I didn't finish. I had an accident so I bailed out.

Q. Okay.

A. Actually, it was a long distance learning. I did some didactics on campus, and then you basically worked and did the remainder of the didactics at the workplace.

Q. Okay. And you say you didn't finish. You just basically -- you had --

A No, I had an accident that --

Q. Car accident or --

A. It was a freak accident. I fell out -- fell off some stairs and broke my knee and both ankles and was incapacitated for quite a while.

Q Okay. Then that basically ended that fellowship?

A. Uh-huh.

Q. You went back and you did another fellowship, you said, at Harvard?

Page 9

A. At Harvard, uh-huh.

Q. What was that for?

A. That was a -- again, that was a certificate program with a Cosmo fellow -- as a Cosmo fellow for public administration, public health administration, at the John F. Kennedy School.

Q. And what did that entail, what kind of work did you do there or what kind of --

A. It was six weeks didactics, and then I had a year to complete a report that then had to be presented to the foundation that funded the fellowship. The major adviser was Dr. Schlesinger.

Q. And did you complete that one?

A. Yes, I did.

Q. Okay. Timeframe-wise, approximately what years did you do the --

A. Let's see, I don't remember exactly. It was somewhere in the '70s, late '70s, for Trinity.

Q. Okay. And the one for Harvard came after so --

A. So '90 or '91.

Q. Okay. Do you have a resume? Have you ever prepared a resume?

A. Yes.

Q. Okay. How -- when did you do your most recent resume?

A. Gosh, to be honest, I don't really keep up with it. I -- my secretary kind of handles that.
Q. Okay. Did you -- as far as your education goes, do you have any other education with regard to a degree and stuff?
A. I'm currently -- I'm currently in the masters of public health program at UT -- UT Houston.
MR. COWLEY: Be sure to let him finish a question before you start --
THE WITNESS: Okay.
MR. COWLEY: -- for the benefit of the court reporter.
THE WITNESS: All right.
Q. And how many years do you have into that?
A. Just a year.
Q. You're commuting? Is that the way you go to these classes?
A. No, they have interactive and a branch here in Brownsville.
Q. Okay. With regard to the fellowship that you did at Harvard, what foundation sponsored the fellowship?
A. It came through Cosmo, which is a Hispanic health organization out of Washington DC, and they got money from another foundation, and I don't remember if

it was -- I think it was Johnson & Johnson, the Johnson Foundation.
Q. Okay. And that program was for Hispanics; is that what it was?
A. Yes, it was.
Q. Okay.
A. There were five fellows in my class.
Q. And you're -- what background do you have ethnic-wise?
A. I'm sorry. I don't --
Q. Do you consider yourself Mexican-American, Cuban-American?
A. Mexican-American.
Q. Okay. What -- are you involved in the community with different organizations and different foundations, groups, you know, social groups and all that?
A. I'm involved with -- actively with the church.
Q. Okay, which church?
A. Christ the King.
Q. Okay. Is that the only place that you're involved -- well, what do you do at church?
A. I -- I'm a lector and a eucharistic minister, and I am -- I also lead a Bible class.
Q. Okay. Are you involved with any political

action groups?
A. Not currently.
Q. Which ones have you been involved in in the past?
A. Valley Interfaith.
Q. Okay, any other ones?
A. No.
Q. Have you ever been a member of La Raza?
A. No.
Q. Have you ever been a member of any active, you know, political group for a certain, let's say, ethnic background?
A. No.
Q. Okay. What other organizations or political groups or civic groups have you been involved in besides Christ -- well, Christ the King is your church?
A. Uh-huh.
Q. -- and Valley Interfaith?
A. Are you asking throughout my entire life or --
Q. Just go back ten years.
A. Ten years. I was involved with the Audubon Society, the Gorgas Science Foundation still.
Q. Now, is the Gorgas Science Foundation, is it like through the college now or --
A. It's private nonprofit but, yes, affiliated

with the university.
Q. Okay.
A. Under the -- actually, technically under the auspices of Texas Southmost College.
Q. Yeah, I thought somehow that was now connected. Any other organization?
A. Not that I can recall.
Q. You are presently employed with the -- who is your employer?
A. Brownsville Community Health Center.
Q. Okay, and what is your title there?
A. Executive director.
Q. So basically you're -- what is your responsibility there?
A. Well, my chief responsibilities are to ensure that we have the necessary funding to fulfill the mission statement.
Q. Okay.
A. And to make sure that the regulations that govern healthcare are followed.
Q. Okay. Do you remember -- do you know what your mission statement is?
A. Verbatim?
Q. No, I mean, just off the top of your head, in part, in general.

A. Yes, to provide healthcare for the residents of the City of Brownsville, particularly the underserved, and that should be primary healthcare.
Q. Now, as far as when you started working for the health centers, did you get the job of executive director right off the bat or did you move up the ladder?
A. No, I got it right off the bat.
Q. Okay.
A. I came from another clinic.
Q. Oh, okay. What other clinic did you work for?
A. I worked for Su Clinica Familiar in Harlingen.
Q. Okay. And what was your position there?
A. I was administrative assistant and personnel director.
Q. And is there a reason for you leaving Su Clinica Familiar?
A. Yeah, they asked me to apply for this position. I always lived in Brownsville so it seemed time.
Q. Who asked you to apply for the position?
A. Actually, I had some board members approach me and --
Q. Okay. And who -- which board members?
A. Gosh, let's see, there were three people. One was, I believe, Lois Del Castillo, Jaime Chahin.

Q. Chahin?
A. Chahin, C-H-A-H-I-N.
Q. H-I-N.
A. He's no longer here.
Q. Is Ms. Castillo there? Is she a board member?
A. You know, I haven't seen -- no, she's not a board member anymore.
Q. Okay.
A. I haven't seen her in a while. And another person was Sarah White, and she was -- I could be wrong, but I -- she was working for the City of Brownsville, but she was on the board of directors at the time.
Q. Okay.
A. She's also no longer in town.
Q. When was it that you worked -- well, how long have you been the executive director for the clinic?
A. A little over 16 years.
Q. Okay. Can you tell me a little bit about your duties -- besides, you know, fulfilling your mission statement, what typically are your duties that you would have as the executive director?
A. Well, I mean, I do public relations, I do -- I do reports, I do -- I am responsible for answering to the board of directors, I oversee the hiring and firing

of staff, I look for money
Q. Do you -- are you involved in making sure that the organization follows federal and state regulations with regard to different reporting --
A. Yes.
Q -- deadlines? With regard to federal employment statutes, are you involved in them?
A. Yes.
Q Are you the one that's responsible for making sure that the, you know, COBRA has been -- the COBRA letters have been given to the employees and stuff when they have separated or have been terminated?
A. Could you -- can you restate that?
Q. Are you the one that's responsible to ensure that the employees have continued -- have the option to have continuing insurance?
A. Yes.
Q. After they have been terminated or something like that?
A. Yes.
Q. Let's see, one of the things that you say is that -- and let me ask you one more quick question. The Su Clinica Familiar, how long did you work there?
A. Ten years.
Q Okay. So basically the two jobs that you have

had in the last 25 years have been in those two particular places; is that right?
A. That's correct.
Q. Okay. Who is the persons that you would talk to at Su Clinica Familiar? Who was your supervisor, if any?
A. I had three supervisors over the time that I was there. The first one was Daniel Hawkins. He's in Washington DC now.
Q. Okay.
A. And Francisco Gonzalez.
Q. Okay.
A. And Carlos Trevino, sandwiched right in between Dan and Francisco.
Q. Okay. Are Francisco and Carlos still there?
A. Carlos is off on some island someplace. I'm not sure where.
Q. Lucky man.
A. Yeah. And Francisco is retired.
Q. Does he live here in the Valley?
A. He lives in Harlingen.
Q. You said you oversee the hiring and firing of staff. Did you oversee the hiring and the firing of Paul Kavanaugh?
A. Could you explain what you mean?

Q. Well, did you make the ultimate decision to --
A. Yes.
Q. -- fire Paul Kavanaugh?
A. Yes.
Q. Was it your decision alone, or was the decision made in conjunction with other people?
A It's -- it was with other people.
Q Okay, what other people did you consult with?
A Emily Alpert and Hilda Gonzalez. Emily Alpert, A-L-P-E-R-T.
Q. Okay.
A. And Hilda Gonzalez.
Q. And, now, what is Emily Alpert's position?
A. She's the director of operations.
Q. Okay. Does she -- is she Mexican-American?
A. No.
Q. What is her age?
A. She's like 48.
Q. Okay. Director of operations, what -- is that a direct supervisory position over Paul Kavanaugh?
A. Yes.
Q Okay. What about Hilda Gonzalez, what is --
A. She's our personnel manager or human resource manager.
Q Okay. And how did she get involved in the

decision for termination?
A. She's the one that makes sure things are in place so that we are doing things according to our policies. She also maintains the personnel files.
Q. Anyone else assist you in making the decision besides Emily Alpert, Hilda Gonzalez and yourself?
A. His file, his personnel file.
Q. His personnel file. As far as people go, did you talk to any other person to make that decision?
A. Not to make the decision, no.
Q. Generally, not getting into detail because I'm going to give you his personnel file in a little while, but what was the basis of his termination?
A. Well, he had a lengthy history of things that were not acceptable as a manager, as a director/supervisor, and there had been a number of serious issues that had been discussed with him, and there had been some recommendations so that he could improve. He had ignored those recommendations.

And we had counseled him again and again, and at one point I asked him to consider taking another position because I felt like we were -- I was spending most of my time and his supervisor was spending most of her time putting out fires that he created and felt that he really did not or could not supervise people.

He had some talents, but supervision was not one of them.

So he asked me for three weeks to think about it. I agreed. I told him that I was offering him this other position as a lateral transfer but would have no supervisory responsibilities. He said he was going to think about it.

Three weeks passed, and I approached him and I asked him if he had thought about it. He said yes and that he felt that I was wrong, that he was, in his mind, an excellent administrator and supervisor and that that's what he felt he wanted to be.

I told him that that was not one of the options, and I said, "Look, you know, think about it overnight. Tomorrow let's talk about it in my office. Let's talk about it again," and he just nodded his head up and down, didn't say much, and I walked out of his office, went to my office.

The following morning I had advised that after that -- I had advised his supervisor that I had talked with him but that I -- you know, his response had been that he didn't feel he wanted to take that position, that he felt that he was an excellent supervisor and administrator and that's what he wanted to be and so that I had asked him to meet us in my

office in the morning at 8:00, and she said, "Okay, I will be there."

So the following morning, Emily called me in my office and she said, "I'm in my office. As soon as Paul gets there, let me know."

8:30, 9:00, he didn't show, and finally I got a phone call from her saying, "I found him."

And I said, "Who?"

And she said, "Paul."

And I said, "Where is he?"

And she said, "He has been right next door to my office conducting his own meeting with his staff."

And so I said, "Okay, well, see if you can get him to come to the office, and let's just fix this. Let's just -- this is it. Clearly he's not going to listen to you. He's not going to listen to me. There is no other alternative."

We brought him in and I spoke with him and I told him that, you know, he was insubordinate at that point and he had clearly been told to meet with me in the morning. There was no remorse. He was, you know, blank, so I terminated him.

Q. When you talked about his supervisor just a second ago, are you talking about Emily?

A Yes
Q The person that --
A. Yes, Emily Alpert
Q As far as -- okay, I'll get into some detail a little bit about that later Let me -- Hilda -- is it Gonzalez?
A. Yes
Q. Was she involved in the meeting -- was she to be involved in that meeting, also?
A In that particular meeting?
Q Yeah.
A. No.
Q. Okay. And Hilda Gonzalez is Mexican-American, also?
A. Yes.
Q. And do you know what her age is?
A. She's between 32 and 35. I'm not really exactly sure.
Q. Okay. Do you know if Mr. Kavanaugh had a prior scheduled meeting at the same time that he was supposed to have a meeting with you?
A. I do not.
Q. When you said that that was it, did you have an option to transfer him, you know, laterally?
A. Yes.

Q. And you opted not to do that?
A. I opted not to do that.
Q. I'm going to hand you what you produced for me, which is the policy manual that was apparently existent on the day that he was terminated. Can you look at that and tell me if that's correct?
THE WITNESS: I don't remember Paul's termination date.
MR. COWLEY: July 26th or 27th of 2000.
THE WITNESS: Okay.
MR. COWLEY: While she's looking, I just want to put one objection into the record. When you asked about COBRA, the responsibility for sending out a COBRA notification is defined by law and it falls under the plan administrator, so I don't assume you were asking if she is the plan administrator. Her answer was just with respect to what she felt was her obligation within the organization.
A. Yes, this looks like it's it.
MR. ZABARTE: Okay. Now that you have couched that objection, Ray, let me --
Q. Who is your plan administrator for COBRA?
MR. COWLEY: You don't need to guess. If you don't know --
A. I don't know.

MR. COWLEY: -- we can provide -- that would be in the summary plan description, and if you would like that -- Mr. Kavanaugh should have it, but if he doesn't, I'll provide you with one.
Q. I would like to go ahead and attach this to the deposition, as Exhibit 1 to the deposition.
MR. COWLEY: I see sticker numbers on here. I assume I gave you this.
MR. ZABARTE: Which sticker numbers? Yeah, the Bates stamps, that came with it. The only thing that's there is what I'm going to cover up right now which is when we received it.
MR. COWLEY: Yeah, okay.
Q. Okay, Ms. Gomez, I would like you to look at that policy manual and tell me basically when that policy manual took effect.
A. It says that it was approved or reviewed April 2000, and that generally means that that's when the board approved it.
Q. Okay, so prior to -- at the time when Mr. Kavanaugh was hired there was another policy in effect?
A. Probably.
Q. Is that the policy that's in effect today?
A. No.

Q. Okay. When did the policy change?
A. It was reviewed and approved sometime this year. I can't give you exact dates. I'm not really sure.
Q. Okay, like in the summertime this year?
A. I'm thinking it was in the spring, but I could be wrong.
Q. Okay, but this was the policy that was in effect at the time that Mr. Kavanaugh was fired; is that right?
A. Yes, yes.
Q. Is there a policy there for termination? And let me be a little more specific. Are there guidelines there for termination?
A. Yes.
Q. Okay. Where would they be?
A. At Section XII, 12.01, 12.02, 12.03. There's also under Section XI, 11.05, and I guess applicable would also be 11.06.
Q. Okay, and as far as -- what is the process to be followed before you terminate an employee, pursuant to the policy?
A. I'm sorry. Could you state that again?
Q. What process do you follow before you terminate an employee?

A. Well, all terminations are a little bit different. They are not all the same, so depending on the situation The ultimate responsibility is mine, and so the ultimate would be a letter from me

Q. But do -- so basically you're saying that it is very subjective when you make a decision to terminate an employee?

A. It depends. There are situations where clearly there are violations, major violations.

Q. But basically, in this situation, was there -- you know, you were saying that it depends on the situation. Was it a subjective decision to terminate him?

A. No, it was not subjective. It was objective

Q. Okay, what was the -- what were the reasons that -- you know, based on the policy, because I want to know, you know, the objective reasons you would have some kind of guidelines that you followed in order to terminate him. How did he get terminated? Was it because of major violations, specifically which ones?

A. There was --

MR. COWLEY: I'm going to object to the form of the question. There's several questions including an instruction or testimony from counsel within it, and I object to the form

Q. What I'm asking you, Ms. Gomez, is did you use your policy -- did you follow your policy with regard to the termination of Mr. Kavanaugh?

A. Yes.

Q. Does your policy have steps before you -- that you need to follow before you terminate an employee?

A. There are guidelines that you can follow.

Q. Did you say, "Guidelines if you can follow"?

A. That you can follow.

Q. Oh, that you can follow. And as far as guidelines go, what guidelines did you use to terminate Mr. Kavanaugh?

A. Well, if you have a copy of the termination letter, I think I can show you.

Q. Unfortunately -- I am going to give you a copy of his personnel file and we'll attach it.

MR. ZABARTE: It sounds really weird, guys, but I'm going to tell you what I don't have. I have his termination letter, but I have two pages of the termination letter and I don't have the last page. And these were all stamped, I guess, from your office, Ray.

MR. COWLEY: It may have just been a mistake in copying.

Q. I am going to ask you, Paula, if you can take a

break from looking over that, what objective factors did you use or consider in making your decision to terminate Mr. Kavanaugh?

MR. COWLEY: I think her answer was that she wanted to see the letter. I have a copy of it here, if you would like to make a copy, and this is the one that was intended for you. This is the three pages.

MR. ZABARTE: Okay.

MR. COWLEY: We can take a break if you would like to make a copy.

MR. ZABARTE: Okay, if you will make a copy so we can mark that.

Q. As far as any objective factors that you considered to get the decision to terminate him, what are they?

A. 11.05, Page 33, "An employee may be dismissed for a single act of gross malperformance or misconduct, a series of three written reprimands or infractions of BCHC standards of conduct or failure to complete a probationary period satisfactorily. Documentation may be written before or after dismissal depending on severity of the situation."

Q. Okay, of those three, is it every single one of those factors?

A. It's a -- yeah, it's a whole series of things. It was problems and issues, having been put on probation, continuing to do what he wanted to do, failure to even notify his supervisor that he had chosen not to go on specific training for supervisors, even though we had paid already for him to go.

He -- I mean, it was just a whole series of things that he just chose not to do, the culmination being he just didn't show up for a meeting that he was scheduled for and didn't think anything of it and did not notify me, nor his supervisor, that he was not going to do that. That's insubordination, by the way.

Q. Did -- well, did you -- do you believe that you followed your regulations --

A. Yes.

Q. -- with regard to his termination and with regard to his probation or anything --

A. Yes.

Q. -- you did? Okay, I want to go ahead and get it --

MR. ZABARTE: Can you get a copy, David, of that?

MR. HORTON: Yeah, I will.

MR. ZABARTE: Well, no, we'll take a break later on and we'll attach it.

Q But insofar as your policy where grievances are concerned, what policy is there for Mr. Kavanaugh to grieve your having fired him?
A I believe at that point we had already -- the board had already moved to complete the grievance process with me as the executive director so there really was no appeal at that point. However, we did allow him to go to the board if he wanted to, and he did.
Q Okay, but there was no policy in that manual for him to grieve a decision of termination; is that correct?
A. Yes, there is. The situation, however, is such that the grievance policy states that the ultimate place would be at the executive director's office.
Q Right, so he can't appeal your decision?
A. He can't appeal my decision, no.
Q. Okay. And that is with regard to the policy of April of 2000; is that right?
A. Right, uh-huh.
Q Do you know if the prior manual had a grievance process in place whereupon the individual can then appeal to the board a termination?
A. Yes.
Q Okay. And so the policy changed about two

months before he was terminated; is that right?
A. Four months. It's April.
Q. April and he was terminated in --
A. July.
Q. -- July? Do you know if the policy today is that they can -- that they can grieve a decision of termination from the executive director to the board?
A. No, the policy is the same, as far as I know.
Q. They cannot grieve it, as far as you know?
A. The board has chosen to keep it as such.
Q. Okay. But prior to that he could have gone directly to them as part of the grievance process?
A. There was a time where they would go to a committee that included board members and staff members.
Q. As far as -- I want to go ahead and have you look over that -- the personnel file that I was handed, and I would like to attach it as Exhibit No. 2 to the deposition. And I would like to also include, if I can do this, Exhibit 2-A. I would like to just include a copy of the --
MR. ZABARTE: David, did you get two copies of that?
MR. HORTON: Yes, this copy is for you.
MR. ZABARTE: I would like to attach that.

This is 2-A since it's part and parcel of the same thing. It's just one page was missing.
Q This is the personnel file that I was handed of Mr. Kavanaugh. I particularly have a question as to -- it would be your Bates stamp No. 9 in that policy manual.
A. I'm sorry. I don't know what Bates stamp is.
Q. It's the little numbered pages, at the bottom. Okay, could you identify that for the jury?
A. This is a memorandum from our human resource manager to the assistant controller regarding the final check for Paul.
Q. Okay. And that -- basically would you agree with me it says that his termination was for cause?
A. That's what the letter says.
Q. Okay. What does "for cause" mean?
A. There's a statement in the personnel policies that talks about at will, an employee at will, that says, "At will further indicates that the employment can be terminated by either party with or without cause at any time during employment."
Q. Okay. Did you say that -- was he fired for cause? Is that your opinion?
A. Yes.
Q. Okay. What does "for cause" mean?

A. I believe you just asked me that.
Q. Well, but the answer that you gave me basically says that, you know, it's an at-will policy. That doesn't mean anything for a description. I want an objective reason as to what is for cause. What do you rely --
A. There is a reason for his being fired.
Q. Is there a definition of "for cause" in that policy manual?
A. I couldn't tell you for sure. I haven't read it all.
Q. Well, can you look at that?
MR. ZABARTE: Okay, I'm going to -- we'll take a break for a few minutes and let her look through the policy.
MR. COWLEY: Okay.
(Brief recess)
Q. Okay, we've been off for a while. You have had a little time to review the policy manual, and what I wanted to ask you is did you see if there was a definition of "for cause" or -- yeah, "for cause" in the manual?
A. There really is no definition, per se.
Q. Okay. And so -- and there's no guidelines to say what's "for cause" or not "for cause" or anything

like that in the manual?
A. No.
Q Is that right? So when you said and when it was written down that it was for cause, it's basically a statement made -- was it a subjective decision to say that?
A. It's not subjective.
Q But no basis in your policy to say that it's for cause?
A. I'm not sure. Could you reword that?
Q Well, you didn't follow any particular guidelines or any particular thing to say it's for cause. It doesn't fall under a definition that the health center -- community health center manual says, "These things are for cause."
A No, there is no definition of cause in the manual.
Q. So there's -- so the decision to state that it is for cause is a subjective decision?
A. It's a subjective decision to write that as part of the sentence.
Q Okay. Have you ever applied that standard? Have you ever said somebody has been terminated for cause for anybody else?
A. I couldn't tell you absolutely because I can't

tell you a person or situation.
Q. Can you remember whether within the last year you have said anybody was fired for cause, other than Kavanaugh?
A. Yes, yes.
Q. Okay, who? Who else would that be?
A. There were five people that were fired in the last few weeks.
Q. And what was -- and that was for cause, also?
A. Yes.
Q. Who were those five people?
A. Gosh, I can't give you names. I don't -- I can't give you names off the top of my head.
Q. What was the reason?
A. Failure to report missing money from their money bags.
Q. All five of them?
A. Yes.
Q. And what was their title, job titles?
A. They were billing clerks.
Q. Who did they work under?
A. They work under Patti Cisneros.
Q. Anybody else that you state has been terminated for cause maybe within the last five years?
A. I can't remember off the top of my head.

Q. Okay, but there's nothing in the manual that says there is a definition for "for cause"?
A No.
MR. COWLEY: That's about the fourth time you have asked it.
Q. Okay, I would like for you, when and if you do recall other people that you have terminated for cause within the last five years, that you list them for us. Would you agree --
MR. COWLEY: She's going to testify to what she can recall. If you have other questions, you can address them to me. She will tell you what she's able to recall now. We're not agreeing to leave blank spots and to add to the deposition transcript.
MR. ZABARTE: Okay.
MR. COWLEY: If she recalls them within the course of the deposition, she'll certainly tell you.
Q. If you recall anything between now and the time of trial which changes the story, which I have asked, you know, as far as within the last five years, who you have terminated for cause, would you inform your attorney of that?
A. Sure.
Q. Okay. I assume that he would supplement the

deposition, which is part of discovery. I was looking over the memorandum that you gave, which is his letter of termination, which we have attached to his personnel file, and it seems like the termination really was based on insubordination; is that correct?
A. That was the last straw.
Q. I mean, apparently you wrote in there that you were going to be fair with him and that you were going to -- that he was an asset to the health center; is that correct?
A. Yes.
Q. And you basically, you know, tell him that he -- you appreciate -- you believe that he has a commitment to the program and to the health center and that -- and it seems to me that what you're basing your opinion there on is -- has to do with insubordination, that he failed to come to a meeting at 8:00 a.m.; is that correct?
A. I said before that it was the final straw. There was a whole series of other things that was also being weighed.
Q. And those other things are documented in his personnel file or is it in this letter?
A. They are written right there in this letter.
Q. Okay, did you get all of this information from

Page 38

your own notes or from other parts of his personnel file before you wrote this?
A. From speaking with his supervisor, Ms. Alpert.
Q. And it's Ms. Alpert that kept all the notes, basically, from what you're --
A. Yes.
Q. -- referring to here? Did you review the personnel file before you made the decision?
A. I had been reviewing it all along.
Q. Okay. How long had you been reviewing his personnel file?
A. Probably since the first time that the human resource supervisor came in and told me that we had some complaints on him regarding his telling staff that they were possessed and that they needed exorcism.
Q. Did -- how long ago was that?
A. I can't tell you for sure.
Q. You can't tell for sure. Was it over five months before he was terminated?
A. Let's see, it would have been probably four -- five months before, yeah.
Q. At that time, you were monitoring him; is that what you're saying?
A. Yes, uh-huh.
Q. With regard to your meeting with him that you

Page 39

wanted to have at 8:00 a.m., did -- when was your meeting before, scheduling your first meeting? Was it by yourself with him?
A. I'm sorry, what --
Q. Were you by yourself with him when you were scheduling the meeting for 8:00 a.m.?
A. Yes, I was.
Q. Okay, there was nobody else with you at the time?
A. No.
Q. Okay. Did he tell you that he was going to be there at 8:00 a.m.?
A. He nodded his head yes. He went like this, nodded his head up and down.
Q. Okay. Have you ever had any other person who was late to a meeting or did not show up for a meeting, did you ever write them up for insubordination?
A. Not if they came in and said they had a flat tire or they had a problem or they couldn't get to a phone or anything like that.
Q. Has anybody ever walked in late to a meeting with you without giving you any kind of forewarning?
A. Yes.
Q. Have you written them up for that?
A. I'll repeat, not if they had given me an

Page 40

excuse, a reason, even if they said, "I forgot we were having a meeting."
Q. Did you allow Mr. Kavanaugh to give you a reason for why he did not show up at 8:00 in the morning?
A. Yes.
Q. What did he tell you?
A. He said that he didn't see any point in coming to the meeting.
Q. Had you told other people that you were going to meet with him at 8:00 in the morning?
A. Emily.
Q. Only Emily?
A. Yes.
Q. Is she the only person that was going to be there, also?
A. Yes.
Q. And when did you tell her?
A. As soon as I got back from the office, from Paul's office.
Q. So that would have been at noon, the day before?
A. Yes.
Q. Have you ever subjected any employee to discipline for being late to a meeting within the last

Page 41

ten years?
A. Can you restate that?
Q. Have you ever subjected any employee to any kind of discipline with regard to being late to a meeting within the last ten years?
A. Discipline meaning what?
Q. Write them up, reprimand them, put them on probation, different things.
A. Yes, uh-huh.
Q. Okay, who did you do that to?
A. Gosh, I don't remember.
Q. Within the last five years?
A. I can't give you names. People are late.
Q. Okay. So there are people that do come in late and you're saying that you do --
A. I do tell them --
Q. -- reprimand them in some way?
A. -- that this is not acceptable if there is no reason for it.
Q. Have you terminated an employee for that?
A. No.
Q. What was Mr. Kavanaugh's job description?
A. He was the director for the campus care centers.
Q. Okay. Did you have a job description for him?

Page 42

A. Yes.
Q. When did you provide a job description for him?
A He and Ms. Alpert worked on it when he was hired.
Q When was it completed?
A. I couldn't tell you.
Q. If you want to look at your -- it's Exhibit 1 or 2, the personnel file, No. 28, Page 28, is that the job description that Mr. Kavanaugh had for his job?
A. It's signed by both Emily and Paul. I'm assuming that it was. It was the last one.
Q. Okay, and when was the job description given to him?
A That particular one was signed in May of 2000.
Q. You imply that there are different job descriptions that he's had; is that correct?
A Job descriptions are things that change with time.
Q. Has any -- I don't see anywhere in that policy manual or in any personnel manual any other job description.
MR. COWLEY: You said "personnel manual." Did you mean personnel file?
MR. ZABARTE: The personnel file. Excuse me, Ray.

Page 43

Q. Is there any other job description in there that he's ever had?
A. I know there was another one that was being used by a previous director. I do not know for sure if he ever signed one like that or anything a little bit different.
Q. Okay. Would any other job description be included in that personnel file?
A. I really can't tell you. I don't keep track of everybody's files.
Q. Typically, are they removed from the file?.
A. I don't know. The rules change.
Q. Okay. So basically this particular job description was given to him on May 8, 2000, which is approximately a month and a half or two before he was fired; is that right?
A. That's what it says.
Q. So what part of that job description did he violate? What did he not do?
A. Actually, there were several areas where he did not perform up to par.
Q. Okay. Can you point them out, please?
A. Well, No. 3, "Develops plans for the future expansion and permanent funding of the center's school-based and community-based youth health services

Page 44

program and teen clinics."
Q. He did not do that?
A. He did not complete that.
Q. Let me -- before you go -- he did not complete that because --
A. I don't know why.
Q Was he supposed to complete it at any given point in time?
A. We were running out of funding by August. He was terminated in July. There was money that was not planned for that would have been missing.
Q. If he was terminated in July and the funding runs out in August, when does he have to get everything out?
A. As a director, depending on where the funding sources are coming from, you usually plan way in advance, don't wait until the last month.
Q. Do you know that he is the only person that can do that kind of application, or can someone else?
A. There are other people that can do it, but he was to lead that part.
Q. Is this a collaborative effort?
A. Everything we do is collaborative.
Q. Okay, so there's other people there that could have done it; is that right?

Page 45

A. There are other people that picked it up when he left.
Q. And who might they be?
A. The new director.
Q. And what's his name?
A. His name is Alix Flores. Emily Alpert, Enrique Garcia, Chayo Reyna, Kathy Lawless, those are all people that have picked up and looked for additional money.
Q. All of those people together have done that job that he was supposed to do?
A. Independent of one another, they have looked for money, they have written proposals, have come together to put bits and pieces. They were all people that would have worked with him, had been working with him, to get funding.
Q. All of these people, though, together -- you're saying that they were working under him?
A. Enrique and Chayo are finance people. They would put budgets together.
Q. Okay.
A. Emily and Kathy assisted in the writing and looking for funds.
Q. Okay.
A. And Alix has done that. Alix stepped into

Page 46

Paul's shoes, basically, in his position, and started searching for money and writing proposals.

Q Did you bring that up to his attention before you fired him?

A I brought up to his attention exactly what's written in the letter.

Q Nothing else?

A. No.

Q. Everything that's in the letter is when you -- is what you brought to his attention when --

A. The day that he was fired.

Q. Okay. Before that time, had you brought this particular matter -- and, by that, we're talking about the funding --

A. There were many instances where I discussed with him possible funding sources, areas that he could look for funding, organizations that he could tap for resources.

MR. ZABARTE: I object to the responsiveness of the answer.

Q. What I want to know is, did you tell him that he wasn't doing his job, you know, that he needed to get some funding out, you know, applications out?

A. No, I didn't run on his case, get on his case over that. I didn't beat him over the head over that.

Page 47

You know, he's not a moron. He knows how much money was there. He knew how much -- when the funding would run out. We had -- that's something that we discussed all the time.

Q. Who was "we"? All of you --

A. Emily, Paul himself, Enrique.

Q. Did -- okay, now let's go to another part of his job description which you say that he failed to do.

A. Completing, files pending quarterly and annual reports with funding agencies such as the Brownsville Independent School District, private foundations, Texas and federal departments of education, department of health.

In particular, there was a tremendous dragging on his part in completing reports for one of the foundations for alcohol and drug abuse. And the only reason I found that out was because the liaison, the community liaison, called me and said, "You know, I keep talking to this man who keeps telling me he's going to submit the report. He hasn't submitted the report. He keeps giving me promises of when he's going to do that, and I just called his secretary and I was told that he's on three weeks vacation and I still don't have the report. He's behind by almost a year."

Q. Okay. Did you bring that up to him?

Page 48

A. I most definitely did when he got back, and I brought it up to his supervisor, as well.

Q When did he go on vacation?

A. I don't know. I don't -- I can't give you dates right now.

Q. Was it, like, within the time that he was -- you know, within the last six months before he was terminated?

A. I don't know. I remember he was going to go to a seminar or something like that, a convention, and then from there he was going to take an additional two weeks off, so he was gone for three weeks.

Q Was that right before his termination or, you know --

A. No.

Q. -- six months before?

A. It had to have been something like that.

Q Okay. Did you ever document that he did not do this?

A. That was his supervisor's responsibility.

Q. Okay, do you coordinate with the supervisor? Do you tell them, "I talked to him. I got a call" --

A. Yes, I do.

Q. Okay. So if it's not in any of the personnel files, it's because she didn't document that?

Page 49

A. It could have been a verbal warning, which does not have to be written.

Q. You're not sure if that happened or not?

A. She told me that she had talked to him about it and that he had promised that he would write the report. He eventually wrote it.

Q. But there's no way to verify that; is that correct?

A. I don't know if she keeps notes to herself. I think she may have something along those lines, but I can't speak for her.

Q. Okay. Okay, what else did you say that --

A. There was a problem with Item No. 8 and particularly with his relationship with the school district health services director.

Q. Okay, and what is that person's name?

A. Anna Milan.

Q. Okay. Is Anna Milan -- did she complain about him?

A. She did, uh-huh.

Q. Okay, and what --

A. She complained even at the beginning, shortly after he was hired.

Q. Okay, shortly after he was hired?

A. Yes, it didn't take long.

Q Okay, and is Anna Milan Mexican-American?
A Yes.
Q Did you at that time support Paul Kavanaugh in what he was doing?
A I always supported him.
Q. Okay. Okay, so with regard to Anna Milan, you supported him?
A. Yes.
Q. Did she -- if this -- is Anna Milan -- could you give me a little bit of background about her? Was she --
A. She's an RN. She's health services director.
Q. A what services --
A. Health services director for the school district. I'm not real sure about what her job description is totally.
Q. Okay.
A. But she is the person that we coordinate with for campus care centers.
Q. Did you ever work with Anna Milan before?
A. Yes, I worked with her or in the same -- in the same organization in the late '60s.
Q. Which organization would that be?
A. Or mid '60s, late '60s.
Q. At Su Clinica?

A. No, I worked with her at what was then Mercy Hospital, now BMC, Brownsville Medical Center. She was a floor nurse and I worked in the emergency room.
Q. Did -- what was Anna's position before working at the school district?
A. I don't know what her job immediately before was. I know somewhere in between, she -- from the time that I first met her, she married Mr. Milan, and he was in the -- he was in the armed services so they left. So I don't know what she did during that period of time. I left, as well, so I didn't see her.
Q. Did she ever work at that clinic?
A. No.
Q. She's never been employed at the clinic?
A. No.
Q. Now, is that something that you discussed with Paul before -- was that a reason for his termination?
A. What?
Q. This complaint about Anna Milan.
A. And your question was?
Q. Was that a reason for the termination?
A. No.
Q. Okay. Where else did Paul have a lack in meeting the standards of his job description?
A. That's basically -- those are the big ones, you

know, aside from the major infraction that I have -- you know, I just felt like he was a detriment at that point. There was no -- he was not adhering to any recommendations that were being given to him to improve on his performance
Q. With regard to efforts made to correct any problems with him, okay, did you try to suggest certain things to him personally?
A. Such as?
Q. "To do this, to help you along or to make you feel satisfied that, you know, you're doing the job that I want you to do so that you wouldn't be a detriment." I mean, you're basically saying he was a detriment.
A There were specific recommendations, like going to specific seminars, you know, checking with his supervisor before he said things that were off the wall, meeting with his supervisor regularly, and --
Q. Now, with regard to the specific seminars that you're talking about, do you know for a fact that he was told there was a seminar that he needed to attend?
A. Yes.
Q. And that he did not show?
A. Yes. He signed off on it. There's, you know, a series of forms that are required in order to approve

travel. Those were signed off. The final sign-off is mine, which means he has to sign it, his supervisor has to sign it, the finance director has to sign it to make sure there's money there for that, and then the ultimate is mine. And that -- all of those signatures were on there.
Q. Okay. Do you know if he discussed the reason for his nonattendance with his supervisor?
A. No, he did not even advise her. He told a finance director who, along with one or two other people were going to be going, that -- something along the lines of, "Aren't you going to go, Paul?"
And he said, "No, I have decided I don't have time for that. I don't need to go."
Q. Okay, is there any --
A. He called me at that point.
Q. Paul?
A. No, the finance director. And he requested if someone else could go in his place because we had already approved it and, you know, the money had already been spent on the seminar.
Q. Okay.
A. At that point I said, "Let me check with Emily. Maybe there's something going on that I don't know." I called her and I said, "Did you authorize Paul not to

Page 54

go?"

And she said, "No, what are you talking about?"

Q Okay. So you don't know if Paul and Emily had had a conversation with regard to not attending the meeting?

A She said that he had not talked to her about not going.

Q Okay. Did she say that there were any alternative plans for him to go to another seminar?

A. No.

Q. Did she -- and you personally did not talk to Paul about it?

A No.

Q. Is that right? With regard to correcting another problem, apparently you wanted to give him a new job description; is that correct? You wanted to transfer him to another job?

A. Yes.

Q Was -- did you propose the new job to him?

A. Yes, I did.

Q. Did you give him a job description as to what he -- what work it would entail?

A. No, we discussed the fact that there was a position that had not been filled and that I felt that

Page 55

that would be something that he could do fairly well. He was a good writer.

Q. What was the position?

A. The job was as a grant writer.

Q. Okay. Has the job description ever been approved by the board or prepared by you?

A. Yes.

Q. Okay. And who --

A. It has been on the board -- I mean, it has been in the approved -- money has been approved for that particular function forever, since -- I'm going to say the '90s.

Q. Okay. But it has never been filled?

A. It has been filled on and off, yes.

Q. Has it been filled since Paul Kavanaugh has been terminated?

A. We have somebody on contract.

Q. And who is that person?

A. Kathy Lawless. And she was on contract at the time, as well. She's been on contract for a long time.

Q. Okay.

A. She was also the person that was there full-time. Her husband was transferred and --

Q. So Kathy --

A. -- lives someplace else.

Page 56

Q. -- was doing that job? You wanted them to fill it from within the department, is that correct?

A. Yes, uh-huh.

Q. Did the salary as to that job get -- does Kathy have a job description as to -- you know, a contract, "This is what you're going to do"?

A. Yes, she has a contract She has an agreement.

Q. Okay. So that position in-house does not exist today; is that right?

A. As a full-time equivalent?

Q. Uh-huh.

A. No.

Q. Did you discuss with Paul as to what his salary would be?

A. I told him it would be a lateral transfer

Q. And by that you mean that it's going to be the same pay?

A. Same, uh-huh.

Q. Ms. Gomez, when you said that Paul would make off-the-wall comments, can you give me, like, an example of the off-the-wall comments that he would give you?

A. Well, the one that sticks in my mind is that he came in and he told me he felt that all of his employees were possessed. I asked him to explain what

Page 57

that meant to him, and he said, "There are evil spirits inside each one of them."

I said, "You mean they are mean-spirited or what exactly?"

And he said, "No, I saw this in Peru. I know exactly what I'm talking about. They are possessed. They need to be exorcized."

Q. Okay. Do you think he was joking with you?

A. No.

Q. How did you deal with him?

A. I asked him what he thought he could do, and he said, "I am planning to get a priest to come in and exorcize them." And I told him that I didn't know any priests in town that might be qualified to do that but that I felt that was pretty drastic and that, "Oh, by the way, this is a secular place. You cannot make those kinds of statements, to begin with," and he might be offending someone if he did so.

Q. Did you -- the fact that he said people were possessed, is that one of the reasons for your termination?

A. No, that was a reason -- one of the first reasons to become alarmed at the way he was or appeared to be communicating with staff. I really felt I had reached him, however, that afternoon. He left my

Page 58

office and went directly to a staff meeting wherein he told them specifically they were possessed and that he wanted to fix it.
His staff was offended and went -- particularly the mid-level practitioners and counselors, they went to their supervisors and complained.
Q. Is that -- did they file a grievance against him?
A. There was a flurry of events. I know that there was discussion with the social workers. I know that a couple of the mid-levels -- I'm pretty sure one of them did write it down.
I know that they did go to their medical supervisor and said that they had never worked in a place where they had been so insulted by anyone and that they took offense to that personally and they wanted an apology, at which point we moved in that direction and requested Paul to call a meeting of the entire group and apologize. And this time I sent our human resource manager to attend this meeting with him.
Q. Did -- should -- the process is for them to file some kind of a grievance against Paul. They have a right to do that under the policy; is that right?
A. Yes.

Page 59

Q. Okay, and that's what would have been called for under the circumstance; is that correct?
A. It would have been called for if they had felt that we were not going to do anything about their complaints, and that certainly was within their rights to do that.
Q. Okay, and none of them did do that; is that right?
A. Obviously they did. They went to their supervisor and complained, which is the first step.
Q. Okay. And, from there, they never took it further?
A. A meeting was called and Paul apologized to them, although not that specifically. He went round and round in circles until he said that he was sorry, and so they swallowed it and went on.
Q. Did you take any kind of adverse action against Paul because of that particular incident?
A. What do you mean by "adverse"?
Q. Did you write him up for that?
A. I spoke with him and his supervisor at the same time.
Q. You didn't put anything in writing?
A. That's the same as a verbal warning. No.
Q. Did you -- other than that, okay, did you take

Page 60

any other type of adverse action against him?
A. No.
Q. Okay. Is that more of a serious matter than the matter where you -- when you -- in your letter of termination when you said he was insubordinate?
A. More of a serious matter?
Q. Yes.
A. At the time, I did not think so. I felt like he was a newcomer to the business and had been working as a missionary before and working in various other capacities and probably just felt that he could pull it off, so I felt he was redeemable. I felt we could work with him.
Q. What -- in the personnel file, can you specifically go through and tell me which documents -- actually, you told me you did not rely on any particular document for terminating him; is that right?
A. That's right.
Q. You talked to Emily, and Emily was the one that gave you --
A. Emily and Hilda.
Q. -- the feedback?
A. Yes.
Q. What do you know about -- I'm going to have you look at the -- it's Page 63 of the personnel file.

Page 61

A. I'm sorry. Did you say 53 or 63?
Q. 63. Do you agree with me that's a letter written by Emily Alpert to Paul Kavanaugh on March 3rd of 2000?
A. Yes.
Q. There are -- do you know anything about a Mrs. Moody?
A. Yes.
Q. What was her complaint about Paul?
A. The complaint was that there were a group of four or five staff that had gone with Paul to a convention in Atlanta, and while there in the lobby of the hotel they were having a discussion and Dori basically asked Paul for a raise.
Q. Wait a second. Who is Dori?
A. Doricela Moody.
Q. Okay.
A. Asked Paul for a raise, and he laughed at her and said, "Bend over and I'll show you a raise -- or give you a raise." She was insulted and complained when she got back. She was highly offended.
Q. Did she talk to you about that personally?
A. She -- I did ask her, yes.
Q. Who did she complain to?
A. She complained to -- she complained to Paul,

Page 62

but she also complained to Emily and to Hilda.
Q Did -- was there ever an incident about laptops being missing with regard to Ms. Moody's laptop?
A There was a laptop missing. She was gone for a while and came back. She reported it missing from her office.
Q Is Ms. Moody still employed by the center?
A. No, she's not.
Q. Is she a -- is she Mexican-American?
A Yes.
Q. And what is her age?
A. I have no idea.
Q Do you know why she's not employed, any of the reasons for her --
A. She resigned.
Q Okay. Now, was her husband employed, also, by the center?
A. Yes, for a short period of time.
Q Was he -- did he get terminated by the center?
A. Yes.
Q. What was the reason for his termination?
A. I don't remember exactly.
Q. How long after his termination did she resign?
A. I couldn't tell you. I don't know.
Q. So what do you recall? I mean, how --

Page 63

A. I recall that Paul hired him to do cleaning in the campus care centers and --
Q. Was he hired by the center and not Paul? I mean, by the clinic?
A. He chose him. Yes, he offered him the position.
Q. Was Paul the only person that gave him the position?
A. We concurred, but Paul had already done his thing. He had already told him he could have this job.
Q. Okay. He -- Mr. Moody did not -- was he terminated by Paul?
A. I don't think his last name was Moody.
Q. Okay, what was his name?
A. I don't remember.
Q. Okay. Did Paul have the ultimate authority to -- did Paul fire him or did --
A. No.
Q. -- the center fire him? Who terminated him?
A. I don't know. I would have to look at his file. I remember that there were some things that were not quite right, and I don't remember -- I mean, I remember signing the letter, the final letter, but I don't remember what the contents of the letter were.
Q. So you ultimately fired him?

Page 64

A Uh-huh. Yes
Q Did you agree with the firing?
A I signed the letter.
Q. Okay. What do you recall were the circumstances at all?
A. I think there were a number of issues. I think, you know, showing up late, you know, some things that were missing that he would borrow and then not bring back.
Q. Okay. So basically would one of those things be the laptop, like a missing laptop; is that a possibility?
A. No, he was gone before that
Q. Had not -- did Paul not call the police to get -- for an investigation with regard to the laptop?
A. Yes, and he did that because I asked him to.
Q. Okay
A. And the reason for that was because we needed to report that to the insurance company and the only way the insurance company would replace the equipment was if we had a police report.
Q Is that incident with Ms. Moody that she complained about, is that more of a serious thing to you than not showing up for your meeting?
A. What?

Page 65

Q. The alleged incident with regard to Mrs. Moody, what he told her.
A. Which time?
Q. You said that he basically had told her some things at a conference and that, you know, those are allegations made against him. Is that more serious of a matter, to you, than him --
A. No.
Q. -- being late for a meeting?
A. They are different incidents. They are, you know, different times in -- during his employment.
Q. Okay. About how long into his employment did that matter take place?
A. Which matter?
Q. The complaint of Mrs. Moody and/or the lap -- you know, the missing laptop incident.
A. You know, I can't tell you. I don't remember exact dates.
Q. Okay. In that letter they also refer to this incident with the Clearwater staff.
A. Uh-huh.
Q. Okay, do you remember anything about that?
A. I remember that it happened. I don't remember exact dates.
Q. What was the allegation?

Page 66

A. The allegation from staff was that they had been insulted by a professional on their professional performance and that they were being accused of things that were very serious in a very serious nature that they did not take lightly.
Q Okay, the staff at Clearwater, was there not some type of problem with regard to them fighting with each other?
A. I don't know about fighting.
Q Bickering, complaining about each other?
A. Bickering discussion, yes.
Q. And is that an appropriate thing for the staff to be doing?
A I don't know that the whole staff was.
Q. Well, I mean, if you investigated an incident which you know about and the staff complained about him, you had to have figured out what was going on.
A. There were concerns, yes. There were concerns by a lot of different people and his style of managing.
Q. But was the style of managing in reference to the fact that some people were fighting within that staff?
A. It was more than that, a lot more than that.
Q. What was the staff doing?
A. According to Paul, they were not doing what he

Page 67

wanted them to do. He wanted them to paint the offices, and he was refusing to let them go on their leave requests or on their continuing medical education because their office space was not painted.
He threatened them with taking their paycheck or withholding their paycheck and canceled their leave. He talked down to them. He, you know, accused them of being possessed. He was intimidating to them. He would raise his voice to them.
Q. Did they file complaints against him?
A. Yes, they did.
Q. And what happened to those complaints? I mean, did they grieve it?
A. We told them that we would talk with him and, you know, that it was -- that we didn't feel he was doing this to be mean to them, if in fact he was doing it.
Q. A lot of people that you said were concerned about him were -- who were those people? Can you name some?
A. Yeah, Maria Castillo, Rachel Eason.
Q. E-A-S-O-N?
A. Yes. Gloria, Dr. Gloria Kury; Teresa Gomez; Glenda Reiff, R-E-I-F-F. She has a -- she's been married so I don't know what her new last name is. I'm

Page 68

blank again on some of their names. I just can't remember the other names.
Q. Okay. Is Maria Castillo Mexican-American?
A. Yes.
Q. Is Rachel Eason Mexican-American?
A. No.
Q Okay. What is her ethnic background?
A. She's Anglo. I don't know what her ethnicity is.
Q. Okay. Gloria Kury, is she Mexican-American?
A. Yes, she is.
Q. Teresa Gomez?
A. She's Mexican-American.
Q Glenda Reiff?
A. She is Anglo.
Q. Are any of these ladies under the age of 40?
A. Some, yes.
Q. Which ones?
A. Glenda. I think Rachel is.
Q. Is that it?
A. Uh-huh.
Q. Okay. It also points out to some problem with the Lucio staff. What was the complaint there?
A. That was the complaint that -- gosh, there were so many. That was -- the bigger complaint there was

Page 69

that they had not painted their areas.
Q. Is it --
A. And they had requested time off.
Q. So which one was it that was complaining about not painting the areas? Was it Lucio or the other one or --
A. Lucio.
Q. Okay, so the complaint at Clearwater had nothing to do with the painting of their offices or anything like that?
A. No.
Q. Okay. So what you were basically talking about in general there, about the offices and all that, you're talking about Lucio's staff. The problem with the Clearwater staff was what?
A. I don't remember exactly. I mean, there was -- the problem is that the staff was interchangeable, okay? They go and some of the staff is interchangeable. Some of the -- the professional staff.
Q. The -- as far as Lucio's staff was concerned, you're talking about the paint thing, did they not receive monies and supplies in order to do certain work? They requested money and supplies to do certain work?

Page 70

A. Paul requested it.
Q. It was not at their request?
A. No.
Q. You don't believe that they promised to do a certain -- if they got certain supplies and certain things, then they would promise to do certain things?
A. As far as I knew, that's what Paul wanted to do. I mean, I didn't talk to them about, you know, their conversation with Paul. Paul asked if they could -- if he could buy the supplies.
Q. For them?
A. For the staff. I remember discussing with him that he needed to make sure that it was all voluntary or he was going to get into trouble with that.
Q. Did they not believe -- did you have the understanding from Paul that they promised that they would do all this if they were given supplies for free?
A. He said, "I can handle it." He never told me that they had promised anything.
Q. Is it appropriate for them to be -- assuming that they made a promise and they got something for that promise, is it appropriate for them not to have followed through?
A. I don't know what understanding they had between each other.

Page 71

Q. But you ultimately made the decision that you thought it was a problem of Paul's, not theirs; is that right?
A. I recognized that there was a problem when one of them complained to her immediate supervisor, the medical director, that she really needed to take her time off, that she had requested with ample time, to do continuing medical education because it was a matter of licensure, and the medical director asked me what could be done.
At that point, I asked Emily to look into it and she did. She found that not only had he threatened them with revoking their requests but had also threatened them with withholding their paycheck.
Q. Is that something that you gleaned from Emily?
A. Yes.
Q. Did Emily put that in writing?
A. I can't tell you for sure. I don't know.
Q. But you never talked to Paul about that particular incident?
A. We discussed it, yeah, sure, when we had our counseling session together.
Q. Did you talk to him about the fact -- did you ask him, "Did you threaten this," or, "Did you" --
A. I said, "Paul, you can't go around doing that."

Page 72

Q. And what was his response?
A. He just said, "Well, I feel like they should -- what else could I use to get them to paint their area?"
Q. Because he was under the impression that they promised to do it; is that correct?
MR. COWLEY: I'll object.
A. I don't know.
Q. Is there documentation in the file at all with regard to the seminars that he's supposed to have signed up for and -- it says in here that he was supposed to have attended two different seminars.
A. Yes.
Q. And my question is, what seminars were they and where is the documentation of the seminars that he didn't attend?
A. It would be in finance.
Q. And who is the director of finance?
A. Enrique Garcia. But Paul should also have a copy. Those are multi-copied forms, so he gets to keep a copy, his supervisor keeps a copy, and finance has the originals.
Q. And with respect to the Lucio and the Clearwater school, on both of those situations did you have any -- did you ask Paul either to put in writing or ask him, "What is your side of the story, Paul?"

Page 73

A. Yeah, uh-huh.
Q. And you never got an answer from him, or you did get an answer from him?
A. The response is always pretty much the same, "I felt there was no harm in doing or saying what I have done or said."
Q. He told you that verbally?
A. Yes.
Q. As to both incidences?
A. Uh-huh.
Q. Okay, let's -- the first documentation I saw was that March 3rd letter. After that, there is supposedly a situation where Paul was put on probation, and that was on March 23rd. Do you recall that?
A. I remember -- I don't remember exact dates, but I remember talking with him and Emily with reference to, "It's time to put you on probation. I don't know what else to do at this point. I want you to succeed. I want you to change. You know, we've had a lot of verbal communication. You have had a lot of communication with your supervisor. We don't seem to be getting very far."
Q. You told him those things?
A. Yes, I did.
Q. Is there any letter documenting or

memorializing the reasons for his probation?
A That would have been his supervisor's situation.
Q Would that have been put in his personnel file or should have been put?
A. It should have, yes.
Q Okay. Can you look through the personnel file and tell me if you see any letter from his supervisor on or about March 23?
MR. COWLEY: While she's looking, it's 12:00 noon. What's your pleasure about a lunch break?
MR. ZABARTE: Oh, I would like to try to get done with this in less than an hour.
MR COWLEY: Completely done?
MR. ZABARTE: If I can. I'm not sure if it will happen, but I'm hoping because I have got a --
MR. HORTON. Can we go off the record?
MR. ZABARTE: Yeah, let's go off the record.
(Off the record)
Q. Okay, Ms. Gomez, I had asked you previously if there's any kind of a memorandum or some type of a document where there is an explanation or memorializing the reasons for the probation.
A. March 3rd.

Q. Did you find one?
A. March 3rd.
Q Okay, that's what we had just discussed about. I just went through that letter of March 3rd with you, but that's March 3rd, and he was put on probation on March the 23rd. On that day was there any kind of a document put in his personnel file?
A. March the 16th, there's a notice in his file by Ms. Alpert signed by Paul on the 23rd. He signed it on the 23rd.
Q Okay. What is that -- what Bates stamp is it that -- or the number at the bottom?
A. Yeah, it's -- oh, I don't know. 0062 and 0063 and 4.
Q. What -- okay, 0062 is a notice and it says -- it doesn't have any attached memo. What memorandum is attached?
A. The memorandum attached is 0063 and 4.
Q. Okay, so this thing was written on March 3rd and it was then documented by Emily on the 16th of March but was not given to Paul until the 23rd of March is what --
A. I don't know if it was given to him at that time. I think he signed it at that time.
Q. Well, and his probation begins on what date,

according to the policy?
A. It begins on the date that he was told that he was on probation.
Q So it would begin on the 23rd; is that correct?
A. Yes.
Q. Okay, I'll -- if you look at stamp -- well, somewhere around 50, there should be a -- it's a personnel action notice.
A. Uh-huh.
Q. Okay, the one before it. What number -- that one is not numbered. Oh, yes, it is. It's up on top, 49.
A. 49.
Q. That one in particular, does it state when the probation begins?
A. It says 90 days, effective the 23rd of March.
Q. Okay, so presumably that's when he was given notice of something that happened on -- that was documented on March 3rd; is that correct?
A. That's what it says, yes.
Q. Okay. And that probation lasted until June 21; is that correct?
A. Yes, uh-huh.
Q. Did he ever come off of probation?
A. I do not believe so. We continued to have

problems with him as we went on.
Q. Is there any document -- because he didn't get fired until --
A. The 26th.
Q. Of July?
A. Uh-huh.
Q. Any document that tells him that there is a continued probation on him or anything of that sort?
A. Not that I know of.
Q. Does the policy state that you're supposed to give somebody notice that they are off probation?
A. No.
Q. During that time period, did he receive some type of a national award?
A. He did not. The organization did.
Q. Okay. Was it based on something that he had done for the organization?
A. No, it was based on what the team did.
Q. And he happens to be the person that was running the show?
A. He was the director. It was -- it had to do with medical performance.
Q. And --
A. He's not in charge of the medical aspect.
Q. Okay, and so what -- did he not go -- was he

not the person chosen from the clinic to go there and be recognized?
A. Emily requested that he go. I reminded her that he was on probation and according to policy that was not recommended, and her response was, "If we don't get this award, it will be given to someone else, if we don't send someone. I can't go and you can't go," because we had other things that were happening at that particular time And so she said, "Please, please, let me let him go" So I did.
Q. Okay, so Ms. Alpert, then, had him go and --
A. Receive the award on behalf of --
Q. Of everybody?
A. -- Brownsville Community Health Center
Q. Did you have -- can an employee go out -- is that not part of the policy, he cannot go, if he's on probation, to go pick up any particular award?
A. It's not -- when you're on disciplinary probation, basically there is no travel unless you're specifically sent by administration to carry out a function of your job.
Q. Okay, and is that part of -- is that in the policy or what?
A. Yeah.
Q. Where in the policy does it say that?

A. I can't find it. I -- I would have to talk with -- I would have to talk with Hilda because I remember discussing it with her, as well. It may be part of the travel policy. I just -- you know, you have to issue money to people, and if they are on probation, that's not something you do.
Q. Okay, but it's not in the policy that you can tell?
A. Not in the personnel manual, that I can see.
Q. Okay. Please look at that Bates stamp 49 again that I was referring to. And particularly what I'm trying to focus on and what I'm trying to understand is when somebody is given probation on, you know, 3-23, which is March 23, would all of the signatures not have been written down and dated on 3-23?
A. It should have been.
Q. So this is dated almost right before he was terminated; is that correct?
A. Two days before.
Q. And in here it doesn't even have the employee's signature; is that right?
A. That's correct.
Q. And all of the other employee action notices that I think we have in here are signed by everybody on the date in which the effect is given -- the effective

date.
A. Not always.
Q. Or close thereto?
A. Not always.
Q. Well, look at all the personnel --
A. Yeah, look at 52. He's signing on the 20th of February, Hilda signed on the 8th of March, Enrique on the 9th. I signed on the 7th.
Q. 52?
A. Uh-huh.
Q. All within a month period; is that right?
A. 30 days, within 30 days.
Q This one just happens to be done four months later; is that about right?
A. Yes.
Q. Okay. I also wanted to ask you a question with regard to No. 50. That also is an employee action notice; is that right?
A. It's an employee action notice, yes.
Q. And that -- it was effective February 1, 2000, right, the effective date?
A. Yes.
Q. And what I'm -- is this supposed to be for, like, a pay increase or a suspension?
A. It says suspension, but it is a salary increase

and an allocation of a pension plan deduction.
Q. So as far as is --
A. I mean, I'm sorry, an allocation of percentage of his money or his salary going to different pay categories.
Q. So in this particular scenario, it doesn't -- did he ever get suspended that you're aware of?
A. No.
Q. This would be misleading insofar as his record is concerned; is that right?
A. Yes, it would be.
Q. And that's never been corrected; is that correct? I mean, you don't have any --
A. It appears that way. I don't really know.
Q. Okay. There was a letter that was produced by -- in responses to request for production, also, and I did not see it as part of the personnel file. I got it in Responses to Request for Production Nos. 4 and 10. It's a memorandum by Gloria -- I mean, Emily Alpert to Gloria Kury.
MR. COWLEY: You have that backwards. It's from Gloria Kury.
A. It's from Gloria Kury to Emily Alpert.
Q. Okay, what -- are you aware of that memorandum or the existence of that memorandum?

Page 82

A. I knew that something had been written. I don't recall having read it

Q. Okay, and that's something that you didn't look into in making your decision?

A. No, I had heard it -- I had heard it --

Q. But you never --

A. -- ad nauseam. I had heard about this --

Q. Okay.

A. -- from not just her but her supervisor, her medical director, from Emily, from Hilda.

Q. Okay In there they talk about a documentation on March 31st, 2000, that they had some kind of a meeting on March 31st, 2000; is that right?

A. It says, "The memo subsequent to our meeting with Paul Kavanaugh of March 31st, 2000." I don't know what meeting she's talking about.

Q. Okay. There's no documentation -- do you have any documentation or are you aware of any documentation memorializing that meeting with Paul on March 31?

A. I did not -- I mean, I was not at that meeting. I have nothing with reference to that.

Q Okay. And you don't know if any documentation resulted as a result of that meeting; is that right?

A. I don't know.

Q The second sentence says that "The following"

Page 83

-- why don't you read me that second sentence?

A. It says, "The following issues discussed on the above mentioned date have not been addressed."

Q. Does that mean that they never addressed those issues with Paul Kavanaugh at his meeting, at a meeting with him?

A. I have no idea. This was with reference to Emily and Gloria and a meeting they had with Paul, the way I read it. I don't know --

Q. Okay.

A. -- what they discussed.

Q. So basically --

A. I was not there.

Q. -- they are issues that they have but they never really presented to him?

MR. COWLEY: Objection.

A. I don't know. I was not there.

Q. From reading that sentence, is that what you glean from that sentence?

A. I think what she's saying is that Paul made some promises to them and had not complied.

Q. That's your understanding of the sentence that says that there were issues --

A. It says, "Dissemination of healthy schools, healthy communities, grants to mental health

Page 84

personnel." It says, "Mental health personnel have not received a copy of the grant, no response to request for direction in terms of what the mental health staff are responsible for in relation to the" --

MR. ZABARTE: Let me -- I object to the responsiveness.

Q. What I'm asking is, from reading this sentence, is it stuff that they did not discuss with him?

A. No, no, that's not what it's talking about.

Q. Because it says, "The following issues" --

MR. COWLEY: Excuse me. She has answered your question. Do you have another one?

A. That's not what it's talking about.

Q You think that it says that it was discussed with him and --

A. It says "have not been addressed" means he hasn't complied.

Q. Okay. That's the way you understand that --

A. Yes.

Q. -- document? You never got to know any other documentation with regard to the meeting of 3-31; is that right?

A. Right.

Q. You have never seen anything?

A. No.

Page 85

Q. Is Ms. Kury --

A. Dr. Kury.

Q. Dr. Kury, is she supervised by Paul?

A. Supervised administratively, not medically.

Q. Okay.

A. Meaning he oversees --

Q. Paul is her superior administratively?

A. Right.

Q. And I guess this is a followup to my other question, which is, can there be other files on Paul Kavanaugh that other people have that are not in his personnel file?

A. I don't know that there would be files on Paul. I mean, memos that he might have sent to other people that were with reference to issues, ideas, programs, that might be a piece of a bigger thing.

Q. Well, what I'm asking is if there are people that would have complaints about him or documents, you know, memorializing different meetings that they had with him or, you know, lunch meetings that they have had with him that are not in his personnel file.

A. Well, the only things that we would have in the personnel file would be those that would be filed as such, that have the bottom, that are actually either personnel action forms or specific things that refer to

a personnel file such as insurance forms, etc. You know, communications between employees or between a supervisor and employee would not be part of the personnel file unless the supervisor felt it was specific for personnel action

Q. Well, obviously they took personnel action against him, and so what I'm asking is all these memorandums about correcting your behavior, would they not belong in a personnel file?

A. They would if that's the way they were meant.

Q. But if they are not in there --

A. If they are not in there, it's because they are either seeking information, wanting a conclusion to a question, or things of that nature

Q And that nothing really definitive came of that meeting --

A. Right.

Q -- with regard to addressing issues and concerns?

A. Right.

Q. Okay, on July 21, 2000, there were two different memos that were sent by Emily Alpert, and they would be in the personnel file, Bates stamp No. 59 and 61. Is that right?

Ms. Gomez, these two memorandums were put

out on the same day; is that correct?

A. That's what the dates say.

Q. One is addressed to you and one is addressed to Paul; is that correct?

A. Yes.

Q. The one which is addressed -- well, actually, do you know which one was sent out first?

A. No, I do not.

Q. Again, one of those documents refers to a meeting, and I believe it's the one that's Bates stamped 59, the one from Emily to Paul. It refers to a meeting that they allegedly had on 3-23; is that correct?

A. Yes.

Q. Again, there is no documentation in that personnel file with regard to, you know, any memo of that meeting anywhere; is that correct? I mean, if you want to take a moment to look through it, you can.

And while you're looking, is it not typical when you're referring to somebody, you know, at a meeting and if there is some kind of documentation, you would attach it?

A. Some people do. Actually, let's see, there is a form that he signed with reference to poor work performance on the 23rd, and attached would have been

the March 3rd memorandum

Q Okay, so, again, it refers to the incident that was a March 3rd memorandum and which he signed on the 23rd, and we've previously -- you know, you have previously testified about that; is that correct?

A. Right. Excuse me. Yes.

Q Okay, now, the two memorandums that -- the complaints that Ms. Alpert has about Paul are -- bring up different things; is that correct?

A. Yes, various things.

Q. Different things from each other; is that correct?

A. Yes.

Q Do you have any reason why he would tell you certain complaints about Paul and tell Paul certain complaints that are different?

A. I'm sorry. Who are you referring to?

Q. Ms. Alpert, in her letter.

A. That she would tell me one thing and tell him something else?

Q. Yes, in the memorandum.

A. No.

Q. But they are not -- would you agree with me that they are not consistent with regard to the examples that he brings up -- that she brings up?

A. They are not that much different. I think the only -- the only possible thing that she refers to in 61 and does not refer to in 59 specifically was his lack of appropriate communication with Ms. Milan, but the others are -- Gloria Kury and James Hamel were under his purview.

Q. Well, where is that specific, in No. 61, about Gloria Hamel and -- I mean, James Hamel and Gloria Kury?

A. "Ongoing lack of appropriate and timely communication with staff; inappropriate or misleading communication with staff."

Q. But they are not specific as to giving you examples?

A. Right.

Q. If at the meeting on March 23rd, which allegedly took place, he was placed on probation and the ending of the probation period was in July -- or June, why would she wait two days before firing him before writing a memorandum like this?

A. I don't know.

Q. Is this memorandum what prompted you to take your decision to fire him or her to -- is that letter to you what prompted your decision to fire him?

A. It was a culmination of a series of events that

just appeared to not improve that caused the final decision. It was not one thing. It was a whole lot of things.
Q When was your decision made to fire him?
A. When he told me that -- well, when he didn't show up. He just -- that was the end. It was clear at that point.
Q. And at that point you had already read Ms. Alpert's letter and you wanted to transfer him; is that correct?
A. I had offered him a transfer three weeks before.
MR. ZABARTE: I'll object to the responsiveness of the answer.
MR. COWLEY: Well, let's read the question back. You asked two questions at once. Let's have the question.
THE REPORTER: Question, "And at that point you had already read Ms. Alpert's letter and you wanted to transfer him; is that correct?"
MR. COWLEY: And her response was she had offered to transfer him before then. I don't know what is unresponsive about that.
MR. ZABARTE: Let's read the first --
Q At that point you had already read Ms. Alpert's

letter; is that right?
MR. COWLEY: At what point? Do you understand the question?
A. I'm understanding that you're asking me if I had read the letter on the 21st and therefore on the 26th decided to fire him as a result of those two letters.
Q. Okay.
A. Is that correct?
Q. It's fair to understand that. No, what I'm trying to get --
A. Okay.
Q. -- in my question is if you had read her letter, okay, and then tried to schedule your meeting with him. You had a meeting with him shortly before you fired him?
A. No, no, no, I had been waiting for him to come, and it was actually more than three weeks and he had not responded. I just wanted to put closure to things.
MR. ZABARTE: Okay, I'll still object to the responsiveness of the answer.
Q. What I'm asking is, when you said that -- because he did not show up at the meeting was the reason that you finally said that was enough and you wanted to fire him, okay? So you had a meeting the day

before, you had said; is that right?
A. I had a meeting with him, yes.
Q Okay. The day before would have been on the 25th?
A. Yes.
Q. And that was at noon; is that right?
A. It was right before noon.
Q Okay. So it was this letter that prompted you to have a meeting with him on the 25th; is that right?
A. No.
Q. Okay. When did you -- why did you decide to have a meeting with him on the 25th?
A. Because I looked at my calendar. It had been more than three weeks and I had not heard from him.
Q. Okay, was that totally independent from this letter of Ms. Alpert to you?
A. Yes. In fact, I asked her, "Has he told you anything? Is he willing to take that lateral transfer or not?"
And she said, "You know, I haven't heard from him."
And I said, "Well, I think I'm going to drop in on him because it's been more than three weeks."
Q Had you read her letter before you talked to

her?
A. I couldn't tell you for sure. I'm usually running several days behind on my mail.
Q. Okay.
A. I can't swear on a stack of Bibles that I had absolutely read it or not.
Q. But four days later, then, you had the meeting with him?
A. Four days later --
Q. After her letter of July 21st.
A. Yes.
Q. Okay. Did you read the letter, her letter of the 21st, before you met with him?
A. I don't know. I can't tell you for sure. I'm not good on dates.
Q. Okay. I'm going to hand you what has been -- I'm going to go ahead and mark it as Exhibit 3 to your deposition, but it was attached to answers to interrogatories which you verified. What I'm trying to find out from that Exhibit A is what are exempt employees? Why are they called exempt employees?
A. Exempt employees are by and large people that have supervisory responsibilities and/or are professionals.
Q. Okay. Or professionals. They are not

necessarily all employees of the clinic; is that right?
A. That's right.
Q. Can you tell me which people are not directly employed by the clinic of that group? And I guess what you're saying is these people are contract employees; is that --
A. No, I didn't say that.
Q. Are any of these people contract employees?
A. Some people are.
Q. Can you go ahead and put a C next to the names of the people -- outside of the margin next to the names of the people that are contract employees?
A. Uh-huh.
Q Okay, and also what I wanted to find out is if everybody else in that list, are they all regular employees of the clinic? Are they employees of the clinic?
A. Yes.
Q. Outside of the contract people?
A. Yes.
Q Okay. Can you also give me, like, the hierarchy of the clinic within the group of people that are employed? I mean, I would assume that you as the executive director are -- is there a chart that you guys have ever prepared with regard to the hierarchy?

A. Yes.
Q. Would that be in a manual, a personnel manual, or something like that?
A. It's usually part of what we give an employee when he is hired, and it is posted in the human resource office.
Q. Posted in human resources?
A. Uh-huh.
Q. What do you call that document?
A. I'm trying to think. Something chart, but the first word escapes me.
MR. COWLEY: Organizational?
THE WITNESS: There you go. Thank you.
Q. I should have known. I'm on different boards and I always get one. That's what I wanted to know.
Under the -- being the executive director, that would put you on the top of the hierarchy, basically; is that correct?
A. At the top is the board of directors.
Q. Okay. And then after the board of directors comes --
A. Myself, the executive director.
Q. -- you. Who would come in after you?
A. There is a core group of directors, the medical director, the director of operations, the finance

director, and the director of human services -- human resources.
Q. And who are they?
A Henry Imperial is the medical director, and Hilda Gonzalez is the human resource manager, and Emily Alpert is the director of operations, and Enrique Garcia is the finance director.
Q. Are these the same people that were in charge when Mr. Kavanaugh was fired?
A. I couldn't swear on a stack of Bibles because I would have to look at the chart. There may have been an additional position of dental director. We have changed that since. That dental director person is under the medical director currently
Q. So at the time when he was fired it was a different --
A. I don't remember exactly. I don't remember I know that there was a change. I just don't remember exactly when.
Q. You would have another organizational chart stating who it was on that day; is that correct?
A. Yes, I believe Hilda keeps those. And, in fact, I'm pretty sure she has a revised date on the bottom.
Q. Okay, what ethnic persuasion is your core

people? I guess Henry --
A. Henry Imperial is Asian.
Q. Okay.
A. Emily Alpert is Jewish.
MR. COWLEY: Caucasian and Hispanic.
THE WITNESS: Caucasian, okay. Is that what ethnic means these days?
Q. Well, ethnic is fine, Jewish. Caucasian -- Jewish is really, I think, a religion but --
A. She thinks it's more than that.
Q. The finance director would be --
A. He's Caucasian.
Q. And Hilda, she's Mexican-American?
A. Yeah.
MR. COWLEY: You can say Hispanic if that's what you mean.
THE WITNESS: Whatever.
Q. No, it doesn't have to be. You can say Hispanic.
A. She's -- I mean, she is -- she was born in Mexico. She is a U.S. citizen so Mexican-American is okay.
Q. Okay. And you don't know who it was on the particular date in question; is that right?
A. No, I don't know.

Q. Okay. And the -- Mr. Imperial is not really an employee of the clinic. He's a contract employee, right?
A. Yes.
Q. Hold on.
A. I think if I may just clarify, there are some instances where our physicians are -- certain employees -- or certain contract people will have sort of like dual citizenship. They are both employees and contract.
Q. Okay.
A. Dr. Imperial is one of those.
Q. Okay, so he's an employee and on contract?
A. Yeah.
Q. And how does that work?
A. Well, they have a contract to carry out certain functions, but they have within their contract employee privileges which also means they follow the employee policy manual.
Q. Are all of these people that you put a C by --
A. Yes.
Q. -- on Exhibit No. 3, are they employee/contract people?
A. Yes.
Q. Now, he was -- because he was terminated, he

forfeited his annual leave; is that correct?
A. That's correct.
Q. That's pursuant to policy; is that right?
A. Right.
Q. Is that also pursuant to the policy that was in effect before the date of termination? You remember how we talked about there being a policy before that?
A. I'm sorry. Could you restate that?
Q. Is that -- we had talked about previously that there was a policy probably a year before that -- or actually not even that, three or four months before his termination; is that right?
A. What policy are you referring to?
Q. The policy manual.
A. Could have been. I don't know for sure.
Q. You don't know if the terms of that other policy allowed him to have annual leave even if he was terminated?
A. No, I do not believe that has ever been allowed.
Q. Okay. You believe that the older policy would have said the same thing?
A. That's correct.
Q. And the subsequent policy?
A. It's still the same.

Q. Okay. Now, I asked you -- I touched upon it, but who is responsible for your employee benefits program?
A. Could you be more specific?
Q. Who is the person that -- or the designated -- who is the person that decides on the employees' benefits? I mean, who is your administrator?
MR. COWLEY: Okay, again, I don't want to belabor a point. If you're referring to plan administrator as a legal term, she may not know, but that is identified in the summary plan description. If you're asking who within the organization normally would carry that function out, she could probably tell you.
Q. Who carries that function out?
A. Hilda Gonzalez.
Q. Your letter of termination does speak about him being very qualified for the job; is that correct? He had a lot of --
A. My letter of termination basically says he has a lot of assets, that he performs well in some aspects.
Q. Okay. And then also the -- his job -- there's like a 30-day performance appraisal, and there is another evaluation which he had had --
A. Prior to that.

Q. -- about a year -- probably like a year and a half to a year before his termination. I can refer you to both. One begins on Page 54, and the other begins on 58.
A. Yes, the three-month and the one-month, 30-day and three months.
Q. Okay. Would you agree that the one which was the evaluation date of February 7th, 1999, which is the Bates stamped 54 page, praises his work performance and his dependability?
A. I haven't read it, but if you give me a few minutes I'll read it.
Q. Sure.
A. Yes.
Q. It's very laudatory about his supervisory skills; is that right? It's Page 6, at least where I'm looking at.
A. I have 5 of 8 and 7 of 8. I don't have Page 6.
Q. Look on the back.
A. It's not here.
Q. That's not good.
A. It's not here.
Q. Okay, I'm going to -- I want to make sure that whatever I have in the original file that I got from you -- I'm going to double-check it before the

deposition is over just to make sure all the pages are in

I will loan you the one that you guys responded on. It should be in there.

A. All right

Q This is the original one from which the copies all were made.

A. Okay. Well, it certainly sounds laudatory.

Q. Okay, thank you. Also, the -- have you guys ever had any other review on him? Is there any other review other than this particular review?

A. I couldn't tell you. I -- you know, Emily would be the best person for that I know that he was -- I mean, there were many meetings that were conducted with him about his performance.

Q. Prior to this date?

A. I don't know about prior to this date. It doesn't appear to have any reason to have meetings with him other than the usual, you know, "How are things going," and, "What's up next," and, "What are you working on?"

Q Because prior to February of 1999, there's nothing negative in that review that I can tell. If you see any problem with it, let me know.

A. No.

Q. Now -- and after that there's been no other reviews. Is it typical to review people afterwards? Do you guys have, like, yearly reviews or something like that?

A. Yes, we do.

Q Would you know of a reason why there would not be a review in February 7th of 2000?

A. Only if Emily was backlogged, she had a lot of -- I mean, she has a lot of people she's responsible for. That would be the only reason.

Q. The reason for these reviews are basically to go over some things with the employees and put them on track and say, "You're doing fine," or, you know, "You need to improve here." Is that --

A. For feedback.

Q. Would you agree with me?

A. Yes. It's a method of formal feedback, although there is a lot of informal stuff going on always.

Q. Do you believe that other employees such as Emily and maybe other people who were in the clinic felt threatened by Mr. Kavanaugh based on how much knowledge that he did have?

A. No.

Q. Okay. Did they feel threatened about him

disclosing something about them?

A. No.

Q. Now, who -- the people -- who were the people that applied for his position?

MR. COWLEY: Are you asking at the time he was hired or after he had left?

MR. ZABARTE: After he had left.

A. There were a number of people that applied. I don't remember all their names.

Q. A number of people?

A. Yes, there was a gentleman named Alex Anzaldua.

Q. Okay.

A. There was obviously Alix Flores.

Q. Okay.

A. There were a couple of other people. I don't remember names.

Q. Judy Gonzalez, does that ring a bell?

A. Judy, Judy had applied even when Paul had applied.

Q. Okay. And Lisa Frausto?

A. That's correct, Lisa applied, as well.

Q. Anybody else that you can think of?

A. No, I don't remember right offhand.

Q. Okay. Is the -- did any of these people come from within the clinic?

A. No.

Q. Okay, so these were all outside people applying --

A. Right.

Q. -- for the first time?

A. Oh, there was a lady that worked for Texas Southmost College that was looking for a career change. She applied. I don't remember her name.

Q Her application was not considered or what?

A. She came and she asked for, you know, just kind of briefing on what did the job entail, and she herself said, "You know, I don't believe I have the qualifications."

Q. Okay. So then she never made a formal application or anything like that?

A. No.

Q. The person chosen, based on my interrogatory -- the responses to interrogatories, between you and Ms. Alpert, were the ones that really made the decision to hire Mr. Flores; is that correct?

A. Actually, it was -- it was Emily's ultimate recommendation, but she had spoken with several other people regarding his application.

Q. And, what, she presents it -- she's the one that interviews the person, or do you interview along

with her?
A. Generally, what it is is that it's three people interviewing for those kinds of positions, those kinds of directors' positions, and I am one of those people. There are -- Anna Milan from the school district is another person, and I believe there was somebody else in the group. I can't remember exactly. It was somebody from within our organizational structure.
Q. And is Emily part of the interview process?
A. Yes, she is.
Q. So it's Emily --
A. Hilda obviously would be there.
Q. Anna Milan?
A. Anna Milan was asked. I don't know that she participated, but she was asked.
Q. And then you're one of the other --
A. She may have had a scheduling conflict. And I am another person, yes.
Q. Okay, and you all met and discussed each one of those applicants?
A. We didn't meet exactly. I met with Emily, and Emily was the one that was working with Hilda to coordinate the interviews and check references, etc.
Q. Okay. So Emily and Hilda were the ones that were really putting the packet together?

A. Yes, uh-huh.
Q. And then the interview, though, came but for all four of you?
A. Actually, if I am -- generally, that's what we do. In this particular case, I did not. I don't -- I don't recall, you know, being part of the interview process for all of the candidates.
Q. Did you ultimately make the decision to hire --
A. Yes.
Q. -- Art Flores?
A. Yes, Alix Flores.
Q. Alix Flores, excuse me. Did each one of these applicants that we mentioned, did they all get interviewed or you're not sure?
A. I don't know.
Q. You only were present at a few of the interviews?
A. The last -- yeah, the final -- the final candidates, yes.
Q. Who were the final candidates?
A. Alix was one -- well, both Alexes.
Q. Were the two final --
A. Right.
Q. Okay.
MR. COWLEY: For the court reporter, Alix

Flores is A-L-I-X.
THE REPORTER: Thank you.
Q. When you compare the qualifications -- actually, what is the degree that Alix Flores has?
A. He has a bachelor's degree in journalism
Q. Anything else as far as college background?
A. No, I know that he is working on a masters degree in public health.
Q. Is he Mexican-American?
A. Yes
Q. How old is he?
A. 39.
Q. When you compare his qualifications with that of Paul, who has got better qualifications?
A. In retrospect, Alix
Q. And if they were going to go through the interview process together today, not knowing what you know, who has got better qualifications?
A. Alix.
Q. Does he have any fellowships? Does Alix have any fellowships?
A. Not that I know of. I don't know for sure, but he came to us from having worked with the county health department.
Q. For how long?

A. Oh, I can't tell you. A couple of years.
Q. And his journalism degree helps him to --
A. With just about everything.
Q. -- accomplish what he's doing?
A. Well, not only that, he also had experience working in personnel with the company he was with in California.
Q. What company was that?
A. You know, I can't tell you. I don't know right off the bat.
Q. What is his starting salary?
A. I don't know.
Q. Was that not discussed at all?
A. No, it was the same thing that Paul was earning, and I can't tell you what that was, either.
Q. Paul's application and his resume are inside his personnel file; is that right?
A. I believe I read something like that.
Q. Is that right?
A. Yes.
Q. Do you want to review his resume, briefly?
Okay, and I'm also going to give you -- I'm going to hand you what I'm going to attach as Exhibit No. 4 to the deposition. It's responses to Request for Production Nos. 4 and 20. Basically it's

the application and resume of Mr. Flores.

Now, you have reviewed both resumes in front of me, and basically is it still your opinion that the better application and the better person qualified is Mr. Flores?

A. Yes.

Q. Okay. Have you had any complaints about Mr. Flores?

A. None.

Q. Have you had -- and how long has he been employed there now?

A. A little over a year, year and a half.

Q. Okay. Do you have any persons who -- do you have any statements from people that may be witnesses in this particular case?

A. In what case?

Q. In this particular lawsuit.

A. Witnesses like for what?

Q. Of people -- that have any information which is relevant to this case.

A. Sure, I mean, of course, yes.

Q. Have they all been produced in this particular case?

A. How can I produce a witness? I'm sorry, I guess I don't --

Q. Oh, a statement would be something in writing which you have in which an individual would write what they believe about a certain situation and then signed by that individual.

A. I can't tell you that for sure. I don't know.

Q. If you have any witness statements, we would request that they be attached or responded to in the request for production. You have gone over the request for production with your attorney; is that correct?

A. Yes, it was my understanding that those were things that I had in my possession within the clinic.

Q. Okay, do --

A. There may be others that, you know, people have in their own possession that never came to my attention.

Q. Okay. That you wouldn't know --

A. Right.

Q. Actually which are not the basis of your decisions?

A. Right.

Q. But it -- with regard to any statements which you have made decisions about, they would have all been produced --

A. Yes.

Q. -- here? Have you talked to any board members

about Paul Kavanaugh?

MR. COWLEY: I'm going to object if it would refer to a point in time after we were on notice that there would be litigation involving him, on the basis of the party communication privilege.

MR. ZABARTE: Your objection is noted

Q. But what I'm asking about is did you have any conversations with any board members about him prior to him filing a lawsuit?

A. He had sent numerous pieces of correspondence to individual board members, and they called me to ask me about him prior to the lawsuit being filed.

Q. Okay. And did they -- who -- when you say "they," which board members are we talking about?

A. All of them.

Q. All of them?

A. Yes

Q. Each and every one of them?

A. Yes, Paul sent out a 37-page or 39-page memorandum to each of them, as well as staff.

Q. And so they called -- the board members specifically talked to you. After the lawsuit, have you spoken to any of them?

A. To the board members?

Q. Any board member.

A. Yes, I speak with them every month.

Q. About Paul Kavanaugh?

A. We have had them ask questions to counsel regarding the lawsuit.

Q. Okay. But none have specifically spoken to you about that lawsuit?

A. No.

Q. Did you send any documents to any of the board members before the lawsuit was filed?

A. No.

Q. Have you ever been a party to any litigation?

A. What do you mean by that?

Q. Has anybody ever sued you before?

A. Yes.

Q. Under what context?

A. The George Angelos case.

MR. COWLEY: He's asking about you individually.

A. He sued me and then dropped the --

Q. Okay. Is that the only time?

A. Yes, that I can remember, yeah.

Q. Have you ever sued anybody else?

A. No.

Q. Have you ever filed a claim against someone else?

A. No.
Q. Do you have -- and this is an uncomfortable question, but I still need to ask it. Do you have any kind of a criminal record?
A. Speeding tickets. No.
Q. Can I take a minute break?
A. Okay.
Q. Just a quick break.
(Brief recess)
Q. Ms. Gomez, in addition to the BHC's manual which you produced here, are there any other documents which contains policies and procedures for BCHC?
A. Yes, there are numerous manuals for each department.
Q. Okay.
A. Or let me rephrase it. There are manuals for each department.
Q. Okay. And each one would have violations of policy and stuff like that, I mean, that they would say, "You would be violating policy if you do this, this, and this"?
A. I don't know that all of them have that.
Q. Okay. Any other manuals besides each departmental manual?
A. Finance probably has the most manuals because

they follow various guidelines.
Q. Okay. Are there any writings concerning policy and procedure, other than manuals themselves, you know, like a sheet of paper telling all employees, "You need to follow this policy"?
A. You mean above and beyond the personnel manual?
Q. Yes, and the departmental manuals.
A. There are certain things that are guidelines, like for filing insurance claims and things like that.
Q. Okay. Who would have those guidelines? Finance?
A. Well, it depends on the department, where you work. I'm thinking specifically of the laboratory. The laboratory has its manual, but then it also has manuals for the different machines that they use and the different ways to calibrate, things like that, so it depends on the department.
Q. But as far as procedures manual, certain things that employees have to follow, you know, like a complaint about this or, "You should not do this in this department," or something like that, that would be in each one of the departmental manuals?
A. That would be in the departmental manuals.
Q. And there would be no other --
A. It might state it specifically in a paragraph

or it might refer to a personnel manual.
Q. No other writings that you know of?
A. That I know of, no.
Q. With regard to the definition of "for cause," again, I know we touched on it before, there is no writing that gives you a definition of "for cause"; is that correct?
A. That's correct.
Q. Have you taken any formal adverse action for anybody with regard to insubordination?
A. Yes.
Q. Who would that be?
A. The last one I remember just off the top of my head, Delina Barrera.
Q. Okay, and what did she do?
A. She screamed in the phone and hung up.
Q. What's her job title?
A. She was clinic manager.
Q. Did she get fired?
A. Yes.
Q. Anybody else that you can remember?
A. Yes, there was a physician.
Q. Okay.
A. I don't remember her name. Janet Lawson, I believe.

Q. Was she an employee or contract --
A. She was a contract person.
Q. And when did you fire her?
A. Gosh, I can't give you dates, but I think it would have been sometime around the late -- late '80s. I want to say '89, but, you know, I can't swear to that.
Q. Okay. And what were -- she was one of the physicians that worked there?
A. She was a physician. She was an Ob/Gyn.
Q. And what did she do?
A. I asked her repeatedly to sign her contract, and she refused so I told her that if -- that she had one last chance, she had 30 minutes to sign it, and she said she needed more time. I told her, "You have had four months. I think that's more than enough time."
And she said, "Well, you can't make me."
I said, "No, I can't make you sign it, but if you don't sign it you're out of here."
And she said, "You can't touch me. I'm a National Honors Scholar."
And I said, "There's the door."
Q. Did she file any kind of action against you?
A. Yes, she did. It didn't go anywhere but she did.

Page 118

Q. Did -- and when was Delina fired?
A. Golly, I don't remember exactly.
Q. Give or take.
A. Maybe '87, '88, maybe '89, somewhere around there.
Q. Okay. Anybody else that you can remember that you fired for insubordination?
A. I think there might have been one more, but I just can't remember. I'm going through the list of all the physicians that I might have dismissed, but, no.
Q. Okay. I also have a question with regard to your -- when you talked about the interview process when Mr. Flores was hired, one of the people that was sitting on the board is a BISD employee; is that right, one of them sitting on the committee to hire him?
A. I'm sorry. Rephrase that.
Q. That when you hired Mr. Flores, one of the people that was on the committee to hire him was a BISD employee.
A. Right.
Q. Is that correct?
A. Yes.
Q. And BISD is not part of the board --
A. That's correct.
Q. -- is that correct? As a matter of fact, you

Page 119

guys get funding from BISD; is that correct?
A. Yes, we do.
Q. And how is it that this employee is able to sit on the board -- I mean on the committee?
A. It was out of courtesy. It was -- you know, we had that happen when we interviewed the candidates for -- during the time that Paul was hired, and it's just a practice that we continued because it is such a close relationship from that position to BISD that we wanted to -- we thought that they could ask questions pertinent to the relationship with BISD that we might not be aware of.
Q. Is the -- was Paul hired by -- was Anna Milan on the committee that chose Paul?
A. Yes.
Q. Is there any other of your funding entities that sit on any of your committees?
A. No.
Q. Is there any kind of an agreement, anything in writing that you have with BISD, that Ms. Milan is able to sit on your committee?
A. No.
Q. What are the sources of your nonpublic monies?
A. The patient fees and, you know, some special foundations, Robert Wood Johnson.

Page 120

Q. I'm sorry?
MR. COWLEY: Repeat that for the court reporter.
A. Robert Wood Johnson Foundation.
Q. Okay, and what percentage of the total money sources is the patient fees to the clinic?
A. It's over 50 percent, you know, when you add it all together. The patient fees is something like 37 percent, something like that.
Q. And Robert Wood?
A. I don't know exact percentage. Total nonfederal; is that what you're getting at?
MR. COWLEY: Nongovernmental.
Q. Nongovernmental.
A. Nongovernmental, 50 -- about 57 percent.
Q. And the two you can think of is the patient fees and the Robert Wood Foundation?
A. Yes. We have other little grants, have other little grants, continue to get others that are nongovernmental.
Q. Can you name them?
A. Well, I mean, we have private donors. Mr. Edelstein, E-D-E-L-S-T-E-I-N. I should be able to rattle it all off but I can't. Sorry.
Q. That's okay.

Page 121

MR. ZABARTE: Okay, no more questions. I thank you very much for your time.
MR. COWLEY: We'll reserve.
(Deposition concluded)

PAULA GOMEZ - ERRATA SHEET

Reasons for changes (1) Clarify the record
(2 ) Conform to the facts
(3 ) Correct transcription errors

PAGE LINE CHANGE FROM/CHANGE TO REASON

PAULA GOMEZ



SIGNATURE OF PAULA GOMEZ

I have read the foregoing transcript of my deposition and it is a true and accurate record of my testimony given on DECEMBER 19, 2001, except as to any corrections I have listed on page 122 herein.

PAULA GOMEZ

THE STATE OF TEXAS
COUNTY OF CAMERON

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this the ________ day of ______________________, 2002.

Notary Public in and for
The State of Texas

My commission expires:
________________



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

PAUL CAMERON KAVANAUGH X
X
X
X
VS X CASE NO B-01-104
X
X
BROWNSVILLE COMMUNITY HEALTH X
CLINIC CORPORATION, D/B/A X
BROWNSVILLE COMMUNITY HEALTH X
CENTER X

REPORTER'S CERTIFICATE

I, SHELLEY STINGLEY, Certified Court Reporter, certify that the witness, PAULA GOMEZ, was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on DECEMBER 19, 2001, that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this the _____ day of ____________________, 2002.

SHELLEY STINGLEY, CSR NO. 5725
Expiration Date: 12/31/02
Bryant & Stingley, Inc.
2010 East Harrison
Harlingen, Texas 78550

-&-

& [3] 1:26 11:1 124 32

-'-

'60s [3] 50:22,24,24
'70s [2] 9.18,18
'80s [1] 117:5
'87 [1] 118.4
'88 [1] 118.4
'89 [2] 117:6 118:4
'90 [1] 9:20
'90s [1] 55:12
'91 [1] 9:20

-0-

0062 [2] 75:13,15
0063 [2] 75 13,18

-1-

1 [4] 24:6 42:7 80:20 122:2
10 [1] 81:18
100 [1] 1.26
109 [1] 2:4
11.05 [2] 25:18 28 17
11.06 [1] 25:19
12.01 [1] 25:17
12.02 [1] 25:17
12.03 [1] 25:17
12/31/02 [1] 124:31
122 [1] 123.5
12:00 [1] 74:11
14 [1] 2:4
16 [1] 15 18
16th [2] 75:8,20
18 [2] 1.18,23
19 [2] 123:4 124:20
1999 [2] 101:8 102:22

-2-

2 [3] 31:18 42:8 122:3
2-A [2] 31:20 32:1
20 [2] 2:4 109:25
2000 [12] 23:9 24:18 30:19 42:14 43:14 61:4 80:20 82:12,13,15 86:21 103:7
2001 [4] 1:18,23 123:4 124:20
2002 [2] 123:13 124:28
2010 [1] 124:33
20th [1] 80:6
21 [2] 76:21 86:21
21st [3] 91:5 93:10,13
23 [2] 74:9 79:14
23rd [10] 73:14 75:6,9,10 75:21 76:4,16 87:25 88:4 89:16
24 [1] 2 1
25 [1] 17:1
25th [3] 92:4,9,12
26th [3] 23:9 77:4 91.6
27th [1] 23 9
28 [2] 42 8,8
2a [1] 2 2

-3-

3 [4] 43:23 93:17 98:22 122:3
3-23 [3] 79:13,15 87:12
3-31 [1] 84:21
30 [3] 80:12,12 117:14
30-day [2] 100:23 101 5
31 [3] 2:2,2 82.19
318 [1] 6.10
31st [3] 82:12,13,15
32 [1] 22 17
33 [1] 28:17
35 [1] 22:17
37 [1] 120:8
37-page [1] 112:19
39 [1] 108:12
39-page [1] 112:19
3rd [10] 61:3 73:12 74:25 75.2,4,5,19 76:19 88:1,3

-4-

4 [5] 75:14,18 81:18 109:24,25
40 [1] 68:16
48 [1] 18:18
49 [3] 76:12,13 79:10

-5-

5 [1] 101:18
50 [4] 76:7 80:17 120:7 120:15
52 [2] 80:6,9
53 [1] 61:1
54 [2] 101:3,9
57 [1] 120:15
5725 [2] 1:24 124:30
58 [1] 101:4
59 [3] 86:23 87:11 89:3

-6-

6 [2] 101:16,18
61 [3] 86:24 89:3,7
63 [3] 60:25 61:1,2

-7-

7 [1] 101:18
7-26-00 [1] 2:2
78550 [1] 124:34
7th [3] 80:8 101:8 103:7

-8-

8 [4] 43 14 49:13 101.18 101:18
83 [1] 1:26
8:00 [7] 21.1 37 17 39 1 39:6,12 40 4,11
8:30 [1] 21:6
8th [1] 80 7

-9-

9 [1] 32:5
90 [1] 76:16
93 [1] 2:3
9:00 [1] 21:6
9th [1] 80:8

-A-

A&I [3] 6:22 7 15,24
A-L-I-X [1] 108:1
A-L-P-E-R-T [1] 18:10
a.m [1] 39:1
a.m. [3] 37 17 39:6,12
able [4] 36.13 119:3,20 120 23
above [3] 1:22 83:3 115:6
absolutely [2] 34:25 93:6
abuse [1] 47:16
acceptable [2] 19:15 41:18
accident [4] 8:7,16,17 8:18
accomplish [1] 109:4
according [4] 19:3 66:25 76:1 78:4
accurate [1] 123:3
accused [2] 66:3 67:8
act [1] 28:18
action [14] 3:8 12:1 59:17 60:1 76:8 79:23 80:17,19 85:25 86:5,6 116:9 117:23 124:26
active [1] 12:10
actively [1] 11:18
ad [1] 82:7
Adams [1] 6:10
add [2] 36:14 120:7
addition [1] 114:10
additional [3] 45:8 48:11 96:12
address [1] 36:12
addressed [6] 83:3,4 84:16 87:3,3,6
addressing [1] 86:18
adhering [1] 52:3
administration [4] 8:4 9:5,5 78:20
administrative [1] 14:14
administratively [2] 85 4,7
administrator [7] 20:11 20:24 23:15,16,22 100:7 100:10
advance [1] 44:17
adverse [4] 59:17,19 60:1 116:9
advise [1] 53:9
advised [2] 20 19,20
adviser [1] 9:12
affiliated [1] 12:25
afternoon [1] 57:25
afterwards [1] 103:2
again [12] 9:3 19 20,20 20 16 25:23 68:1 79:10 87:9,15 88:2 100:8 116:5
against [11] 3:8 5:4 58 8 58:23 59:17 60:1 65.6 67:10 86:7 113:24 117:23
age [5] 5.4 18:17 22:16 62:11 68.16
agencies [1] 47:10
ago [2] 21:25 38:16
agree [7] 32:13 36:9 61:2 64:2 88:23 101:7 103:16
agreed [1] 20:4
agreeing [1] 36:13
agreement [2] 56:7 119:19
ahead [5] 24:5 29:19 31:16 93:17 94:10
alarmed [1] 57:23
alcohol [1] 47:16
Alex [1] 104:11
Alexes [1] 107:21
Alix [12] 45:6,25,25 104:13 107:11,12,21,25 108:4,15,19,20
allegation [2] 65:25 66:1
allegations [1] 65:6
alleged [1] 65:1
allegedly [2] 87:12 89:17
allocation [2] 81:1,3
allow [2] 30:8 40:3
allowed [2] 99:17,20
almost [2] 47:24 79:17
alone [1] 18:5
along [6] 38:9 49:10 52:10 53:10,11 105:25
Alpert [20] 18:9,9 19:6 22:3 38:3,4 42:3 45:6 61:3 75:9 78:11 81:19,23 86:22 88:8,18 92:16 96 6 97:4 105:19
Alpert's [4] 18:13 90:9 90:19,25
alternative [2] 21:18 54:10
always [7] 14:19 50:5 73:4 80:2,4 95:15 103:19
ample [1] 71:7
Angelos [4] 3 22 4:15 4:16 113:16
Anglo [2] 68 8,15
ankles [1] 8:19
Anna [11] 49:17,18 50:1 50:6,9,20 51:19 106:5,13 106.14 119 13
Anna's [1] 51 4
annual [3] 47:9 99:1,17
answer [9] 5 9 23:16 28:4 33:2 46:20 73:2,3 90 14 91:21
answered [1] 84:11
answering [1] 15:24
answers [1] 93:18
Anzaldua [2] 3:6 104.11
apologize [1] 58:20
apologized [1] 59 13
apology [1] 58 18
appeal [4] 30 7,16,17,23
appear [1] 102:18
appeared [2] 57:23 90:1
applicable [1] 25:18
applicants [2] 106:20 107:13
application [7] 44 19 105:9,15,23 109:16 110:1 110 4
applications [1] 46:23
applied [7] 34 22 104:4 104:8,18,19,21 105:8
apply [2] 14:18,20
applying [1] 105:3
appraisal [1] 100:23
appreciate [1] 37:13
approach [1] 14:21
approached [1] 20:8
appropriate [5] 66:12 70:20,22 89:4,10
approve [1] 52:25
approved [7] 24:17,19 25:2 53:20 55:6,10,10
April [4] 24:17 30:19 31:2,3
area [1] 72:3
areas [4] 43:20 46:16 69:1 69:5
armed [1] 51:9
Art [1] 107:10
Asian [1] 97:2
aside [1] 52:1
aspect [1] 77:24
aspects [1] 100:21
asset [1] 37:9
assets [1] 100:21
assist [1] 19:5
assistant [2] 14:14 32:11
assisted [1] 45:22
assume [4] 23:15 24:8 36:25 94:23

assuming [2] 42 11 70:20
at-will [1] 33:3
Atlanta [1] 61.12
attach [7] 24:5 27:16 29·25 31·18,25 87:22 109.23
attached [7] 37.3 75:16 75.17.18 87·25 93 18 111.7
attend [3] 52:21 58:21 72:15
attended [1] 72:11
attending [1] 54:5
attention [4] 46:3,5,10 111:15
attorney [4] 36.23 111:9 124·24,25
Audubon [1] 12:21
August [2] 44:9,13
auspices [1] 13 4
authority [2] 63·16 123:12
authorize [1] 53.25
award [4] 77:14 78:6,12 78:17
aware [4] 81:7,24 82:18 119:12

-B-

B [1] 7:13
B-01-104 [2] 1:8 124:8
BA [1] 7:14
bachelor's [1] 108:5
background [6] 6:15 11:8 12:12 50:10 68:7 108·6
backlogged [1] 103:8
backwards [1] 81:21
bags [1] 35:16
bailed [1] 8:7
Barrera [1] 116:14
based [6] 26:16 37:5 77:16,18 103:22 105:17
basing [1] 37:15
basis [4] 19:13 34:8 111:18 112:5
bat [3] 14:6,8 109:10
Bates [8] 24:10 32:5,7 75:11 79:10 86:23 87:10 101:9
BCHC [2] 28:20 114:12
beat [1] 46:25
become [1] 57:23
begin [2] 57:17 76:4
beginning [1] 49:22
begins [5] 75:25 76:2,15 101:3,3
behalf [1] 78:12
behavior [1] 86:8
behind [2] 47:24 93:3
belabor [1] 100 9
bell [1] 104 17
belong [1] 86.9
Bend [1] 61 19
benefit [1] 10:11
benefits [2] 100:2,7
best [1] 102:13
better [4] 108·14,18 110·4 110:4
between [9] 3:19 17:13 22:17 36:19 51:7 70:25 86·2,2 105:18
beyond [1] 115·6
BHC's [1] 114:10
Bible [1] 11:24
Bibles [2] 93:5 96:10
Bickering [2] 66:10,11
big [1] 51:25
bigger [2] 68:25 85:16
billing [1] 35:20
biology [2] 7:11,17
BISD [7] 118:14,18,23 119:1,9,11,20
bit [5] 15·19 22:5 26:1 43.5 50:10
bits [1] 45:14
blank [3] 21:23 36:13 68:1
BMC [1] 51:2
board [28] 14:21,23 15:5 15:7,12,25 24:19 30:5,8 30:23 31:7,10,14 55:6,9 95:19,20 111:25 112:8,11 112:14,21,24,25 113:8 118:14,23 119:4
boards [1] 95:14
born [1] 97:20
borrow [1] 64:8
bottom [4] 32:8 75:12 85:24 96:24
branch [1] 10:18
break [7] 28:1,10 29:24 33:14 74:11 114:6,8
Brief [2] 33:17 114:9
briefing [1] 105:11
briefly [1] 109:21
bring [4] 46:3 47:25 64:9 88:8
brings [2] 88:25,25
broke [1] 8:19
brought [5] 21:19 46:5 46:10,12 48:2
Brownsville [16] 1:3,11 1:13,26 6:17 10:19 13:10 14:2,19 15:12 47:10 51:2 78:14 124:3,11,13
Bryant [1] 124:32
budgets [1] 45:20
business [1] 60:9
buy [1] 70:10

-C-

C [2] 94:10 98.20
C-H-A-H-I-N [1] 15.2
calendar [1] 92.13
calibrate [1] 115·16
California [1] 109·7
Cameron [4] 1:4 4 3 123.10 124:4
campus [4] 8·11 41:23 50:19 63:2
canceled [1] 67·6
candidates [4] 107·7,19 107:20 119:6
cannot [3] 31·9 57:16 78:16
capacities [1] 60·11
Car [1] 8:17
care [3] 41:23 50:19 63:2
career [1] 105:7
Carlos [3] 17:13,15,16
carries [1] 100 15
carry [3] 78:20 98:16 100:13
case [10] 1:8 46:24,24 107:5 110:15,16,20,23 113:16 124:8
Castillo [4] 14:25 15:5 67:21 68:3
categories [1] 81:5
Caucasian [4] 97:5,6,8 97:12
caused [1] 90:1
center [14] 1:14 13:10 34:14,14 37:9,14 51:2 62:7,17,19 63:3,19 78:14 124:14
center's [1] 43:24
centers [4] 14:5 41:24 50:19 63:2
certain [16] 12:11 52:7 69:23,24 70:5,5,5,6 88:15 88:15 98:7,8,16 111:3 115:8,18
certainly [3] 36:17 59:5 102:8
certificate [2] 9:3 124:15
Certified [2] 1:24 124:16
certify [2] 124:17,23
Chahin [3] 14:25 15:1,2
chance [1] 117:14
change [7] 25:1 42:17 43:12 73:19 96:18 105:7 122:4
changed [3] 7:3 30:25 96:13
changes [2] 36:20 122:2
charge [2] 77:24 96:8
chart [5] 2:3 94:24 95:10 96:11,20
Chayo [2] 45:7,19
check [3] 32 12 53 23 106·23
checking [1] 52 16
chief [1] 13·15
children [1] 6:13
chose [3] 29·8 63:5 119 14
chosen [4] 29:5 31:10 78 1 105 17
Christ [3] 11:20 12:16,16
church [4] 11:18,19,22 12.16
circles [1] 59:15
circumstance [1] 59:2
circumstances [1] 64:5
Cisneros [1] 35:22
citizen [1] 97:21
citizenship [1] 98:9
City [2] 14:2 15:11
civic [1] 12:15
Civil [1] 1.27
claim [1] 113:24
claims [1] 115:9
clarify [2] 98:6 122:2
class [2] 11.7,24
classes [1] 10:17
cleaning [1] 63 1
clear [1] 90:6
clearly [3] 21:16,21 26:8
Clearwater [5] 65:20 66:6 69:8,15 72:23
clerks [1] 35:20
clinic [22] 1·12 3:8,19 14:10,11 15:17 51:12,14 63:4 78:1 94:1,4,16,17,22 98:2 103:21 104:25 111:11 116:18 120:6 124:12
Clinica [5] 14:12,17 16:23 17:5 50:25
clinics [1] 44:1
close [2] 80:3 119:8
closure [1] 91:19
COBRA [5] 16:10,10 23:13,14,22
collaborative [2] 44:22 44:23
college [6] 6:18,21 12:24 13:4 105:7 108:6
coming [2] 40:8 44:16
comments [2] 56:20,21
commission [1] 123:17
commitment [1] 37:14
committee [6] 31:14 118:15,18 119·4,14,21
committees [1] 119:17
communicating [1] 57:24
communication [6] 73:20,21 89:4,11,12 112:5
communications [1] 86·2
communities [1] 83·25
community [10] 1:11,13 8:3 11:15 13:10 34:14 47:18 78·14 124:11,13
community-based [1] 43:25
commuting [1] 10:16
company [4] 64·19.20 109:6,8
compare [2] 108 3.13
complain [2] 49:18 61:24
complained [10] 49:22 58.7 59:10 61:20,25,25 62:1 64:23 66:16 71.5
complaining [2] 66:10 69:4
complaint [11] 5:2,3 51:19 61:9,10 65:15 68:23 68:24,25 69:8 115:20
complaints [10] 4 13 38:14 59:5 67:10,12 85:18 88:8,15,16 110 7
complete [7] 9:10,13 28:20 30·5 44:3,4,7
completed [1] 42:5
Completely [1] 74:14
completing [2] 47:9,15
complied [2] 83:21 84:17
concerned [4] 30:2 67:18 69:21 81:10
concerning [1] 115:2
concerns [3] 66:18,18 86:19
concluded [2] 7:21 121:4
conclusion [1] 86:13
concurred [1] 63:9
conduct [1] 28:20
conducted [1] 102:14
conducting [1] 21:12
conference [1] 65:5
conflict [1] 106:17
Conform [1] 122:3
conjunction [1] 18:6
connected [1] 13:5
consider [3] 11:11 19:21 28:2
considered [2] 28:15 105:9
consistent [1] 88:24
consult [1] 18:8
contains [1] 114:12
contents [1] 63:24
context [1] 113:15
continue [1] 120:19
continued [4] 16:15 76:25 77:8 119:8
continuing [4] 16:16 29:3 67:3 71:8

contract [18] 55 17,19 55:20 56·6,7 94·5,8,12,19 98:2,8,10,13,16,17 117·1 117:2,12
controller [1] 32·11
convention [2] 48.10 61.12
conversation [2] 54:5 70:9
conversations [1] 112·8
coordinate [3] 48:21 50:18 106:23
copies [2] 31:23 102:6
copy [13] 27:13,15 28·5,6 28:11,13 29:21 31:21,24 72:19,20,20 84:2
copying [1] 27:24
core [2] 95:24 96:25
CORPORATION [2] 1:12 124 12
correct [46] 17 3 23·6 30:12 37:5,10,18 42:16 49·8 52.6 54:17 56:2 59:2 72:5 76.4,19,22 79.18,22 81:13 87:1,4,13,17 88:5,9 88.12 90:10,20 91:9 95:18 96.21 99·1,2,23 100:18 104:21 105 20 111:9 116:7,8 118.21,24,25 119:1 122:3 124:19
corrected [1] 81:12
correcting [2] 54:15 86·8
corrections [1] 123:5
correspondence [1] 112:10
Cosmo [3] 9:4,4 10:23
couched [1] 23:21
counsel [4] 26:24 113:3 124:24,26
counseled [1] 19:20
counseling [1] 71:22
counselors [1] 58:6
county [3] 4:3 108:23 123:10
couple [3] 58:12 104:15 109:1
course [2] 36:17 110:21
court [9] 1:1,24 4:5 5:21 10:12 107:25 120:2 124:1 124:16
courtesy [1] 119:5
cover [1] 24:11
COWLEY [39] 4:8 5:8 10:8,11 23:9,11,23 24:1,7 24·13 26:22 27:23 28:4 28:10 33:16 36:4,10,16 42:22 72:6 74:10,14 81:21 83:16 84:11 90:15,21 91:2 95:12 97:5,15 100:8 104:5 107:25 112:2 113:17 120:2,13 121:3
created [1] 19:24
criminal [1] 114:4
CSR [1] 124:30
Cuban-American [1] 11:12
culmination [2] 29 8 89·25

-D-

D/B/A [2] 1:12 124:12
Dan [1] 17:14
Daniel [1] 17.8
date [14] 23.8 75:25 76:2 79·25 80:1,21 83.3 96:23 97:24 99.6 101.8 102:16 102.17 124:31
dated [3] 2:2 79:15,17
dates [9] 3:15 25:3 48:5 65:18,24 73·15 87:2 93:15 117:4
David [2] 29:21 31:22
days [9] 76 16 79:19 80:12,12 89:19 93:3,7,9 97 7
DC [2] 10:24 17:9
deadlines [1] 16 6
deal [1] 57:10
DECEMBER [4] 1:18 1.23 123.4 124.20
decide [1] 92:11
decided [2] 53·13 91 6
decides [1] 100:6
decision [28] 18 1,5,5 19:1,5,9,10 26:6,12 28:2 28:15 30:11,16,17 31:6 34:5,18,19,20 38:8 71:1 82:4 89:23,24 90:2,4 105:19 107:8
decisions [2] 111:19,22
deduction [1] 81:1
defined [1] 23:14
definitely [1] 48:1
definition [8] 33:8,21 33:23 34:13,16 36:2 116:4 116:6
definitive [1] 86:15
degree [8] 7:1,5,21 10:5 108:4,5,8 109:2
Del [1] 14:25
Delina [2] 116:14 118:1
dental [2] 96:12,13
dentist [1] 3:20
dentist's [1] 3:21
department [8] 47:12 56:2 108:24 114:14,17 115:12,17,21
departmental [4] 114:24 115:7,22,23
departments [1] 47:12
dependability [1] 101:10
depending [3] 26:2 28:22 44:15
deposition [18] 1:16,20 3:11,14 5:12 24:6,6 31:19 36 14,17 37 1 93 18 102:1 109.24 121.4 123 3 124:18,20
depositions [1] 3:23
description [20] 24 2 33:4 41 22,25 42:2,9,12 42 21 43·1,7,14,18 47.8 50:16 51:24 54·17,22 55:5 56·5 100:11
descriptions [2] 42:16 42:17
designated [1] 100:5
detail [2] 19:11 22:4
detriment [3] 52:2,13,14
Develops [1] 43:23
didactics [3] 8:11,12 9:9
different [22] 11 15,15 16:4 26:2 41:8 42:15 43:6 65:10,11 66:19 72:11 81:4 85:19 86:22 88:9,11,16 89:1 95 14 96·16 115:15 115.16
direct [1] 18:20
direction [2] 58.19 84:3
directly [3] 31:12 58.1 94·3
director [38] 13:12 14:6 14:15 15:17,22 18·14,19 30:6 31.7 41:23 43:4 44:15 45.4 49:15 50:12 50:14 53:3,10,18 71:6,9 72:17 77:21 82.10 94·24 95:16,22,25,25 96:1,1,4,6 96:7,12,13,14 97:11
director's [1] 30:15
director/supervisor [1] 19:16
directors [5] 15:12,25 95:19,20,24
directors' [1] 106:4
disciplinary [1] 78:18
discipline [3] 40:25 41:4 41:6
disclosing [1] 104:1
discovery [1] 37:1
discriminated [1] 5:3
discuss [2] 56:13 84:8
discussed [13] 19:17 46:15 47:3 51:16 53:7 54:24 71:21 75:3 83:2,11 84:14 106:19 109:13
discussing [2] 70:12 79:3
discussion [3] 58:11 61:13 66:11
dismissal [1] 28:22
dismissed [2] 28:17 118:10
Dissemination [1] 83:24
distance [1] 8:10
district [9] 1:1,2 47:11 49:15 50:15 51:5 106:5 124:1,2
DIVISION [2] 1·3 124 3
document [9] 48 18,25 60 17 74·23 75·7 77 2,7 84·20 95.9
documentation [12] 28:21 72:8,14 73 11 82:11 82·17,18,18,22 84:21 87·15,21
documented [3] 37·22 75:20 76:19
documenting [1] 73:25
documents [5] 60:15 85:18 87:9 113:8 114:11
doesn't [8] 24:4 33.4 34:13 75:16 79·20 81:6 97 18 102:18
done [10] 44:25 45:10,25 63:9 71.10 73.6 74:13,14 77:17 80:13
donors [1] 120:22
door [2] 21:11 117 22
Dori [2] 61:13,15
Doricela [1] 61·16
double-check [1] 101:25
down [6] 20:17 34:4 39:14 58:13 67:7 79:15
Dr [6] 4:16 9·12 67·23 85·2,3 98.12
dragging [1] 47:15
drastic [1] 57:15
drop [1] 92:23
dropped [1] 113:19
drug [1] 47:16
dual [1] 98:9
duly [2] 3:2 124:18
during [5] 32:21 51:10 65:11 77:13 119:7
duties [2] 15:20,21

-E-

E-A-S-O-N [1] 67:22
E-D-E-L-S-T-E-I-N [1] 120:23
earning [1] 109:15
Eason [2] 67:21 68:5
East [1] 124:33
Edelstein [1] 120:23
education [5] 10:3,4 47:12 67:3 71:8
educational [1] 6:15
EEOC [1] 4:13
effect [6] 24:16,22,24 25:9 79:25 99:6
effective [4] 76:16 79:25 80:20,21
effort [1] 44:22
efforts [1] 52:6
either [5] 32:20 72:24 85:24 86:13 109:15
emergency [1] 51:3
Emily [42] 18:9,9,13 19 6 21:3,25 22:3 40.12,13 42.10 45:6,22 47:6 53·23 54·4 60:19,19,21 61·3 62:1 71:11,15,17 73:16 75.20 78.3 81·19,23 82:10 83·8 86.22 87.11 96 5 97:4 102:12 103 8,21 106:9,11,21,22,24
Emily's [1] 105·21
emotional [1] 6 6
employed [8] 13:8 51 14 62:7,13,16 94:4,23 110:11
employee [27] 25:21,25 26:7 27:6 28:17 32:18 40:24 41:3,20 78:15 79:23 80:17,19 86:3 95:4 98:2,2 98:13,17,18 100.2 117:1 118:14,19 119.3 124:24 124:25
employee's [1] 79:20
employee/contract [1] 98:22
employees [20] 2:3 16:11,15 56:25 86:2 93:21 93:21,22 94:1,5,8,12,16 94:16 98:7,9 103:12,20 115:4,19
employees' [1] 100:6
employer [1] 13.9
employment [5] 16:7 32:19,21 65:11,12
end [1] 90:6
ended [1] 8:21
ending [1] 89:18
Enrique [6] 45:6,19 47:6 72:18 80:7 96:6
ensure [2] 13:15 16:14
entail [3] 9:7 54:23 105:11
entire [2] 12:19 58:20
entities [1] 119:16
entitled [1] 2:3
equipment [1] 64:20
equivalent [1] 56:10
ERRATA [1] 122:1
errors [1] 122:3
escapes [1] 95:11
etc [2] 86:1 106:23
ethnic [5] 12:11 68:7 96:25 97:7,8
ethnic-wise [1] 11:9
ethnicity [2] 5:4 68:8
eucharistic [1] 11:23
evaluation [2] 100:24 101:8
events [2] 58:10 89:25
eventually [1] 49:6
everybody [3] 78:13 79:24 94:15
everybody's [1] 43:10
evil [1] 57:1
exact [6] 3:15 25:3 65:18

65:24 73 15 120 11
exactly [13] 4 19 9:17 22.18 46 5 57 4,6 62 22 69:16 96:17,19 106 7,21 118:2
EXAMINATION [1] 3.3
example [1] 56.21
examples [2] 88.25 89:14
excellent [2] 20:11,23
except [1] 123:4
excuse [5] 40:1 42 24 84:11 88.6 107:12
executive [10] 13:12 14:5 15:17,22 30:6,15 31:7 94:24 95:16,22
exempt [4] 2:3 93:20,21 93:22
Exhibit [8] 24:6 31:18 31:20 42:7 93:17,20 98:22 109:24
exist [1] 56:8
existence [1] 81:25
existent [1] 23:4
exorcism [1] 38 15
exorcize [1] 57:13
exorcized [1] 57 7
expansion [1] 43:24
experience [1] 109:5
Expiration [1] 124:31
expires [1] 123:17
explain [2] 17:25 56:25
explanation [1] 74:23
Expressway [1] 1:26

-F-

F [1] 9:6
fact [9] 52:20 54:24 57:19 66:21 67:16 71:23 92:17 96:23 118:25
factors [3] 28:1,14,25
facts [1] 122:3
failed [2] 37:17 47:8
failure [3] 28:20 29:4 35:15
fair [2] 37:8 91:10
fairly [1] 55:1
fall [1] 34:13
falls [1] 23:14
Familiar [4] 14:12,17 16:23 17:5
far [21] 3:10 5:14 6:1,15 10:3 14:4 19:8 22:4 25:20 27:10 28:14 31:8,9,16 36:21 69:21 70:7 73:22 81:2 108:6 115:18
February [5] 80:7,20 101:8 102:22 103:7
federal [5] 4:5,7 16:3,6 47:12
feedback [3] 60 22 103 15,17
fees [4] 119 24 120.6,8 120.17
fell [2] 8:18,18
fellow [2] 9 4,4
fellows [1] 11.7
fellowship [7] 6:22,23 8:22,24 9:11 10:20,22
fellowships [3] 8:1 108:20,21
felt [19] 19:22,24 20:10 20:12,23 23:17 52:2 54.25 56.24 57:15,24 59:3 60:8 60:11,12,12 73:5 86:4 103:22
few [4] 33:14 35:8 101.11 107:16
fighting [3] 66.7,9,21
figured [1] 66:17
file [42] 2:2 4:1 19 7,7,8 19:12 27:16 31:17 32:3 37:4,23 38:2,8,11 42:8,23 42:24 43.8,11 58:8,23 60:14,25 63:21 67:10 72:8 74:4,7 75:7,8 81:17 85:12 85:21,23 86:1,4,9,23 87:16 101:24 109:17 117:23
filed [5] 3:8 85:23 112:12 113:9,24
files [6] 19.4 43:10 47:9 48:25 85:10,13
filing [2] 112:9 115:9
fill [1] 56:1
filled [4] 54:25 55:13,14 55:15
final [9] 32:11 37:19 53:1 63:23 90:1 107:18,18,20 107:22
finally [2] 21:6 91:24
finance [12] 45:19 53:3 53:10,18 72:16,17,20 95:25 96:7 97:11 114:25 115:11
financially [1] 124:26
fine [3] 5:25 97:8 103:13
finish [3] 8:7,14 10:8
finished [2] 7:8,11
fire [9] 18:3 63:17,19 89:23,24 90:4 91:6,25 117:3
fired [17] 25:9 30:3 32:22 33:7 35:3,7 43:16 46:4,11 63:25 77:3 91:16 96:9,15 116:19 118:1,7
fires [1] 19:24
firing [5] 15:25 17:22,23 64:2 89:19
first [11] 17:8 38:12 39:2 51:8 57:22 59:10 73:11 87:7 90:24 95:11 105:5
five [12] 3:16 11:7 35:7 35:11,17,24 36:8,21 38:18 38 21 41 12 61 11
fix [2] 21:15 58:3
flat [1] 39:18
floor [1] 51 3
Flores [13] 45:6 104:13 105:20 107 10,11,12 108 1,4 110 1,5,8 118:13 118:17
flurry [1] 58.10
focus [1] 79.12
follow [12] 25:24 27:2,6 27:7,8,9,10 34:11 98.18 115:1,5,19
followed [5] 13:20 25:21 26:18 29:14 70:23
following [5] 20:19 21:3 82:25 83:2 84:10
follows [2] 3 2 16 3
followup [1] 85:9
foregoing [1] 123:2
forever [1] 55 11
forewarning [1] 39:22
forfeited [1] 99:1
forgot [1] 40:1
form [3] 26:23,25 87 24
formal [3] 103:17 105:14 116:9
forms [4] 52:25 72:19 85:25 86:1
found [3] 21:7 47:17 71:12
foundation [8] 9:11 10:21,25 11:2 12:22,23 120:4,17
foundations [4] 11:16 47:11,16 119:25
four [10] 3:16 31:2 38:20 61:11 80:13 93:7,9 99:11 107:3 117:16
fourth [1] 36:4
Francisco [4] 17:11,14 17:15,19
Frausto [1] 104:20
freak [1] 8:18
free [1] 70:17
FROM/CHANGE [1] 122:4
front [1] 110:3
fulfill [1] 13:16
fulfilling [1] 15:20
full-time [2] 55:23 56:10
fully [1] 6:7
function [4] 55:11 78:21 100:13,15
functions [1] 98:17
funded [1] 9:11
funding [14] 13:16 43:24 44:9,12,15 45:16 46:14 46:16,17,23 47:2,10 119:1 119:16
funds [1] 45:23
future [1] 43:23

-G-

Garcia [3] 45:7 72:18 96 7
general [2] 13:25 69:13
generally [4] 19:11 24.18 106.2 107:4
gentleman [1] 104:11
George [2] 3:22 113.16
given [16] 4:8 16:11 39:25 42:12 43:14 44:7 52:4 70:17 75:21,23 76:17 78:6 79:13,25 123.4 124.19
giving [3] 39:22 47:21 89:13
glean [1] 83:19
gleaned [1] 71:15
Glenda [3] 67:24 68:14 68:19
Gloria [11] 67:23,23 68:10 81:19,20,22,23 83:8 89:5,8,8
goes [1] 10:4
Golly [1] 118:2
Gomez [19] 1:17,20 2:2 3:1,6,7 24:14 27:1 56:19 67:23 68:12 74:21 86:25 114 10 122:1,25 123.1,6 124:17
gone [6] 31:11 48:12 61:11 62:4 64:13 111:8
Gonzalez [10] 17:11 18:9 18:12,22 19:6 22:6,13 96:5 100:16 104:17
good [3] 55:2 93:15 101:21
Gorgas [2] 12:22,23
gosh [6] 10:1 14:24 35:12 41:11 68:24 117:4
govern [1] 13:20
grant [2] 55:4 84:2
grants [3] 83:25 120:18 120:19
grievance [6] 30:5,14,21 31:12 58:8,23
grievances [1] 30:1
grieve [5] 30:3,11 31:6,9 67:13
gross [1] 28:18
group [7] 12:11 58:20 61:10 94:4,22 95:24 106:7
groups [5] 11:16,16 12:1 12:15,15
guess [7] 23:23 25:18 27:21 85:9 94:4 97:1 110:25
guidelines [11] 25:13 26:18 27:7,8,11,11 33:24 34:12 115:1,8,10
guys [6] 27:18 94:25 102:3,9 103:3 119:1

-H-

H-I-N [1] 15:3
half [4] 7.20 43:15 101:2 110:12
Hamel [3] 89:5,8,8
hand [4] 23:3 93:16 109:23 124:27
handed [2] 31.17 32:3
handle [1] 70:18
handles [1] 10:2
happening [1] 78:8
Harlingen [3] 14:12 17:21 124:34
harm [1] 73:5
Harrison [1] 124:33
Harvard [7] 6:23,25 8:2 8:25 9:1,19 10:21
Hawkins [1] 17:8
head [8] 13:24 20:16 35:13,25 39:13,14 46:25 116:14
health [25] 1:11,13 8:4 9:5 10:7,24 13:10 14:5 34:14,14 37:9,14 43.25 47:13 49:15 50:12,14 78:14 83:25 84:1,3 108:8 108:23 124.11,13
healthcare [3] 13:20 14:1,3
healthy [2] 83:24,25
heard [5] 82:5,5,7 92:14 92:20
help [2] 4:9 52:10
helps [1] 109:2
Henry [3] 96:4 97:1,2
herein [1] 123:5
herself [2] 49:9 105:11
hierarchy [3] 94:22,25 95:17
high [2] 6:16,17
highly [1] 61:21
Hilda [18] 18:9,12,22 19:6 22:5,13 60:21 62:1 79:2 80:7 82:10 96:5,22 97:13 100:16 106:12,22 106:24
himself [1] 47:6
hire [4] 105:20 107:8 118:15,18
hired [12] 24:21 42:4 49:23,24 63:1,3 95:5 104:6 118:13,17 119:7,13
hiring [3] 15:25 17:22,23
Hispanic [4] 10:23 97:5 97:15,19
Hispanics [1] 11:3
history [1] 19:14
Hold [1] 98:5
honest [1] 10:1
Honors [1] 117:21
hoping [1] 74:16

HORTON [3] 29 23 31:24 74 17
Hospital [1] 51.2
hotel [1] 61 13
hour [1] 74:13
Houston [1] 10·7
human [9] 18·23 32 10 38 12 58 21 95·5,7 96:1,1 96 5
hung [1] 116:16
husband [2] 55·23 62:16

-I-

idea [2] 62:12 83:7
ideas [1] 85:15
identified [1] 100·11
identify [1] 32:9
ignored [1] 19:19
immediate [1] 71 5
immediately [1] 51:6
Imperial [4] 96:4 97:2 98:1,12
imply [1] 42:15
impression [1] 72:4
improve [4] 19:19 52.4 90:1 103.14
in-house [1] 56:8
inappropriate [1] 89:11
Inc [1] 124·32
incapacitated [1] 8 20
incidences [1] 73·9
incident [9] 59:18 62:2 64:22 65:1,16,20 66:15 71:20 88·2
incidents [1] 65:10
include [2] 31:19,20
included [2] 31.14 43:8
including [1] 26:24
increase [2] 80:24,25
independent [3] 45:12 47:11 92:15
indicates [1] 32:19
individual [4] 30:22 111:2,4 112:11
individually [1] 113:18
inform [1] 36:22
informal [1] 103:18
information [6] 4:18,23 5:20 37:25 86:13 110:19
infraction [1] 52:1
infractions [1] 28:19
inside [2] 57.2 109:16
insofar [2] 30:1 81:9
instance [1] 1:21
instances [2] 46:15 98:7
instruct [1] 5:8
instruction [1] 26:24
insubordinate [2] 21:20 60:5
insubordination [6] 29:12 37:5,16 39·17 116.10 118.7
insulted [3] 58.16 61 20 66:2
insurance [5] 16.16 64 19,20 86.1 115.9
intended [1] 28:7
interactive [1] 10 18
interchangeable [2] 69:17,19
interested [1] 124 26
Interfaith [2] 12.5,18
interrogatories [2] 93:19 105:18
interrogatory [1] 105:17
interview [6] 105.25 106 9 107.2,6 108:17 118:12
interviewed [2] 107.14 119.6
interviewing [1] 106:3
interviews [3] 105:25 106:23 107.17
intimidating [1] 67:8
investigated [1] 66:15
investigation [1] 64:15
involved [14] 3·24 5:13 11:14,18,22,25 12.3,15 12:21 16:2,7 18:25 22:8,9
involving [1] 112:4
island [1] 17:16
issue [1] 79·5
issues [10] 19:17 29:2 64:6 83:2,5,14,23 84:10 85:15 86:18
Item [1] 49:13

-J-

Jaime [1] 14:25
James [2] 89:5,8
Janet [1] 116:24
Janis [1] 1:26
Jewish [3] 97:4,8,9
job [37] 14:5 35:19 41:22 41:25 42:2,9,9,12,15,17 42:20 43:1,7,13,18 45:10 46:22 47:8 50:15 51:6,24 52:11 54:17,18,20,22 55:4 55:5 56:1,4,5 63:10 78:21 100:18,22 105:11 116:17
jobs [1] 16:25
John [1] 9:6
Johnson [5] 11:1,1,1 119:25 120:4
joking [1] 57:8
journalism [7] 7:4,5,8 7:12,17 108:5 109:2
Judy [3] 104:17,18,18
July [9] 23:9 31:4,5 44:10 44:12 77:5 86:21 89:18 93:10
June [2] 76 21 89 19
jury [1] 32 9

-K-

Kathy [5] 45:7,22 55 19 55 24 56:4
Kavanaugh [30] 1.4 2:2 2 2 3:7 17 24 18:3,20 22 19 24.3,21 25·9 27 3 27:12 28:3 30:2 32:4 35:4 40:3 42:9 50:3 55:15 61:3 82:15 83·5 85:11 96.9 103:22 112:1 113:2 124:4
Kavanaugh's [1] 41:22
keep [5] 10:1 31:10 43:9 47:19 72:19
keeps [5] 47·19,21 49:9 72 20 96 22
Kennedy [1] 9.6
kept [1] 38:4
kind [19] 6.6 8:6 9:7,8 10:2 26:18 39:22 41:4 44:19 58:23 59:17 74:22 75:6 82:12 87:21 105.10 114:4 117:23 119:19
kinds [3] 57:17 106:3,3
King [2] 11:20 12:16
knee [1] 8·19
knew [3] 47:2 70:7 82:1
knowing [1] 108:17
knowledge [1] 103:23
known [1] 95:14
knows [1] 47:1
Kury [10] 67:23 68:10 81:20,22,23 85:1,2,3 89:5 89:9

-L-

laboratory [2] 115:13 115:14
lack [3] 51.23 89:4,10
ladder [1] 14:7
ladies [1] 68:16
lady [1] 105:6
lap [1] 65:15
laptop [6] 62:3,4 64:11 64:11,15 65:16
laptops [1] 62:2
large [1] 93:22
last [19] 17:1 27:20 35:2 35:8,24 36:8,21 37:6 40:25 41:5,12 42:11 44:17 48:7 63:13 67:25 107:18 116:13 117:14
lasted [1] 76:21
late [13] 9:18 39:16,21 40:25 41:4,13,14 50:22 50:24 64:7 65:9 117:5,5
lateral [3] 20:5 56:15 92:18
laterally [1] 22:24
laudatory [2] 101:15 102 8
laughed [1] 61:18
law [2] 5:21 23·14
Lawless [2] 45:7 55:19
Lawson [1] 116·24
lawsuit [10] 3.19 4·1 5:5 110 17 112:9,12,22 113:4 113:6,9
lead [2] 11·24 44·21
learning [1] 8.10
least [1] 101:16
leave [5] 36:13 67:3,7 99:1,17
leaving [1] 14:16
lector [1] 11:23
left [6] 45:2 51 9,11 57:25 104:6,7
legal [1] 100:10
lengthy [1] 19:14
less [1] 74:13
letter [38] 26:4 27:14,19 27:20 28:5 32·15 37·2,23 37:24 46.6,9 60:4 61.2 63:23,23,24 64:3 65:19 73:12,25 74:8 75:4 81:15 88.18 89:23 90.9,19 91·1 91:5,14 92:8,16,25 93:10 93·12,12 100:17,20
letters [2] 16:11 91:7
liaison [2] 47·17,18
licensure [1] 71:9
life [1] 12:19
lightly [1] 66.5
LINE [1] 122:4
lines [2] 49:10 53:12
Lisa [2] 104:20,21
list [3] 36:8 94:15 118:9
listed [1] 123:5
listen [2] 21:17,17
litigation [2] 112:4 113:11
live [2] 6:9 17:20
lived [1] 14:19
lives [2] 17:21 55:25
loan [1] 102:3
lobby [1] 61:12
Lois [1] 14:25
longer [2] 15:4,15
look [21] 16:1 20:14 23:5 24:14 31:17 33:12,14 42:7 46:17 60:25 63:20 71:11 74:7 76:6 79:10 80:5,6 82:3 87:18 96:11 101:19
looked [3] 45:8,12 92:13
looking [8] 23:11 28:1 37:1 45:23 74:10 87:19 101:17 105:7
looks [1] 23:19
Lucio [4] 68:23 69:5,7 72:22
Lucio's [2] 69:14,21
Lucky [1] 17:18
lunch [2] 74:11 85 20

-M-

machines [1] 115.15
mail [1] 93:3
maintains [1] 19:4
major [4] 9:12 26 9,20 52:1
makes [1] 19:2
malperformance [1] 28:18
man [2] 17·18 47:19
manager [7] 18:23,24 19:15 32:11 58:21 96:5 116:18
managing [2] 66 19.20
manual [28] 2:1 23 4 24:15,16 30:10,21 32:6 33.9,19,22 34.1,14,17 36:1 42:20,20,22 79.9 95:2,2 98:19 99:14 114.10 114:24 115 6,14,18 116:1
manuals [9] 114:13,16 114:23,25 115:3,7,15,22 115:23
March [24] 61:3 73:12,14 74:9,25 75·2,4,5,6,8,19 75.21,21 76.16,19 79:14 80:7 82:12,13,15,19 88.1 88:3 89·16
margin [1] 94:11
Maria [2] 67:21 68:3
marital [1] 6:11
mark [2] 28:13 93:17
married [2] 51:8 67:25
masters [2] 10:6 108:7
matter [11] 3:17,18 46:13 60:3,4,6 65:7,13,14 71:8 118:25
may [13] 27:23 28:17,21 42:14 43:14 49:10 79:3 96·11 98:6 100:10 106:17 110:14 111:13
mean [43] 8:5 13:24 15:23 17:25 29:7 32:16,25 33:4 37:7 42:23 52:13 55:9 56:16 57:3 59:19 62:25 63:4,22 66:15 67:12,16 69:16 70:8 81:3,13,19 82:20 83:4 85:14 87:17 89:8 94:23 97:16,20 100:7 102:14 103:9 110:21 113:12 114:19 115:6 119:4 120:22
mean-spirited [1] 57:3
meaning [2] 41:6 85:6
means [5] 24:18 53:2 84:16 97:7 98:18
meant [2] 57:1 86:10
medical [12] 51:2 58:14 67:3 71:6,8,9 77:22,24 82:10 95:24 96:4,14
medically [1] 85·4

medication [1] 6 5
meet [4] 20·25 21 21 40.11 106.21
meeting [52] 21·12 22.8 22:9,10,20,21 29.9 37:17 38·25 39 2.2,6.16,16,21 40 2,9,25 41:5 51 24 52 18 54·6 58.1,19,21 59·13 64.24 65:9 82.13 82:14,16,19,20,23 83·5,5 83:8 84:21 86:16 87:10 87·12,17.21 89:16 91·14 91:15,23,25 92:2,9,12 93:7
meetings [4] 85.19,20 102:14,18
member [5] 12:8,10 15:5 15:7 112 25
members [11] 14.21,23 31.14,15 111.25 112:8,11 112 14,21,24 113:9
memo [3] 75:16 82:14 87·16
memorandum [15] 2·2 32.10 37 2 74.22 75.16 75:18 81:19,24,25 88:1,3 88:21 89:20,22 112:20
memorandums [3] 86.8 86:25 88 7
memorializing [4] 74:1 74 23 82.19 85:19
memos [2] 85:14 86:22
mental [3] 83.25 84·1,3
mentioned [2] 83 3 107:13
Mercy [1] 51 1
met [4] 51:8 93:13 106:19 106:21
method [1] 103:17
Mexican-American [13] 11:11,13 18:15 22.13 50:1 62:9 68:3,5,10,13 97:13,21 108:9
Mexico [1] 97:21
mid [1] 50:24
mid-level [1] 58:5
mid-levels [1] 58:12
might [10] 45:3 57:14,17 85:14,16 115:25 116:1 118:8,10 119:11
Milan [14] 49:17,18 50:1 50:6,9,20 51:8,19 89:4 106:5,13,14 119:13,20
mind [2] 20:11 56:23
mine [3] 26:3 53:2,5
minister [1] 11:23
minute [1] 114:6
minutes [3] 33:14 101.12 117:14
misconduct [1] 28:18
misleading [2] 81:9 89:11
missing [9] 32:2 35:15 44:11 62:3,4,5 64:8,11 65 16
mission [3] 13 17,22 15.20
missionary [1] 60.10
mistake [1] 27:24
moment [1] 87.18
money [17] 5:10 10 25 16.1 35·15,16 44:10 45·9 45:13 46·2 47 1 53·4,20 55:10 69:24 79:5 81.4 120:5
monies [2] 69:23 119:23
monitoring [1] 38:22
month [4] 43·15 44.17 80:11 113:1
months [10] 31:1,2 38:19 38:21 48:7,16 80:13 99:11 101 6 117:16
Moody [8] 61 7,16 62:7 63:11,13 64:22 65:1,15
Moody's [1] 62:3
morning [6] 20:19 21:1 21:3,22 40·5,11
moron [1] 47:1
most [5] 9:24 19:23,23 48:1 114 25
move [2] 4:9 14.6
moved [2] 30:5 58:18
Mrs [3] 61:7 65:1,15
Ms [27] 2:2 3·7 15:5 24·14 27:1 38 3,4 42:3 56·19 62:3,7 64:22 74:21 75:9 78:11 85:1 86:25 88:8,18 89:4 90:9,19,25 92:16 105:19 114:10 119:20
multi-copied [1] 72:19

-N-

name [12] 3·5,21 45:5,6 49:16 63:13,14 67:19,25 105:8 116:24 120:21
named [1] 104:11
names [9] 35:12,13 41:13 68:1,2 94:10,12 104:9,16
national [2] 77:14 117:21
nature [2] 66:4 86:14
nauseam [1] 82:7
necessarily [1] 94:1
necessary [1] 13:16
need [8] 5:17 23:23 27:6 53:14 57:7 103:14 114:3 115:4
needed [7] 38:15 46:22 52:21 64:18 70:13 71:6 117:15
negative [1] 102:23
never [15] 51:14 55:13 58:15 59:11 70:18 71:19 73:2 81:12 82:6 83:4,15 84:20,24 105:14 111:14
new [5] 8:3 45:4 54:17,20 67:25
newcomer [1] 60:9
next [4] 21 11 94 10.11 102:20
nobody [1] 39 8
nodded [3] 20:16 39·13 39.14
nonattendance [1] 53 8
none [3] 59·7 110·9 113 5
nonfederal [1] 120:12
nongovernmental [4] 120·13,14,15,20
nonprofit [1] 12:25
nonpublic [1] 119:23
noon [4] 40 21 74.11 92:6 92:7
nor [3] 29:11 124:25,26
normally [1] 100:12
North [1] 1:26
Nos [3] 2·4 81 18 109 25
Notary [1] 123:15
noted [1] 112.6
notes [3] 38:1,4 49·9
nothing [7] 5 20 36·1 46.7 69:9 82:21 86:15 102:23
notice [8] 75:8,15 76 8 76:18 77:11 80:18,19 112:3
notices [1] 79:23
notification [1] 23:14
notify [2] 29·4,11
now [23] 12:23,24 13:5 14:4 17:9 18:13 23:20 24:12 36:13,19 47:7 48.5 51:2,16 52:19 62:16 88:7 98:25 100:1 103:1 104:3 110:2,11
number [6] 19:16 64:6 75:12 76:10 104:8,10
numbered [3] 1:22 32:8 76:11
numbers [3] 4:9 24:7,9
numerous [2] 112:10 114:13
nurse [1] 51:3

-O-

oath [1] 5:19
Ob/Gyn [1] 117:10
object [8] 26:22,25 46:19 72:6 84:5 90:13 91:20 112:2
objection [4] 23:12,21 83:16 112:6
objective [5] 26:14,17 28:1,14 33:5
obligation [1] 23:18
obtain [1] 5:21
obviously [4] 59:9 86:6 104:13 106:12
off [24] 8:19 13:24 14:6,8 17:16 33:18 35:13,25 48:12 52:17,24 53:1 55:14 60 12 69 3 71 7 74 17,18 74.20 76 24 77 11 109·10 116 13 120 24
off-the-wall [2] 56·20 56:21
offended [2] 58:4 61:21
offending [1] 57.18
offense [1] 58:17
offered [3] 63.5 90 11 90:22
offering [1] 20:4
offhand [1] 104 23
office [16] 20·15,18,18 21:1,4,4,12,15 27.21 30:15 40:19,20 58:1 62:6 67:4 95:6
offices [4] 1:25 67:2 69:9 69 13
old [1] 108:11
older [1] 99:21
once [1] 90:16
one [76] 4:6,7 5:24 7 20 9:13,19 14:24 16 9,14,21 16:22 17:8 19:2,21 20:1 20:13 23:12 24:4 28:7,24 32·2 42:11,14 43:3,5 45:12 47:15 53:10 56:23 57:2,20,22 58:12 60:19 64:10 69:4,5 71·4 75:1 76:10,11,14 80:13 84:12 87:3,3,6,7,9,10,11 88:19 90:2 95:15 98:12 101:3,7 102:3,6 105:24 106:4,16 106:19,22 107:12,21 112:18 114:18 115:22 116:13 117:8,14 118:8,13 118:15,17
one-month [1] 101:5
ones [7] 12:3,6 26:20 51:25 68:18 105:19 106:24
Ongoing [1] 89:10
operations [4] 18:14,19 95:25 96:6
opinion [3] 32:23 37:16 110:3
opted [2] 23:1,2
option [2] 16:15 22:24
options [1] 20:14
ORAL [2] 1:16,20
order [3] 26:18 52:25 69:23
organization [9] 10:24 13:6 16:3 23:18 50:22,23 77:15,17 100:12
organizational [3] 95:12 96:20 106:8
organizations [3] 11:15 12:14 46:17
original [2] 101:24 102:6
originals [1] 72:21
outside [3] 94:11,19 105:2
overnight [1] 20:15
oversee [3] 15·25 17 22 17 23
oversees [1] 85:6
own [3] 21:12 38·1 111:14

-P-

packet [1] 106:25
page [11] 27 20 28·17 32:2 42.8 60·25 101 3,9 101:16,18 122·4 123:5
pages [4] 27.19 28:8 32·8 102:1
paid [2] 5 10 29·6
paint [3] 67:1 69:22 72:3
painted [2] 67:4 69:1
painting [2] 69:5,9
paper [1] 115:4
par [1] 43:21
paragraph [1] 115 25
parcel [1] 32.1
part [18] 13:25 31:12 32·1 34:21 37:1 43 18 44:21 47:7,15 78:16,22 79:4 81:17 86:3 95:4 106:9 107:6 118:23
participated [1] 106:15
particular [23] 3:18 17:2 22:10 34:11,12 42:14 43:13 46:13 47:14 55:11 59:18 60:17 71:20 76:14 78:9,17 81:6 97 24 102:11 107:5 110:15,17,22
particularly [5] 14:2 32:4 49:14 58:5 79:11
parties [1] 124:25
parts [1] 38:1
party [3] 32:20 112:5 113:11
passed [1] 20:8
past [1] 12:4
patient [4] 119:24 120:6 120:8,16
Patti [1] 35:22
Paul [77] 1:4 3:7 17:24 18:3,20 21:5,9 32:12 42:10 47:6 50:3 51:17,23 53:12,17,25 54:4,13 55:15 56:13,19 58:19,23 59:13 59:18 61:3,9,11,14,18,25 63:1,3,7,9,12,16,17 64:14 66:25 70:1,7,9,9,16 71:19 71:25 72:18,24,25 73:13 75:9,21 82:15,19 83:5,8 83:20 85:3,7,10,13 87:4 87:11 88:8,15,15 104:18 108:14 109:14 112:1,19 113:2 119:7,13,14 124:4
Paul's [5] 23:7 40:20 46:1 71:2 109:16
Paula [10] 1:17,20 3:1,6 27:25 122:1,25 123:1.6 124:17
pay [3] 56:17 80:24 81:4
paycheck [3] 67:6,6

.71 14
**pending** [1] 47 9
**pension** [1] 81 1
**people** [63] 14:24 18.6,7 18:8 19:8,25 35:7,11 36:7 40.10 41.13,14 44 20,24 45 1,8,10,14,17,19 53.11 57 19 66:19,21 67.18,19 79:5 85 11,14,17 87:23 93:22 94:3,5,8,9,11,12,19 94:22 96:8 97:1 98.8,20 98.23 103:2,9,21 104:3,3 104:8,10,15,24 105.2,23 106:2,4 110:14,19 111.13 118:13,18
**per** [1] 33.23
**percent** [3] 120:7,9,15
**percentage** [3] 81:3 120:5,11
**perform** [1] 43:21
**performance** [7] 52.5 66:3 77:22 87:25 100:23 101:9 102.15
**performs** [1] 100:21
**period** [6] 28:21 51:10 62:18 77:13 80:11 89:18
**permanent** [1] 43:24
**person** [23] 15:10 19:9 22:2 35:1 39:15 40:15 44:18 50:18 55:18,22 63:7 77:19 78:1 96:13 100:5,6 102:13 105 17,25 106:6 106.18 110.4 117.2
**person's** [1] 49:16
**personally** [4] 52:8 54:12 58:17 61:22
**personnel** [50] 2:2 14 14 18:23 19:4,7,8,12 27:16 31:17 32:3,17 37:3,23 38:1,8,11 42:8,20,22,23 42:24 43:8 48:24 60:14 60:25 74:4,7 75:7 76:8 79:9 80:5 81:17 84:1,1 85:12,21,23,25 86:1,4,5,6 86:9,23 87:16 95:2 109:6 109:17 115:6 116:1
**persons** [2] 17:4 110:13
**persuasion** [1] 96:25
**pertinent** [1] 119:11
**Peru** [1] 57:5
**phone** [3] 21:7 39:20 116:16
**physician** [2] 116:22 117:10
**physicians** [3] 98:7 117:9 118:10
**pick** [1] 78:17
**picked** [2] 45:1,8
**piece** [1] 85:16
**pieces** [2] 45:14 112:10
**place** [9] 11:21 19:3 30:15,22 53:19 57:16 58:16 65:13 89:17
**placed** [1] 89:17
**places** [1] 17 2
**PLAINTIFF** [1] 1:21
**plan** [8] 23 15,16,22 24:2 44:16 81.1 100:9,11
**planned** [1] 44:11
**planning** [1] 57:12
**plans** [2] 43 23 54.10
**pleasure** [1] 74:11
**point** [20] 19:21 21.21 30:4,7 40:8 43:22 44:8 52:3 53:16,23 58:18 71:11 73:18 90:7,8,19,25 91 2 100:9 112:3
**points** [1] 68:22
**police** [2] 64:14,21
**policies** [3] 19:4 32:17 114:12
**policy** [52] 2.1 23.4 24:15 24:16,21,24 25:1,8,12,22 26.16 27:2,2,5 30:1,2,10 30:14,18,25 31:5,8 32:5 33:3,9,15,19 34:8 42:19 58.24 76:1 77:10 78:4,16 78:23,25 79:4,7 98.19 99:3,5,7,10,13,14,17,21 99:24 114:19,20 115:2,5
**political** [3] 11:25 12.11 12:14
**poor** [1] 87:24
**position** [18] 14:13,18 14:20 18:13,20 19:22 20:5 20.23 46:1 51 4 54:25 55:3 56:8 63.6,8 96:12 104:4 119:9
**positions** [2] 106:3,4
**possessed** [6] 38:15 56:25 57:7,20 58:2 67:8
**possession** [2] 111:11 111:14
**possibility** [1] 64:12
**possible** [2] 46:16 89:2
**posted** [2] 95:5,7
**practice** [1] 119:8
**practitioners** [1] 58:5
**praises** [1] 101:9
**pre-med** [3] 7:3,10,11
**prepared** [3] 9:22 55:6 94:25
**present** [1] 107:16
**presented** [2] 9:10 83:15
**presently** [1] 13:8
**presents** [1] 105:24
**presumably** [1] 76:17
**pretty** [4] 57:15 58:12 73:4 96:23
**previous** [1] 43:4
**previously** [4] 74:21 88:4,5 99:9
**priest** [1] 57:12
**priests** [1] 57:14
**primary** [1] 14:3
**private** [3] 12:25 47:11 120:22
**privilege** [1] 112 5
**privileges** [1] 98 18
**probation** [22] 29:3,17 41:8 73:13,17 74:1,24 75:5,25 76:3,15,21,24 77:8,11 78:4,17,19 79:6 79:13 89:17,18
**probationary** [1] 28:21
**problem** [11] 6:6 39:19 49:13 54:16 66.7 68:22 69:14,17 71:2,4 102:24
**problems** [3] 29:2 52:7 77.1
**procedure** [2] 1:27 115:3
**procedures** [2] 114:12 115:18
**process** [10] 25:20,24 30:6,22 31:12 58:22 106:9 107:7 108:17 118:12
**produce** [1] 110:24
**produced** [6] 1:21 23:3 81:15 110:22 111:23 114:11
**production** [6] 4:24 81:16,18 109:25 111:8,9
**professional** [3] 66.2,2 69:19
**professionals** [2] 93:24 93:25
**program** [7] 8:3 9:4 10:7 11:3 37:14 44:1 100:3
**programs** [1] 85:15
**promise** [3] 70:6,21,22
**promised** [5] 49:5 70:4 70:16,19 72:5
**promises** [2] 47.21 83:21
**prompted** [3] 89:22,24 92:8
**proposals** [2] 45:13 46:2
**propose** [1] 54:20
**provide** [4] 14:1 24:1,4 42:2
**public** [6] 9:5,5 10:7 15:23 108:8 123:15
**pull** [1] 60:11
**pursuant** [4] 1:27 25:21 99:3,5
**purview** [1] 89:6
**put** [20] 23:12 29:2 41:7 45:14,20 59:23 71:17 72:24 73:13,17 74:4,5 75:5,7 86:25 91:19 94:10 95:17 98:20 103:12
**putting** [2] 19:24 106:25

-Q-

**qualifications** [5] 105:13 108:3,13,14,18
**qualified** [3] 57:14 100:18 110:5
**quarterly** [1] 47:9
**questions** [7] 5:17 26:23 36 11 90 16 113 3 119 10 121:1
**quick** [2] 16:22 114 8
**quite** [2] 8 20 63 22

-R-

**R-E-I-F-F** [1] 67:24
**Rachel** [3] 67.21 68:5,19
**raise** [5] 61 14,18,19,20 67:9
**rattle** [1] 120:24
**Ray** [3] 23:21 27.22 42:25
**Raza** [1] 12:8
**reached** [1] 57:25
**read** [18] 33:10 82:2 83:1 83.9 90:8,15,19,24,25 91 5,13 92:25 93:6,12 101:11,12 109:18 123:2
**reading** [2] 83:18 84:7
**real** [1] 50:15
**really** [18] 10:1 19:25 22:17 25:3 27:17 30:7 33:23 37:4 43:9 57:24 71:6 81:14 83:15 86:15 97:9 98:1 105:19 106:25
**reason** [22] 4:17 14:16 33:5,7 35:14 40:1,4 41:19 47:17 51:17,21 53:7 57:22 62:21 64.18 88:14 91:24 102:18 103:6,10,11 122:4
**reasons** [9] 4:25 26.15 26:17 57:20,23 62:14 74:1 74:24 122:2
**recalls** [1] 36:16
**receive** [3] 69:23 77.13 78 12
**received** [2] 24:12 84:2
**recent** [1] 9:24
**recess** [2] 33:17 114:9
**recognized** [2] 71:4 78:2
**recommendation** [1] 105:22
**recommendations** [4] 19:18,19 52:4,15
**recommended** [1] 78:5
**record** [10] 3:5 23:12 74:17,19,20 81:9 114.4 122:2 123:3 124:19
**redeemable** [1] 60:12
**refer** [6] 65:19 85:25 89:3 101:2 112:3 116:1
**reference** [6] 66:20 73:16 82:21 83:7 85:15 87:24
**references** [1] 106:23
**referring** [6] 38:7 79:11 87:20 88:17 99:13 100:9
**refers** [4] 87:9,11 88:2 89:2
**refused** [1] 117:13
**refusing** [1] 67:2
**regard** [31] 3:17 10:4,20 16 4,6 27:2 29 16,17 30:18 38:25 41:4 50:6 52 6,19 54.5,15 62:3 64:15 65.1 66.7 72.9 80:17 84:21 86:18 87:16 88:24 94:25 111:21 116:4 116.10 118.11
**regarding** [4] 32:11 38:14 105:23 113:4
**regular** [1] 94:15
**regularly** [1] 52:18
**regulations** [3] 13.19 16:3 29:14
**Reiff** [2] 67.24 68:14
**relation** [1] 84:4
**relations** [1] 15:23
**relationship** [3] 49:14 119:9,11
**relative** [2] 124:24,25
**relevant** [1] 110:20
**religion** [1] 97:9
**rely** [2] 33:6 60:16
**remainder** [1] 8:12
**remember** [45] 4:5,19,19 5:14 9:17 10:25 13:21 23:7 35 2,25 41:11 48:9 62:22 63:15,21,22,23,24 65:17,22,23,23 68:2 69:16 70:12 73:15,15,16 79:3 96:17,17,18 99:6 104:9 104:16,23 105:8 106:7 113:21 116:13,21,24 118:2,6,9
**reminded** [1] 78:3
**remorse** [1] 21:22
**removed** [1] 43:11
**repeat** [2] 39:25 120:2
**repeatedly** [1] 117:12
**rephrase** [2] 114:16 118:16
**replace** [1] 64:20
**report** [8] 9:10 35:15 47:20,21,24 49:6 64:19 64:21
**reported** [3] 1:23 62:5 124:20
**reporter** [7] 1:24 10:12 90:18 107:25 108:2 120:3 124:17
**REPORTER'S** [1] 124:15
**reporting** [1] 16:4
**reports** [3] 15:24 47:10 47:15
**represent** [1] 3:7
**reprimand** [2] 41:7,17
**reprimands** [1] 28.19
**request** [10] 2:4 4:23 70:2 81:16,18 84:2 109:25 111:7,8,8
**requested** [7] 53:18 58:19 69:3,24 70:1 71:7 78:3

requests [2] 67 3 71 13
required [1] 52 25
reserve [1] 121:3
residents [1] 14.1
resign [1] 62.23
resigned [1] 62 15
resource [6] 18·23 32 10 38.13 58.21 95:6 96:5
resources [3] 46 18 95 7 96:2
respect [2] 23.17 72:22
responded [3] 91 19 102 4 111:7
response [8] 5:17,25 20:21 72:1 73:4 78·5 84:2 90·21
responses [5] 4 23 81·16 81 18 105·18 109·24
responsibilities [3] 13:15 20·6 93 23
responsibility [4] 13:14 23:13 26:3 48.20
responsible [6] 15.24 16:9,14 84.4 100:2 103:9
responsiveness [4] 46 20 84 6 90·14 91 21
restate [3] 16 13 41·2 99·8
result [2] 82:23 91.6
resulted [1] 82:23
resume [6] 9:21,22,25 109:16,21 110:1
resumes [1] 110:2
retired [1] 17:19
retrospect [1] 108:15
review [9] 33·19 38:7 102:10,11,11,23 103:2,7 109:21
reviewed [3] 24:17 25:2 110:2
reviewing [2] 38:9,10
reviews [3] 103:2,3,11
revised [1] 96:23
revoking [1] 71:13
reword [1] 34:10
Reyna [1] 45:7
right [71] 3:9 7:23,25 10:13 14:6,8 17:2,13 21:11 24:11 25:10 30:16 30:19,20 31:1 34:3 37:24 43:16 44:25 48:5,13 54:15 56:9 58:24,24 59:8 60:17 60:18 63:22 71:3 79:17 79:21 80:11,14,18,21 81:10 82:13,23 84:22,23 85:8 86:17,20,24 88:6 89:15 91:1 92:1,6,7,9 94:1 94:2 97:24 98:3 99:3,4,12 101:16 102:5 104:23 105:4 107:23 109:9,17,19 111:17,20 118:14,20
rights [1] 59:5
ring [1] 104:17
RN [1] 50 12
Robert [4] 119 25 120 4 120 10,17
room [1] 51·3
round [2] 59:14,15
rules [2] 1.27 43 12
run [2] 46 24 47.3
running [3] 44 9 77 20 93.3
runs [1] 44:13

-S-

salary [5] 56:4,13 80·25 81:4 109:11
Sanchez [1] 1:25
sandwiched [1] 17 13
Sarah [1] 15 10
satisfactorily [1] 28:21
satisfied [1] 52:11
saw [2] 57.5 73:11
says [23] 24:17 32:14,15 32.19 33 3 34·15 36.2 43:17 72:10 75:15 76:16 76:20 80:25 82:14,25 83:2 83.23,24 84:1,10,14,16 100·20
scenario [1] 81 6
schedule [1] 91:14
scheduled [2] 22:20 29:10
scheduling [3] 39:2,6 106:17
Schlesinger [1] 9:12
Scholar [1] 117·21
school [8] 6:16 9:6 47:11 49:14 50:14 51:5 72·23 106:5
school-based [1] 43:25
schools [1] 83:24
Science [2] 12:22,23
screamed [1] 116:16
se [1] 33:23
searching [1] 46:2
second [4] 21:25 61:15 82:25 83:1
secretary [2] 10:2 47:22
Section [2] 25:17,18
secular [1] 57:16
see [16] 9:17 14:24 16:21 21:14 24:7 28:5 33:20 38:20 40:8 42:19 51:11 74:8 79:9 81:17 87:23 102:24
seeking [1] 86:13
seem [1] 73:21
seminar [4] 48:10 52:21 53:21 54:10
seminars [6] 52:16,19 72:9,11,13,14
send [2] 78:7 113:8
sending [1] 23:13
sent [7] 58 20 78 20 85 14 86 22 87:7 112.10,19
sentence [7] 34·21 82.25 83.1,18,19,22 84.7
separated [1] 16:12
series [6] 28 19 29.1,7 37:20 52·25 89·25
serious [7] 19·17 60:3,6 64 23 65:6 66·4,4
services [7] 43:25 49:15 50:12,13,14 51·9 96·1
session [1] 71·22
settle [1] 5·7
settled [1] 5:5
several [4] 26:23 43:20 93:3 105·22
severity [1] 28 23
sheet [2] 115 4 122:1
SHELLEY [3] 1 23 124.16,30
shoes [1] 46:1
short [1] 62:18
shortly [3] 49:22,24 91:15
show [11] 4:22 21·6 27·14 29.9 39:16 40:4 52 23 61·19 77·20 90:6 91·23
showing [2] 64:7,24
side [1] 72:25
sign [7] 53:2,3,3 117 12 117:14,18,19
sign-off [1] 53:1
signature [2] 79:21 123:1
signatures [2] 53:5 79:14
signed [16] 42:10,14 43:5 52:24 53:1 64:3 72:10 75:9,9,24 79:24 80:7,8 87.24 88:3 111:3
signing [2] 63:23 80:6
single [3] 6:12 28:18,24
sit [3] 119:3,17,21
sitting [2] 118:14,15
situation [9] 26:3,10,12 28:23 30:13 35:1 73:13 74:3 111:3
situations [2] 26:8 72:23
six [3] 9:9 48:7,16
skills [1] 101:16
social [2] 11:16 58:11
Society [1] 12:22
someone [6] 44:19 53:19 57:18 78:6,7 113:24
someplace [2] 17:16 55:25
sometime [2] 25:2 117:5
somewhere [4] 9:18 51:7 76:7 118:4
soon [2] 21:4 40:19
sorry [14] 7:8 11:10 25:23 32:7 39:4 59:15 61:1 81:3
88·17 99.8 110 24 118 16 120·1,24
sort [2] 77 8 98 8
sounds [2] 27:17 102.8
sources [4] 44·16 46·16 119:23 120 6
SOUTHERN [2] 1:2 124:2
Southmost [6] 6.21 7 1 7:2,19 13.4 105:7
space [1] 67:4
speak [3] 49:11 100:17 113:1
speaking [1] 38:3
special [1] 119:24
specific [10] 25·13 29·5 52 15,16,19 85 25 86:5 89:7,13 100 4
specifically [10] 26:20 58 2 59:14 60:15 78:20 89:3 112:22 113·5 115.13 115:25
Speeding [1] 114:5
spending [2] 19:22,23
spent [1] 53:21
spirits [1] 57:1
spoke [2] 21:19 59·21
spoken [3] 105.22 112:23 113:5
sponsored [1] 10:21
spots [1] 36:14
spring [1] 25:6
stack [2] 93:5 96:10
staff [29] 16:1 17:23 21:13 31:14 38·14 57:24 58:1,4 61:11 65:20 66:1,6 66:12,14,16,22,24 68:23 69:14,15,17,18,20,21 70·12 84:3 89:11,12 112:20
stairs [1] 8:19
stamp [6] 32:5,7 75:11 76:6 79:10 86:23
stamped [3] 27:21 87:11 101:9
stamps [1] 24:10
standard [1] 34:22
standards [2] 28:20 51:24
start [1] 10:9
started [4] 7:3,9 14:4 46:1
starting [1] 109:11
state [13] 1:24 3:5 4:5,6 16:3 25:23 34:18 35:23 76:14 77:10 115:25 123:9 123.16
statement [6] 13:17,22 15:21 32:17 34:5 111:1
statements [4] 57:17 110:14 111:6,21
states [3] 1:1 30:14 124:1
stating [1] 96:21
status [1] 6.11
statutes [1] 16:7
stenograph [1] 124 21
step [1] 59:10
stepped [1] 45:25
steps [1] 27.5
sticker [2] 24:7,9
sticks [1] 56·23
still [8] 12:22 17:15 47:23 62:7 91:20 99:25 110:3 114:3
Stingley [4] 1:23 124:16 124:30,32
story [2] 36:20 72:25
straw [2] 37·6,19
structure [1] 106.8
studied [1] 7.17
studies [1] 7:22
study [1] 7:15
stuff [5] 10:5 16:11 84 8 103:18 114:19
style [2] 66:19,20
styled [1] 1:22
Su [5] 14:12,16 16·23 17·5 50:25
subjected [2] 40·24 41.3
subjective [7] 26:6,12 26:14 34:5,7,19,20
submit [1] 47:20
submitted [1] 47:20
SUBSCRIBED [1] 123:11
subsequent [2] 82:14 99:24
subsequently [1] 124:21
succeed [1] 73:18
such [9] 30:13 31:10 47:10 52:9 85:24 86:1 103:20 119:8 124:25
sued [3] 113:13,19,22
suggest [1] 52:7
summary [2] 24:2 100:11
summertime [1] 25:5
superior [1] 85:7
supervise [1] 19:25
supervised [2] 85:3,4
supervision [2] 20:1 124:22
supervisor [26] 17:5 19:23 20:11,20,24 21:24 29:4,11 38:3,13 48:2,21 52:17,18 53:2,8 58:15 59:10,21 71:5 72:20 73:21 74:8 82:9 86:3,4
supervisor's [2] 48:20 74:2
supervisors [3] 17:7 29:5 58:6
supervisory [4] 18:20 20:6 93:23 101:15

supplement [1] 36 25
supplies [5] 69 23,24 70 5,10,17
support [1] 50.3
supported [2] 50.5,7
supposed [7] 22 20 44·7 45 11 72 9,11 77·10 80:23
supposedly [1] 73 13
suspended [1] 81.7
suspension [2] 80·24,25
swallowed [1] 59 16
swear [3] 93 5 96.10 117 6
sworn [3] 3 2 123:11 124·18

-T-

taking [2] 19.21 67:5
talents [1] 20·1
talks [1] 32 18
tap [1] 46.17
team [1] 77 18
technically [1] 13:3
teen [1] 44 1
telling [3] 38:14 47:19 115 4
tells [1] 77 7
ten [5] 12 20,21 16:24 41 1,5
Teresa [2] 67:23 68:12
term [1] 100:10
terminate [9] 25:21,24 26 6,12,19 27:6,11 28:3 28:15
terminated [25] 5:1 16.12,18 21:23 23:5 26 19 31 1,3 32:20 34·23 35:23 36:7,22 38:19 41:20 44:10 44 12 48:8 55:16 62:19 63 12,19 79·18 98:25 99:18
terminating [1] 60:17
termination [29] 4:17 19:1,13 23:8 25:12,14 27:3,13,19,20 29:16 30:11 30:23 31:7 32:14 37:3,4 48:13 51:17,21 57:21 60:5 62:21,23 99:6,12 100:17 100:20 101.2
terminations [1] 26:1
terms [2] 84:3 99:16
testified [2] 3:2 88:5
testify [2] 6:7 36:10
testimony [3] 26:24 123:4 124:19
Texas [18] 1.2,25,27,27 6:21,21 7:2,7,15,18,24 13:4 47:11 105:6 123:9 123:16 124:2,34
thank [4] 95:13 102:9 108:2 121:2
theirs [1] 71·2
themselves [1] 115 3
therefore [1] 91:5
thereto [1] 80·3
thinking [2] 25 6 115 13
thinks [1] 97 10
thought [5] 13 5 20:9 57.11 71 2 119·10
threaten [1] 71.24
threatened [5] 67 5 71:13,14 103:22,25
three [16] 14·24 17.7 20:3 20:8 28:7,19,24 47:23 48:12 90·11 91:18 92·14 92·23 99:11 101:6 106:2
three-month [1] 101.5
through [10] 10:23 12:24 33 14 60:15 70 23 74:7 75:4 87:18 108 16 118:9
throughout [1] 12:19
tickets [1] 114 5
Timeframe-wise [1] 9:15
timely [1] 89:10
times [1] 65:11
tire [1] 39:19
title [3] 13:11 35.19 116 17
titles [1] 35:19
today [6] 5:16 6:7 24.24 31 5 56:9 108·17
together [8] 45:10,14,17 45:20 71:22 106:25 108:17 120:8
Tomorrow [1] 20:15
took [5] 24:16 58:17 59:11 86:6 89:17
top [7] 13:24 35:13,25 76:11 95:17,19 116:13
total [2] 120:5,11
totally [2] 50:16 92:15
touch [1] 117:20
touched [2] 100:1 116:5
town [2] 15:15 57:14
track [2] 43:9 103:13
training [1] 29:5
transcribed [1] 124:21
transcript [2] 36:14 123:2
transcription [1] 122:3
transfer [9] 20:5 22:24 54:18 56:15 90:9,11,20 90:22 92:18
transferred [1] 55 23
travel [3] 53:1 78:19 79:4
tremendous [1] 47:14
Trevino [1] 17:13
trial [2] 5:22 36:20
tried [1] 91:14
Trinity [4] 6:22 8:1,3 9:18
trouble [1] 70:14
true [2] 123 3 124 18
truth [2] 5·19.20
try [2] 52.7 74 12
trying [5] 79 12,12 91:11 93.19 95 10
two [19] 4 6 16 25 17·1 27 19 30·25 31.22 43:15 48.11 53·10 72:11 79:19 86·21,25 88.7 89.19 90:16 91.6 107:22 120·16
type [5] 6:5 60:1 66·7 74:22 77·14
typical [2] 87:20 103:2
typically [2] 15:21 43:11

-U-

U.S [1] 97 21
ultimate [7] 18 1 26.3,4 30:14 53:5 63:16 105·21
ultimately [3] 63 25 71:1 107·8
uncomfortable [1] 114:2
under [19] 5:19 6:5 13:3 13·3 23:14 25:18 34:13 35.21,22 45:18 58:24 59:2 68:16 72.4 89.6 95·16 96.14 113:15 124.21
underserved [1] 14:2
undersigned [1] 123:12
understand [8] 5:15,22 6:1,2 79:12 84:18 91:3,10
Unfortunately [1] 27:15
UNITED [2] 1:1 124:1
university [2] 6:23 13:1
unless [2] 78:19 86:4
unresponsive [1] 90·23
up [31] 10:1 14:6 20:17 24:11 29:9 39:14,16,17 39:24 40:4 41:7 43:21 45:1,8 46:3,5 47:25 48:2 59:20 64:7,24 72:10 76:11 78:17 88:9,25,25 90:6 91:23 102:20 116:16
used [1] 43:4
usual [1] 102:19
usually [3] 44:16 93:2 95:4
UT [2] 10:7,7

-V-

vacation [2] 47:23 48:3
Valley [3] 12:5,18 17:20
various [3] 60:10 88:10 115:1
verbal [4] 5:25 49:1 59:24 73:20
verbally [1] 73:7
Verbatim [1] 13:23
verified [1] 93:19
verify [1] 49:7
VIDEOTAPED [2] 1·16,20
violate [1] 43 19
violating [1] 114·20
violations [4] 26:9,9,20 114.18
voice [1] 67·9
voluntary [1] 70:13
VS [2] 1:8 124 8

-W-

wait [3] 44:17 61.15 89:19
waiting [1] 91:17
walked [2] 20:17 39:21
wall [1] 52 18
wanting [1] 86 13
warning [2] 49:1 59:24
Washington [2] 10:24 17:9
ways [1] 115:16
weeks [11] 9:9 20:3,8 35:8 47:23 48:12,12 90:11 91:18 92:14,24
weighed [1] 37·21
weird [1] 27:17
West [1] 6:10
wherein [1] 58.1
White [1] 15 10
Whittington [1] 1:25
whole [6] 5:19 29:1,7 37:20 66:14 90:2
willing [1] 92:18
withholding [2] 67:6 71:14
within [23] 23:18 26:25 35·2,24 36:8,16,21 40:25 41:5,12 48:6,7 56:2 59:5 66:21 80:11,12 94:22 98:17 100:12 104:25 106:8 111:11
without [2] 32·20 39:22
witness [13] 1:21 10:10 10:13 23:7,10 95:13 97:6 97:17 110:24 111:6 124:17,19,27
witnesses [2] 110:14,18
Wood [4] 119:25 120:4 120:10,17
word [1] 95:11
wording [1] 4:20
worked [12] 8:12 14:12 15:16 42:3 45:15 50:21 51:1,3 58:15 105.6 108:23 117:9
workers [1] 58.11
workplace [1] 8:13
write [7] 34:20 39:17 41:7 49:5 58:13 59:20 111:2
writer [2] 55:2,4
writing [9] 45:22 46:2 59:23 71:17 72:24 89:20 111:1 116 6 119·20
writings [2] 115:2 116:2
written [12] 28:19,22 34·4 37·24 39.24 45 13 46 6 49:2 61:3 75:19 79·15 82·1
wrong [3] 15·11 20:10 25 7
wrote [3] 37.7 38.2 49:6

-X-

X [22] 1:4,5,6,7,8,9,10,11 1:12,13,14 124:4,5,6,7,8 124:9,10,11,12,13,14
XI [1] 25:18
XII [1] 25·17

-Y-

year [12] 9:10 10:15 25:3 25:5 35 2 47:24 99·10 101·1,1,2 110:12,12
yearly [1] 103 3
years [18] 3:16,16 7·18 7:20 9:15 10:14 12:20,21 15:18 16:24 17:1 35:24 36:8,21 41:1,5,12 109·1
yourself [4] 11:11 19:6 39:3,5
youth [1] 43.25

-Z-

Zabarte [26] 1:26 3:4 4:11 23:20 24:9 27:17 28:9,12 29:21,24 31:22 31:25 33:13 36:15 42:24 46:19 74:12,15,18 84:5 90:13,24 91:20 104.7 112:6 121:1



BRYANT & STINGLEY, INC.
CERTIFIED COURT REPORTERS
2010 East Harrison Street
Harlingen, Texas 78550

McAllen Office
(956) 618-2367 Fax: (956) 618-0087

Harlingen Office
(956) 428-0755 Fax: (956) 428-7133

E-Mail: bryantstingley@bryantstingley.com
Texas: (800) 462-0253

March 7, 2002

Francisco J. Zabarte
SANCHEZ, WHITTINGTON, JANIS & ZABARTE
100 North Expressway 83
Brownsville, Texas 78521

RE: CIVIL ACTION NO: B-01-104
PAUL CAMERON KAVANAUGH VS. BROWNSVILLE COMMUNITY HEALTH CLINIC CORP., ET AL.
IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS BROWNSVILLE DIVISION

**Name of Deponent(s):** **Paula Gomez**
**Date Taken:** **December 18, 2001**

Enclosed are the following items:

☑ Original Errata Sheet/Signature Page
XXXX Signed & Notarized
______ Exhibit(s) provided by Deponent
______ Signed, not notarized
______ Unsigned

☐ ______ Unclaimed al Documents

Sincerely,

**BRYANT & STINGLEY, INC.**

Yadi Jauregui
Enclosures

cc: Raymond A. Cowley

PAULA GOMEZ - ERRATA SHEET

Reasons for changes: (1) Clarify the record
(2) Conform to the facts
(3) Correct transcription errors

PAGE LINE CHANGE FROM/CHANGE TO REASON

PAULA GOMEZ

BRYANT & STINGLEY, INC.
RECEIVED
2-16-02
DATE

TN-1285
DDB-2-11-02

ORIGINAL

SIGNATURE OF PAULA GOMEZ

I have read the foregoing transcript of my deposition and it is a true and accurate record of my testimony given on DECEMBER 19, 2001, except as to any corrections I have listed on page 122 herein.

Paula S. Gómez
PAULA GOMEZ

THE STATE OF TEXAS
COUNTY OF CAMERON

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this the 14th day of February, 2002.

S. B. MORAN
Notary Public, State of Texas
My Commission Expires
August 06, 2003

SBmoran
Notary Public in and for
The State of Texas

My commission expires: August 6, 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| PAUL CAMERON KAVANAUGH | X | |
| | X | |
| | X | |
| | X | |
| VS. | X | CASE NO. B-01-104 |
| | X | |
| | X | |
| BROWNSVILLE COMMUNITY HEALTH CLINIC CORPORATION, D/B/A BROWNSVILLE COMMUNITY HEALTH CENTER | X | |

REPORTER'S CERTIFICATE

I, SHELLEY STINGLEY, Certified Court Reporter, certify that the witness, PAULA GOMEZ, was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on DECEMBER 19, 2001; that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this the 11th day of January, 2002.

Shelley Stingley by: RoRR
SHELLEY STINGLEY, CSR NO. 5725
Expiration Date: 12/31/02
Bryant & Stingley, Inc.
2010 East Harrison
Harlingen, Texas 78550